IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN
DISTRICT OF FLORIDA MIAMI DIVISION

| | |
|---|---|
| **DONALD J. TRUMP, the Forty-Fifth President of the United States, LINDA CUADROS AND AMERICAN CONSERVATIVE UNION, INDIVIDUALLY AND ON BEHALF OF THE CLASS,**<br><br>**Plaintiffs,**<br><br>**V.**<br><br>**TWITTER, INC., and JACK DORSEY,**<br>**Defendants.** | 1:21-cv-22441<br><br><br>FILED BY _____ D.C.<br>JUL 16 2021<br>ANGELA E. NOBLE<br>CLERK U.S. DIST. CT.<br>S. D. OF FLA. - MIAMI |

**AMICUS CURIAE BRIEF BY CHRIS SEVIER OF DE FACTO ATTORNEYS GENERAL, JOHN GUNTER JR OF SPECIAL FORCES OF LIBERTY, AND PASTOR RICH PENKOSKI OF WARRIORS OF CHRIST ON THE ISSUE OF STANDING IN PARTIAL SUPPORT AND IN PARTIAL OPPOSITION OF THE PLAINTIFFS**

*"Why just make a political statement, when you can win by having Florida enact the Stop Social Media Censorship Act and by then bringing a cause of action under a state statute that falls squarely in the state law exemption under Section 230(e)(3)" - De Facto Attorneys General - Interview with the Washington Examiner*

**www.specialforcesoflibety.com**

### TABLE OF CONTENTS

I. INTRODUCTION
...........................................................................................................................1

II. THE LEGISLATIVE HISTORY AND PROCEDURAL HISTORY OF OF THE STOP SOCIAL MEDIA CENSORSHIP ACT, SB 7072, AND RELEVANT CASES
...........................................................................................................................3

III. IDENTIFYING THE BEST COURSE OF ACTION FOR THE PLAINTIFFS TO TAKE
...........................................................................................................................5

VI. ARGUMENT
...........................................................................................................................8

A.  What Is The Best Solution To This Ongoing Bi-partisan Problem?
...........................................................................................................................8

B.  How Did We Get Here - Understanding The Current Landscape And The Misuse Of Section 230
………....................................................................................................................................9

C.  The Stop Social Media Censorship Act Is The Cure-all In View Of The Significant State-law Exemption Already Built Into Section 230 By Congress
………....................................................................................................................................11

D.  Comparing The Differences Between HB 33, the Stop Social Media Censorship Act & SB 7072
………....................................................................................................................................12

E.  The First Amendment Is On The Side Of The Stop Social Media Censorship Act
………....................................................................................................................................20

V. CONCLUSION
………....................................................................................................................................20

**Cases**

*Almeida v. Amazon.com*, Inc.,
456 F.3d 1316 (11th Cir. 2016)
………....................................................................................................................................11

*Biden v. Knight First Amend. Inst.*,
141 S. Ct. 1220 (2021)
………....................................................................................................................................16

*Burroughs v. United States*,
290 U.S. 534 (1934)
………....................................................................................................................................15

*Curry v. Baker*,
802 F.2d 1302 (11th Cir. 1986)
………....................................................................................................................................16

*Crellin Techs., Inc. v. Equipmentlease Corp.*,
18 F.3d 1 (1st Cir. 1994)
………....................................................................................................................................15

*Cf. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013)
………....................................................................................................................................12

*Domen v. Vimeo, Inc.*,
991 F.3d 66 (2d Cir. 2021)
………....................................................................................................................................19

*FCC v. Fox TV Stations, Inc.*,
567 U.S. 239, 253 (2012)
………....................................................................................................................................13

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)
………....................................................................................................................................13

*Google, Inc. v. Hood*,
822 F.3d 212 (5th Cir. 2016)
………....................................................................................................................................11

*Jackson v. Metro. Edison Co.*,

419 U.S. 345 (1974)
.........................................................................................................................2

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018)
.........................................................................................................................2

*Lindell v. McCallum*,
352 F.3d 1107 (7th Cir.2003)
.......................................................................................................................18

*Malnak v. Yogi*,
592 F.2d 197 (3d Cir.1979)
.......................................................................................................................18

*Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019)
.........................................................................................................................2

*Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021)
..........................................................................2, 4, 6, 7, 9, 12, 15, 19

*Ohralik v. Ohio State Bar Ass'n,*
436 U.S. 447 (1978)
.......................................................................................................................15

*Parks v. Alta Cal. Tel. Co.,*
13 Cal. 422 (1859)
.......................................................................................................................17

*Prager Univ. v. Google LLC,*
951 F.3d 991 (9th Cir. 2020)
.........................................................................................................................2

*Real Alternatives, Inc. v . Sec'y Dep 't of Health & Human Servs.*, 150 F. Supp. 3d 419 (3d Cir.
Aug. 4, 2017)
.......................................................................................................................18

*Reno v. American Civil Liberties Union,*
521 U.S. 844 (1997)
.......................................................................................................................12

*Rossignol v. Voorhaar,*
316 F.3d 516 (4th Cir. 2003)
.........................................................................................................................2

*Sable Commc'n of Cal., Inc. v. FCC,*
492 U.S. 115 (1989)
.......................................................................................................................12

*School District of A Bington Township, Pa. v. Schempp,*
374 U.S. 203 (1963)
.......................................................................................................................18

*Schnabel v. Trilegiant Corp.,*
697 F.3d 110, 119 (2d Cir. 2012)
.......................................................................................................................17

*Smith v. Trusted Universal Standards in Elec. Transactions, Inc.,*
2010 WL 1799456, (D.N.J. May 4, 2020)
.......................................................................................................................16

*Stratton Oakmont, Inc. v. Prodigy Services Co.,*
1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)

………...................................................................................................9
*Skinner v. Ry. Lab. Execs.' Ass'n*,
489 U.S. 602 (1989)
………...................................................................................................2
*Theriault v. Silber*,
547 F.2d 1279, 1281 (5th Cir.1977)
………...................................................................................................18
*Thomas v. Review Bd.*,
450 U.S. 707 (1981)
………...................................................................................................18
*Torcaso v. Watkins*, 367 U.S. 488 (1961)
………...................................................................................................18
*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994)
………...................................................................................................15
*United States v. Seeger*,
380 US 163 (1965)
………...................................................................................................18
*United States v. Williams*,
553 U.S. 285 (2008)
………...................................................................................................13
*Ward v. Rock Against Racism*,
491 U.S. 781  (1989)
………...................................................................................................13
*Wells v. City and County of Denver*,
257 F.3d 1132 (10th Cir. 2001)
………...................................................................................................18
*Welsh v. United States*,
398 U.S. 333 (1970)
………...................................................................................................18
*Wollschlaeger v. Governor*,
848 F.3d 1293 (11th Cir. 2017)
………...................................................................................................13


**Other Authority**
47 U.S.C. § 230
…………………………………………………………...1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 16

HB33 - THE STOP SOCIAL MEDIA CENSORSHIP ACT
……………………………………………………...1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16,  17, 18
SB7072 - §106.072, § 287.137, and § 501.204
…………………………………………………...1, 4, 6, 7, 8, 12, 13,  14, 15, 16, 17, 18
Fla. Stat. § 48.193
………...................................................................................................17
I.  AMEND.  U.S. CON.

…......................................................................................2, 3,  8, 11, 12, 13, 15, 19, 20

X AMEND. U.S. CON

….................................................................................................................17

XIV AMEND. U.S. CON

…..........................................................................................................................2

ARTICLE III, SECTION 3, OF THE FLORIDA CONSTITUTION

….....................................................................................................................4, 6

FRCP 15

…......................................................................................................................6

FRCP 12

…....................................................................................................................10

CLAUSE 3, ARTICLE VI U.S. CON

…......................................................................................................................6

15 U.S.C. §§ 1051

…....................................................................................................................7

28 U.S. Code § 1332

…....................................................................................................................7

FRCP 8(e)(2)

…....................................................................................................................7

1 Corinthians 3:15

…......................................................................................................................10

# I. INTRODUCTION

Christopher Sevier Esq., executive director of De Facto Attorneys General, John Gunter

Jr., executive director of Special Forces Of Liberty Miami Division, and Pastor Rich Penkoski,

executive director of Warriors For Christ respectfully submit this *amicus* brief on the narrow

issue of standing, given how the original complaint is pled.[1]  The *Amici* partially support the

Plaintiffs' case, but not necessarily under the current causes of action asserted in the original

complaint on certain conditions.  On the surface, Plaintiffs' causes of action unnecessarily puts

the judicial branch in a difficult position by asking the Court to either (1) strike down or void 47

U.S.C. § 230 [2] (which is generally "good law" but is undoubtedly being wrongfully abused by

---

[1]  The evidence shows that lawyers know just enough to be dangerous on any topic unless they have litigated the issue. (See the staff lawyers who work for Governor Desantis, who wrote SB7072 the bill which created §106.072, § 287.137, and § 501.2041).  The *Amici* have litigated Section 230 issues and social media censorship before a host of Federal Courts, but most importantly, they have litigated the matter before countless legislative committees in the face of robust opposition.
    (1)  See the video of the hearing on the Social Media Censorship Act before the public laws committee in Missouri, which included arguments from De Facto Attorneys General, Google, and the Heartland Institute: (https://www.youtube.com/watch?v=e4QUKoTHKZs)
    (2)  See the video of the hearing  before the Commerce Committee in the Louisana Senate with testimony by Senator Morris, De Facto Attorneys General, Netchoice, and (https://www.youtube.com/watch?v=c-NqZhBqkBs&t=8s)
    (3)  See the video of the hearing before the Judiciary Committee in the State of Maine with testimony by Rep. Sampson and De Facto Attorneys General.
    (https://www.youtube.com/watch?v=jjZ_Ljnx-dE)
It is in the wake of fighting in legislative committees against their adversaries that the *Amici* have been able to perfect the language of a proposed legislative instrument for all 50 states entitled the Stop Social Media Censorship Act,  a bill parallels the spirit of Section 230 and draws from it in a manner so that the statute will fall squarely in the state-law exemption under subsection (e) subparagraph (3) of Section 230. (See Appendix A). The Stop Social Media Censorship Act is not preempted by Federal law and a cause of action brought under it, once enacted, will cut through an immunity defense floated by social media websites that break their promises, deceive consumers, and act in bad faith. At the 2021 legislative session Rep. Sabatini introduced the measure as HB 33, which is referred to as the Stop Social Media Censorship Act.
    [2] If the Plaintiffs want to ask a Court to strike down Section 230, the Plaintiffs might need to name the enforcer of Congress's laws as the defendant, not Twitter. The U.S. Congress created Section 230, not Twitter.  Perhaps if the Plaintiffs named the U.S. as the Defendant, the Plaintiffs would have colorable claim to have Section 230 struck down for violating the "right to reddress grievence clause" or petition and access clause of the First Amendment, if and only if the

social media websites to perpetrate bad faith acts at the expense of a litany of fundamental

freedoms) or to (2) find that certain social media websites are quasi-state actors that are subject

to comply with First Amendment restrictions.[3] While Plaintiffs' causes of action are not

necessarily invalid, they are seemingly weak, asking too much from the judicial branch.  But the

recent decision in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L

2021)(DE 113) changes everything.   In the wake of the *Netchoice* decision, either (1) Section

230 is unconstitutional under the petition and access clause of the First Amendment or (2) the

Court must rule that Florida needs to pass a better law, like the amended version of HB 33, the

Stop Social Media Censorship Act, by Rep. Sabatini and Sen. Gruters, that will allow consumers

---

"state-law exemption" under subsection (e) subparagraph (3) doesn't allow for proposed statutes like the Stop Social Media Censorship Act to stop the abusive misuse of Section 230 in the view of verifiable injuries. Congress provided a way for an aggrieved individual to seek redress through the state-law exemption. But not a single state has passed the Stop Social Media Censorship Act, which is a very narrowly tailored proposed state-statute that would allow for aggrieved party to get reddress against the a social media website for the kinds of wrongdoing inflicted on the Plaintiffs in this case by the Defendants. The evidence shows that if Section 230 was construed to preempt the Stop Social Media Censorship Act, which is designed to protect Florida consumers from fraud, breach of contract, and safeguard their free speech rights, it would raise serious doubts about Section 230's constitutionality under the First Amendment under *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018) (discussing constitutional avoidance canon)

[3]   First Amendment says "Congress" shall make no law abridging the freedom of speech or of the press. The Fourteenth Amendment extended this prohibition to state and local governments. The First Amendment does not restrict the rights of private entities not performing traditional, exclusive public functions. *See, e.g., Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019).  Some courts have found that private forums—however popular they might be—are not state actors, and thus cannot violate anyone's First Amendment rights. See *Prager Univ. v. Google LLC*, 951 F.3d 991, 994 (9th Cir. 2020). Yet, the Plaintiffs could argue that Section 230 creates a broad law-free zone in which internet companies can censor however they like, even in bad faith, raising serious questions whether their censorship constitutes state action. See *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 615 (1989) (finding state action where the government "removed all legal barriers" to private companies drug-testing their employees and "made plain . . . its strong preference for testing"). If total immunity exists then, Section 230 would create "a sufficiently close nexus between" Congress and social-media platforms engaged in censorship to support a finding of state action. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). This analysis is powerfully reinforced by the history of the First Amendment, for censorship by nominally private actors with monopoly power over an important form of communication was the precise evil that the founding generation had in mind when the First Amendment was ratified. See *Rossignol v. Voorhaar*, 316 F.3d 516, 526–27 (4th Cir. 2003)

like the Plaintiffs to obtain relief when they are the victims of deceptive trade practices, fraudulent inducement, breach of contract, unjust enrichment, false advertising, and deceptive trade practices.  The *Amici* believe that the Court should find that the Stop Social Media Censorship Act is the "cure-all" to the litany of competing problems presented in this ongoing controversy and that the state-law exemption under subsection (e) subparagraph (3) is the saving grace, while advising that if Florida wants to protect consumers like the Plaintiffs it should enact the Stop Social Media Censorship Act.

By permitting the *Amici* to submit this brief, perhaps all parties and this Honorable Court will better understand the complex issues involved that will help all interested parties in the adjudication of these proceeding, while permitting the Court to reach the best outcome in the interest of justice in a manner that does not offend the rule of law or hurt the public's welfare. The bottom-line is that either this Court needs to acknowledge that Florida needs to pass a better law like the Stop Social Media Censorship Act, HB 33 in its amended form, or the Court needs to rule Section 230 of the Communications Decency Act unconstitutional for constituting Congressional action that violates the petition and access clause of the First Amendment of the United States Constitution. Those are the only two legally cognizable options.

## II.  THE LEGISLATIVE HISTORY AND PROCEDURAL HISTORY  OF OF THE STOP SOCIAL MEDIA CENSORSHIP ACT, SB 7072, AND RELEVANT  CASES

Here is a breakdown of the relevant legislative and procedural history concerning this case. In 2019, the *Amici* convinced Sen. Gruters to draft and introduce the Stop Social Media Censorship Act. The bill was reintroduced at the 2020 legislative session by Sen. Gruters and Rep. Sabatini.[4]  In 2021, Rep. Sabatini introduced the Stop Social Media Censorship Act (HB33), and subsequently, for unknown reasons, Rep. Sabatini got into some kind of squabble

---

[4] See the press conference with Laura Loomer:
https://www.facebook.com/watch/live/?v=907548599640066&ref=watch_permalink)

with Speaker Sprowls, as passions do tend to run high in the legislative branch, unlike in the

cooler judicial one. This dust-up caused the members of the Florida House to oppose Rep.

Sabatini's bills simply because of "who he was" and not because of "the meritorious substance of

his bills." In the wake of the Sabatini/Sprowls squabble, Governor DeSantis got his staff to use

the Stop Social Media Censorship Act as a preliminary foundation to draft the monstrosity that

became SB 7072. SB 7072 was undoubtedly perverted by ambitions and legal ignorance issues

at hand. On May 24, 2021, SB 7072 was enacted and set to go into effect in early July. In early

June, Netchoice and others filed a lawsuit to stop the state from enforcing the statutes. See

*Netchoice, LLC et al., v. Moody et. al.* 4:21-cv-00220-RH-MAF (N.D.F.L 2021). On June 30,

2021, the court in *Netchoice* granted the plaintiffs' motion for preliminary injunction to enjoin

Florida state officials from enforcing parts of SB 7072. (DE 113). On July 7, 2021, the Plaintiffs,

here, filed the instant case but did not include a cause of action under state statute written to fall

within the state-law exemption of Section 230.[5] The *Amici* now request leave to have this brief

docketed. The *Amici* will immediately file a separate lawsuit of their own on the same exact

issues before the District Court in the Southern District, attacking this issue from different angles

than the Plaintiffs, naming the U.S. Attorney General as the defendant. Having authored the

---

[5] The evidence shows that President Trump - alone - has the leadership skills to sort this out. The *Amici* are calling upon President Trump to lean on his connections with Governor DeSantis to call a special session pursuant to Article III, Section 3, of the Florida Constitution to enact the Stop Social Media Censorship Act in its amended form: see Appendix B. The *Amici* are then recommending that the Plaintiffs amend their complaint to include a cause of action under the Stop Social Media Censorship Act. President Trump should remind Governor of Florida, Speaker Sprowls, and Rep. Sabatini of the Reagan principle that "there is no limit to the amount of good you can do if you don't care who gets the credit." President Trump should be advised that if he gets Florida to call a special session and pass the Stop Social Media Censorship Act, then he can rest assured that virtually all of the states will pass the Stop Social Media Censorship Act out of the gate at the 2022 legislative session. (See Appendix A). Even if President Trump does not take this recommended course of action, the *Amici* will all but ensure that countless states will enact the Stop Social Media Censorship Act at the inception of the 2022 legislative session.

Stop Social Media Censorship Act for all 50 states, the *Amici* have a special interest in the outcome of this case.[6] The *Amici* are working in over 37 states on this issue before the state legislatures. (See Appendix A). While the *Amici* appreciate Florida's initiative on this topic, Florida cannot be allowed to muck it up for the rest of the nation. No matter what, the evidence shows that the days of social media tyranny are going to end.

## III.  IDENTIFYING THE BEST COURSE OF ACTION FOR THE  PLAINTIFFS TO TAKE

---

[6] The *Amici* consists primarily of Christ-followers, who served in the United States Military in foreign theaters of war, namely on the rule of law mission, which is purposed to better ensure a government's compliance with their highest Constitutional authority. The *Amici* have continued that mission state-side in America even though they no longer officially operating under Title 10 jurisdiction on behalf of the Armed Forces. The *Amici* routinely file comprehensive lawsuits across the United States on different controversial and complex issues that typically concern the "culture wars" and First Amendment issues that are too "politically hot" for the government-funded Attorneys General to pursue.  In bringing such lawsuits, the *Amici* - without apology - often end up converting Article III Courts into their own private legislative research commission. Out of the overflow of the litigation pursued by the *Amici*, the *Amici* subsequently draft legislation for all 50 states and for the federal government, which is then routinely introduced by a bi-partisan network of sponsors that stretches across the Country before the Article I branch. The legislation authored by the *Amici* that gets presented to the members of legislative branch is legally vetted ad nausem and is calculated to survive judicial review, if subsequently challenged once enacted.

One of the fights that the *Amici* have undertaken in multitudes of Federal District Courts concerns Big Tech censorship, since this fight has created a freedom crisis that is eroding the quality of life for millions of Americans.  Subsequently, the *Amici* authored a proposed bill called the "Stop Social Media Censorship Act" that is customized for all 50 states and is narrowly tailored to parallel the spirit of Section 230 of the CDA so that it falls squarely in the state-law exemption under subsection (e) subparagraph (3) of the Section 230 - thereby getting around the problem of preemption. Here is a website for the bill:

https://www.specialforcesofliberty.com/.  Here is a short video that the *Amici* provide to state legislatures who prime sponsor, co-sponsor, or support the bill so that they can easily understand the bill and the issues involved: (https://youtu.be/CCcOALXNteM).

Over 25 states moved on two primary bills written to stop the on-going problem of social media censorship that were drafted by either De Facto Attorneys General or Professor Hamburger of Columbia Lawschool.  Countless Republicans and Democrats prime sponsored, co-sponsored, or supported these legislative measures. For a breakdown by state and by prime sponsor for the 2021 legislative session and the 2022 legislative session of the proposed language of the bills see Appendix A.

President Trump likes to win. So do the *Amici*.  If Plaintiffs want to prevail in this legal fight, not just making a political statement, they should take the following steps:

(1) seek leave to temporarily hold these proceedings in abeyance or delay serving process on the Defendants pursuant to FRCP 4;

(2) President Trump should use his personal connections to press Governor DeSantis to immediately hold a special session pursuant to Article III, Section 3,[7] of the Florida Constitution, to pass the amended version of HB33,[8] the "Stop Social Media Censorship Act" (a narrowly tailored state bi-partisan statute that parallels the spirit of Section 230 and was intentionally created to fall in the state-law exemption under subjection (e) subparagraph (3) of Section 230, that over 25 states introduced this past session, and that does not suffer from the same overt problems presented by Senate Bill 7072);

(3) after the Stop Social Media Censorship Act is enacted, the Plaintiffs should then reopen this case, amend their original complaint pursuant to FRCP 15 et. seq, as a matter of course, to include a cause of action under the Stop Social Media Censorship Act, which will not be preempted under the doctrine of preemption, cutting through any Section 230 immunity defense - thereby having the potential to solve this ongoing bi-partisan problem for the whole of the Nation, accomplishing the Plaintiffs paramount objective;[9]

---

[7] In view of the recent decision in *Netchoice, LLC et al., v. Moody et. al.* 4:21-cv-00220-RH-MAF (N.D.F.L 2021), Governor DeSantis has a duty pursuant to his oath of office undertaken pursuant to clause 3 of Article VI of the United States Constitution to call a special session under Article III, Section 3 of the Florida Constitution to enact the Stop Social Media Censorship Act to cure the Constitutional defects presented in SB7072.

[8] https://www.dropbox.com/s/b65ugwxs2nfj48t/2022%20Florida%20Stop%20Social%20 Media%20Censorship%20Act%20AMENDED.pdf?dl=0

[9] If the Plaintiffs undertake this suggested course of action - getting Florida to enact the Stop Social Media Censorship Act and then amending the complaint to include a cause of action under that statute - then this Court would retain jurisdiction over these proceedings under diversity question jurisdiction because the parties are diverse and the amount in controversy is more than $75,000. 28 U.S. Code § 1332. Fraud, false advertising, breach of contract, bad faith, unfair dealing are not protected forms of speech for purposes of the First Amendment, and the

(4) the Plaintiffs should also amend their original complaint to include a cause of action

for false advertising under the Lanham Act, 15 U.S.C. §§ 1051 et seq, which is not preemption

by section 230 and which will confer Federal Question jurisdiction on this Court;

(5)  If Governor DeSantis refuses to call a special session under Article III, Section 3, to

enact the Stop Social Media Censorship Act for whatever reason, the Plaintiffs should amend

their complaint and include a cause of action under § 501.2041(6)[10] which may still be alive and

found to fall in the state-law exemption under 47 U.S.C. § 230(e)(3) by this Court;

(6) The Plaintiffs should amend their complaint and file a cause of action under Florida's

existing deceptive trade practice law, which the Court might also fall in the state-law exemption

under section 230.

## VI. ARGUMENT
### A.  What Is The Best Solution To This Ongoing Bi-partisan Problem?

state of Florida has a narrowly tailored compelling public interest to deter those forms of harmful
unprotected speech to protect consumers from the kinds of abuses that the Plaintiffs have
experienced. But because the Doctrine of preemption under the Supremacy Clause of the United
States Constitution might allow the Defendants to currently invoke blanket immunity under
Section 230 - a federal law - the Plaintiffs need a sure fire way around this immunity defense.
Fortunately, Congress already built into Section 230 exemptions where Section 230 immunity
defense could not be successfully invoked by internet providers.  If the State of Florida would
enact the Stop Social Media Censorship Act - unmolested by petty politics and self-interests -
then the Plaintiffs will prevail here, taking a massive step towards combating the epidemic of
censorship that has cultivated a threat to election integrity and a litany of fundamental freedoms
that undermine our citizens right to pursue life, liberty, and hapiness.

[10] FRCP 8(e)(2) allows for a plaintiffs to plead inconsistent and alternative claims.- so the
Plaintiffs could ask the Court to either (1) let them enforce Sec. 501.2041(6) or to (2) render
Section 230 unconstitutional in view of Judge Hinkle's decision in *Netchoice, LLC et al., v.
Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021). Sec. 501.2041(6), part of SB 7072, creates a
private right of action: any "user" may sue if she (1) believes moderation standards were not
applied "in a consistent manner" or (2) did not receive the required notice following a
moderation action. Courts may award up to $100,000 in statutory damages per violation, plus
actual and potentially punitive damages. Id. While Judge Hinkle granted a preliminary injuction
against Florida state actors in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF
(N.D.F.L 2021) when it comes to enforcing SB 7072, this does not necessarily mean that the
injuction extends to private citizens like the Plaintiffs.  Therefore, the Plaintiffs could include a
cause of action under Sec. 501.2041(6). But there is no doubt that the Stop Social Media
Censorship Act is a vastly superior law for a host of reasons discussed throughout this brief.

The ultimate question presented is what is the best solution to the ongoing bi-partisan

problem of social media censorship?  Is it (a) "an executive order by the President?" or (b) "to

have the judicial branch decree that social media websites are quasi-state actors for purposes of

the First Amendment?" or  (c) "the striking down Section 230 by judcial action or the total repeal

of Section 230 by Congressional responsiveness?";  or (d) "to do nothing, allowing the status quo

of abuse to continue in total disregard of the Petition and Access Clause?"  or (e)  "to allowing

censored litigants to successfully bring a cause of action pursuant to a sound narrowly tailor state

statute that will allow injured consumers to punish social media websites for having engaged in

self-evident unprotected harmful forms of speech and practices to include: (1) breach of contract,

(2) false advertising, (3) deceptive trade practices, (4) bad faith, (5) unfair dealing, (6) unjust

enrichment, and (7) fraudulent inducement?" The best solution to this problem is unequivocally

the fifth option - option (e). This is because already built into section 230 is the "state-law

exemption" under subsection (e) subparagraph (3). [11]  Put simply, this Court should ultimately

indicate that Florida made a mistake in enacting SB 7072, when it should have enacted the

amended version of HB33.[12] If this Court does not make that finding, then some logically

_____

[11] When Congress passed section 230 they included exception provisions for when a
section 230 immunity defense could not be successfully invoked by an internet intermediary, like
the Defendants, under subsection (3). While the Plaintiffs filed a federal question lawsuit that
asks the Court to hold that the Defendants' conduct and the validity of Section 230, in view of
the First Amendment of the United States Constitution, the Plaintiffs would dramatically
increase their chances of success if they would amend their complaint to include at least one
cause of action under a state statute that would fall in the state-law exemption.

[12] President Trump should (1) hold these proceedings in abeyance; (2) press Governor
Desantis to hold a special session to pass the amended version of HB33 by Rep. Sabatini and
Sen. Gruters referred to as the "Stop Social Media Censorship Act,"
(https://www.dropbox.com/s/b65ugwxs2nfj48t/2022%20Florida%20Stop%20Social%20Media%
20Censorship%20Act%20AMENDED.pdf?dl=0) (3) amend the original complaint to include
this new cause of action to include a cause of action brought under the Stop Social Media
Censorship Act.  Florida passed § 106.072, § 287.137, and § 501.2041 this session - three
statutes that were initially based on the Stop Social Media Censorship Act until political

consistent Federal court in one of the other 11 Circuits likely will, permitting Section 230 to be

struck down completely in view of the *Netchoice* decision. This will start a causal chain that will

cultivate additional problems that are different but perhaps not quite as bad as allowing social

media websites to operate under total immunity.

### B.  How Did We Get Here - Understanding The Current Landscape And The Misuse Of Section 230

The evidence shows that the decision in *Stratton Oakmont, Inc. v. Prodigy Services Co.*,

1995 WL 323710, at *3–4 (N.Y. Sup. Ct. May 24, 1995) in part led to the creation of Section

230.[13]  The *Amici,* unlike the Plaintiffs, contend that there are valid uses of Section 230 that

should remain in place.[14]  However, what has been happening to the Plaintiffs, the *Amici*, and

---

ambition corrupted the process, causing the three statutes created by SB7072 for failing to survive heightened scrutiny.

[13] In *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710, at *3–4 (N.Y. Sup. Ct. May 24, 1995), an anonymous user posted allegedly defamatory content on an electronic bulletin board—an earlier version of what today might be called social media. The court said that if the provider of such a bulletin board did not undertake to review posted content—much as a librarian does not undertake to review all the books in a library—the provider would not be deemed the publisher of a defamatory post, absent sufficient actual knowledge of the defamatory nature of the content at issue. On the facts of that case, though, the provider undertook to screen the posted content—to maintain a "family-oriented" site. The court held this subjected the provider to liability as a publisher of the content.  At least partly in response to that decision, which was deemed a threat to development of the internet, Congress enacted 47 U.S.C. § 230. The Stop Social Media Censorship Act does not subject computer services to tort liability for passively hosting content posted by others but seeks to empower users by limiting how content may be censored. See 47 U.S.C. § 230(b)(2) (describing congressional purpose to ensure that users retain "a great degree of control over the information that they receive")

[14] Preliminarily, Section 230 should be explained so that a fifth-grader can understand it. Basically, Section 230 was a federal statute created by Congress, not Twitter, in 1996 that was part of the Communications Decency Act (CDA). The Communications "Decency" Act was designed to promote "decent" speech, not the "deceptive trade practices" that the Defendants have engaged in causing the direct injury of the Plaintiffs and the *Amici*.  Section 230 allows for certain internet intermediaries to invoke an immunity defense for the harmful acts of third parties, if and only if, the internet intermediary was not acting as a publisher/speaker/common carrier to a certain arbitrary and hard to determine degree. So, since that explanation is still confusing and since trying to determine whether a platform provider was a speaker,  publisher, or common carrier tends to be a linguistic nightmare, the best way for anyone to understand a valid Section 230 immunity defense is through the following example: "If a Floridian maliciously posts a defamatory comment on Twitter against a person from New York, the New Yorker who

millions of Americans, who are both registered Democrat and Republican, is that social media

websites have been arbitrarily censoring their speech when it offends the delicate sensibilities of

the employees who happen to work at the social media website at that time. When censored

individuals file a lawsuit against the social media website for such injurious wrongdoing, the

social media defendants invariably make the same questionable argument that they were "merely

engaging in general editorializing and should not be held liable in view of the Section 230

immunity shield." So far in such cases, the courts have reluctantly allowed the social media

defendants to barely escape liability, like a man jumping through flames. See 1 Corinthians 3:15.

In rendering such decisions, the courts have been hinting that if the state legislature was to enact

a statute that was (1) narrowly tailored, (2) consistent with the spirit of Section 230, and (3)

intentionally designed to fall in the state-law exemption, then such a cause of action would

successfully pierce through a Section 230 immunity defense. The Stop Social Media Censorship

Act - a state statute - is the answer that everyone is looking for whether they realize it or not.[15]

### C.  The Stop Social Media Censorship Act Is The Cure-all In View Of The Significant State-law Exemption Already Built Into Section 230 By Congress

There is no need to throw the baby out with the bathwater in doing away with Section

230 in view of the state-law exemption and the potential passing of the Stop Social Media

Censorship Act. 47 U.S.C. § 230(e)(3). Again to reiterate, this Court must either declare that

---

was defamed could legitimately sue the Floridian for defamation. However, if the New Yorker named Twitter as a co-defendant in the lawsuit, then Youtube could successfully file a motion to dismiss under FRCP 12 et. seq. invoking Section 230 immunity defense as the legal basis, and legitimately have the lawsuit dismissed with prejudice against it."

That example involves a good use of Section 230 - showing that Section 230 is good law - because Youtube was merely acting as an innocent platform in that scenario. Therefore, the Plaintiffs demand that the Court completely strike down Section 230 of the Communications Decency Act should not be granted on the condition that the Court finds that the Social Media Censorship Act would survive judicial review if enacted.

[15] A bill is just words on a piece of paper, and by enacting the Stop Social Media Censorship Act, it will not necessarily help the *Amici* when it comes to credit and glory, but it will help the Nation, and helping the Nation flourish is the paramount mission of the *Amici*.

Florida should have passed HB 33 over SB 7072 or render Section 230 unconstitutional under the petition and access clause of the First Amendment.[16] Any choice beyond that would be intellectually dishonest. The Stop Social Media Censorship Act is the escape hatch, built-in by Congress in the statute itself. The "state-law exemption" is the only provision of Section 230 that speaks directly to the relationship between this federal statute and state law expressly *preserves* the states' authority to "enforc[e] any State law that is consistent with this section." 47 U.S.C. § 230(e)(3). In fact, the wording of this provision—which is expressly tied to particular actions "enforcing" acts like the Stop Social Media Censorship Act *id.*—disfavors preemption challenges in a pre-enforcement posture.  In conformity with that provision and the well-established presumption against preemption, this Court should construe the rest of Section 230 narrowly and in a manner that allows federal and state law in this area to coexist. In doing so, this Court should find that the Stop Social Media Censorship Act, if enacted, would neatly fall within the state-law exemption and that if Florida wants to protect consumers like the Plaintiffs, then it should enact the Stop Social Media Censorship Act sooner rather than later.

If, however, the Stop Social Media Censorship was found to be unconstitutional or preempted by Section 230, as was seeming the case with SB7072, then a serious First Amendment challenge to Section 230 would exist under *Cf. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013)  (discussing when conditions on federal funding

---

[16] In creating this "broad federal immunity" in passing section 230, *Almeida v. Amazon.com*, Inc., 456 F.3d 1316, 1321 (11th Cir. 2016), Congress gave statutory form to the core First Amendment right to editorial judgment. See *Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016), but Congress cannot have legitimately done that by totally blocking access to petition against obvious grievances without violating the First Amendment. While Federal law preempts state under the Supremacy Clause, the First Amendment of the United States Constitution preempts and outranks Federal laws, like Section 230, that violate the petition and access clause. The *Amici* believe that the state-law exemption provides the only way around this dilemma. The Stop Social Media Censorship Act is not just the best solution to this problem, it is the only solution to stop Section 230 from being completely struck down.

"result in an unconstitutional burden on First Amendment rights").  Accordingly, the courts should not lightly conclude that Congress made a law that not only allows unbridled censorship, but also prevents states from doing anything about it. The States have an ongoing compelling interest to protect their citizens in step with their police powers under the Tenth Amendment of the United States Constitution from fraud, deceptive trade practices, breach, bad faith, etc - none of which is protected speech for purposes of the First Amendment.

### D.  Comparing The Differences Between HB 33, the Stop Social Media Censorship Act & SB 7072

Never since the inception of American jurisprudence has a plaintiff brought a lawsuit under a state statute and argued that the Section 230 immunity defense could not be successfully invoked because the lawsuit was filed under a statute that fell within the state-law exemption, piercing through the Section 230 immunity defense.  Yet, when comparing the Stop Social Media Censorship Act to SB 7072, the *Amici* somewhat agree with Judge Hinkle's sentiment that the "statutes [created by SB7072] are not narrowly tailored" and might constitute an "instance of burning the house to roast a pig."  See *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021) (page 27 of DE 113).  See also, e.g., *Reno v. American Civil Liberties Union,* 521 U.S. 844, 882 (1997*); Sable Commc'n of Cal., Inc. v. FCC,* 492 U.S. 115, 131 (1989).  It would be more accurate to say that striking down Section 230 of the CDA completely as the Plaintiffs' request would be an "instance of burning the house to roast a pig" when the Stop Social Media Censorship Act is obviously the cure-all from the perspective of any reasonable observer to this ongoing dilemma because it falls squarely in the state-law exemption.

There are several differences between the Stop Social Media Censorship Act and SB 7072 that should be identified.  First, SB7072 is vague and the Stop Social Media Censorship

Act is not.[17] "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). The Stop Social Media Censorship Act is not vague whatsoever in view of its ten legislative findings, the purpose section, and the straightforward structure of the language. The legislative findings of the Stop Social Media Censorship Act spell out the legislative intent in a common sense manner.[18] Furthermore, the purpose and legal framework of

---

[17] "[A]n enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). To pass muster, laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and prevent "arbitrary and discriminatory enforcement" by "provid[ing] explicit standards for those who apply them." Id.; accord *Wollschlaeger v. Governor*, 848 F.3d 1293, 1320 (11th Cir. 2017). Although greater clarity is necessary when a statute regulates expression, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity," *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989); see also *Grayned*, 408 U.S. at 110 ("Condemned to the use of words, we can never expect mathematical certainty from our language."). Furthermore, "the mere fact that close cases can be envisioned" does not "render[] a statute vague." *United States v. Williams*, 553 U.S. 285, 305 (2008).

[18] The legislative findings of the Stop Social Media Censorship Act are as follows:
WHEREAS, the Communications Decency Act was created to protect decent speech, not deceptive trade practices, and
WHEREAS, repealing section 230 of the Communications Decency Act at the federal level is unnecessary because it already includes a state-law exemption and the Stop Social Media Censorship Act was crafted to fall squarely in the state-law exemption of section 230 to cure abuses of section 230 to protect the consumers of this state, and
WHEREAS, contract law is a state-law issue, and when a citizen of this state signs up to use certain social media websites, they are entering into a contract, and
WHEREAS, this state has a compelling interest in holding certain social media websites to higher standards for having substantially created a digital public square through fraud, false advertising, and deceptive trade practices, and
WHEREAS, major social media websites have engaged in the greatest bait and switch of all times by marketing themselves as free, fair, and open to all ideas to induce subscribers only to then prove otherwise at great expense to consumers and election integrity, and
WHEREAS, breach of contract, false advertising, bad faith, unfair dealing, fraudulent inducement, and deceptive trade practices are not protected forms of speech for purpose of the first amendment of the United States Constitution or the Constitution of this state, and
WHEREAS, the major social media websites have already reached critical mass, and they did it through fraud, false advertising, and deceptive trade practices at great expense to the health, safety, and welfare of consumers of this state, while making it difficult for others to compete with them, and

the Stop Social Media Censorship Act is crystal clear, whereas the purpose of SB7072 is not.

The purpose section of the Stop Social Media Censorship Act states:

> This section is intended to create a statute that parallels the spirit of 47 U.S.C. § 230 that falls within the state law exemption under 47 U.S.C. § 230(e)(3) and create a civil right of action that will deter the following: (1) Deceptive trade practices; (2) False advertising; (3) Breach of contract; (4) Bad faith; (5) Unfair dealing; (6) Fraudulent inducement; and(7) The stifling of political and religious speech in the modern-day digital public square cultivated by social media websites that have achieved critical mass through fraud.

The purpose of the Stop Social Media Censorship Act is to parallel the goals and spirit of Section 230 so that the state statute threads the needle and unquestionably falls within the state-law exemption of Section 230 in a way that SB7072 fails to do so.

Second, unlike with SB7072, the language of the Stop Social Media Censorship Act and Section 230 are parallel and identical in some respects. For example, 47 U.S.C. § 230(c)(2)(A) states that an interactive computer service, like the Defendants, cannot be "held liable" on account of "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." Similarly, the Stop Social Media Censorship Act states that social media websites that are subject to the act cannot be held liable if they censor content that:

> 1. Calls for immediate acts of violence; 2. Is obscene, lewd, lascivious, filthy or pornographic in nature; 3. Is the result of operational error; 4. Is the result of a court order; 5. Comes from an inauthentic source or involves false personation; 6. Entices

---

WHEREAS, the state has an interest in helping its citizens enjoy their free exercise rights in certain semi-public forums commonly used for religious and political speech, regardless of which political party or religious organization they ascribe to, and

WHEREAS, this state is generally opposed to online censorship unless the content is injurious to children or promotes human trafficking; only then does this state accept limited censorship, and

WHEREAS, this act is not intended to apply to a website that merely deletes comments posted by members of the general public in response to material published by the website's owner,

criminal conduct; 7.  Involves minors bullying minors; 8.  Constitutes trademark or copyright infringement; 9.  Is excessively violent; and 10.  Constitutes harassing spam of the commercial, not religious or political, nature.

Because the Stop Social Media Censorship Act neatly parallels the spirit and intent of Section 230, threading the needle in a way that SB 7072 does not. From every angle, it is clear that the Stop Social Media Censorship Act has been crafted for all 50 states in a manner that respects federal law, while allowing the state's consumers to be protected from deceptive trade practices.

Third, by framing the issues as breach of contract, bad faith, false advertising, unfair dealing, unjust enrichment, deceptive trade practices, and consumer protection violations, the Stop Social Media Censorship Act fulfills a litany of compelling government interests in ways that SB7072 fails to do so. The Stop Social Media Censorship Act "promote[s] the widespread dissemination of information from a multiplicity of sources," an interest that the Supreme Court in *Turner* had "no difficulty concluding" was "an important governmental interest." *Turner Broad. Sys., Inc. v. FCC ("Turner"),* 512 U.S. 622, 662–63 (1994). Ensuring that the public "has access to a multiplicity of information sources," the Supreme Court explained, "is a governmental purpose of the highest order, for it promotes values central to the First Amendment." *Id.* at 663. Furthermore, Florida has a substantial interest in protecting its residents from unfair or deceptive acts or practices in commerce. *See* FLA. STAT. § 501.204; *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 460 (1978); *Crellin Techs., Inc. v. Equipmentlease Corp.,* 18 F.3d 1, 12 (1st Cir. 1994). Additionally, Florida also has a compelling interest in preserving the democratic process and ensuring fair elections. *Burroughs v. United States,* 290 U.S. 534 (1934); *Curry v. Baker,* 802 F.2d 1302, 1317 (11th Cir. 1986).

Fourth, by framing the issue as arising under breach of contract, bad faith, fraudulent inducement, false advertising, unjust enrichment principles, a social media website sued under

the Stop Social Media Censorship Act could not assert "good faith" protections under Section 230(c)(2)(A).[19] Judge Hinkle seemed incapable of or unwilling to pick up on this critical factor in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021).

    <u>Fifth</u>, where SB7072 construes social media websites as common carriers,[20] the Stop Social Media Censorship Act focuses more on consumer protection violations, existing torts, and existing breach of contract principles. The Stop Social Media Censorship treats social media websites like any entity doing business in the state, and prevents the business from harming consumers for engaging in fraud, breach, decetive practices, false advertising, etc.  While the Florida Legislature permissibly determined that the "old rules" applicable to common carriers should be applied to the "new circumstances" of social media in SB7072, the Stop Social Media Censorship Act merely gets existing consumer protection laws and contract law principles to apply to the "new circumstances" of social media, while invoking the state-law exemption

---

[19] Section 230(c)(2)(A) does not provide blanket immunity. It only applies when an interactive computer service acts in "good faith." While the parameters of "good faith" immunity under Section 230(c)(2)(A) are not necessarily well-defined in the caselaw, courts might ultimately conclude that a social media platform's acting differently than how it marked itself and shifting its standards is determinative as to whether the platform acted in "good faith." *See Smith v. Trusted Universal Standards in Elec. Transactions, Inc.*, 2010 WL 1799456, at \*7 (D.N.J. May 4, 2020).  In *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021), the court stated in its order granting a preliminary injunction that "the legislation compels providers to host speech that violates their standards—speech they otherwise would not host—and forbids providers from speaking as they otherwise would."  But that court fails to realize that the social media website providers shift those standards in bad faith in an arbitrary and dishonest manner in total breach of how they marked themselves to the public to induce reliance. That court also fails to realize that the providers invited, enticed, and induced members of the public to speak out openly and freely on different religious and political doctrines without any threat of emotional or economic reprisal, only to then turn around and deploy a "gotcha game" with the expectation of total immunity.

[20] In Section 1 of SB7072, the Florida Legislature found that "[s]ocial media platforms have become as important for conveying public opinion as public utilities are for supporting modern society," and they "hold a unique place in preserving first amendment protections for all Floridians and should be treated similarly to common carriers." SB 7072 § 1(5), 1(6). In fact, as Justice Thomas recently explained, "[i]n many ways, digital platforms that hold themselves out to the public resemble traditional common carriers." *Biden v. Knight First Amend. Inst.*, 141 S. Ct. 1220, 1224 (2021) (Thomas, J., concurring)

directly. See *Parks v. Alta Cal. Tel. Co.*, 13 Cal. 422, 422 (1859). Put simply, the Stop Social Media Censorship Act does not ask the judicial branch to reinvent the wheel; it merely asks that existing law be permitted to catch up to modern-day technology to safeguard consumers and election integrity in a manner that accords with the policing powers of the State.

Sixth, because the Stop Social Media Censorship Act is framed on breach of contract, tort, and consumer protection principles, jurisdiction for enactment and enforcement is not Constitutionally probematic in view of the Ten Amendment of the United States Constitution, unlike with SB 7072.[21]

Seventh, perhaps the biggest distinction between the Stop Social Media Censorship Act and SB7072 is that the Stop Social Media Censorship only applies to social media websites that have more than 75 million profile users that were never affiliated with any particular religious or political party from their inception.[22] A social media website that was affiliated with a religious

---

[21] The state of Florida has the legal authority to enact the Stop Social Media Censorship and injured parties, like the Plaintiffs, have the right to enforce it under the long-arm statute. See Fla. Stat. § 48.193. When the Plaintiffs signed up to use Facebook and Twitter, they entered into a contract in Florida. One of the oldest jurisprudence is that "contract law" is a "state-law issue." States have paramount jurisdiction to enact statutes that place certain restrictions on contracts to protect consumers from harm. Otherwise, all consumer protection laws and all products liability laws could be declared to violate the First Amendment. Twitter reached into the state of Florida and induced the Plaintiffs to sign up to use their services by a contract, which gives the state of Florida jurisdiction to regulate those contracts. While it is an undisputed fact that a contract does exist between the Defendants and the Plaintiffs, the contract is only relevant for the purpose of the state having jurisdiction to regulate those contracts because the contract at issue is undoubtedly a contract of adhesion. Twitter and Facebook have billions of subscribers, they never had a realistic expectation that the Plaintiffs would employ lawyers to review their contract. Therefore, the contract is a contract of adhesion. Accordingly, the specific terms of the adhesion contract do not matter. *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119, 126–27 (2d Cir. 2012). However, what does matter is the fact that Twitter, Facebook, and Youtube have conspired to falsely market themselves as being "free, fair, open to the public, and open to all religious and political ideas" to induce reliance only to then break their promise and censor certain users in bad faith. This is a problem of broken promises and lying out of the overflow of moral superiority complexes.

[22] The reason why the Stop Social Media Censorship Act only applies to social media websites that have more than 75 million users is not to treat different potential speakers differently. The reason for this threshold is because the purpose of Section 230 was to allow

or political party can, therefore, continue to censor users at will.[23] If from their inception

Facebook, Twitter, or Youtube had marked themselves as being aligned with the Democrat Party

or with the licentious religion of secular humanism, then they would have a defense for the

removal of political and religious speech that does not happen to conform to their favored

religious and political worldview.[24] But those social media websites did not make such

affiliations known upfront causing a classic reliance and inducement problem. The Stop Social

Media Censorship Act and the Lanham Act are both calculated to stop businesses from harming

consumers through broken promises, false advertisement, and fraud.  The so-called "standards"

floated by Facebook, Twitter, and Youtube have always been unclear, vague, and shifting,

constituting per se bad faith. While it is true that social media websites might be able "to

establish standards of decency without risking liability for doing so," what they cannot do is to

websites on the internet to grow without the fear of certain liability. The evidence shows from
the reasonable observer perspective that a social media website that has over 75 million profile
users has "sufficiently grown." Therefore, a statute, such as the Stop Social Media Censorship
Act, that allows victims of the deceptive, fraudulent, and dishonest honest trade practices of
social media websites to acquire relief against a social media provider with more than 75 million
subscribers is consistent with the spirit and "growth goals" of Section 230, which further causes
it to fall squarely in the state-law exemption.  The 75 million threshold is not imposed to treat
smaller and larger social media websites differently. The threshold is included out of respect for
the doctrine of preemption so that the Stop Social Media Censorship Act will squarely fall in the
state-law exemption.

[23] A Black Lives Matter social media website, a Christian social media website, a Muslim
social media website, an LGBTQ social media website could censor any profile user who
opposed their fundamental doctrine and not be subjected to liability under the Stop Social Media
Censorship Act.

[24] The United States Supreme Court found that Secular Humanism is a religion for the
purposes of the First Amendment Establishment Clause in *Torcaso v. Watkins*, 367 U.S. 488
(1961); *School District of A Bington Township, Pa. v. Schempp*, 374 U.S. 203, 225 (1963);
*United States v. Seeger*, 380 US 163, 166 (1965); and *Welsh v. United States*, 398 U.S. 333
(1970). Most of the Federal Court of Appeals have found that Secular Humanism is a religion in
cases such as: (A) *Malnak v. Yogi*, 592 F.2d 197, 200-15 (3d Cir.1979); *Theriault v. Silber*, 547
F.2d 1279, 1281 (5th Cir.1977); *Thomas v. Review Bd.*, 450 U.S. 707, 714, 101 S.Ct. 1425, 67
L.Ed.2d 624 (1981);  *Lindell v. McCallum*, 352 F.3d 1107, 1110 (7th Cir.2003); *Real
Alternatives, Inc. v . Sec'y Dep 't of Health & Human Servs.*, 150 F. Supp. 3d 419, 2017
WL3324690 (3d Cir. Aug. 4, 2017), and Cir. 2001); and  *Wells v. City and County of Denver*, 257
F.3d 1132, 1148 (10th Cir. 2001).

change those standards arbitrarily after they induced billions of people to subscribe and invest in user profiles, having relied on the fact that the social media websites marketed themselves as free, fair, open to the public, and neutral towards political and religious speech. See *Domen v. Vimeo, Inc.*, 991 F.3d 66, 73 (2d Cir. 2021).   The court in *Netchoice, LLC et al., v. Moody et. al.* 4:21cv220-RH-MAF (N.D.F.L 2021) failed to pick up on the critical factor that Facebook, Twitter, and Youtube arbitrarily changed their standards in bad faith all the time, after fraudulently inducing billions of people to subscribe and invest in their service at great personal expense to themselves, their families, and their communities. That court ignored the shifting standards completely, shrugging it off in callous disregard.

In sum, this controversy is just about making the mega social media websites keep their promises to consumers. The goal of the Stop Social Media Censorship Act is not to punish disfavored, out-of-state businesses and to stop or deter them from exercising their First Amendment rights in ways the *Amici* dislikes. The goal is to force certain social media websites to honor their promises and to live up to the way that they marketed themselves from their inception in order to induce reliance. Social media websites like Twitter marked themselves as being neutral on religion and politics, and they should be legally forced to remain so despite the unwarranted inflated view that the employees who work there arrogantly harbor for themselves.

### E.  The First Amendment Is On The Side Of The Stop Social Media Censorship Act

The First Amendment combined with the state's inherent policing powers to protect consumers from fraud are the underlying legal basis supporting the Stop Social Media Censorship Act.  The state of Florida has a narrowly tailored compelling interest to pass the Stop Social Media Censorship Act in order to protect the varying religious and political views of their citizens from deceptive censorship trade practices because the Defendants, Youtube, and

Facebook have set out to create a digital public square and they have successfully done so through fraud. Attorney General Barr called the concerted deceptive efforts of the major social media websites the greatest "bait and switch" of all time.[25]  The Plaintiffs should press the State of Florida to enact the Stop Social Media Censorship Act because the State of Florida has a narrowly tailored compelling interest to ensure that its citizens all across the political and religious spectrums are permitted to share their views in what amounts to as the modern-day digital public square.[26]  The Stop Social Media Censorship Act is not about helping Democrats or Republicans or about putting one religion over another. It is about making social media websites that marked themselves as being neutral on issues of religion and politics to be just that. Democrats in Hawaii, Rhode Island, and New York are the prime sponsor of the Stop Social Media Censorship Act because this is a bi-partisan problem.

## V. CONCLUSION.

This Court must either find that in order to prevail the Plaintiffs must proceed under a law like the Stop Social Media Censorship Act or that Twitter cannot invoke Section 230 as a defense in view of the petition and access clause of the First Amendment.

hin

---

[25]https://www.rawstory.com/2020/05/barr-blasts-social-medias-bait-and-switch-and-censorship-as-trump-suggests-hed-shut-down-twitter/

[26]  As the Supreme Court has said, "the vast democratic forums of the Internet, and social media in particular" have become "the most important places . . . for the exchange of views." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (cleaned up). According to the Pew Research Center, 71% of Americans get news from social media. App.534. It is not surprising then that news publishers feel "increasingly beholden" to digital platforms. App.90.

/s/Christopher Sevier Esq./
DE FACTO ATTORNEYS GENERAL
Mailing: 118 16th Ave S #247 - Music Row
Nashville, TN 37203
(615) 500-4411
BCN: 026577
909 Santa RosaBlvd,
Fort Walton Beach, FL 32548
ghostwarsmusic@gmail.com
www.specialforcesofliberty.com
www.chrissevier.com
www.stopsocialmediacensorship.com
1LT 27A JAG
Bravo Two Zero

/s/Greg' Degeyter Esq./
DE FACTO ATTORNEYS GENERAL
BCN: 24062695
degeyterlaw@gmail.com
9898 Bissonnet St Ste 626
Houston , Texas 77036
(713) 505-0524
Attorney On Behalf Of Special Forces Of Liberty &
Warriors For Christ

## CERTIFICATE OF SERVICE

A true copy of the foregoing was emailed and/or mailed to the following address
on July 15, 2021 for the Attorneys of record: Frank C. Dudenhefer , Jr. The Dudenhefer
Law Firm, LLC 2721 St. Charles Ave, Suite 2A New Orleans, LA 70130 (504) 616-5226
Email: FcdLaw@aol.com; John P. Coale 2901 Fessenden St. NW Washington, DC 20008
(202) 255-2096 Email: johnpcoale@aol.com; John Q. Kelly Ivey, Barnum & O'Mara 170
Mason Street Greenwich, CT 06830 (203) 661-6000 Email: jqkelly@ibolaw.com;
Michael J. Jones Ivey, Barnum & O'Mara 170 Mason Street Greenwich, CT 06830 (203)
661-6000; Roland A. Paul Ivey Barnum & O'Mara 170 Mason Street Greenwich, CT
06830 (203) 661-6000; Ryan Tougias Ivey, Barnum & O'Mara 170 Mason Street
Greenwich, CT 06830 203-661-6000; Sean M. Hamill Ivey, Barnum & O'Mara 170
Mason Street Greenwich, CT 06830 (203) 661-6000; Matthew Lee Baldwin Vargas
Gonzalez Hevia Baldwin, LLP 815 Ponce de Leon Blvd. Third Floor Coral Gables, FL
33134 (305) 631-2528 Fax: (305) 631-2741 Email: MBaldwin@VargasGonzalez.com;
support@twitter.com, legal@twitter.com, Jack Dorsey CEO 1355 Market Street Suite
900. San Francisco, CA 94103 jack@twitter.com.

/s/Christopher Sevier Esq./

# APPENDIX A

**1. Alabama** - Drafted as follows for the 2022 legislative session:
https://www.dropbox.com/s/mh0kpmi8s9bkisp/2022%20ALABAMA%20STOP%20SOCIAL%2
0MEDIA%20CENSORSHIP%20AMENDED%20FINAL.pdf?dl=0
**2. Alaska.** Drafted by Senator Showers (R) for introduction at the 2022 legislative session:
https://www.dropbox.com/s/ci7c8x9r10jb55z/2022%20Alaska%20Stop%20Social%20Media%2
0Censorship%20Act%20AMENDED%20FINAL.pdf?dl=0
**3. Arizona. SB1428 sponsored by Sen. Townsend (R)** - provided by De Facto Attorneys
General - at the 2021 legislative session:
https://legiscan.com/AZ/text/SB1428/2021
-Amended for 2022 legislative session to be introduced by Sen. Townsend:
https://www.dropbox.com/s/7i0iakb3z4to1eg/2022%20Arizona%20Stop%20Social%20Media%
20Censorship%20final.pdf?dl=0
**4. Arkansas.** Drafted by Chairman Sen. Clark (R) to be introduced at the 2023 legislative
session:
https://www.dropbox.com/s/o98fkpfblyzgkmy/2023%20Arkansas%20Stop%20Social%20Media
%20Censorship%20Act%20AMENDED%20%281%29.pdf?dl=0
**5. California.** In review by Sen. Grove to be introduced at the 2022 legislative session as
follows:
https://www.dropbox.com/s/b7n96qegfhkgsw3/2022%20California%20Stop%20Social%20Medi
a%20Censorship%20Act.pdf?dl=0
**6. Colorado.** To be introduced by Rep. Williams at the 2022 legislative session as follows:
https://www.dropbox.com/s/tcc7uxddoqwgs6f/2022%20Colorado%20Stop%20Social%20Media
%20Censorship%20Act%20Final.pdf?dl=0
**7. Connecticut.** To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/db4xv70hcu5j4jp/2022%20Connecticut%20Stop%20Social%20Med
ia%20Censorship%20Act%20FINAL%20AMENDED.pdf?dl=0
**8. Delaware.** To be introduced by Sen. Richardson (R) at the 2022 legislative session:
https://www.dropbox.com/s/0x3ayrs6964xy9n/2022%20Delaware%20Stop%20Social%20Media
%20Censorship%20Act.pdf?dl=0
**9. Florida. HB 33 sponsored by Rep. Sabatini (R)** - provided by De Facto Attorneys General -
at the 2021 legislative session :
https://legiscan.com/FL/bill/H0033/2021
To be introduced at the 2022 legislative session as follows:
https://www.dropbox.com/s/b65ugwxs2nfj48t/2022%20Florida%20Stop%20Social%20Media%
20Censorship%20Act%20AMENDED.pdf?dl=0
**10. Georgia.** To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/391sacz7gg3oekj/2022%20New%20Georgia%20Stop%20Social%2
0Media%20Censorship%20Act%20FINAL%20%281%29.pdf?dl=0

**11. Hawaii. <u>SB357</u> sponsored by Sen. Gabbard (D)** - provided by De Facto Attorneys General - at the 2021 legislative session:
https://legiscan.com/HI/text/SB357/2021
To be introduced at the 2022 legislative session by Sen. Gabbard as follows:
https://www.dropbox.com/s/4drp0d1wrkp4gah/2022%20Hawaii%20Stop%20Social%20Media%20Censorship%20Act%20%281%29.pdf?dl=0

**12. Idaho. <u>H0323</u> sponsored by Rep. Nichols (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:
https://legiscan.com/ID/text/H0323/2021
To be introduced at the 2022 legislative session by Rep. Nichols as follows:
https://www.dropbox.com/s/5m97v1mpdrs36cg/2022%20Idaho%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**13. Illinois.** Drafted as follows for the 2022 legislative session:
https://www.dropbox.com/s/tun4sxpl4r4h2ka/2022%20Illinois%20Stop%20Social%20Media%20Censorship.pdf?dl=0

**14. Indiana:** To be introduced at the 2022 legislative session by Rep. Jacobs as follows:
https://www.dropbox.com/s/laea6ssvk03j5lj/2022%20Indiana%20Stop%20Social%20Media%20Censorship%20Act%20.pdf?dl=0

**15. Iowa. <u>HF171</u> sponsored by Rep. Salmon** - provided by De Facto Attorneys General - at the 2021 legislative session:
https://legiscan.com/IA/text/HF171/2021
To be introduced at the 2022 legislative session by Rep. Salmon as follows:
https://www.dropbox.com/s/66e8he2cd0zxsj4/2022%20Iowa%20Stop%20Social%20Media%20Censorship%20Act%20AMENDED.pdf?dl=0

**16. Kansas. <u>HB2322</u> sponsored by Rep. Gaber (R)** - provided by De Facto Attorneys General. To be introduced by Rep. Garber at the 2022 legislative session as follows:
https://www.dropbox.com/s/6dxnzcfpzlr67qd/2022%20Kansas%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**17. Kentucky. <u>SB 111</u> sponsored by Sen. Mills (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:
https://legiscan.com/KY/text/SB111/2021
To be introduced at the 2022 legislative session by Sen. Mills as follows:
https://www.dropbox.com/s/tlr4kcqakr1elyc/2022%20Kentucky%20Stop%20Social%20Media%20Censorship%20Act%20%281%29.pdf?dl=0

**18. Louisiana. <u>SB196</u> sponsored by Sen. Morris (R)** - provided by De Facto Attorneys General - at the 2021 legislative session:
**https://legiscan.com/LA/text/SB196/2021**
To be introduced at the 2022 legislative session by Sen. Morris as follows:
https://www.dropbox.com/s/o0qiu7nout6np6h/Louisiana-2021-SB196-Engrossed%20%283%29.pdf?dl=0

19. **Maine. LD1609** sponsored by Rep. Sampson (R) - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/ME/text/LD1609/2021

To be introduced at the 2022 legislative session by Rep. Sampson as follows:

https://www.dropbox.com/s/xji2kpbtktkkrsf/2022%20Maine%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

20. **Maryland. HB1314** sponsored by Del. Adams (R) - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/MD/text/HB1314/2021

To be introduced at the 2022 legislative session by Del. Adams as follows:

https://www.dropbox.com/s/nshl9js3df3vyn5/2022%20Maryland%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

21. **Massachusetts.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/yy2ubrqeo5eft6k/2022%20Massachusetts%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

22. **Michigan.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/n3lqn0uw23re37z/2022%20Michigan%20Stop%20Social%20Media%20Censorship%20Act%20Final%20amendment.pdf?dl=0

23. **Minnesota.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/7zrv9qy8jzv48gi/2022%20Minnesota%20Stop%20Social%20Media%20Censorship%20Act%20Amended%20final.pdf?dl=0

24. **Mississippi: SB 2617** sponsored by Sen. Hill (R) - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/MS/text/SB2617/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/wyjq7ean5b37ogw/Mississippi%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

25. **Missouri. HB 482** sponsored by Rep. Coldman (R) - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/MO/bill/HB482/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/2hj5e2vlyro8m39/2022%20Missouri%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

26. **Montana.** To be introduced as follows at the 2023 legislative session:

https://www.dropbox.com/s/qtwz360f2dik04u/2023%20MONTANA%20STOP%20SOCIAL%20MEDIA%20CENSORSHIP%20ACT%20AMENDED%20FINAL.pdf?dl=0

27. **Nebraska. LB621** sponsored by Sen. Curt Friesen (R) - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/NE/text/LB621/2021

To be introduced as follows at the 2023 legislative session:

https://www.dropbox.com/s/4s6wsko5dw9suj4/2022%20Nebraska%20%20Stop%20Social%20
Media%20Censorship%20Act%20FINAL.pdf?dl=0

**28. Nevada:** To be introduced as follows at the 2023 legislative session:

**29. New Hampshire. HB133 sponsored by Rep. Plett (R)** - provided by De Facto Attorneys
General - at the 2021 legislative session:

https://legiscan.com/NH/text/HB133/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/bi1whnhjf4cfxui/2022%20New%20Hampshire%20Stop%20Social
%20Media%20Censorship%20Act.pdf?dl=0

**30. New Jersey. A578 sponsored by Asm. Auth** - provided by De Facto Attorneys General - at
the 2021 legislative session:

https://legiscan.com/NJ/text/A578/2020

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/pkt2wqtqx8mwpjb/New%20Jersey%20Stop%20Social%20Media%
20Censorship%20Act.pdf?dl=0

**31. New Mexico.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/3rjkno4547telvr/2022%20New%20Mexico%20Stop%20Social%20
Media%20Censorship%20Act%20AMENDED.pdf?dl=0

**32. New York.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/fretoaagwy7108z/2022%20New%20York%20Stop%20Social%20M
edia%20Censorship%20Act%20FINAL%20AMENDED%20.pdf?dl=0

**33. North Carolina. S497 sponsored by Sen. Alexander** - provided by De Facto Attorneys
General - at the 2021 legislative session:

https://legiscan.com/NC/text/S497/2021

**34. North Dakota. HB1144 sponsored by Rep. Kading.** - provided by  Professor Hamburger-
at the 2021 legislative session:

https://legiscan.com/ND/text/1144/2021

To be introduced as follows at the 2022 legislative session by Rep. Jones:

https://www.dropbox.com/s/iwf5b1eyvj82wsi/2022%20North%20Dakota%20Stop%20Social%2
0Media%20Censorship%20Act.pdf?dl=0

**35. Ohio.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/yziri2z6g80eer4/2022%20New%20Ohio%20Stop%20Social%20Me
dia%20Censorship%20Act%20Final.pdf?dl=0

**36. Oklahoma. SB383 sponsored by Sen. Standridge** - provided by De Facto Attorneys
General - at the 2021 legislative session:

https://legiscan.com/OK/text/SB383/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/l50i8fe4z7qwuxb/2022%20Oklahoma%20Stop%20Social%20Medi
a%20Censorship%20Act%20FINAL%20AMENDED.pdf?dl=0

**37. Oregon.** To be introduced as follows at the 2022 legislative session by Rep. Leif:

https://www.dropbox.com/s/4k0sm4j5o0iub68/2022%20Oregon%20Stop%20Social%20Media%20Censorship%20Act%20FINAL%20AMENDED.pdf?dl=0

**38. Pennsylvania. SB604 sponsored by Sen. Mastriano** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/PA/text/SB604/2021

**39.  Rhode Island. H5564 sponsored by Vella-Wilkinson (D) -** provided by De Facto Attorneys General - at the 2021 legislative session:

https://www.dropbox.com/s/hnk11ybifb0bqk8/2022%20Rhode%20Island%20Stop%20Social%20Media%20Censorship.pdf?dl=0

**40. South Carolina. H3450 sponsored by Rep. Burns (R) -** provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/SC/text/H3450/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/73d6fwl1hwr204t/2022%20South%20Carolina%20Stop%20Social%20Media%20Censorship%20Act%20Consolidated%20%282%29.pdf?dl=0

**41. South Dakota.  HB1223 sponsored by Rep. Jensen** - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/SD/bill/HB1223/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/7bnc8jvt50hhzbu/2022%20South%20Dakota%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**42. Tennessee.**  To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/y1r1biujf5awlep/2022%20Tennessee%20Stop%20Social%20Media%20Censorship%20bill%200859%20amended%20FINAL%20.pdf?dl=0

**43. Texas. SB12 sponsored by Sen. Hughes**   - provided by De Facto Attorneys General - at the 2021 legislative session:

https://www.dropbox.com/s/upeh2w5u5pn6zfc/2022%20Texas%20Stop%20Social%20Media%20Censorship%20Act.pdf?dl=0

**44. Utah. SB228 sponsored by Sen. McKell**  - provided by De Facto Attorneys General - at the 2021 legislative session:

https://legiscan.com/UT/text/SB0228/2021

To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/6zv60b2iqd5xpun/2022%20Utah%20Stop%20Social%20Media%20Censorship%20Act%20AMENDED%20FINAL.pdf?dl=0

**45. Vermont.** To be introduced as follows at the 2022 legislative session:

https://www.dropbox.com/s/kyx6ok5u8o1fhwu/2021%20Vermont%20Stop%20Social%20Media%20Censorship%20Act%20FINAL%20.pdf?dl=0

**46. Virginia.** To be introduced as follows at the 2022 legislative session by Delegate Byron:

https://www.dropbox.com/s/fmbibg9oe9r6st3/2022%20Virginia%20Stop%20Social%20Media%20Censorship%20Act%20%281%29.pdf?dl=0

47. **Washington.** To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/x3tig83nsjdhr0p/2022%20Washington%20Stop%20Social%20Medi
a%20Censorship%20Act%20FINAL.pdf?dl=0

48. **West Virginia.** To be introduced as follows at the 2022 legislative session by Sen Azinger:
https://www.dropbox.com/s/6tfkmxloznw5jgj/West%20Virginia%20Stop%20Social%20Media%
20Censorship%20Act.pdf?dl=0

49. **Wisconsin.** To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/pt8v99suwbirje1/2022%20Wisconsin%20Stop%20Social%20Media
%20Censorship%20Act.pdf?dl=0

50. **Wyoming. SF0100 sponsored by Sen. Steinmetz** - provided by Professor Hamburger- at
the 2021 legislative session:
https://legiscan.com/WY/text/SF0100/id/2339364/Wyoming-2021-SF0100-Engrossed.pdf
To be introduced as follows at the 2022 legislative session:
https://www.dropbox.com/s/mdr58wy4wsuvh91/2022%20Wyoming%20Stop%20Social%20Me
dia%20Censorship%20Act.pdf?dl=0

# APPENDIX B

## The Amended version of HB 33 - the Stop Social Media Censorship Act For Florida

FLORIDA HOUSE OF REPRESENTATIVES

HB___                                                          2022

### A bill to be entitled

An act relating to social media websites; providing a short title;
providing definitions; providing that the owner or operator of a
social media website is subject to a private right of action by
certain social media website users in this state under certain
conditions; providing for damages; authorizing the award of
reasonable attorney fees and costs; prohibiting a social media
website from using hate speech as a defense; authorizing the Attorney
General to bring an action on behalf of social media website users;
providing exceptions for the deletion or censorship of certain types
of speech; provides for fines by the secretary of state; provides for
severability; providing an effective date.

WHEREAS, the Communications Decency Act was created to
protect decent speech, not deceptive trade practices, and

WHEREAS, repealing section 230 of the Communications
Decency Act at the federal level is unnecessary because it
already includes a state-law exemption and the Stop Social Media
Censorship Act was crafted to fall squarely in the state-law
exemption of section 230 to cure abuses of section 230 to
protect the consumers of this state, and

WHEREAS, contract law is a state-law issue, and when a
citizen of this state signs up to use certain social media
websites, they are entering into a contract, and

WHEREAS, this state has a compelling interest in holding
certain social media websites to higher standards for having

substantially created a digital public square through fraud, false advertising, and deceptive trade practices, and

WHEREAS, major social media websites have engaged in the greatest bait and switch of all times by marketing themselves as free, fair, and open to all ideas to induce subscribers only to then prove otherwise at great expense to consumers and election integrity, and

WHEREAS, breach of contract, false advertising, bad faith, unfair dealing, fraudulent inducement, and deceptive trade practices are not protected forms of speech for purpose of the first amendment of the United States Constitution or the Constitution of this state, and

WHEREAS, the major social media websites have already reached critical mass, and they did it through fraud, false advertising, and deceptive trade practices at great expense to the health, safety, and welfare of consumers of this state, while making it difficult for others to compete with them, and

WHEREAS, the state has an interest in helping its citizens enjoy their free exercise rights in certain semi-public forums commonly used for religious and political speech, regardless of which political party or religious organization they ascribe to, and

WHEREAS, this state is generally opposed to online censorship unless the content is injurious to children or promotes human trafficking; only then does this state accept limited censorship, and

WHEREAS, this act is not intended to apply to a website that merely deletes comments posted by members of the general public in response to material published by the website's owner, NOW THEREFORE,

Be It Enacted by the Legislature of the State of Florida:

Section 1.  This act may be cited as the "Stop Social Media
Censorship Act."

Section 2.   This section is intended to create a statute
that parallels the spirit of 47 U.S.C. § 230 that falls within
the state law exemption under 47 U.S.C. § 230(e)(3) and create a
civil right of action that will deter the following:
    (1)  Deceptive trade practices;
    (2)  False advertising;
    (3)  Breach of contract;
    (4)  Bad faith;
    (5)  Unfair dealing;
    (6)  Fraudulent inducement; and
    (7) The stifling of political and religious speech in the
modern-day digital public square cultivated by social media
websites that have achieved critical mass through fraud.

Section 3.   Social media website speech; cause of action;
penalties.—

    (1)  As used in this section, the term:
    (a)  "Algorithm" means a set of instructions designed to
perform a specific task.
    (b)  "Hate speech" means a phrase concerning content that
an individual finds offensive based on his or her personal moral
code.
    (c)  "Obscene" means that an average person, applying
contemporary community standards, would find that, taken as a
whole, the dominant theme of the material appeals to prurient
interests.
    (d)  "Political speech" means speech relating to the state,
government, body politic, or public administration as it relates
to governmental policymaking. The term includes speech by the

government or a candidate for office and any discussion of social issues. The term does not include speech concerning the administration, law, or civil aspects of government.

(e)   "Religious speech" means a set of unproven answers, truth claims, faith-based assumptions, and naked assertions that attempt to explain such greater questions created, what constitutes right and wrong what happens after death.

(f)   "Social media website":

1. Means an Internet website or application that enables users to communicate with each other by posting information, comments, messages, or images and that meets all of the following requirements:

i.   Is open to the public.

ii.   Has more than 75 million subscribers with personal user profiles.

iii.   From its inception, has not been specifically affiliated with any one religion or political party.

iv.   Provides a means for the website's users to report obscene materials and has in place procedures for evaluating those reports and removing obscene material; and

v.   Allows for subscribers to sign up for a personal user profile page or account where beliefs and preferences can be expressed by the user.

2. The term does not include a website that merely permits members of the general public to post comments on content published by the owner of the website.

(g)   "User profile" means a collection of settings and information associated with a user or subscriber who signs up for an account made available by a social media website. Such accounts often include the explicit digital representation of the identity of the user or subscriber with respect to the operating environment of a social media website. Such accounts

often associate characteristics with a user or subscriber, which may help in ascertaining the interactive behavior of the user along with their personal preferences and beliefs.

(2)(a)   The owner or operator of a social media website who contracts with a social media website user in this state is subject to a private right of action by such user if the social media website purposely:

1.   Deletes or censors the user's religious speech or political speech; or

2.   Uses an algorithm to disfavor or censure the user's religious speech or political speech.

(b)   A social media website user may be awarded all of the following damages under this section:

1.   Up to $75,000 in statutory damages.

2.   Actual damages.

3. If aggravating factors are present, punitive damages.

4.   Other forms of equitable relief.

(c)   The prevailing party in a cause of action under this section may be awarded costs and reasonable attorney fees.

(d)   A social media website that restores from deletion or removes the censoring of a social media website user's speech in a reasonable amount of time may use that fact to mitigate any damages.

(3)   A social media website may not use the social media website user's alleged hate speech as a basis for justification or defense of the social media website's actions at trial.

(4)   The Attorney General may also bring a civil cause of action under this section on behalf of a social media website user who resides in this state and whose religious speech or political speech has been censored by a social media website.

(5)   This section does not apply to any of the following:

(a)  A social media website that deletes or censors a social media website user's speech or that uses an algorithm to disfavor or censure speech that:

1.  Calls for immediate acts of violence;

2.  Is obscene, lewd, lascivious, filthy or pornographic in nature;

3.  Is the result of operational error;

4.  Is the result of a court order;

5.  Comes from an inauthentic source or involves false personation;

6.  Entices criminal conduct;

7.  Involves minors bullying minors;

8.  Constitutes trademark or copyright infringement;

9.  Is excessively violent; and

10.  Constitutes harassing spam of the commercial, not religious or political, nature.

(b)  A social media website user's censoring of another social media website user's speech.

(6)  Only users who are 18 years of age or older have standing to seek enforcement of this section.

Section 4.  The Secretary of State may:

(1)  Issue a fine in one of the following amounts if the Secretary of State finds that the social media website has engaged in deplatforming or shadowbanning a political candidate seeking office in Connecticut in violation of this act:

(a)  If the candidate is seeking Statewide office, up to $100,000 per day of the violation;

(b)  For all other candidates, up to $10,000 per day of the violation; and

(2) Disclose a social media company's algorithmic bias for or against a political candidate seeking Statewide office under subsection (1) of this section as a campaign contribution.

Section 5.   <u>If any section in this act or any part of any
section is declared invalid or unconstitutional, the declaration
shall not affect the validity or constitutionality of the
remaining portions.</u>

Section 6.   This act shall take effect July 1, 2021.