# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| DONALD J. TRUMP, the Forty-Fifth President of the United States, LINDA CUADROS, AMERICAN CONSERVATIVE UNION, RAFAEL BARBOZA, DOMINICK LATELLA, WAYNE ALLYN ROOT, NAOMI WOLF, INDIVIDUALLY AND ON BEHALF OF THOSE SIMILARLY SITUATED, <br><br> Plaintiffs, <br><br> v. <br><br> TWITTER, INC., and JACK DORSEY, <br><br> Defendants. | Civil Action No. 1:21-cv-22441-RNS-JG <br><br> **CLASS ACTION** <br> **AMENDED COMPLAINT FOR:** <br><br> **FIRST AMENDMENT VIOLATION** <br><br> **DECLARATORY JUDGMENT OF UNCONSTITUTIONALITY OF SECTION 230 AND THE COMMUNICATIONS DECENCY ACT** <br><br> **FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLORIDA STATUTES § 501.201 et seq. (INJUNCTIVE RELIEF, FLORIDA STATUTES § 501.211(1))** <br><br> **FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLORIDA STATUTES § 501.201 et seq. (INCONSISTENT APPLICATION OF STANDARDS, FLORIDA STATUTES § 501.2041)** <br><br> **JURY TRIAL REQUESTED** |

## AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff, Donald J. Trump, the Forty-Fifth President of the United States, Putative Class

Members Linda Cuadros, American Conservative Union, Rafael Barboza, Dominick Latella, Wayne

Allyn Root, and Naomi Wolf individually, and on behalf of those similarly situated, pursuant to Fed. R. Civ. P. 15(a)(1)(A), files this Amended Complaint as a matter of right prior to service of the Complaint [D.E. 1], and states:

## INTRODUCTION

1.      Plaintiff, Donald J. Trump, the Forty-Fifth President of the United States and Putative Class Members Linda Cuadros, American Conservative Union, Rafael Barboza, Dominick Latella, Wayne Allyn Root, and Naomi Wolf individually, and on behalf of those similarly situated, by and through the undersigned counsel, brings this action against Defendant Twitter, Inc., ("Twitter") and the Chief Executive Officer of Twitter, Jack Dorsey ("Dorsey"), individually. The allegations herein of the Plaintiff and Putative Class Members are based upon personal knowledge and belief as to their own acts, upon the investigation of their counsel, and upon information and belief as to all other matters.

2.      Defendant Twitter is a social media platform with more than three hundred forty (340) million Users worldwide, including approximately seventy (70) million daily Users in the United States. Since 2018, approximately five hundred (500) million tweets are posted, or "tweeted," each day. Twitter reported $3.72 billion in annual revenue in 2020.

3.      Defendant Twitter has increasingly engaged in impermissible censorship in response to coercive measures of congressional legislators and the Executive Branch, a misguided reliance upon Section 230 of the Communications Decency Act, 47 U.S.C. § 230, and willful participation in joint activity with federal actors. Defendant Twitter's status thus rises beyond that of a private company to that of a state actor. As such, Defendant Twitter is constrained by the First Amendment right to free speech in the censorship decisions it makes regarding its Users.

4.      Legislation passed twenty-five (25) years ago intended to protect minors from the transmission of obscene materials on the Internet, and to promote the growth and development of Internet commerce, has enabled Defendant Twitter to grow into a commercial giant that now censors (flags, shadow bans, etc.) and otherwise restricts with impunity the constitutionally protected free speech of the Plaintiff and the Putative Class Members.

5.      The immediacy of Defendants' threat to their Users', and potentially every citizen's, right to free speech cannot be overstated. Defendants' callous disregard of its Users' constitutional rights is no better exemplified than in the matter currently before the Court.

6.      On January 7, 2021, Defendants permanently banned the sitting President of the United States from their platform for exercising his constitutional right of free speech.

7.      Twitter's censorship runs rampant against the entire Class, and the result is a chilling effect on our nation's pressing political, medical, social, and cultural discussions.

8.      Plaintiff was de-platformed by the Defendants, as were the Putative Class Members, using non-existent, broad, vague, and ever-shifting standards. While Twitter's de-platforming and prior restraint of the Plaintiff are well-documented, the untold stories of the Putative Class Members are now stirring the public conscience.

9.      Using the unconstitutional authority delegated to them by Congress, Defendants have mounted an aggressive campaign of prior restraint against a multitude of Putative Class Members through censorship (flagging, shadow banning, etc.) resulting from legislative coercion and collusion with federal actors.

10.     Defendants de-platformed Plaintiff and the Putative Class Members at the behest of, in cooperation with, and with the approval of Congress and the Executive Branch.

11.     Akin to forcing a round peg into a square hole, Twitter declared that specific Twitter posts of Plaintiff had violated its self-composed "Twitter Rules." Countless other Twitter Users have not been as fortunate, with Twitter taking detrimental action against their accounts with no explanation whatsoever.

12.     If Defendants can effectively censor and impose a prior restraint on the protected political speech of a sitting President of the United States, then the threat to Putative Class Members, our citizens, and our United States Constitution is imminent, severe, and irreparable.

13.     Plaintiff respectfully asks this Court to declare that Sections 230(c)(1) and (c)(2) of the Communications Decency Act of 1996 are an unconstitutional delegation of authority on their face and as applied in the instant matter, and that the Defendants' actions directed at the Plaintiff and Putative Class Members are a prior restraint on their First Amendment right to free speech. The Plaintiff also respectfully requests that the Court order the Defendants to restore the access of the Plaintiff and the Putative Class Members to their Twitter accounts, as well as those de-platformed Putative Class Members, and to prohibit Defendants from exercising any censorship or prior restraint in its many forms over the posts of the Plaintiff or the Putative Class Members.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 1332, 28 U.S.C. §§ 2201-2202.

15.     Jurisdiction is also proper in this Court pursuant to the Class Action Fairness Act 28 U.S.C. § 1332(d) ("CAFA"), because: (i) the proposed class consists of well over one (1) million Members; (ii) the parties are minimally diverse, as Members of the proposed class,

including the Plaintiff, are citizens of states different from Defendants' home states; and (iii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

16.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2), (d), and (e)(1). A substantial part of the events giving rise to this claim occurred in this District, and the Plaintiff brings this suit for actions taken by Defendants that occurred while the Plaintiff was serving in his capacity as the President of the United States. Also, the Defendants' prior restraint of the Plaintiff's and the Putative Class Members' speech continues to this day.

**PARTIES**

**Plaintiff**

17.    Donald J. Trump ("Plaintiff"), the 45th President of the United States, is a private citizen and is domiciled in Palm Beach, Florida.

**Class**

18.    All Twitter platform Users ("The Class") who have resided in the United States between June 1, 2018, and today that had their Twitter account censored by Defendants and were damaged thereby.

19.    Putative Class Member Linda Cuadros, a United States citizen, domiciled in the state of Florida.

20.    Putative Class Member American Conservative Union is a social welfare organization in the United States, established in 1964 in the District of Columbia.

21.    Putative Class Member Rafael Barboza, a United States citizen, domiciled in Miami-Dade County, state of Florida.

22.    Putative Class Member Dominick Latella, a United States citizen, domiciled in Miami-Dade County, state of Florida.

23.     Wayne Alan Root ("Putative Class Member"), a United States citizen, domiciled in Las Vegas, Nevada.

24.     Naomi Woolf ("Putative Class Member"), a United States citizen, domiciled in Millerton, New York.

**Defendants**

25.     Defendant Twitter is a foreign corporation with its principal place of business located at 1355 Market Street, Suite 900, San Francisco, California, and conducts business in the state of Florida. Twitter has eleven (11) offices in the United States and twenty-one (21) offices located worldwide.

26.     Defendant Dorsey is the co-founder and CEO of Twitter.

## STATEMENT OF FACTS

I.     **DEFENDANTS TWITTER AND DORSEY**

A.  **Defendant Twitter**

27.     The United States Supreme Court has recognized that social media platforms such as Twitter provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737. These platforms have been revolution[ary]," not least because they have transformed civic engagement by allowing elected officials to communicate instantaneously and directly with their constituents. *Id.* Twitter enables ordinary citizens to speak directly to public officials and listen to and debate others about public issues, in much the same way they could if gathered on a sidewalk or in a public park or city council meeting or town hall.

28.     On March 21, 2006, Defendant Dorsey, Biz Stone, and Evan Williams launched Twitter. By July 15, 2006, Twitter's microblogging service was officially available to the public.

Twitter is a social networking service that allows its Users to post and interact with each other through short messages known as "tweets."

29.    Since the birth of Twitter, the platform has grown immensely. In November of 2008, one (1) billion tweets were generated. In October of 2009, five (5) billion tweets were generated. In March of 2011, one (1) billion tweets were generated every week. As of January 1, 2021, over five hundred (500) million tweets are generated every day.

30.    Twitter is a social networking service that allows its Users to post and interact with each other through short messages known as "tweets."

31.    Speech posted on Twitter ranges from observations on everyday life to the most important news events of the day, including political speech.  Users' tweets are freely available to anyone connected with the Internet.

32.    A Twitter "User" is an individual who has created an account on the Twitter platform.  A User can post "tweets," up to 280 characters in length, to a webpage on Twitter that is attached to the User's account.

33.    A "tweet" comprises the tweeted content (i.e., the message, including any embedded photograph, video, or link), the User's account name (with a link to the User's Twitter webpage), the User's profile picture, the date and time the tweet was generated, and the number of times the tweet has been replied to, retweeted by, or liked by other Users.

34.    Twitter webpages and their associated timelines are visible to everyone with Internet access, including those who are not Twitter Users.  Twitter Users can subscribe to other Users' messages by "following" those Users' accounts. Beyond publishing tweets to their followers, Twitter Users can engage with one another in a variety of ways.  For example, they can "retweet"—i.e., republish—the tweets of other Users, either by publishing them directly to

their own followers or by "quoting" them in their own tweets.  The reply will also appear on the original User's feed in a "comment thread" under the tweet that prompted the reply.  Other Users' replies to the same tweet will appear in the same comment thread.

35.     Twitter's platform has been the catalyst for social movements across the globe, allowing Users to connect and collectively organize. In the world of American politics, Twitter is used by elected officials to make policy announcements, for those with political aspirations to announce they are running for office, and by political supporters to express their support or disapproval of politicians and major political figures, including Plaintiff.

36.     Today, Twitter is a social media platform with more than three hundred forty (340) million active Users worldwide, including some seventy (70) million in the United States.

37.      Twitter's Terms of Service ("TOS") is comprised of its Privacy Policy, the Twitter Rules and Policies, and all other incorporated policies of Twitter.  The Twitter TOS, User Agreement, and Privacy Policies span seventy-six (76) pages.  In addition, Twitter's Rules and Policies contains sixty-five (65) hyperlinks to topics incorporated into the User Agreement. Understanding the confusing TOS requires a continuous cross-reference to other sections and previously defined terms.  Twitter further reserves the right to change its TOS from time to time and states that it "will try to notify" Users of any changes to its TOS.

38.     Twitter's TOS refers to a body of rules known as the "Twitter Rules," which Twitter claims to outline its standards regarding the content Users can post to Twitter and other Twitter products.

39.     The "Twitter Rules" guidelines regarding hate speech, incitement, or praise of violence are vague, broad, ill-defined, or not defined at all.

40.     "The Rules" on Twitter state:

Violence: "You may not threaten violence against an individual or a group of people. We also prohibit the glorification of violence."

Violent Threats: "We prohibit content that makes violent threats against an identifiable target. Violent threats are declarative statements of intent to inflict injuries that would result in serious and lasting bodily harm."

Incitement against protected categories: "We prohibit inciting behavior that targets individuals or groups of people belonging to protected categories."

**B. Defendant Jack Dorsey**

41.     Defendant Dorsey is a co-founder of Twitter, Inc., and at all times relevant hereto, has served as Twitter's Chairman, Chief Executive Officer, and controlling shareholder.

42.     Defendant Dorsey exercises control over and implementation of the content and policy of Twitter and has spoken on behalf of, and represented Twitter at congressional hearings on social media ("Big Tech") issues, along with Mark Zuckerberg for Facebook, Inc. and Sundar Pichai for YouTube, Inc., Google, Inc., and Alphabet, Inc.

## II.  PRESIDENT TRUMP'S USE OF TWITTER'S PLATFORM

### A.  The Donald J. Trump Twitter account (@realDonaldTrump)

43.     The Plaintiff established his Twitter account in May of 2009 and used the account for several years to engage with his followers about politics, celebrities, golf, and his business interests, among other topics. After he announced his campaign for the presidential nomination of the Republican Party, Plaintiff used his Twitter account to speak directly to his followers and the public at large. By using social media, including Twitter, Plaintiff strategically circumvented what he viewed as a mainstream media that was biased against his candidacy.

44.     After his inauguration in January of 2017, Plaintiff's Twitter account became an instrument of his presidency. Plaintiff's tweets became an important source of news and information about the government, along with his followers' associated tweets. Plaintiff's

account became a public forum for speech by, to, and about government policy. When Plaintiff utilized his Twitter account in his official capacity as President: (a) it became an important outlet for news organizations and the U.S. government; and (b) his Twitter account operated as a public forum, serving a public function.

45.     In *Biden v. Knight* 141 S. Ct. 1220 (2021), the Supreme Court discussed the Second Circuit's decision in *Knight First Amendment Inst. at Columbia Univ. v. Trump*, No. 18-1691, holding that Plaintiff's threads on Twitter from his personal account were, in fact, official presidential statements made in a "public forum."

46.     Likewise, President Trump would discuss government activity on Twitter in his official capacity as President of the United States with almost any User who chose to follow him and with the public at large.

47.     The comments generated by Plaintiff's tweets also gave rise to important public discussion and debate about government policy. Typically, tweets from Plaintiff would generate thousands of replies posted by other Users, some of which would generate hundreds or thousands of replies in turn. Plaintiff's account was a digital town hall in which Plaintiff communicated news and information to the public directly. Members of the public used the reply function to respond directly to Plaintiff and his office, often retweeting to exchange views with one another.

48.     Plaintiff used his Twitter account and other social media platforms to communicate directly with the American people more than any other President in U.S. history.

49.     Plaintiff used his Twitter account to interact on a myriad of subjects with the public at large. With few exceptions, supporters and critics alike were welcome on the President's Twitter page.

50.     The Putative Class Members used their Twitter accounts in a similar fashion. They created their accounts to share information, opinions, pictures, videos, and news with their networks ranging from friends and family to larger public audiences.

### III. DEMOCRAT LEGISLATORS COERCED DEFENDANTS TO CENSOR THE PLAINTIFF AND PUTATIVE CLASS MEMBERS

51.     Democrat legislators feared the Plaintiff's skilled use of social media as a threat to their own re-election efforts. These legislators exerted overt coercion, using both words and actions, to coerce Defendants to censor the views and content that Democrat Members of Congress disagreed with expressed by both the Plaintiff and the Putative Class Members.

52.     Not only did Democrat legislators openly voice their displeasure with Defendants for providing a platform to the Plaintiff and the Putative Class Members, but they also spoke publicly of the steps they would take against Defendants if they continued to provide a platform for the expression of views and content contrary to the legislators' own agendas.

53.     Legislators (and in multiple instances, the current Vice President of the United States, Kamala Harris, and the former First Lady of the United States, Michelle Obama) made it increasingly clear that they wanted President Trump, and the views he espoused, to be banned from Defendants' platform.

54.      Democrat legislators threatened to revoke the unconstitutional limited immunity for "good faith" censorship under Section 230 and coerced Defendants to act as their agent to exercise content and viewpoint censorship against the Plaintiff and the Putative Class Members that the Democrat legislators knew they could not lawfully accomplish on their own.

55.     Below are just some examples of Democrat legislators threatening new regulations, antitrust breakup, and removal of Section 230 immunity for Defendants and other social media platforms if Twitter did not censor views and content with which these Members of

11

Congress disagreed, including the views and content of the Plaintiff and the Putative Class

Members:

- "Look, let's be honest, @realDonaldTrump's Twitter account should be suspended." (Sen. Kamala Harris, September 30, 2019);

- "But I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it.  And it is not out of the question that that could be removed." (Rep. Nancy Pelosi, Speaker of the House, April 12, 2019);

- "The idea that it's a tech company is that Section 230 should be revoked, immediately should be revoked, number one.  For Dorsey and other platforms."  (Joe Biden, Interview in December of 2019 and published January 2020);

- "We can and should have a conversation about Section 230. – and the ways in which it has enabled platforms to turn a blind eye as their platforms are used to . . . enable domestic terrorist groups to organize violence in plain sight."  (Statement of US Sen. Mark Warner on Section 230 Hearing on October 28, 2020.);

- "It's long past time to hold the social media companies accountable for what's published on their platforms."  (Bruce Reed, Biden's Top Tech Advisor, December 2, 2020);

- "Hey @jack (Jack Dorsey) Time to do something about this Tweet [picture of a Tweet from President Trump]."  (Sen. Kamala Harris's Tweet, October 2, 2019);

- 2020 Presidential candidate Sen. Kamala Harris calls on Twitter to suspend President Trump's account. (ABCNews.go.com, October 2, 2019);

- If the president goes on Facebook and encourages violence, that you will make sure your company's algorithms don't spread that content and you will immediately remove those messages? (Sen. Markey October 23, 2020, Dorsey Senate Testimony);

- "Senator, yes.  Incitement of violence is against our policy and there are not exceptions to that, including for politicians." (Mark Zuckerberg response, November 17, 2020, Mark Zuckerberg and Jack Dorsey, Senate Tech Hearing);

- ". . . Daily, the president shocks our conscience and shakes the very foundations of our democracy using a powerful megaphone, social media.  The President has used this microphone to spread vicious falsehoods and an apparent attempt to overturn the will of voters…  Now, Mr. Zuckerberg and Mr. Dorsey, you have built terrifying tools of persuasion and manipulation with power far exceeding the robber barons of the last Gilded Age."  (Sen. Blumenthal (13:35) October 23, 2020: Tech CEO's Senate Testimony);

- "I have urged, in fact, a breakup of tech giants because they've misused their bigness and power.  And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad and victims of their harms deserve a day in court."  (Sen. Blumenthal (14:48) October 23, 2020: Tech CEO's Senate Testimony);

- "Now is the time for Silicon Valley companies to stop enabling this monstrous behavior and go even further than they have already by permanently banning this man (Trump) from their platforms.  (Michelle Obama on Twitter, January 7, 2021);

- "The law (230) acts as a shield allowing them (Internet platforms) to turn a blind eye.  The SAFE TECH ACT brings 230 into the modern age and makes platforms accountable for the harm they cause."  (Sen. Mazie Hirono's Tweet, February 5, 2021);

- Before a joint hearing of the Communications and Technology Subcommittee in March of 2021, the following statement was issued by the respective Democrat Chairmen: "This hearing will continue the Committee's work of holding online platforms accountable for the growing rise of misinformation and disinformation.  Industry self-regulation has failed.  We must begin the work of changing incentives driving social media companies to allow and even promote misinformation and disinformation;" and

- "There's no Constitutional protection for using social media to incite an insurrection.  Trump is willing to do anything for himself no matter the danger to our country.  His big lies have cost America dearly.  And until he stops, Facebook must ban him.  Which is to say, forever."  (Rep. Adam Schiff's Tweet, May 5, 2021).

56.    Democrat legislators not only voiced their threats (e.g., new regulations and removing Section 230 immunity) to social media platforms, but they also employed additional measures to deliver their unmistakable message that they were prepared to act against the social media platforms if Defendants did not increase their censorship of disfavored views and content of the Plaintiff and the Putative Class Members.

57.    These additional measures included convening public hearings, issuing subpoenas, dragging in the CEOs of the largest social media companies to testify publicly before Congress, and subjecting these CEOs to lengthy, embarrassing questioning.

58.     Some specific examples of when these coercive measures were applied to

Defendants:

On July 29, 2020, Four Big Tech CEOs testified before the House in an antitrust hearing.
Amazon Founder and CEO Jeff Bezos, Facebook Founder and CEO Mark Zuckerberg,
Apple CEO Tim Cook, and Alphabet and Google CEO Sundar Pichai defended their
companies against accusations of anticompetitive practices. (Online Platforms and
Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and
Google | U.S. House of Representatives Judiciary Committee); and

On October 23, 2020, Mark Zuckerberg Testimony Transcript: Zuckerberg Testifies on
Facebook Cryptocurrency Libra and Is Confronted on Child Exploitation on Facebook.
(Zuckerberg Testifies on Facebook Cryptocurrency Libra | October 23, 2019); and

On November 17, 2020, Facebook CEO Mark Zuckerberg and Defendant Dorsey
testified before the Senate Judiciary Committee on November 17. They were questioned
on speech moderation policies. (Censorship, Suppression, and the 2020 Election |
Hearings | November 17, 2020); and

On March 25, 2021, Facebook's Mark Zuckerberg, Defendant Dorsey, and Google's
Sundar Pichai appeared virtually before the House Energy and Commerce Committee.
(House Hearing on Combating Online Misinformation and Disinformation | March 25,
2021).

59.     With this coercion directed at Twitter by repeatedly requiring appearances at

hearings and reinforcing their ability to impose regulations and to strip it of Section 230

immunity, Democrat legislators intended to force Defendants into permanently banning

Plaintiff's access to his Twitter account. The other intended result of the legislators' coercion

was to deny the Putative Class Members and the public access to the Plaintiff's content and

views.

60.     The coercive message conveyed by Democrat legislators to Defendants was clear:

ban the Plaintiff and those Putative Class Members who tweeted content and views contrary to

those legislators' preferred points of view or risk losing the immunity and competitive

protections of Section 230 granted by Congress, along with the tens of billions of dollars of

market share that came with it.

61.     The legislators who pressured Defendants to censor the Plaintiff, and the Putative Class Members who supported his views, employed social media themselves extensively to communicate with their own constituents, promote their accomplishments in office, fundraise, and campaign.

62.     With the Plaintiff removed from Twitter, it is considerably more difficult for the Plaintiff to act as head of the Republican Party, campaign for Republican candidates, fundraise, and lay the groundwork for his own potential campaign for the 2024 Republican Party nomination for President of the United States.

63.     Likewise, with the Plaintiff now removed from Twitter and other social media platforms, balanced, direct public discussions between competing political views on national and local issues has ended.

64.     By banning the Plaintiff and the Putative Class Members, Defendants have made it more difficult to communicate directly with the American public. Our national discourse is becoming immeasurably more altered and one-sided on race, medicine, the election process, the economy, immigration, etc.

## IV. LEGISLATION SIGNIFICANTLY ENCOURAGED DEFENDANTS' CENSORSHIP OF THE PLAINTIFF AND THE PUTATIVE CLASS MEMBERS

65.     Twitter is currently one of the largest social media platforms. Its growth, and very existence, have been directly authorized by congressional legislation.

66.     In 1996, Congress passed the Communications Decency Act of 1996, which included Section 230(c). The section was intended to promote the growth and development of Internet commerce and to protect against the transmission of obscene materials over the Internet to children.

Twitter relies upon 47 U.S.C. § 230, commonly referred to as simply "Section 230," or the "Good Samaritan" provision, to censor constitutionally permissible free speech of Plaintiff and the Putative Class Members.

67.     Section 230(c) provides:

(1).  TREATMENT OF PUBLISHER OR SPEAKER

No provider or User of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2).  CIVIL LIABILITY

No provider or User of an interactive computer service shall be held liable on account of—

> A.  any action voluntarily taken in good faith to restrict access to or availability of material that the provider or User considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or
>
> B.  any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

68.     The Internet is a government-created and publicly accessible medium/place and has been found by Congress to be an important public forum for the expression of economic, social, and political information and to conduct business in interstate commerce and is Communications Decency Act of 1996 as codified, including Section 230.

69.     Section 230(c) has accomplished and exceeded its original purpose in terms of promoting the growth and development of social media platforms.

70.     Section 230(c)(2) is a permissive statute in that it allows, not requires, the social media platforms to take action in "good faith."

The titles under which Section 230 were enacted ("Communications Decency Act" and "Good Samaritan Provision") entitled **"**Protection for private blocking and screening of offensive material" and title of the original bill H.R.1978 - Internet Freedom and Family Empowerment Act, 104th Congress (1995-1996)) as well as the context/language for the provision itself, indicates the congressional preference at the time the provision was enacted was that Section 230 be used to prevent the transmission of obscene material, and promote unfettered growth of the social media platforms on the Internet.

71.     That unfettered growth is reflected in Twitter's market share of social media. According to Twitter's latest released figures from the fourth quarter of 2020, the platform boasts three hundred forty (340) million daily Users. Seventy (70) million of Twitter's daily Users are in the U.S. Since 2018, approximately 500 million tweets are sent out or "tweeted" each day. Twitter reported $3.72 Billion in annual revenue in 2020.

72.     On the other hand, Twitter has failed to adhere to the congressional preference spelled out initially in enacting Section 230(c), which was preventing the transmission of obscene materials to youths over the Internet.

73.     Twitter has been cited for knowingly violating several obscenities and sex trafficking laws. Twitter is not only promoting child exploitation in the United States but is allegedly doing so globally.

74.     In passing 230 (c), Congress permitted but did not mandate, action be taken by social media platforms.  Section 230(c) permits Twitter to take down or block speech deemed "objectionable . . . whether or not such material is constitutionally protected." Section 230(c) also pre-empts all conflicting state laws, preventing such censorship from being "made illegal . . . by any provisions of the laws of a State."

75.     Democrat legislators and Executive Branch Officials have made it clear that they have a "strong preference" as to what views should and should not be expressed on Twitter, and have coerced Defendants to censor and prohibit the Plaintiff and the Putative Class Members from expressing their views, including any speech relating to:

- so-called COVID-19 "misinformation," including the lack of safety and efficacy of hydroxychloroquine and the use of face masks;

- that COVID-19 originated from a Chinese government laboratory in Wuhan; and

- questioning the integrity and results of the 2020 Presidential election.

76.     Neither Plaintiff nor Putative Class Members were free to decline the speech restrictions imposed by Twitter in its TOS if they wished to use the Twitter platform. Use of its platform was expressly conditioned on agreeing to these restrictions, or User access was denied.

77.     Federal actors are also sharing the fruits of Twitter censorship of Plaintiff and Members of the Class. These benefits include:

- The Centers for Disease Control and Prevention ("CDC") and the White House have used Defendants to inexpensively and effectively promote their directives, messages, and policies concerning COVID-19, and to suppress contradictory medical views and content;

- Suppression of information suggesting or showing flaws in CDC and/or other federal governmental policy;

- Increasing the number of visitors to the CDC's website;

- Boosting the CDC's highly questionable reputation as reliable and authoritative in its factual and policy determinations;

- Creating a false impression of unequivocal support in the scientific community for the CDC and other governmental directives;

- And suppression of opinions and information that might lead people to take actions contrary to the government's preferences.

**V. DEFENDANTS' WILLFUL PARTICIPATION IN JOINT ACTIVITY WITH FEDERAL ACTORS TO CENSOR PLAINTIFF AND THE PUTATIVE CLASS MEMBERS**

18

78.     The CDC has publicly stated that it works with "social media partners," including Twitter, to "curb the spread of vaccine misinformation."  In a document dated October 11, 2019, the CDC expressly stated that it was "engaging . . . partners" to "contain the spread of [vaccine] misinformation" and specifically states that the CDC would "work with social media companies" to that end.

79.     Twitter is among the social media "partners" referred to by the CDC.



*Stop Myths*

CDC is engaging local messengers and partners to contain the spread of misinformation and ensure key stakeholders have critical information about vaccines.

*New Investments and Partnerships*

- Work with social media companies to promote trustworthy vaccine information
- Provide accurate, accessible information on vaccines to state policy makers
- Engage state and local health officials to advance effective local responses to misinformation

80.     Defendant Dorsey and Twitter acted to censor other medical opinions that did not uphold that narrative of Dr. Anthony Fauci and the CDC, which took on both a political and medical nature, given the interconnection between government policy and pending science.

81.     On January 20, 2020, Twitter released a statement on its website entitled, "Helping the world find credible information about novel #coronavirus."  The statement explained Twitter's censorship policy, "As ever, those who engage in these practices will be removed from our service. We do not permit platform manipulation, and we encourage people to think before sharing or engaging in deliberate attempts to undermine the public conversation."

82.     Twitter announced that it would prevent automated search results that are "likely to direct individuals to non-credible content" and, instead, intentionally directed Users to authoritative information from organizations like the CDC.

83.     Dr. Anthony Fauci, the director of the National Institute of Allergy and Infectious Diseases ("NIAID"), had previously disputed that the virus was made in a lab. On February 21, 2020, Dr. Fauci asked a Deputy Director at NIAID to "Please handle" an email Fauci received by a group of doctors and scientists, including a virologist, that opined that "we think there is a possibility that the virus was released from a lab in Wuhan (sic)." Whatever Fauci meant by "Please handle," Twitter censored those who presented information that contradicted Dr. Fauci's narrative.

84.     In February 2020, Twitter permanently suspended Harry Chen, Ph. D., after he reported about the coronavirus directly from Wuhan, China.  His Twitter account was @IsChinar.  Reporter Stephania Becker broke the news about this development, saying that the suspension came after Dr. Chen "spent weeks posting insider video from Wuhan about coronavirus & rampant abuses by CCP [Chinese Communist Party]."

85.     Twitter suspended the account of Li-Meng Yan, a Chinese virologist and former researcher at the Hong Kong School of Public Health who has publicly claimed that COVID-19 was developed in a Wuhan laboratory. She said the virus was "man-made" and "not from nature."

86.     Twitter de-platformed Ms. Li-Meng's account in September of 2020, after she accused China of intentionally manufacturing and releasing COVID-19. The Twitter message on her page read: "Account suspended. Twitter suspends accounts which violate the Twitter Rules."

87.     Twitter's censorship (i.e., flagging, censoring, suspending, shadow banning, etc.) of Users who engaged in speech with a different opinion regarding the COVID-19 virus and treatment advanced by Dr. Fauci and the CDC was a coordinated interaction between Defendants and a specific government actor, Dr. Fauci, and Executive Branch agencies, including the Department of Health and Human Services, the CDC, and the current administration, to constrain free speech.

88.     When Twitter states or implies that Users who espouse a different narrative regarding the safety and efficacy of the vaccination are spreading "false" information, it is an act of bad faith. It is necessary for people to have a robust exchange of ideas, yet Defendant Dorsey and Twitter have worked closely with government actors to silence any opposing views.

89.     Another example of Defendants working directly with government actors to censor free speech occurred when the Plaintiff and Putative Class Members posted views and information to support that hydroxychloroquine might be an effective, preventative option to protect against the coronavirus.

90.     The Plaintiff's and the Putative Class Members' tweets about the use of hydroxychloroquine were censored by Twitter, as only the narrative crafted by Dr. Fauci, NIAID, the CDC, and "local health authorities" regarding best practices for treating COVID-19 was allowed on Twitter.

91.     The Plaintiff also expressed the view on Twitter that COVID-19 originated in a laboratory in Wuhan, China, and would specifically refer to it as the "China virus."

92.     Subsequently, Twitter Users posting tweets discussing the laboratory in Wuhan, China, as the origin of COVID-19 or referring to COVID-19 as the "China virus" were similarly censored (flagged, shadow banned, etc.) by Twitter.

93.     On July 20, 2021, Senator Rand Paul (R-Kentucky) accused the National Institute of Health of funding a study by the Wuhan Institute of Virology that contributed to the spread of COVID-19.

94.     In censoring Tweets that challenged the government's preferred narrative that COVID-19 did not originate in the Wuhan Laboratory, Defendants were willing participants with the federal government in censoring the protected free speech of the Plaintiff and the Putative Class Members.

95.     Recently, the Wuhan laboratory and China virus theories have been given credence by government actors, including the current administration, which announced an investigation into the theory on May 26, 2021. President Joe Biden announced that he ordered a closer intelligence review of what he said were two equally plausible scenarios of the origins of the Covid-19 pandemic:

> "[W]hile two elements in the IC [Intelligence Community] leans toward the [human contact] scenario and one leans more toward the [lab leak scenario] – each with low or moderate confidence – the majority of elements do not believe there is sufficient information to assess one to be more likely than the other," Biden said.

96.     On July 15, 2021, White House Press Secretary Jennifer Psaki confirmed that Executive Branch officials regularly "engage" with social media platforms at the highest levels to promote speech preferred by the government, and to identify and censor the content of other speech related to COVID-19, which the government views as false. The transcript from the White House press briefing held on July 15, 2021, reads as follows:

> Q   Can you talk a little bit more about this request for tech companies to be more aggressive in policing misinformation? Has the administration been in touch with any of these companies and are there any actions that the federal government can take to ensure their cooperation, because we've seen, from the start, there's not a lot of action on some of these platforms.

MS. PSAKI: Sure.  Well, first, we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team, given, as Dr. Murthy conveyed, this is a big issue of misinformation, specifically on the pandemic.

We've increased disinformation research and tracking within the Surgeon General's office. We're flagging problematic posts for Facebook that spread disinformation. We're working with doctors and medical professionals to connect — to connect medical experts with popular — with popular — who are popular with their audiences with — with accurate information and boost trusted content. So we're helping get trusted content out there.

We also created the COVID-19 — the COVID Community Corps to get factual information into the hands of local messengers, and we're also investing, as you all have seen in the President's, the Vice President's, and Dr. Fauci's time in meeting with influencers who also have large reaches to a lot of these target audiences who can spread and share accurate information.

You saw an example of that yesterday. I believe that video will be out Fri- — tomorrow. I think that was your question, Steve, yesterday; I did a full follow-up there.

There are also proposed changes that we have made to social media platforms, including Facebook, and those specifically are four key steps.

One, that they measure and publicly share the impact of misinformation on their platform. Facebook should provide, publicly and transparently, data on the reach of COVID-19 — COVID vaccine misinformation. Not just engagement, but the reach of the misinformation and the audience that it's reaching.

That will help us ensure we're getting accurate information to people. This should be provided not just to researchers, but to the public so that the public knows and understands what is accurate and inaccurate.

Second, that we have recommended — proposed that they create a robust enforcement strategy that bridges their properties and provides transparency about the rules. So, about — I think this was a question asked before — there's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms. All of them remain active on Facebook, despite

some even being banned on other platforms, including Facebook — ones that Facebook owns.

Third, it's important to take faster action against harmful posts. As you all know, information travels quite quickly on social media platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days. That's too long. The information spreads too quickly.

Finally, we have proposed they promote quality information sources in their feed algorithm. Facebook has repeatedly shown that they have the levers to promote quality information. We've seen them effectively do this in their algorithm over low-quality information and they've chosen not to use it in this case. And that's certainly an area that would have an impact.

97.     At the same press conference, Surgeon General Vivek H. Murthy, explicitly stated

that the CDC desired to limit speech related to COVID-19 by requesting technology companies

to take action against those it considers to be spreading misinformation:

[W]e're saying we expect more from our technology companies. We're asking them to operate with greater transparency and accountability. We're asking them to monitor misinformation more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms. The misinformation that we're seeing comes from multiple sources. Yes, there is disinformation that is coming from bad actors. But what is also important to point out is that much of the misinformation that is circulating online is often coming from individuals who don't have bad intentions, but who are unintentionally sharing information that they think might be helpful.

We know that the dramatic increase in the speed — speed and scale of spreading misinformation has, in part, been enabled by these platforms. So that's why in this advisory today, we are asking them to step up. We know they have taken some steps to address misinformation, but much, much more has to be done. And we can't wait longer for them to take aggressive action because it's costing people their lives.

The problem right now is that the voices of these credible health professionals are getting drowned out, and that's one of the reasons

we are asking technology companies to help lift up the voices of credible health authorities. It's also why they have to do more to reduce the misinformation that's out there so that the true voices of experts can shine through.

98.     On July 16, 2021, White House Press Secretary Jennifer Psaki again confirmed that government representatives regularly communicate with social media platforms to promote its goal to limit speech related to COVID-19:

> Q   And just — you went through kind of the topline details of this yesterday, but can you elaborate a little bit on the Facebook . . . the administration to Facebook flagging of disinformation.  And there's also some reporting that we've had that Facebook maybe hasn't been as proactive as the White House would like it to be in response to some of the flagging.  So, the process of how the flagging works, and then whether Facebook has been amenable to those requests.
>
> MS. PSAKI:  Well, I would say first, it shouldn't come as any surprise that we're in regular touch with social media platforms — just like we're in regular touch with all of you and your media outlets — about areas where we have concern, information that might be useful, information that may or may not be interesting to your viewers.
>
> You all make decisions, just like the social media platforms make decisions, even though they're a private-sector company and different, but just as an example. So we are . . . regularly making sure social media platforms are aware of the latest narratives dangerous to public health that we and many other Americans seeing — are seeing across all of social and traditional media.  And we work to engage with them to better understand the enforcement of social media platform policies.
>
> So let me give you an example, just to illustrate it a little bit.  The false narrative that remains active out there about COVID-19 vaccines causing infertility — something we've seen out there, flowing on the internet quite a bit, in other places as well — which has been disproven time and time again.  This is troubling, but a persistent narrative that we and many have seen, and we want to know that the social media platforms are taking steps to address it.  That is inaccurate, false information.
>
> If you are a parent, you would look at that information and then that would naturally raise concerns, but it's inaccurate.  And that is

an example of the kind of information that we are flagging or raising.

So a couple of the steps that we have — you know, that could be constructive for the public health of the country are providing for — for Facebook or other platforms to measure and publicly share the impact of misinformation on their platform and the audience it's reaching, also with the public, with all of you to create robust enforcement strategies that bridge their properties and provide transparency about rules.

You shouldn't be banned from one platform and not others if you — for providing misinformation out there.

Taking faster action against harmful posts.  As you all know, information travels quite quickly.  If it's up there for days and days and days when people see it, you know, there's — it's hard to put that back in a box.

And, of course, promoting quality information algorithms.  I don't know how they work, but they all do know how they work.

So those are some of the steps that we think could be constructive for public health, for public information, for public — and, you know, the right of the public to know.

Q    Just to quickly follow up on the Facebook aspect of this: You said yesterday that 12 people were producing 65 percent of the misinformation on vaccines on social media platforms.  Do you have a sense of who those people are?  Are they bad actors like Russia?

And Facebook responded yesterday after the press briefing.  They say that they removed 18 million pieces of COVID misinformation; they've connected more than 2 billion people to reliable information.  So does the White House find that sufficient?

MS. PSAKI:  Clearly not, because we're talking about additional steps that should be taken.  And frankly, information that media organizations could detr- — could decide whether you're going to report on or not.  I'm not talking just about the misinformation storyline; I'm talking about these individuals.  I'm talking about, you know, how prevalent the spreading of this information is.

MS. PSAKI:  Our biggest concern here — and I, frankly, think it should be your biggest concern — is the number of people who are dying around the country because they're getting misinformation

that is leading them to not take a vaccine —Young people, old people, kids, children — this is all being — a lot of them are being impacted by misinformation.

Q   The big concern though, I think, for a lot of people on Facebook is that now this is Big Brother watching you.

MS. PSAKI:  They're more concerned about that than people dying across the country because of a pandemic where misinformation is traveling on social media platforms?  That feels unlikely to me.  If you have the data to back that up, I'm happy to discuss it.

Q   Okay, and just about things that are on Facebook: I looked this morning, there are videos of Dr. Fauci from 2020, before anybody had a vaccine, and he's out there saying there's no reason to be walking around with a mask.  So, is the administration going to contact Facebook and ask them to take that down?

MS. PSAKI:  Well, first, I think what Dr. Fauci has said himself — who's been quite public out there — is that science evolves, information evolves, and we make that available in a public way to the American people.

Q   Exactly —

99.    While a portion of the comments at the press conference by Ms. Psaki and Dr. Murthy specifically reference Facebook, it is also clear that the comments equally apply more broadly to all social media platforms, including Twitter.

100.    It is the Plaintiff's belief that the White House Press Conference held on July 15, 2021, indicates that Twitter functions as an agent of the Executive Branch in censoring uploads of the Plaintiff, and/or the Putative Class Members, regarding COVID-19.

101.    As admitted by Ms. Psaki at her press conferences on July 15 and July 16, the federal government is in possession of social media information related to twelve (12) individuals that it is claimed spread 65% of the "misinformation" related to COVID-19 and has increased tracking of what it deems to be the spread of COVID-19 misinformation.

102.     As stated by Ms. Psaki, the federal government has proposed that social media platforms promote certain information to promote what the government deems to be quality information or preferred speech.

103.     As stated by Surgeon General Murthy, the CDC has asked the social media platforms "to do more to reduce the misinformation that's out there so that the true voices of experts can shine through."

104.     As stated by Ms. Psaki, it is a goal of the federal government to ensure uniformity in the restriction of speech related to COVID-19 across social media platforms: "You shouldn't be banned from one platform and not others if you — for providing misinformation out there."

105.     Members of Congress also have expressed their desire to restrict speech on the Internet related to the COVID-19 virus, including Senator Amy Klobuchar, who, on February 5, 2021, announced the SAFE TECH Act, which threatens to remove certain legal immunities that social media platforms enjoy under Section 230.

106.     On May 14, 2021, Senator Klobuchar stated that "[g]etting Americans vaccinated is critical to putting this pandemic behind us.  Vaccine disinformation spread online has deadly consequences, which is why I have called on social media platforms to take action against the accounts propagating the majority of these lies[.]"

107.     On March 25, 2021, Representative Mike Doyle called upon Mark Zuckerberg, Jack Dorsey, and Sundar Pichai to immediately remove the twelve (12) individuals dubbed the "Disinformation Dozen" from their platforms during a congressional session on misinformation.

108.     On July 20, 2021, White House Communications Director, Kate Bedingfield, responded to a question from Mika Brzezinski of MSNBC regarding the repeal of the immunity

granted by Section 230 to Facebook, Twitter, and other social media platforms from lawsuits from liability in the following exchanges:

> MS. BRZEZINSKI: As a candidate, the president said he was open to getting rid of Section 230. And I'm just wondering if he's open to amending 230 when Facebook and Twitter and other social media outlets spread false information that cause Americans harm, shouldn't they be held accountable in a real way? . . . Shouldn't they be liable for publishing that information and then open to lawsuits?

> MS. BEDINGFIELD: We're reviewing that and certainly they should be held accountable. And I think you heard the president speak very aggressively about this . . . .

109.    Upon information and belief, representatives of the federal government, including the current administration, CDC, and Members of Congress, have contacted Twitter to implement the government's goals of restricting and censoring the content of speech related to the COVID-19 virus on Twitter's platform.

110.    Another example of coerced censorship by Twitter is illustrated by the labelling of the Plaintiff's tweets before, during, and after the 2020 Presidential election. Plaintiff's Twitter account was censored multiple times, as were the accounts of the Putative Class Members, for the views they expressed or content they shared on Twitter.  For example:



111.    At or about 1:00 a.m., on Wednesday, November 4, 2020, the @TwitterSafety account posted a notice that it had labeled President Trump's tweets as misleading under its civic integrity policy.  "Some or all of the content shared in this tweet is disputed and might be misleading about the election or other civic process, the notice said.  The subject tweet provided:

> They are working hard to make up 500,000 vote advantage in
> Pennsylvania disappear — ASAP. Likewise, Michigan and
> others!
>
> — Donald J. Trump (@realDonaldTrump) <u>November
> 4, 2020</u>

112.   It is the Plaintiff's belief that the White House Press Conference held on July 15,

2021, indicates that Twitter functions as an agent of the Executive Branch in censoring the

tweets of the Plaintiff, or Putative Class Members, regarding COVID-19 and the 2016

presidential election results. Defendants' ban on Plaintiff and Putative Class Members continues

to this day. The ban has directly impacted Plaintiff's ability to communicate with family and

friends and to exercise his right to political speech, including (1) daily communications

necessitated by his unquestioned position as head of the Republican Party; (2) campaigning for

Republican 2022 candidates; (3) fundraising for the Republican Party; (4) laying a foundation for

a potential 2024 Presidential campaign; and (5) expressing views related to COVID-19.

## VI. PRESIDENT TRUMP AND THE PUTATIVE CLASS MEMBERS DE-PLATFORMED

### A. <u>Plaintiff President Trump</u>

113.   On January 7, 2021, Twitter, at the direction of Defendant Dorsey, permanently

banned Plaintiff from his Twitter account, blocking his ability to communicate with his

approximately 89 million followers and the ability of Plaintiff's approximately 89 million

followers to hear, reply to, or retweet the content and speech Plaintiff had expressed.

114.   On January 8, 2021, Twitter issued a public statement from its **@TwitterSafety**

account explaining the motive for removing **@realDonaldTrump.** It states:

> After a close review of recent Tweets from the **@realDonaldTrump** account and the context around them we have permanently suspended the account due to the risk of further incitement of violence.

115.    Expressing his obvious discomfort with his decision to ban Trump from the

Twitter platform Defendant Dorsey issued a public statement from his Twitter account on

January 13, 2021. It states:

> I do not celebrate or feel pride in our having to ban @**realDonaldTrump** from Twitter, or how we got there. After a clear warning we'd take this action, we made a decision with the best information we had based on threats to physical safety both on and off Twitter. Was this correct?

116.    As for Plaintiff returning to Twitter one day, the company's CFO, Ned Segal,

made it clear Wednesday that is not an option. Segal told CNBC's "Squawk Box" on

Wednesday, February 10, 2021, that Trump would never be allowed to return to the site, even if

he decides to run for office again.

117.    While Twitter's censoring of Plaintiff was the most widely publicized action taken

by Twitter, countless other Putative Class Members have had their views or content similarly

censored by Twitter for arbitrary reasons or no reason at all.

B.  **Plaintiff Linda Cuadros**

118.    Putative Class Member Linda Cuadros ("Ms. Cuadros") is a United States citizen

residing in Florida.

119.    Ms. Cuadros has had a personal Twitter account (@wakeupwithlinda) since 2018.

Before her account was suspended, she had approximately 10,000 followers.

120.    Ms. Cuadros used her Twitter account to read news, espouse her views about large

pharmaceutical companies and conservative ideals, and connect with her community.

121.    In 2019, Ms. Cuadros began noticing the Defendants were censoring her account.

122.   In 2019, Ms. Cuadro's account was suspended for 12 hours due to a post that said "shut up and twerk" to Cardi-B (@iamcardib).

123.   Ms. Cuadros has also experienced doxing by other Twitter account Users. Ms. Cuadros had reported the incidences multiple times to Defendants, and nothing was done to stop the sharing of her personal information.

124.   In 2020, Ms. Cuadros's account was permanently banned due to a post about vaccines.

### C. **American Conservative Union**

125.   Putative Class Member American Conservative Union ("ACU") is a social welfare organization organized under Section 501(c)(4) of the Internal Revenue Code and was established in 1964 in the District of Columbia.

126.   Collectively, ACU and related organizations opened Twitter accounts as early as 2009, and together, they post content regularly. Across all ACU-related accounts, the enterprise has 182,300 Twitter followers. Those Twitter accounts include @ACUConservative (41,000 followers, established in July 2009), @ACUFoundation (1200 followers, joined in May 2017), @ACUFforJustice (2700 followers, joined in January 2017), and @CPAC (137,400 followers, joined in March 2010).

127.   The ACU is the oldest conservative grassroots organization in the United States. Founded nearly six decades ago by William F. Buckley, Jr., ACU is comprised of its advocacy arm, the American Conservative Union, its educational arm, the ACU Foundation, and its criminal justice reform operation, AÇU Foundation Nolan Center for Justice.  In addition, the ACU and the ACU Foundation jointly operate the Conservative Political Action Conference ("CPAC"), which is an annual gathering of conservative opinion leaders, activists and elected

officials that in recent years has drawn between 13,000-18,000 physical attendees. During the CPAC conference, the ACU and the ACU Foundation generate in excess of one (1) billion impressions across their social media platforms. Finally, ACU operates CPAC-Now, an online broadcast that takes place three times a week and generates in excess of 200,000 viewers and over one (1) million impressions each week.

128. In 2017, the ACU started noticing a reduction in engagement in its content. This manifested itself during periods of well-below expected numbers of views, reduction in the number of retweets, and a marked decrease in followers.

129. In June of 2020, @CPAC twitter stood at ninety-nine (99) thousand. By January 19, 2021, that number was reduced to eighty-eight (88) thousand. There was no indication from Twitter as to why ACU's followers were purged.

**D.  Rafael Barboza**

130. Putative Class Member Rafael Barboza ("Mr. Barboza") is a United States citizen residing in Miami-Dade County, Florida.

131. Mr. Barboza has had a personal Twitter account (@RB18) since 2008. He began actively engaging on the platform just prior to the 2016 Presidential Election.

132. Before Mr. Barboza's account was suspended by Defendants indefinitely on January 8, 2021, he had approximately 3,500 followers.

133. Mr. Barboza opened his account to interact with friends and family. Mr. Barboza followed friends and family members, sports, athletes, and companies. He also used Twitter to read trending news and keep up with current events.

134.    As the 2020 Presidential Election began, Mr. Barboza began to follow lawyers and political figures fighting for election integrity. Mr. Barboza responded to Tweets and retweeted posts of accounts he was following.

135.    On January 8, 2021, Mr. Barboza was notified by the Defendant, that his account was locked as a result of violating the Defendants' community standards. These standards were stated as "hurtful content, abuse, and harassment."

136.    After receiving two suspensions from the Defendants, Mr. Barboza appealed the account lock. His efforts were unsuccessful.

137.    On January 8, 2021, Mr. Barboza's account was indefinitely suspended from the Defendants' platform. Mr. Barboza was removed after retweeting President Trump and other conservatives on January 6, 2021.

**E.  Dominick Latella**

138.    Putative Class Member Dominick Latella ("Mr. Latella") is a United States citizen residing in Dania Beach, Florida, and Miami, Florida.

139.    Mr. Latella established his Twitter account, @dljrmia, in 2012. At the time of removal from the platform, Mr. Latella's account had approximately 4,000 followers.

140.    Between 2012 and 2018, Mr. Latella built a following of 4,000 followers on the Defendant's platform.

141.    Mr. Latella used this account to post election and politically related content. Mr. Latella engaged with other Users of the Defendant's platform through debates and comments on his own and other pages.

142.    Mr. Latella's account was shadow banned and was first suspended during the 2018 Midterm Election. This suspension was due to posting positive messages about Republican

candidates and President Trump. Mr. Latella did not receive a warning prior to the initial suspension of his account.

143.   Mr. Latella's account was permanently removed from the Defendants' platform during the 2018 election cycle.

144.   Due to the Defendants' censorship, Mr. Latella established a new page on the Defendants' platform. The handle for this page is @dljr2018. Mr. Latella created this account in 2018, ten (10) days after his first account was banned from the platform.

145.   From November 2018 to January 2021, Mr. Latella gained over 9,000 new followers. The Defendants removed 4,000 of those followers in January of 2021.

146.   At this time, Mr. Latella's second account is still active on the platform but has been shadow banned for content that Mr. Latella has shared.

**F. <u>Wayne Allyn Root</u>**

147.   Putative Class Member Wayne Allyn Root ("Mr. Root") is a United States citizen residing in Las Vegas, Nevada.

148.   In May of 2009, Mr. Root opened a Twitter account (@RealWayneRoot) to amplify his radio show, sell merchandise, and promote books he had authored.

149.   Mr. Root used his Twitter account as part of a promotion and marketing model that he had been using for over fifteen (15) years.

150.   On February 6, 2021, the Defendants banned Mr. Root from their platform, causing significant damage to Mr. Root and his brand.

151.   Before the Defendants banned Mr. Root, his Twitter account had 150,300 followers.

152.    Mr. Root recalls multiple occasions where the Defendants censored his account for messages he posted related to COVID-19 and the 2020 election results.

153.    From January 8, 2021, to February 6, 2021. Mr. Root noticed the Defendants had removed a significant number of followers from his account. To Mr. Root's recollection, the Defendants removed over 20,000 followers from his account.

154.    To Mr. Root's knowledge, the Defendants did not start censoring his account until after the 2016 Presidential election. From that point forward, they shadow banned his account and often removed followers.

155.    Mr. Root built a business and livelihood off the tools that the Defendants provided on their platform. Mr. Root put thousands of hours of work into building and branding his Twitter account based on the belief that it was his page and that he was free to express his opinions. Mr. Root never imagined he could be banned permanently by Twitter for voicing his opinions. Defendants' ban of Mr. ban Root caused significant damages to his personal and professional life.

**G. Dr. Naomi Wolf**

156.    Putative Class Member Dr. Naomi Wolf ("Dr. Wolf") is a United States citizen residing in Millerton, New York.

157.    In 2011, Dr. Wolf opened a Twitter account (@naomirwolf) to share civic engagement information and primary sources related to current events. She currently has over 146,000 followers.

158.    On June 4, 2021, Dr. Wolf shared a video discussing gain of function research and funding by the National Institute of Health. It generated 74,000 views in 24 hours.

159.    When she tried a day later to add a video which was a reading of a press release from State Sen. Kim Thatcher about SB 872, her account was suspended. The Defendants suspended Dr. Wolf's account for one (1) month, preventing her from adding new content.

160.    When the Defendants notified Dr. Wolf about her account suspension, she appealed the suspension three (3) times with no response from the Defendants.

161.    Upon information and belief, during this time, a "spokesperson" of the Defendants shared tweets from Dr. Wolf's account with news outlets including The Guardian, The New Republic, The BBC, and Yahoo News without Dr. Wolf's knowledge.

162.    The tweets that were evidently shared with the news outlet were tweets that had been deleted by the Defendants, with the spokesperson claiming she had been suspended for "vaccine misinformation."

163.    Dr. Wolf has had countless personal and professional relationships damaged due to "what she said on Twitter," based on the erroneous claims made by the news outlets who used information apparently shared by the Defendants' spokesperson.

164.    In addition to sharing information with news outlets without Dr. Wolf's consent, the Defendants' spokesperson questioned the professional credibility which Dr. Wolf established over thirty-five (35) years.

165.    News outlets who regularly ran Dr. Wolf's work prior to the suspension of her Twitter account are now hesitant to cite Dr. Wolf's work and opinions in publications and to invite her to participate in media opportunities.

166.    Dr. Wolf has authored multiple bestselling nonfiction books but has been advised that as a result of the negative news reports originating from the Defendants "spokesperson," that her upcoming book could not go to auction.

167.   As a result of Defendants' actions, Dr. Wolf has lost over half of her business model, investors in her business, and other sources of income.

## COUNT ONE

## VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

168.   The Plaintiff and the Putative Class Members restate the allegations set forth in Paragraphs 1 through 167.

169.   Pursuant to Section 230 of the Communications Act, 47 U.S.C. § 230, Defendants are encouraged and immunized by Congress to censor constitutionally protected speech on the Internet, including by and among its one hundred and ninety-two (192) million Users that are citizens of the United States.

170.   As such, censorship by Defendants of constitutionally protected free speech on its platform is unconstitutional on its face.

171.   Using its authority under Section 230(c) together and in concert with federal government actors, including the current administration, the Department of Health and Human Services, the CDC, and Congress, the Defendants regulate the content of speech over a vast swath of the Internet.

172.   Defendants are vulnerable to and react to coercive pressure from the federal government to regulate specific speech.

173.   In censoring the specific speech at issue in this lawsuit and in de-platforming the Plaintiff, Defendants were acting in concert with federal officials, including officials at the CDC, Members of Congress, and the current administration.

174.   As such, Defendants' censorship activities conducted in concert with improper government action amounts to state action by Defendants.

175.    Defendants' censoring the Plaintiff's Twitter account, as well as those accounts of Putative Class Members, violates the First Amendment to the United States Constitution because it eliminates the Plaintiff's and Class Members' participation in a public forum and the right to communicate to others their content and point of view.

176.    Defendants' censorship is being done under the authority, oversight, and coercion of the federal government and its officials in cooperation with Twitter and other social media companies and their agents.

177.    Congress authorized Internet platforms under Section 230(c)(2) to censor and impose a prior restraint without resulting in civil liability on speech that Congress was constitutionally forbidden to censor or restrain, yet congressional committees and congressional leaders took specific steps using Twitter to coerce enforcement of censorship and prior restraint against political opponents in violation of the First Amendment.

178.    These acts by legislators to encourage Twitter to censor or restrain the Plaintiff and the Putative Class Members were malicious, intentional, intended to harm, involved personal misstatements of fact, and made for personal, political, and corporate profit and advantage.

179.    The authority Congress gave to Internet platforms under Section 230(c) was unconstitutional, and Defendants exercised that authority in intentional and reckless disregard to the Plaintiff and the Putative Class Members First Amendment constitutional right to free speech.

180.    Defendants' censoring of the Plaintiff and Putative Class Members from their Twitter accounts violates the First Amendment as applied in this matter because it imposes viewpoint and content-based restrictions on the Plaintiffs' and Putative Class Members' access to information, views, and content otherwise available to the general public.

181.   Defendants' censoring of the Plaintiff and Putative Class Members violates the First Amendment as applied in this matter because it imposes a prior restraint on free speech and has a chilling effect on social media Users and non-Users alike.

182.   Defendants' blocking of the Plaintiff and Putative Class Members from their Twitter accounts violates the First Amendment as applied in this matter because it imposes a viewpoint and content-based restriction on the ability of the Plaintiff and the Putative Class Members to petition the government for a redress of grievances.

183.   Defendants' censorship of the Plaintiff and the Putative Class Members from their Twitter accounts violates the First Amendment as applied in this matter because it imposes a viewpoint and content-based restriction on their ability to speak and the public's right to hear and respond.

184.   Defendants' blocking the Plaintiff and the Putative Class Members from their Twitter accounts violates their First Amendment rights to free speech as applied in this matter.

185.   Defendants' censoring of the Plaintiff by banning him from his Twitter account while exercising his free speech as President of the United States was an egregious violation of the First Amendment as applied in this matter. Defendants' continued ban of the Plaintiff as a private citizen is likewise an egregious violation of the First Amendment as applied in this matter.

186.   Defendant Dorsey is sued in his personal capacity and is liable in damages because, upon information and belief, he was personally responsible for Twitter's unconstitutional de-platforming of the Plaintiff and the Putative Class Members, including Twitter's de-platforming of the Plaintiff and other Putative Class Members, which violated the First Amendment, as applied in this matter.

187.   Defendant Dorsey is also sued in his official capacity, along with Twitter, for injunctive relief to and for the unconstitutional censorship of the Plaintiff and the Putative Class Members, including Twitter's de-platforming of the Plaintiff and other Putative Class Members.

## COUNT TWO

## DECLARATORY JUDGEMENT OF UNCONSTITUTIONALITY OF SECTION 230 AND THE COMMUNICATIONS DECENCY ACT

188.   The Plaintiff and the Putative Class Members restate the allegations set forth in 1 through 187.

189.   In censoring (flagging, banning, etc.) the Plaintiff and the Putative Class Members, Defendants relied upon and acted pursuant to Section 230(c) of the Communications Decency Act.

190.   Upon information and belief, Defendants would not have de-platformed the Plaintiff or similarly situated Putative Class Members but for the immunity purportedly offered by Section 230(c).

191.   Section 230(c)(2) purports to immunize social media companies from liability for action taken by them to block, restrict, or refuse to carry "objectionable" speech even if that speech is "constitutionally protected."  47 U.S.C. § 230(c)(2).

192.   In addition, Section 230(c)(1) also has been interpreted as furnishing an immunity to social media companies for action taken by them to block, restrict, or refuse to carry constitutionally protected speech.

193.   Section 230(c)(1) and 230(c)(2) were deliberately enacted by Congress to induce, encourage, and promote social media companies to accomplish an objective — the censorship of supposedly "objectionable" but constitutionally protected speech on the Internet — that Congress could not constitutionally accomplish itself.

194.   Congress cannot lawfully induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish.

195.   Section 230(c)(2) is therefore unconstitutional on its face, and Section 230(c)(1) is likewise unconstitutional insofar as it has been interpreted to immunize social media companies for action they take to censor constitutionally protected speech.

196.   Section 230(c)(2) on its face, as well as Section 230(c)(1) when interpreted as described above, are also subject to heightened First Amendment scrutiny as content and viewpoint-based regulations authorizing and encouraging large social media companies to censor constitutionally protected speech on the basis of its supposedly objectionable content and viewpoint.

197.   Such heightened scrutiny cannot be satisfied here because: (a) Section 230(c) is not narrowly tailored, but rather a blank check issued to private companies holding unprecedented power over the content of public discourse to censor constitutionally protected speech with impunity, resulting in a grave threat to the freedom of expression and to democracy itself; (b) the word "objectionable" in Section 230(c) is so ill-defined, vague and capacious that it results in systematic viewpoint-based censorship of political speech, rather than merely the protection of children from obscene or sexually explicit speech as was its original intent; (c) Section 230(c) purports to immunize social media companies for censoring speech on the basis of viewpoint, not merely content; (d) Section 230(c) has turned a handful of private companies into agents of the federal government to regulate what information and viewpoints can and cannot be uttered or heard by hundreds of millions of Americans; and (e) the legitimate interests behind Section 230(c) could have been served through far less speech-restrictive measures.

198.    Accordingly, the Plaintiff, on behalf of himself and the Putative Class Members, seeks a declaration that Section 230(c)(1) and (c)(2) are unconstitutional on their face insofar as they purport to immunize from the liability social media companies and other Internet platforms for actions they take to censor constitutionally protected speech.

199.    Accordingly, the Plaintiff on behalf of himself and Putative Class Members also seeks a declaration that Section 230(c)(1) and Section 230(c)(2) are unconstitutional as applied to this matter insofar as they purport to immunize Defendants from liability for the actions taken against the Plaintiff and the Putative Class Members to censor their constitutionally protected speech.

**COUNT THREE**

**FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT,
FLORIDA STATUTES § 501.201 *et seq.*
(INJUNCTIVE RELIEF, FLORIDA STATUTES § 501.211(1))**

200.    The Plaintiff and the Putative Class Members restate the allegations in paragraphs 1 through 199 above.

201.    Defendants are engaged in trade or commerce, as defined by Florida Statutes § 501.203(8), within the State of Florida.

202.    The Plaintiff and the Putative Class Members have been aggrieved as a result of Defendants' deceptive and misleading practices.

203.    Defendants have repeatedly failed to act in good faith and in accordance with their stated policies regarding the removal, demonetization, and moderation of content on their platform.

204.    While Defendants' policies ostensibly proclaim objective, uniform standards by which content may be censored (suspended, flagged, banned, shadow banned, etc.) and content

providers suspended or banned from the platform, in practice, the Defendants have engaged in a subjective pattern of discriminating against disfavored parties, such as the Plaintiff and the Putative Class Members.

205.   Defendants' actions are motivated by a desire to please government actors who have the capacity to remove or alter the protections currently offered by Section 230 of the Communications Decency Act, 47 U.S.C. § 230.

206.   Defendants' actions demonstrate that their ostensibly objective standards omit that content may be removed by Defendants because government actors desire its removal.

207.   These deceptive practices are likely to deceive consumers acting in a reasonable manner.

208.   As detailed above, a reasonable consumer, acting under the mistaken belief that the Defendants are equally and fairly applying their content standards, would be left to presume that the Plaintiff and the Putative Class Members improperly discussed the origins of the COVID-19 virus.

209.   Rather, the statements of the Plaintiff and Putative Class Members regarding the origin of the COVID-19 virus were wrongfully suppressed by the Defendants as these statements offered a viewpoint that was contrary to the position held by other actors responding to the virus wanted to be removed.

210.   This example clearly demonstrates that reasonable consumers who rely on the Defendants' good faith application of their own standards to information about the COVID-19 virus would likely be deceived,and to their detriment.

211.   Consumers relying on Defendants' good faith application of their standards would have the false impression that viewpoints suggesting that COVID-19—either natural or man-

made—originated from a laboratory were false, rather than simply running afoul of the

Defendants' preferred viewpoints and desire to please legislators with outsized influence over the

Defendants' business.

212.    Defendants engaged in an inconsistent application of their standards in banning the

Plaintiff and the Putative Class Members. For example:

213.    Twitter has not removed or censored violent and dangerous tweets from Iranian

ayatollahs calling for armed resistance in Israel, nor has Twitter banned their accounts.

Additionally, when Iranian Supreme Leader Ayatollah Ali Khamenei has called for the

destruction of Israel, his tweets have remained active. He uses the hashtag #handsoffalaqsa, in

reference to the tensions on the Temple Mount as a call to arms:







When Representative Steve Scalise was shot, activist and media personality Tariq

Nasheed indicated support for the shooting on Twitter:



So Rep. Steve Scalise, who once spoke at a white supremacist event sponsored by David Duke (google it) was SHOT today in Alexandria.

8:14 AM · Jun 14, 2017 · Twitter for iPad

**418** Retweets   **281** Quote Tweets   **611** Likes



214.   Mr. Nasheed was not alone. Many tweets were posted that supported or justified the violent act. These tweets were left uncensored and remain active and available for public viewing currently, and the Twitter accounts of those who posted them remain active as well.  For example:



And:



215.   Venezuelan dictator Nicolas Maduro, who, according to a report commissioned by the United Nations Human Rights Council, has committed extensive and systematic human rights abuses, is a frequent Twitter user.  His account is active and available for public viewing currently:



216.   Louis Farrakhan, the leader of the Nation of Islam ("NOI"), has been a notable extremist figure, railing against Jewish people, white people, and LGBT people.  For example, Mr. Farrakhan has alleged that the Jewish people were responsible for the Atlantic slave trade and that they conspire to control the government, the media, and Hollywood, as well as various black individuals and organizations. He frequently denies the legitimacy of Judaism—or Jewish claim to the land of Israel—arguing that Judaism is nothing more than a "deceptive lie" and a "theological error" promoted by Jewish people to further their "control" over the government and economy. His Twitter account, which is used to recruit members and relay his mission, remains active currently:



217.   Consumers relying upon Defendants to honor their content moderation standards and provide a full range of viewpoints are acting to the consumers' detriment given that the Defendants have their "finger on the scale" and filter out inconvenient content.

218.   Consumers are not the only parties affected by Defendants' policies, as advertisers and content providers are also acting in reliance on the Defendants' stated policies.

219.   The Plaintiff and the Putative Class Members are aggrieved by the Defendants' failure to act in good faith and apply their stated policies to the Plaintiffs' content.

220.   Accordingly, the Plaintiff and the Putative Class Members respectfully request that the Court enter judgment in their favor and grant injunctive relief, allowing the Plaintiff and the Putative Class Members to return to the platform, compelling Defendants to honor Twitter's own policies, and impose a monitor to ensure Defendants' compliance with this Court's order consistently to apply Defendants' own standards, only apply Defendants' published standards

when evaluating content on the platform, for such other equitable relief as the Court deems appropriate, and for costs and reasonable attorneys' fees.

## **COUNT FOUR**

### **FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT,**
**FLORIDA STATUTES § 501.201 _et seq._**
**(INCONSISTENT APPLICATION OF STANDARDS,**
**FLORIDA STATUTES § 501.2041)**

221.   The Plaintiff and the Putative Class Members restate the allegations in paragraphs 1 through 220 above.

222.   Defendants own and operate a social media platform, as defined in Florida Statutes § 501.2041(1)(g).

223.   Defendants' platform does business within the State of Florida, has annual gross revenues in excess of $3.7 billion, and has over seventy (70) active monthly Users in the United States.

224.   As detailed above, Defendants have acted in ways contrary to their published standards regarding censorship (suspended, flagged, banned, shadow banned, etc.).

225.   These actions have resulted in inconsistent application of these standards, wherein content posted by the Plaintiff and the Putative Class Members have been removed from the platform, while other content, which by any reasonable standard must be viewed as more clearly in violation of the Defendants' standards is allowed to remain on the platform.

226.   Defendants have engaged in this activity since July 1, 2021, the date Florida Statutes § 201.2041 came into effect.

227.   Florida Statutes § 201.2041(2)(a) requires Social Media Platforms to publish their standards for moderating content on their platforms.

228.   Florida Statutes § 201.2041(2)(b) requires Social Media Platforms to apply the standards required in Section 201.2041(2)(a) in a consistent manner.

229.   Defendants have, since July 1, 2021, failed to apply their standards in a consistent manner.

230.   Specifically, see paragraphs 213-216 above.

231.   The Plaintiff and the Putative Class Members have accounts with the Defendants' platform, and therefore qualify as Users as that term is defined in Florida Statutes § 501.2041(1)(b).

232.   Florida Statutes § 201.2041(6)(a) allows for Users to bring a private cause of action against Social Media Platforms that fail consistently to apply their standards for content moderation.

233.   Accordingly, the Plaintiff and the Putative Class Members respectfully request that the Court enter judgment in their favor and grant an Order for statutory damages of $100,000.00, actual damages to be established at trial, punitive damages as the acts in violation of this statute were perpetrated in knowing and willful violation of the Defendants' obligation to honor their own standards, injunctive relief allowing the Plaintiff and the Putative Class Members to resume posting content to the Defendants' platform, compelling Defendants to honor their own policies, impose a monitor to ensure Defendants' compliance with this Court's order consistently to apply Defendants' own standards, only apply Defendants' published standards when evaluating content on the platform, such other relief as the Court deems appropriate, and for costs and reasonable attorneys' fees.

## CLASS ACTION ALLEGATIONS

234.    The Plaintiff and the Putative class Members bring this lawsuit pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure on behalf of the following proposed class (the "Class"):

*All Twitter platform Members who reside in the United States, and between June 1, 2018, and today, had their access to their social media accounts wrongly restricted or curtailed by these Defendants and who were damaged thereby.*

235.    Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.

236.    Specifically excluded from the Class are Defendants, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or any entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

237.    ***Numerosity***. The Members of the Class are so numerous that individual joinder is impracticable. Upon information and belief, the Plaintiff and the Putative Class Members allege that the Class contains hundreds of thousands of Members. Although the precise number of class members is unknown, the true number is known by Defendants, and thus, may be notified of the pendency of this action by first class mail, electronic mail, social media, and/or published notice.

238.   ***Existence and predominance of common questions of law and fact***. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members of the Class. These common legal and factual questions include, but are not limited to, the following:

(a) whether  the Defendants' conduct violated the First Amendment of the Constitution of the United States.

(b) whether Section 230 is an unconstitutional delegation of power Congress cannot exercise.

(c) whether the Defendants conduct violates any other state or federal statutes.

239.   ***Typicality***.  The Plaintiff and the Putative class Members'  claims are typical of the claims of the other members of the Class in that Defendants arbitrarily prevented the Plaintiff Putative Class Members and those similarly situated from using their social media accounts or curtailed or limited the Plaintiff , the Putative  Class Members and the Class's use of their accounts to inhibit or prevent the Plaintiff, Putative class Members, and the Class from engaging in speech that Defendants disliked or contrary to Defendants' opinions or beliefs, in violation of the First Amendment to the United States Constitution.

240.   ***Adequacy of representation***. The Plaintiff and the Putative Class Members will fairly and adequately protect the interests of the Class. The Plaintiff and the Class have retained counsel highly experienced in complex consumer class action litigation, and the Plaintiff and the Putative class Members intend to vigorously prosecute this action. Further, the Plaintiff, Putative Class Members, and the Class have had no interests that are antagonistic to those of the Class.

241.   ***Superiority***. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by

individual Class Members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for the Class, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if Class Members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court and presents no unusual management difficulties under the circumstances here.

242.    The Class may also be certified because:

(a)    the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudication with respect to individual Class embers that would establish incompatible standards of conduct for the Defendants;

(b)    the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)    Defendants have acted or refused to act on grounds generally applicable to t heClass as a whole, thereby making appropriate final declaratory and/or injunctiv e relief with respect to the members of the Class as a whole.

## **DEMAND FOR JURY TRIAL**

243.    Plaintiff and the Class demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Donald J. Trump and the Class respectfully requests that the Court enter an Order certifying this case as a class action, appointing Plaintiff as Class Representative and appointing Plaintiff's counsel as Lead Class Counsel and that the Court Order, adjudge, and decree in favor of Plaintiff and the Class against the Defendants for:

A. An award of Compensatory and Punitive damages to the Plaintiff and the Class in an amount to be determined at trial;

B. An injunction and declaratory judgment ordering Twitter to immediately reinstate the Twitter accounts of Plaintiff and Putative Class Members;

C. An injunction and declaratory judgment ordering Twitter to remove its warning labels and misclassification of all content of the Plaintiff and the Class and to desist from any further warnings or classifications;

D. Adjudgment declaring Sections 230(c)(1) and (c)(2) of the Communications Decency Act of 1996 unconstitutional;

E. An injunction imposing a monitor to ensure Defendants' compliance with this Court's Order consistently to apply Defendants' own standards, and only apply Defendants' published standards when evaluating content on its platform,

F. Damages and punitive damages pursuant to Florida Statutes § 501.2041.

G. An award of attorneys' fees and costs to Plaintiff and the Class in an amount to be determined at trial;

H. An award of punitive damages to Plaintiff and the Class in an amount to be determined at trial; and

I. An award of such other and further relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Matthew Lee Baldwin
Matthew L. Baldwin, Esq.
Florida Bar No. 27463

VARGAS GONZALEZ
BALDWIN DELOMBARD, LLP
815 Ponce De Leon Blvd.,
Third Floor
Coral Gables, FL  33134
Telephone: (305) 631-2528
Email: Matthew@VargasGonzalez.com
E-service: Service8@VargasGonzalez.com

/s/ Carlos Trujillo
Carlos Trujillo, Esq.
Florida Bar No. 42697
*Of Counsel*
Email: CTrujillo@VargasGonzalez.com
E-service: Service8@VargasGonzalez.com

JOHN P. COALE
(*Pro Hac Vice*)
2901 Fessenden St. NW
Washington, D.C. 20008
johnpcoale@aol.com
Telephone: (202) 255-2096

FRANK C. DUDENHEFER, JR.
THE DUDEHEFER LAW FIRM L.L.C
(*Pro Hac Vice*)
fcdlaw@aol.com
2721 St. Charles Ave, Suite 2A
New Orleans, LA 70130
Telephone: (504) 616-5226

RICHARD P. LAWSON, ESQ.
Florida Bar No. 165085

LUIS MARTINEZ-MONFORT, ESQ.
Florida Bar No. 0132713

Gardner Brewer Martinez-Monfort P.A.
400 North Ashley Drive, Ste. 1100
Tampa, FL  33602
(813) 221-9600 Telephone
(813) 221-9611 Fax
E-mail:
rlawson@gbmmlaw.com
lmmonfort@gbmmlaw.com
litigation@gbmmlaw.com

JOHN Q. KELLY
(*Pro Hac Vice)vin*
jqkelly@ibolaw.com

MICHAEL J. JONES
(*Pro Hac Vice Forthcoming*)
mjones@ibolaw.com

RYAN S. TOUGIAS
(*Pro Hac Vice Forthcoming*)
rtougiceas@ibolaw.com

IVEY, BARNUM & O'MARA
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Facsimile: (203) 661-9462