**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

Civil Action No. 1:21-cv-22441-RNS

DONALD J. TRUMP, the Forty-Fifth President
of the United States, LINDA CUADROS,
AMERICAN CONSERVATIVE UNION,
RAFAEL BARBOZA, DOMINICK LATELLA,
WAYNE ALLEN ROOT AND NAOMI WOLF,
INDIVIDUALLY AND ON BEHALF OF
THOSE SIMILARLY SITUATED,

        Plaintiffs,

        v.

TWITTER, INC. and JACK DORSEY,

        Defendants.

**MOTION FOR PRELIMINARY INJUNCTION WITH MEMORANDUM OF LAW
<u>IN SUPPORT OF PLAINTIFF'S MOTION INCORPORATED HEREIN</u>**

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i
TABLE OF AUTHORITIES ........................................................................................... iii
INTRODUCTION .............................................................................................................. 1
FACTUAL STATEMENT ................................................................................................. 2

   A.   The Donald J. Trump Twitter Account ..................................................................... 2

   B.   Defendant's Censorship And Prior Restraint Of Plaintiff ........................................ 2

ARGUMENT ...................................................................................................................... 3

   LEGAL STANDARD APPLICABLE TO MOTIONS FOR A PRELIMINARY
   INJUNCTION................................................................................................................ 3

   POINT I - Plaintiff is Likely to Succeed on the Merits of His First Amendment Claim .......... 3

   A.   Legal Standards Applicable To A State Action Finding ......................................... 4

   B.   Federal Actors Repeatedly And Coercively Pressured Defendant To Censor And De-
      Platform Plaintiff ...................................................................................................... 6

   C.   Defendant's Censorship Of Plaintiff Resulted From Significant Encouragement By The
      Federal Government................................................................................................... 9

   D.   Defendant Has Willfully Participated In Joint Activity With Federal Governmental
      Actors To Censor Plaintiff's Constitutionally Protected Speech.................................... 11

   E.   Defendant's Acts Violated The First Amendment.............................................................. 13

   POINT II - SECTION 230, AS APPLIED TO THESE FACTS, VIOLATES THE FIRST
   AMENDMENT.............................................................................................................. 15

   A.   Neither Section 230(c)(1) Nor Section 230(c)(2) Protects Defendant From Its
      Discriminatory Treatment Of Plaintiff In Violation Of The First Amendment............ 15

      1.   Section 230 (c)(1) Does Not Protect Defendant From Liability For Its Unlawful
         Deprivation Of    First Amendment Rights And Unfair Trade Practices .................. 16

      2.   Section 230 (c)(2) Does Not Protect Twitter From Liability For Its Unlawful
         Deprivation Of Plaintiff's First Amendment Rights And Unfair Trade Practices ..... 17

   B.   Section 230 Offers No Protection For Defendant's Own Unlawful Speech.................. 18

   C.   Section 230 Is Unconstitutional As Applied ................................................................. 18

   POINT III - PLAINTIFF IS LIKELY TO SUCCEED ON HIS FLORIDA DECEPTIVE AND
   UNFAIR TRADE PRACTICES ACT CLAIM .......................................................... 19

   A.   Florida Deceptive And Unfair Trade Practices Act Standards ......................................... 19

   B.   Defendant Has Inconsistently Applied Its Standards.......................................................... 20

      1.   Election Integrity ................................................................................................ 20

      2.   COVID-19 ......................................................................................................... 21

i

3.    Violence ........................................................................................................ 22

C.   Twitter's Inconsistent Application Of Its Standards Demonstrates Plaintiff's Entitlement
To Preliminary Injunctive Relief ...................................................................... 23

POINT IV - PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HIS SSMCA
CLAIM ..................................................................................................................... 23

POINT V - PLAINTIFF WILL SUFFER IRREPARABLE HARM IF AN INJUNCTION IS
NOT GRANTED ....................................................................................................... 25

POINT VI - THE BALANCE OF HARDSHIPS FAVORS PLAINTIFF .............................. 27

POINT VII - AN INJUNCTION WOULD NOT BE ADVERSE TO THE PUBLIC
INTEREST ................................................................................................................. 27

CONCLUSION .......................................................................................................... 28
REQUEST FOR RELIEF ........................................................................................... 28

## **TABLE OF AUTHORITIES**

**Cases**

*Ahearn v. Mayo Clinic*, 180 So. 3d 165 (Fla. 1st DCA 2015) ..................................................... 20

*Airbnb, Inc. v. City of Boston*, 386 F. Supp. 3d 113 (2019)......................................................... 18

*Alvi Armani Med., Inc. v. Hennessey*, 629 F. Supp. 2d 1302 (S.D. Fla. 2008)............................ 17

*American Family Association, Inc. v. City & County of San Francisco*,
   277 F.3d 1114 (9th Cir. 2002) ................................................................................................. 6

*Associated Press v. United States*, 326 U.S. 1 (1945) ................................................................. 28

*Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015)...................................................... 6, 7

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)..................................................................... 6

*Barrios-Velazquez v. Associcion De Empleados Del Estado Libre Asociado*,
   84 F.3d 487 (1st Cir. 1999) ..................................................................................................... 5

*Bass v. Parkwood Hosp.*, 180 F.3d 234 (5th Cir. 1999) ............................................................... 5

*Bendiburg v. Dempsey*, 909 F.2d 463 (11th Cir. 1990) .............................................................. 12

*Boos v. Barry*, 485 U.S. 312 (1988)........................................................................................... 14

*Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961)........................................................... 4

*Carlin Communications, Inc. v. Mountain States Tel. & Tel. Co.*,
   827 F.2d 1291 (9th Cir. 1987) ................................................................................................. 6

*Corley v. United States*, 556 U.S. 303 (2009)............................................................................. 16

*Dobyns v. E-Systems, Inc.*, 667 F.2d 1219 (5th Cir. 1982)............................................................ 4

*Domen v. Vimeo*, 991 F.3d 66 (2d. Cir. March 11, 2021) ........................................................... 25

*Domen v. Vimeo, Inc.*, 2021 WL 3072778 (2d Cir. July 21, 2021) ............................................. 25

*Elrod v. Burns*, 427 U.S. 347 (1976) ......................................................................................... 26

*Evans v. Valero Energy Corp.*,
   No. CV F 07-0130, 2007 U.S. Dist. Lexis 21402 (E.D. Cal. Mar. 6, 2007).............................. 5

*e-ventures Worldwide, LLC v. Google, Inc.*,
   No. 2:14–cv–646–FTM–PAM–CM, 2017 WL 2210029 (MD Fla., Feb. 8, 2017) ................. 16

*Fairley v. Andrews*, 578 F.3d 518 (7th Cir. 2009)........................................................................ 7

*Florida Abolitionist v. Backpage.com LLC*, No. 6:17-CV-218-ORL-TBS, 2018 WL 1587477
   (M.D. Fla. March 31, 2018)……………………………………………………………...16

*Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263 (11th Cir. 2003).. 4, 9, 13

*Gastaldi v. Sunvest Cmtys. USA, LLC*, 637 F. Supp. 2d 1045 (S.D. Fla. 2009).......................... 20

*George v. Edholm*, 752 F.3d 1206 (9th Cir. 2014) ................................................................. 5, 11

*Goddard v. Google, Inc.*,
   No. C 08-2738 JF, U.S. Dist. Lexis 101890 (N.D. Cal. Dec. 17, 2008)................................... 9

*Gonzalez v. Governor of Georgia*, 978 F.3d 1266 (11th Cir. 2020)............................................. 3

*Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33 (2d Cir. 1983) ............................................ 6

*Hibbs v. Winn*, 542 U.S. 88 (2004)............................................................................................ 16

*Howard Morris v. ADT Sec. Servs.*,
   2009 U.S. Dist. LEXIS 150309 (S.D. Fla. Sept. 11, 2009) ............................................... 19, 24

*Iancu v. Brunetti*, 139 S. Ct. 2294 (2019)................................................................................... 14

iii

*Jacobs v. The Fla. Bar*, 50 F.3d 901 (11th Cir. 1995) ................................................. 18

*Lee v. Macon County Board of Education*, 267 F.Supp. 458 (M.D. Ala. 1967) ......................... 19

*Madsen v. Women's Health Ctr.*, 512 U.S. 753 (1993) .................................................. 14

*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13 (2020)........................... 15

*Marx v. Gen. Revenue Corp.*, 568 U.S. 371 (2013)....................................................... 16

*Millennium Communications & Fulfillment, Inc. v. Office of the Attorney Gen.*,
    761 So.2d 1256 (Fla. 3d DCA 2000) ................................................................ 19

*Mitchum v. Hurt*, 73 F.3d 30 (3rd Cir. 1996)........................................................... 15

*Nat'l Numismatic Certification, LLC. v. eBay, Inc.*,
    No. 6:08-CV-42-ORL-19GJK, 2008 WL 2704404 (M.D. Fla. July 8, 2008) ......................... 17

*Near v. Minnesota*, 283 U.S. 697 (1931) .............................................................. 13

*Netchoice, LLC, v. Moody* 2021 U.S. Dist. Lexis 121951 (N.D. Fla. June 30, 2021) ................ 25

*New York Times Co. v. the United States*, 403 U.S. 713 (1971)..................................... 13, 14, 26

*NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969) ..................................................... 7

*Norwood v. Harrison*, 413 U.S. 455 (1973) ..................................................... 5, 11, 19

*Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003)....................................................... 7

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) ................................................ 3

*Parsons v. Regna*, No. 2021 U.S. App. LEXIS 7758 (11th Cir. 2021) ................................... 3

*Pasadena Republican Club v. Western Justice Ctr.*, 985 F.3d 1161 (9th Cir. 2021) ............... 4, 5

*Perkins v. Londonderry Basketball Club*, 196 F.3d 13 (1st Cir. 1999) .............................. 4

*Pittsburgh Press Co. v. Human Rel. Comm'n*, 413 U.S. 376 (1973) .................................. 14

*PNR Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773 (Fla. 2003)................................... 19

*Railway Employees' Dep't v. Hanson*, 351 U.S. 225 (1956)...................................... 10, 11

Rawson v. Recovery Innovations, Inc., 975 F.3d 742 (9th Cir. 2020) ................................. 5

*Ross v. Duggan*, 402 F.3d 575 (6th Cir. 2004) ....................................................... 18

*Rowe v. City of Ft. Lauderdale*, 279 F.3d 1271 (11th Cir. 2002) ................................... 13

*Rubenstein v. Fla. Bar*, 72 F. Supp. 3d 1298 (S.D. Fla. 2014) ..................................... 18

*Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989).............................. 4, 9, 10, 11

*Song fi Inc. v. Google, Inc.*, 108 F. Supp. 3d 876, 883 (N.D. Cal. 2015)..............................17

*Southeastern Promotions v. Conrad*, 420 U.S. 546 (1975) .......................................... 13

*Sun v. Girardot*, 237 Fed. Appx. 415 (11th Cir. 2007)................................................ 13

*United Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n.*
    531 U.S. 288 (2001)...................................................... 2, 4, 5, 6, 9, 12

*United States v. Alvarez*, 567 U.S. 709 (2012) ..................................................... 14

*Whitney Info. Network, Inc. v. Xcentric Venture, LLC,* 199 Fed. Appx. 738 (11th Cir. 2006) .... 17

*Writers Guild of America, West, Inc. v. FCC*, 423 F. Supp. 1064 (1976) .............................. 7

## Statutes and Rules

Florida Deceptive and Unfair Trade Practices Act ........................... 15, 19, 20, 23, 24, 26

Florida Statutes § 501.204……………………………………………………………………24

Florida Statutes § 501.204(1)....................................................................... 19

Florida Statutes § 501.211(1)....................................................................... 20

Florida Statutes § 501.2041 ........................................................................ 24

Florida Stop Social Media Censorship Act ............................................................... 1, 2, 23, 24, 25, 26

Rule 65 of the Federal Rules of Civil Procedure ............................................................................. 1

Section 230 of the Communications Decency Act of 1996,
    47 U.S.C. § 230 ................................................ 5, 8, 9, 10, 11, 15, 16, 17, 18, 19, 22, 23, 25, 29

**Other Authorities**

Dawn Nunziato, *The Death of the Public Forum in Cyberspace*,
    20 Berk. Tech. L.J. 1115, 1129 (2005) ........................................................................... 9

George Orwell, Nineteen Eighty-Four (1949) ............................................................ 14

**Constitutional Provisions**

First Amendment to the United States Constitution .. 1, 3, 4, 5, 6, 7, 13, 14, 15, 16, 17, 18, 26, 27,
    28, 29

## **INTRODUCTION**

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff Donald J. Trump ("Plaintiff") respectfully moves for a preliminary injunction directing, *inter alia*, Defendant Twitter, Inc. ("Defendant" and "Twitter"), and all persons acting in concert with Defendant, to reinstate Plaintiff's access to Defendant's social media platform(s).

Coerced by members of the United States Congress, operating under an unconstitutional immunity granted by a permissive federal statute, and acting directly with federal officials, Defendant is censoring Plaintiff, a former President of the United States. On January 8, 2021, Defendant indefinitely banned Plaintiff from its platform, a major avenue of public discourse. Defendant's censorship and prior restraint of Plaintiff's speech violates the First Amendment to the United States Constitution and likewise violates Florida's newly enacted Stop Social Media Censorship Act ("SSMCA").

Defendant exercises a degree of power and control over political discourse in this country that is immeasurable, historically unprecedented, and profoundly dangerous to open democratic debate. Defendant not only banned Plaintiff from its platform, but also extended its prior restraint to innumerable Users who post comments about Plaintiff. As Professor Alan M. Dershowitz opines: "[p]laintiff's right to speak freely has been seriously compromised by… Twitter. Moreover, the rights of his audience to have access to his views have also been curtailed." (Declaration of Alan M. Dershowitz, dated July 1, 2021 ("Dershowitz Decl.") annexed hereto as Exhibit A, ¶ 6.)

Defendant's censorship of Plaintiff became state action for First Amendment purposes when it resulted from "the State's exercise of 'coercive power,' . . . when the State provided 'significant encouragement, either overt or covert'" in Plaintiff's censorship, or when Defendant

acted as a "willful participant in joint activity" with the state in censoring Plaintiff. *United Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n.* 531 U.S. 288, 296 (2001) (Thomas, J., dissenting) (citations omitted). All three factors—coercion, significant encouragement, and willful participation in joint activity—are in operation here.  Defendant's censorship of Plaintiff evidences a pattern of content and viewpoint-based prior restraint, carrying the heaviest presumption against constitutional validity, and violates Florida's newly enacted SSMCA.

Thus, on both constitutional and state law grounds, Plaintiff is entitled to an injunction requiring Defendant to reinstate Plaintiff's access to his account(s) with Defendant.

## FACTUAL STATEMENT

### A.    The Donald J. Trump Twitter Account

Plaintiff established the Donald J. Trump Twitter account in May of 2009. After he announced his presidential campaign in June of 2015, Plaintiff used his Twitter account to speak directly to the public at large. Plaintiff's Twitter account became a communication tool of his presidency. (Declaration of Jaclyn Homberg dated September 22, 2021 ("Homberg Decl."), annexed hereto as Exhibit B, ¶ 13, 14.) His page became an important source of news and information about government affairs and was a digital town hall in which Plaintiff posted his views and content. (*Id*.)

### B.    Defendant's Censorship And Prior Restraint Of Plaintiff

Defendant's censorship of Plaintiff during his presidency involved tweets that were labeled "misleading information," were said to violate Defendant's rules against "glorifying violence" and/or questioned election integrity standards. On January 8, 2021, Twitter announced that it was suspending Plaintiff's account(s) indefinitely, claiming falsely that Plaintiff had incited violence and, therefore, must be suspended under Twitter's "standards." (Homberg Decl. ¶ 20.) The

ludicrous incongruity of Twitter's position on the matter came to full focus several months later. On August 8, 2021, a new account named for the Taliban unrecognized state, the Islamic Emirate of Afghanistan (the "Taliban"), a known terrorist organization, appeared on Twitter. (Homberg Decl. ¶ 117, 125.) Over the weeks that followed, Twitter allowed the Taliban to tweet regularly about their military conquests and victories across Afghanistan. (*Id.*) The Taliban's Twitter account is active to this day. (*Id.*)

## ARGUMENT

## LEGAL STANDARD APPLICABLE TO
## MOTIONS FOR A PRELIMINARY INJUNCTION

To obtain a preliminary injunction, Plaintiff must establish: "(1) a substantial likelihood of success on the merits of his claim; (2) an irreparable injury unless the injunction [is] granted; (3) that the harm from the threatened injury outweigh[s] the harm the injunction would cause [defendant]; and (4) that the injunction would not be adverse to the public interest." *Parsons v. Regna*, 847 F. App'x 766, 771 (11th Cir. 2021) (11th Cir. 2021). "A substantial likelihood of success on the merits requires a showing of only *likely* or probable, rather than *certain*, success." *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1271 n.12 (11th Cir. 2020) (emphasis in original). As demonstrated below, all four of these requirements are established here.

### POINT I
### Plaintiff is Likely to Succeed on the
### Merits of His First Amendment Claim

The Internet is "the modern public square." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1732 (2017). For billions of people, it is the most important source and medium for news, information, culture, and communication. *Id*. It is, moreover, "perhaps the most powerful mechanism available to a private citizen to make his or her voice heard." *Id*.

Defendant is an Internet communications platform open to billions of people. It exercises immense and historically unprecedented power over public discourse and has the ability to affect the content of political speech and electoral outcomes. (Homberg Decl. ¶ 5, 14, 18.) "The number of people the former President reached through social media was staggering." (Dershowitz Decl. ¶ 9.)

A.    **Legal Standards Applicable To A State Action Finding**

It is well-established that state action can be found under a variety of different tests and on the basis of several different factors. As the Supreme Court has held, state action exists, "when [the private party's conduct] results from the State's exercise of '*coercive power*,' when the state provides '*significant encouragement*, either overt or covert,' or when a private actor operates as a '*willful participant in joint activity*'" with the government. *United Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001) (citations omitted) (emphasis added); *see Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1277 (11th Cir. 2003). Private party conduct also can become state action when the government has passed a statute or regulation immunizing that conduct from state law liability and has made plain its "strong preference" that the immunized conduct be engaged in. *See, e.g., Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 615 (1989).

A private party's conduct also becomes state action for First Amendment purposes when it results from a "symbiotic relationship" between the private party and the government. *See, e.g., Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961); *Focus on the Family*, 344 F.3d at 1278; *Pasadena Republican Club v. Western Justice Ctr.*, 985 F.3d 1161, 1167 (9th Cir. 2021); *Perkins v. Londonderry Basketball Club*, 196 F.3d 13, 18 (1st Cir. 1999); *Dobyns v. E-Systems, Inc.*, 667 F.2d 1219, 1227 (5th Cir. 1982). Moreover, and fundamental to this case, state action by

4

private parties exists when government deliberately "induces, encourages, or promotes, persons to accomplish what it is" constitutionally forbidden to accomplish. *Norwood v. Harrison*, 413 U.S. 455, 465 (1973). When government officials violate this principle, state action exists, and the private parties who willfully participate may be liable for violating constitutional rights. *See, e.g., George v. Edholm*, 752 F.3d 1206, 1215 (9th Cir. 2014).

Satisfaction of any one of these tests "is sufficient to find state action." *Pasadena Republican Club v. Western Justice Ctr.*, 985 F.3d 1161, 1167 (9th Cir. 2021); *Barrios-Velazquez v. Associcion De Empleados Del Estado Libre Asociado*, 84 F.3d 487, 493 (1st Cir. 1999). Courts may also view these indicia of governmental involvement in private conduct as cumulative factors, each weighing in favor of finding state action. *See, e.g., Rawson v. Recovery Innovations, Inc*., 975 F.3d 742, 754-55 (9th Cir. 2020). When all such factors come together in a single case, as they have here, Defendant's censorship of Plaintiff becomes state action for First Amendment purposes.

The determination whether private party censorship constituted governmental action is "necessarily a fact-bound inquiry." *United Brentwood Acad.*, 531 U.S. at 298, requiring a "totality of the circumstances" analysis. *Evans v. Valero Energy Corp*., No. CV F 07-0130, 2007 WL 707529, at *3 (E.D. Cal. Mar. 6, 2007); *Bass v. Parkwood Hosp.*, 180 F.3d 234, 242 (5th Cir. 1999). Each of Defendant's acts of censorship against Plaintiff, culminating in an indefinite suspension of Plaintiff's account(s), resulted from federal actors inducing Defendant to do what the government could not constitutionally do itself. More specifically, Defendant's censorship of Plaintiff resulted from: (a) coercive pressure imposed on Defendant by federal actors, including numerous Democrat members of Congress; (b) significant encouragement, both overt and covert, by the federal government, including the enactment of a statutory provision, Section 230 of the Communications Decency Act of 1996, 47 U.S.C. § 230 ("Section 230"), immunizing Defendant's

suppression of constitutionally protected speech; and (c) willful participation in joint activity with federal actors, including a federal agency and the White House itself.

> **B.    Federal Actors Repeatedly And Coercively**
> **Pressured Defendant To Censor And De-Platform Plaintiff**

While government officials are permitted to express their, or the government's, preferences about what a private company should or should not do, they cannot exert coercive pressure on private parties to censor the speech of others. *E.g., Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66-67 (1963). Such coercion converts private party conduct into state action. *United Brentwood Acad.*, 531 U.S. at 298; *Carlin Communications, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291, 1295 (9th Cir. 1987) (finding state action in private telephone company's suspension of account due to coercive threats made by state official).

The test in such cases is whether the "comments of governmental officials can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow failure to accede to the officials' request." *E.g., Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983). When governmental actors have exerted such coercive pressure, state action exists regardless of whether the officials' threat "was the real motivating force" behind the private party's conduct and even if the private party "would have acted as he did independently." *Carlin Communications*, 827 F.2d at 1295.

"[A] public official who tries to shut down an avenue of expression of ideas and opinions through 'actual or threatened imposition of government power or sanction' is violating the First Amendment." *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015) (citing, *American Family Association, Inc. v. City & County of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002)). Written and verbal threats of the kind in *Backpage*, similar to those in this case, create an irreparable injury because they are designed to coerce, not persuade. *Id*. at 239. Judge Richard Posner, writing for

the Court in *Backpage*, found that the sheriff's threatening statements constituted prior restraint, "'[t]hreatening penalties for future speech goes by the name of 'prior restraint,' and a prior restraint is the quintessential First Amendment violation.'" *Id*. at 235 (*citing*, *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009)).

In *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) (per curiam), the Second Circuit made clear that subtle or soft language does not obviate the threat, reasoning, "[w]hat matters is the distinction between attempts to convince and attempts to coerce." *Id*. at 344. The "intent" behind a threatening letter controlled, not its formal language. *Id*.

Courts have long held that threats by government officials violate the First Amendment, which "unquestionably constitutes irreparable injury" to the victim or recipient of the threat. *Backpage,* 807 F.3d at 239. The Ninth Circuit described this form of impermissible state action as follows: "If the First Amendment means anything, however, the Commission has no right to accompany its suggestions with vague or explicit threats of regulatory action should the broadcasters consider and reject them. The Commission has no right whatsoever to demand or secure commitments from broadcasters to accept its suggestions. It has no right to launch orchestrated campaigns to pressure broadcasters to do what they do not wish to do." *Writers Guild of America, West, Inc. v. FCC*, 423 F. Supp. 1064, 1150 (1976) (*rev'd on other grounds*).

Using nearly identical analysis, employer speech cases are treated substantially the same. Since employers oversee employees, courts "must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up *intended implications* of the latter that might be more readily dismissed by a more disinterested ear." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969) (emphasis added).

Since 2019, Democrat members of the United States Congress, as well as now-President Joe Biden, have subjected social media companies and their CEOs, including Defendant, to increasing pressure to censor speech disfavored by them, and to promote their favored speech, or else face catastrophic legislative and/or regulatory consequences. (Homberg Decl. ¶¶ 6, 23-25.) On or about April 10-11, 2019, Speaker of the House Nancy Pelosi warned that a "new era" of regulating social media was coming and that Section 230 could be "in jeopardy." (Homberg Decl. ¶ 26.) Speaker Pelosi further commented that "the era of self-regulation" in this country for social media companies is "probably" over, and that "[w]hen we come to 230, you really get their attention . . . it is not out of the question that that could be removed," because "for the privilege of 230, there has to be a bigger sense of responsibility on it." (Homberg Decl.¶ 27.)  (See examples of coercive statements by Chairman Schiff, President Biden, Speaker Pelosi, Congressman Raskin, and Sen. Blumenthal) (Homberg Decl. ¶¶ 28- 35.)

Coercion exerted by Congress on Defendant, and the other social media companies, has become more intense recently. In early October of 2020, the House Judiciary Committee specifically found that the social media companies had monopoly power in their markets and proposed breaking up those companies under either existing federal antitrust law or under proposed reforms thereto. (Homberg Decl. ¶ 25.) Chairman Frank Pallone, Jr.'s opening statement from a March 25, 2021, House Energy and Commerce Committee hearing revealed that a principal topic of the hearing was the "role" of "Facebook, Google, and Twitter" in "spreading disinformation" and extremism." (Homberg Decl. ¶¶ 39, 40.)

As a result of the coercive pressure created by Congress and the Executive Branch, Defendant censored Plaintiff.  As such, Plaintiff's censorship was an unconstitutional deprivation of Plaintiff's free speech, in that the censorship was in response to government coercion.

C.    **Defendant's Censorship Of Plaintiff Resulted From**
      **Significant Encouragement By The Federal Government**

Private party censorship also becomes governmental action "when the State provides 'significant encouragement, either overt or covert.'" *United Brentwood Acad.*, 531 U.S. at 296 (citations omitted); *see also Focus on the Family* 344 F.3d at 1278.  The coercive and threatening statements made by Congressional and Executive Branch members described above in Point I B, applying pressure on and threatening consequences against Defendant if it failed to censor Plaintiff, amounted at a minimum to significant encouragement. Democrat members of Congress, as well as President Biden himself, repeatedly encouraged Defendant to censor and restrain Plaintiff's views, or face catastrophic legal and regulatory consequences. (Homberg Decl. ¶¶ 23, 24, 26-32.)

Section 230(c) itself is a significant encouragement to censor constitutionally protected speech. Section 230(c)(2) immunizes social media companies from liability for any action taken in good faith to "restrict" speech they or their Users deem "objectionable," even if that speech is "constitutionally protected." 47 U.S.C. § 230(c)(2)(A). The express "intent of Congress in enacting Section 230(c)(2) was to *encourage* efforts by Internet service providers to eliminate ['objectionable'] material by immunizing them from liability." *Goddard v. Google, Inc.*, No. C 08-2738 JF, 2008 WL 5245490 at *6 (N.D. Cal. Dec. 17, 2008) (emphasis added); *see also, e.g.*, Dawn Nunziato, *The Death of the Public Forum in Cyberspace*, 20 Berk. Tech. L.J. 1115, 1129 (2005) (through Section 230(c)(2), "Congress *encouraged* private Internet actors to do what it could not do itself" (emphasis added)). Every act by Defendant in censoring Plaintiff's speech was significantly encouraged by, and in reliance upon, the immunity granted by Section 230(c)(2).

Twice, the Supreme Court has held that federal statutes immunizing private conduct from liability turned what would otherwise be private action into state action. *See Skinner*, 489 U.S. at

9

614-15; *Railway Employees' Dep't v. Hanson*, 351 U.S. 225, 232 (1956). In *Hanson*, the Court found state action in private employers' closed-shop agreements—contracts between the employer and a union requiring all employees to be union members—because a federal statute, superseding all conflicting state laws, prevented such agreements from being "made illegal . . . by any provisions of the laws of a State." *Id*. The statute did not require employers to have such agreements; it merely permitted them. *Id*. Similarly, Section 230 permits (but does not require) companies like Defendant to censor speech deemed "objectionable" and preempts all conflicting state laws, preventing such censorship from being "made illegal . . . by any provisions of the laws of a State." *Id.*

In *Skinner*, the Court found state action in certain employee urine and breath tests to be conducted by private railroad companies after the federal government enacted regulations immunizing those companies from liability if they performed such tests. Again, the pertinent regulations (called Subpart D) were, like Section 230, "permissive"—they did not compel such testing but merely permitted it. *Skinner*, 489 U.S. at 611.  Nevertheless, the Court held that these regulations turned the private companies' conduct into state action, emphasizing that: (1) the regulations "removed all legal barriers" to such testing by preempting any conflicting state laws (immunizing the railways from liability); and (2) the government had "made plain" a "strong preference" for such testing. *Id*. at 615.  Similarly, Section 230 (c)(2) "remove[s] all legal barriers" to Defendant's refusal to carry content it deems to be hate speech, or "misinformation," or dangerous, by preempting conflicting state laws and immunizing social media companies from liability for such censorship.

The federal government has "made plain" a "strong preference" for the censoring of COVID-19 "misinformation," or other content Congressional Democrats deem dangerous, and of

Plaintiff himself. On July 17, 2021, President Biden excoriated social media companies for carrying so-called COVID-19 "misinformation," stating that they are "killing people" and demanded that they block it. (Homberg Decl. ¶ 44.)

Thus, under *Hanson* and *Skinner*, the delegation of permissive activity and immunity for certain conduct in Section 230 weighs heavily in favor of a finding of state action in the regulation of the content of speech on the Internet. Indeed, Section 230(c)(2) violates the "axiomatic" constitutional principle set forth by the Supreme Court almost 50 years ago: that the government "may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood*, 413 U.S. at 465. When the government violates this "axiomatic" rule, state action exists, and private parties who intentionally assist the government may be liable for constitutional violations. *George*, 752 F.3d at 1215.

### D. Defendant Has Willfully Participated In Joint Activity With Federal Governmental Actors To Censor Plaintiff's Constitutionally Protected Speech

Defendant had censored Plaintiff prior to January 8, 2021, on the putative ground that Plaintiff was spreading "misinformation" regarding COVID-19. (Homberg Decl. ¶¶ 16, 17.) In censoring Plaintiff's posted content, Defendant was acting as a willful participant in joint activity with federal actors, including the Department of Health and Human Services ("HHS"). On July 15, 2021, White House Press Secretary Jennifer Psaki acknowledged this joint activity, stating that White House senior staff were engaging with social media platforms to combat the spread of misinformation, specifically on the pandemic, and playing an active role in flagging content deemed by the Biden administration to be problematic. (Homberg Decl. ¶ 50.) The next day, Psaki stated that the Biden administration's goal is to ban individuals who spread COVID-19 misinformation from all social media platforms. (Homberg Decl. ¶ 51.) The Centers for Disease Control ("CDC") and Defendant have openly admitted this collaboration between social media

companies and the CDC.  (Homberg Decl. ¶¶ 8, 45, 51.)  The CDC has publicly stated that it acts with "social media" "partners" to "curb the spread of vaccine misinformation." (*See id.*)

Furthermore, upon information and belief, during Plaintiff's term, the White House disseminated official guidance directing agencies to use @RealDonaldTrump instead of @POTUS when referring to Plaintiff on Defendant's platform. The U.S. Department of State sent similar guidance to embassies ahead of foreign visits to ensure correct social media handles were used. For these reasons among others, @RealDonaldTrump was archived in a similar fashion to the @POTUS account.

In addition to this guidance, White House administration officials had direct contacts with Twitter and a specialized account that they could use when contacting them. Upon information and belief, agencies such as the Department of Homeland Security, Department of Health and Human Services, and Department of State used this specialized email account to correspond with Twitter and flag content that believed required action. Apparently, based upon Ms. Psaki's admission, and information and belief, such direct communication and coordination between and among the White House, these federal agencies and Twitter have continued with the present Administration.

Not a hair's breadth separates "direct engagement" between governmental and private actors to achieve an objective from "willful participation in joint activity."  By their own admissions, the White House and social media companies reached a mutual understanding, agreeing to "work together" to "get rid" of disfavored speech.  Therefore, state action exists under *United Brentwood Acad.* *United Brentwood Acad.*, 531 U.S. at 296; *see also*, *e.g.*, *Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th Cir. 1990) ("[P]rivate defendants can be held liable [as state actors] if they act in concert with [government] officials in depriving a plaintiff of constitutional

12

rights."); *cf. Sun v. Girardot*, 237 Fed. Appx. 415, 417 (11th Cir. 2007) (defendants are state actors if they "reached an understanding" with government officials "to violate [plaintiff's] rights"); *Rowe v. City of Ft. Lauderdale*, 279 F.3d 1271, 1283 (11th Cir. 2002) (defendants are state actors if there was an "agreement" with government officials).  Moreover, the federal government reaps, and knowingly accepts, substantial benefits from this partnership.  These benefits include, without limitation: the effective and inexpensive communication of government-approved health information to large numbers of people; suppression of information suggesting or showing flaws in federal government policy and orthodoxy; boosting the CDC's reputation as reliable and authoritative in its factual and policy determinations; creating a false impression of unequivocal support in the scientific community for governmental directives; and suppression of opinions and information that might lead people to take actions contrary to the government's preferences.  *See, e.g.*, *Focus on the Family*, 344 F.3d at 1278.  Where coercive governmental pressure, significant governmental encouragement, and joint governmental activity are all factors in the conduct of a private party, state action must be found; otherwise, every constitutional right could easily be circumvented.

### E.   Defendant's Acts Violated The First Amendment

The First Amendment paradigmatically prohibits prior restraints.  *Near v. Minnesota*, 283 U.S. 697, 713-14 (1931).  "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *New York Times Co. v. the United States*, 403 U.S. 713, 714 (1971).  Because prior restraints are presumptively unconstitutional, the burden to show that Plaintiff's speech is unprotected by the First Amendment rests heavily on Defendant: "the burden . . . of proving that the material is unprotected, must rest on the censor." *Southeastern Promotions v. Conrad*, 420 U.S. 546, 560 (1975); *see Neb. Press Ass'n v. Stuart*, 427 U.S. 539

(1976), citing, *Pittsburgh Press Co. v. Human Rel. Comm'n*, 413 U.S. 376, 396 (1973) (Courts have long "condemn[ed] prior restraint as presumptively unconstitutional").

Further, prior restraint presents an injury that occurs repetitively until remedied, *New York Times Co., 403 U.S. at 715* (prior restraint "amounts to a flagrant, indefensible, and continuing violation of the First Amendment").  The existence of other venues for Plaintiff to speak does not cure the First Amendment violation. *Conrad*, 420 U.S. at 560.  In addition, the First Amendment does not permit governmental actors to discriminate against speech on the basis of the viewpoints, ideas, or opinions they express.  *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) (identifying as a "core postulate of free speech law" that the "government may not discriminate against speech based on the ideas or opinions it conveys").  Injunctions cannot facilitate the suppression of speech from one side of a political debate, but instead must serve to promote as much speech as possible since public debate, rather than partisan government objectives, serves the national interest.  *See Madsen v. Women's Health Ctr.*, 512 U.S. 753, 774 (1993). ("As a general matter, we have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.") (Citing *Boos v. Barry*, 485 U.S. 312, 322 (1988)).

The First Amendment prohibits establishing a "Ministry of Truth," blocking speech that the government deems false.  *See United States v. Alvarez*, 567 U.S. 709, 723 (2012) (plurality opinion) (citing George Orwell, Nineteen Eighty-Four (1949)). "The mere potential for the exercise of that power casts a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom."  *Id*.  Yet, Defendant, working jointly with a federal agency and the White House, has converted its platform into a "Ministry of Truth," particularly with respect to COVID-19.

14

As a government actor, Defendant's prior restraint of Plaintiff is a violation of the First

Amendment, and Plaintiff is therefore entitled to injunctive relief under the federal courts'

longstanding power to "grant equitable relief for constitutional violations." *Mitchum v. Hurt*, 73

F.3d 30, 35 (3rd Cir. 1995) (Alito, J.).

**POINT II**
**SECTION 230, AS APPLIED TO THESE**
**FACTS, VIOLATES THE FIRST AMENDMENT**

Professor Dershowitz notes "[t]he question of social media censorship under Section 230

is an issue of major legal importance and I believe the allegations of the Complaint which I have

reviewed raise serious, substantial legal issues some of which have not been heretofore litigated."

(Dershowitz Decl. ¶ 7.)

Section 230 is not a valid defense to this action and is unconstitutional as applied to the

facts of this case. Section 230 only protects Defendant for (1) causes of action in which third-party

speech is an element and (2) its content moderation for specific reasons outlined in Section

230(c)(2).  Here, Plaintiff's constitutional claims against Defendant involve neither third-party

speech nor the sorts of content specified in Section 230.  Further, binding precedent has determined

Section 230 offers platforms no protection from suits brought under the Florida Deceptive and

Unfair Trade Practices Act ("FDUTPA").

**A.     Neither Section 230(c)(1) Nor Section 230(c)(2) Protects Defendant From Its**
**Discriminatory Treatment Of Plaintiff In Violation Of The First Amendment**

The Supreme Court has confirmed this essential structure: Section 230(c)(1) relieves

platforms of liability from third-party speech, and Section 230(c)(2) relieves platforms for

removing or moderating content. This precedent recognizes that if Section 230(c)(1) protects

removal decisions, it would "swallo[w] the more specific immunity in (c)(2)." *Malwarebytes, Inc.*

*v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 17 (2020) (referencing and quoting to *e-*

15

*ventures Worldwide, LLC v. Google, Inc.*, No. 2:14–cv–646–FTM–PAM–CM, 2017 WL 2210029, *3 (MD Fla., Feb. 8, 2017). "[B]y construing § 230(c)(1) to protect *any* decision to edit or remove content, courts have curtailed the limits Congress placed on decisions to remove content . . . ." *Id.* (internal citation omitted).

Allowing Section 230(c)(1) to swallow Section 230(c)(2) violates the fundamental canon of statutory construction against surplusage.  This interpretive rule requires courts to give effect to all portions of a statute, particularly provisions that follow one another. *Corley v. United States,* 556 U.S. 303, 314 (2009) ("[A] statute should be construed so that effect is given to all its provisions so that no part will be inoperative or superfluous, void or insignificant . . . .") (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)). The Supreme Court emphasizes that the canon "is strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp*., 568 U.S. 371, 386 (2013).

To read Section 230(c)(1) to protect Defendant's decision to censor Plaintiff would eliminate Congress's express limitations.  Thus, Florida federal courts have recognized Section 230's specific structure: Section 230(c)(1) protects against liability from causes of action which have as their elements platforms publishing or speaking third party content.  Section 230(c)(2) protects content moderation for specified reasons. Neither provision applies to this case.

1.      **Section 230 (c)(1) Does Not Protect Defendant From Liability For Its Unlawful Deprivation Of First Amendment Rights And Unfair Trade Practices**

Where a platform works or "materially contributes" to create unlawful content or pursue unlawful schemes, Section 230 does not apply. *Florida Abolitionist v. Backpage.com LLC*, No. 6:17-CV-218-ORL-TBS, 2018 WL 1587477, at *5 (M.D. Fla. March 31, 2018). The Eleventh Circuit states, "where a complaint contained allegations illustrating defendant's involvement in creating or developing the alleged" unlawful content, Section 230 immunity is inappropriate.

*Whitney Info. Network, Inc. v. Xcentric Venture, LLC,* 199 Fed. Appx. 738, 744 (11th Cir. 2006).

Here, it is alleged that Defendant worked with the government to violate Plaintiff's First

Amendment rights. Defendant's actions are at issue—not the speech of third-party Users of its

platform. Such claims have no "immunity under . . . [Section 230]." *Alvi Armani Med., Inc. v.

Hennessey*, 629 F. Supp. 2d 1302, 1306–07 (S.D. Fla. 2008).

> **2.      Section 230 (c)(2) Does Not Protect Twitter From Liability For
> Its Unlawful Deprivation Of Plaintiff's First Amendment Rights
> And Unfair Trade Practices**

As Florida federal courts have ruled, consistent with most courts, Section 230(c)(2) is not

a carte blanche to remove content for any reason. Rather, these terms refer to specific types of

content regulable in 1996, and "otherwise objectionable" is a catch-all term that, under the *ejusdem

generis* canon of statutory construction, refers to types of content Congress thought regulable in

1996. *See Nat'l Numismatic Certification, LLC. v. eBay, Inc.*, No. 6:08-CV-42-ORL-19GJK, 2008

WL 2704404, at *25 (M.D. Fla. July 8, 2008) ("One may find an array of items objectionable; for

instance, a sports fan may find the auction of a rival team's jersey objectionable.  However,

Congress provided guidance on the term 'objectionable' by providing a list of seven examples and

a statement of the policy behind Section 230"). Accordingly, the Court concludes that

"objectionable" content must, at a minimum, involve or be similar to pornography, graphic

violence, obscenity, or harassment. *Song fi Inc. v. Google, Inc.*, 108 F. Supp. 3d 876, 883 (N.D.

Cal. 2015). The six (6) adjectives preceding the phrase "otherwise objectionable" clearly

demonstrate the policy behind the enactment of Section 230 (c)(2) and provide guidance as to what

Congress intended to be 'objectionable' content.  Section 230(c)(2) is not a bar to Plaintiff's

lawsuit, which alleges that Defendant removed content in violation of the First Amendment and

other laws.

**B.**    <u>**Section 230 Offers No Protection For Defendant's Own Unlawful Speech**</u>

Defendant is liable for its own speech as well as its own actions.  When Defendant works as a partner with the government to censor its Users' First Amendment rights, Defendant is legally accountable for its deeds.  Similarly, when Defendant speaks and editorializes, Section 230 offers no protection because "[a]n interactive service provider remains liable for its own speech" and for "its own unlawful conduct." *Airbnb, Inc. v. City of Boston*, 386 F. Supp. 3d 113, 119 (2019) (citations omitted). Defendant's own statements, tags, warnings, and editorializing on Plaintiff's Twitter account are not entitled to statutory protection under Section 230.

Defendant's false statements posted on Plaintiff's Twitter account are unfair trade and deceptive practices, as Users joined Twitter with the expectation that they would be treated fairly and without slander. In reasonable reliance upon Defendant's representations and the expectation of fair business dealings, Users built businesses, political careers, entertainment personae, and public reputations on Defendant. Defendant then changed the rules, arbitrarily censoring and de-platforming people in violation of its own representations. As courts have ruled, Section 230 provides no protection for unfair and deceptive trade practices.

**C.**    <u>**Section 230 Is Unconstitutional As Applied**</u>

Where "plaintiffs seek to vindicate their own rights, the challenge is as-applied." *Rubenstein v. Fla. Bar*, 72 F. Supp. 3d 1298, 1309 (S.D. Fla. 2014) (quoting *Jacobs v. The Fla. Bar*, 50 F.3d 901, 906 (11th Cir. 1995)).  "In an as-applied challenge, the plaintiff contends that application of the statute in the particular context in which he has acted, or in which he proposes to act, would be unconstitutional.  Therefore, the constitutional inquiry in an as-applied challenge is limited to the plaintiff's particular situation." *Id.* (referencing and quoting to *Ross v. Duggan*,

402 F.3d 575, 583 (6th Cir. 2004)).  "When evaluating an as-applied challenge, the court's inquiry and potential relief focuses only on the particular challenged application. . ." *Id.* at 1309.

Section 230, as applied, violates the fundamental principle the Supreme Court has long recognized: government "may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood,* 413 U.S. at 465 (quoting *Lee v. Macon County Board of Education*, 267 F. Supp. 458, 475-76 (M.D. Ala. 1967)).

**POINT III**
**PLAINTIFF IS LIKELY TO SUCCEED**
<u>**ON HIS FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT CLAIM**</u>

The injunctive relief sought by Plaintiff speaks to the purpose of the FDUTPA: protecting the public from deceptive practices.  Defendant has engaged in the systematic practice of limiting the distribution of Plaintiff's content. Other Users—whose content fits the preferred perspective of government actors who have the power to modify Section 230—remain on the platform despite promoting content clearly in violation of the standards applied to Plaintiff.  These inconsistent actions are manifestly deceptive practices.

**A.** <u>**Florida Deceptive And Unfair Trade Practices Act Standards**</u>

FDUTPA prohibits deceptive acts or practices.  Fla. Stat. § 501.204(1). Deception is "a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *PNR Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003) (referencing and quoting to *Millennium Communications & Fulfillment, Inc. v. Office of the Attorney Gen.*, 761 So.2d 1256, 1263 (Fla. 3d DCA 2000)). FDUTPA must be "construed liberally" to "protect the consuming public and legitimate business enterprises . . ." from unfair or deceptive business practices. *Howard Morris v. ADT Sec. Servs.*, No. 07-80950-CIV, 2009 WL 10691165, at *4 (S.D. Fla. Sept. 11, 2009).

19

A party aggrieved by a violation of FDUTPA may seek injunctive relief. Importantly, Florida courts have held that an aggrieved party need only be one who is "angry or sad on grounds of perceived unfair treatment." *Ahearn v. Mayo Clinic*, 180 So. 3d 165, 172 (Fla. 1st DCA 2015).); Fla. Stat §501.211(1). The authority for injunctions under FDUTPA "is broadly worded to authorize declaratory and injunctive relief even if those remedies might not benefit the individual consumers who filed the suit." *Gastaldi v. Sunvest Cmtys. USA, LLC*, 637 F. Supp. 2d 1045,1057 (S.D. Fla. 2009) (internal citation omitted). FDUTPA "is designed to protect not only the rights of litigants but also the rights of the consuming public at large." *Id.*

## B.   Defendant Has Inconsistently Applied Its Standards

Comments related to election integrity, COVID-19, and violence have been the bases cited by Defendant for the censoring of Plaintiff's account and content.

### 1.   Election Integrity

Plaintiff had content removed or flagged for tweets allegedly in violation of Defendant's standards regarding election-related content. (Homberg Decl. ¶¶ 20, 52.) Defendant's policy states "[w]e will label or remove false or misleading information intended to undermine public confidence in an election or other civic process. This includes…disputed claims that could undermine faith in the process itself, such as unverified information about election rigging, ballot tampering, vote tallying, or certification of election results…" (Homberg Decl. ¶ 53.) While Defendant has applied this standard to remove content posted by Plaintiff related to the 2020 election, Defendant's actions show that these standards are inconsistently applied to ensure that disfavored content is removed from their platform, and that third parties who voiced comparable content face no disciplinary action. For example, all of the speakers referred to in the Homberg Declaration (Homberg Decl. ¶¶ 54-67), have Twitter accounts, yet none have faced any

disciplinary sanctions from Defendant.  Defendant's failure to do so demonstrates these policies are in fact little more than a ruse by which disfavored political content is removed.

2.      **COVID-19**

Plaintiff also had content removed or flagged for alleged violations of Defendant's standards related to COVID-19.  (*See* Homberg Decl. ¶¶ 71, 19.)  As with violence and election integrity, Defendant's practices demonstrate that its standards are inconsistently and deceptively applied. Defendant also states that its policies prohibit content that discourages people from seeking medical advice, guarantees a prevention method for COVID-19, or claims that dispute guidance regarding physical distancing to reduce transmission of COVID-19.  (Homberg Decl. ¶ 71.)  Defendant's practices reflect inconsistent application of each of these specific provisions.

For example, numerous news organizations have made inconsistent reports about the effects of large protests on the spread of COVID-19.  Specifically, in relation to the large gatherings during the nationwide protests of the summer of 2020, Vox, USA Today, Business Insider, the Washington Post, Forbes, CNN, The Verge, the Associated Press, the Wall Street Journal, ABC News, and CNBC have all run articles suggesting these events would not cause an increase in virus infections.  Incredibly, these same organizations ran articles suggesting that the events of January 6, 2021, at the U.S. Capitol would cause an increase in virus infections.  (*See* Homberg Dec. ¶¶ 79-87, 127.)

The suggestions contained in the articles – that certain large gatherings are unlikely to cause an increase in virus infections – runs contrary to general guidance related to COVID-19. Despite the fact that some of these articles are in direct conflict with Defendant's standards, no sanctions have been imposed on these news organizations' Twitter accounts. This outright inconsistency is in line with a desire by Defendant to placate government actors who generally approved of the protests of the summer of 2020, generally disapproved of the events of January 6,

2021, and have expressed a great desire and willingness to affect the Defendant's fortunes through manipulation of the protections afforded by Section 230. (*See id.*) Defendant's inconsistent standards deceptively mislead Users as to the reliability of the content that they might find on Defendant's platform.

### 3.    Violence

Shortly before the inauguration of President Biden, Defendant announced that Plaintiff would be prevented from uploading additional content to Defendant's platform due to ongoing concerns about violence. (Homberg Decl. ¶ 52.)  Defendant's toleration of violence in content provided by other politically favored speakers demonstrates that Defendant did not neutrally apply an objective standard in making this decision, but simply did so out of a desire to silence disfavored speakers. (*See* Homberg Decl. ¶¶ 95-110, 117-120, 125.)  Defendant claims to prohibit Users from using its platform to "threaten violence against an individual or a group of people." (Homberg Decl. ¶ 126.)  Further, Defendant states that it will "prohibit the glorification of violence," and it defines "violent threats as statements of an intent to kill or inflict serious physical harm on a specific person or group of people." (*Id.*)  However, Defendant has taken no disciplinary action against any of the speakers in the Homberg Declaration, each of whom maintains their own Twitter accounts, and whose statements clearly run afoul of Defendant's standards.  (*See* Homberg Decl. ¶¶ 96-110, 117-120, 125.)

If Defendant's standards as applied to Plaintiff were objectively applied to all content providers, none of the previously referenced speakers in the Homberg Declaration would be allowed to upload content to Defendant's platform. (*See id.*)  The failure of Defendant to take any action against said speakers is no accident.  This disparate treatment is reflective of Defendant's desire to remove politically disfavored content. As discussed above in Point I B, the determination

of what is or is not "politically disfavored" is measured by the voluminous calls from government actors for Defendant to take censorship action on the disfavored content and views of Plaintiff or face the potential loss of Section 230 protections.

C.    **Twitter's Inconsistent Application Of Its Standards Demonstrates Plaintiff's Entitlement To Preliminary Injunctive Relief**

By publishing its standards on its website, Defendant is promising its Users that it will enforce them fairly and in a consistent manner. Defendant has failed to do so, thus deceiving its Users into thinking that Defendant applies these standards with total viewpoint neutrality.

The failure of Defendant to state that it modifies its content moderation standards to placate government actors is a material misrepresentation. Users are led to believe that parties who have been suspended, tagged, flagged, shadow banned, or otherwise have run afoul of Defendant's standards, are less trustworthy than the content they do find across the platform. Conversely, Users think that the content they see on the platform is consistent with an objective application of Defendant's standards.

Plaintiff is ideally suited to bring this action for injunctive relief. Defendant cannot possibly reconcile the punitive censorship of Plaintiff with the favored treatment of other speakers who violated the same norms. Defendant has systematically removed Plaintiff's politically disfavored content on pretextual grounds. Plaintiff has been aggrieved by these actions, and respectfully submits that he has established a substantial likelihood of success on the merits of his FDUTPA claim.

**POINT IV**
**PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HIS SSMCA CLAIM**

In Count IV of the Amended Complaint, Plaintiff seeks relief under the provisions of the SSMCA. While housed within FDUTPA, the elements for a SSMCA claim have a subtle but

significant variation from the elements of the injunction claim in Count III. Specifically, Count III alleges that the discriminatory practices of Defendant were based on a policy of removing politically disfavored content and that this policy was deceptively omitted from its statements to Users. Plaintiff's allegations in Count IV, however, rest on the very straightforward premise that—regardless of any deceptive practice—Defendant inconsistently applied its own standards.

Under the provisions of Florida Statutes § 501.2041(2)(b), the inconsistent application of censorship, de-platforming, and shadow banning standards—regardless of any deception—is a violation of FDUTPA. Subsection (2)(b) of the SSMCA states that:

> A social media platform must apply censorship, deplatforming, and shadow banning standards in a consistent manner among its users on the platform.[1]

Plaintiff asserts that the allegations raised in the Amended Complaint and detailed above demonstrate that Defendant has failed to enforce its standards for censoring, de-platforming, and shadow banning content in a consistent manner.

The provisions of Subsection (2)(b) hold that a social media company's inconsistent application of standards is a violation of Florida Statutes § 501.204. As the SSMCA is housed within FDUTPA, the corpus of FDUTPA law detailed above in Point III A, is equally applicable to the SSMCA. The same principles hold that FDUTPA must be "construed liberally" to "protect the consuming public and legitimate business enterprises" from unfair or deceptive business practices. *Morris*, 2009 WL 10691165, at *4.

The law was challenged in an action brought in the Northern District of Florida by a technology industry trade association. In a decision dated June 30, 2021, Judge Hinkle of the Northern District enjoined several state agencies from enforcing provisions of the SSMCA stating

---

[1] Censorship, de-platforming, and shadow banning are defined at Florida Statutes § 501.2041(1)(b), (c), and (f), respectively.

it does not address private litigation. *Netchoice, LLC, v. Moody*, No. 4:21CV220-RH-MAF, 2021 WL 2690876, at *6  (N.D. Fla. June 30, 2021).

While Judge Hinkle held that Section 230 preempted the SSMCA, he relied on a Second Circuit opinion that, since the entry of his order, was vacated and replaced.  Relying on the initial opinion in *Domen v. Vimeo*, 991 F.3d 66 (2d. Cir. March 11, 2021) (amended and superseded on rehearing by *Domen v. Vimeo, Inc.*, 2021 WL 3072778 (2d Cir. July 21, 2021)), Judge Hinkle stated that Section 230 preempts claims based on the inconsistency of content removal. *Netchoice, LLC*, 2021 WL 2690876, at *12. However, the original opinion was vacated and replaced with a decision issued on July 21, 2021, roughly three weeks after Judge Hinkle rendered his order. The revised opinion states that the "imperfect exercise of content-policing discretion does not, without more, suggest that enforcement of content policies was not done in good faith;" the necessary implication is that Section 230 immunities disappear when a plaintiff can establish bad faith. *Domen,* 2021 WL 3072778, at *17.  Further, the Second Circuit stated that "[o]ur decision should not be read to confer immunity on providers acting in circumstances far afield from the facts of this case.  Courts have rejected Section 230 defenses against claims for false advertising, deceptive trade practices, and tortious interference." *Id*. at *18.  Section 230 remains a fact-based defense, and the Defendant, in this case, is not entitled to its protections.

**POINT V**
**PLAINTIFF WILL SUFFER IRREPARABLE**
**HARM IF AN INJUNCTION IS NOT GRANTED**

Defendant is an essential platform for communicating in today's global environment.  With the volume of content on its platform, combined with the power of its search functions, Defendant is a premier destination for Users seeking information.   As important as Defendant is for commercial branding, it is no less important for those engaged in political speech.  For candidates,

25

it offers outstanding outreach to potential voters.  "Democracy demands a level playing field . . . The precise effect of continuing their censorship is unpredictable but it is likely to have a profound impact, which will cause the plaintiff and the electorate irreparable harm." (Dershowitz Decl. ¶¶ 10, 12.)

The continuing irreparable harm to Plaintiff, absent an injunction, is indisputable as a matter of law. *Elrod v. Burns,* 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").  Here, the wisdom expressed in *New York Times Co.*, *supra*, comes to bear as "[e]very moment's continuance of the injunctions against [those censored] amounts to a flagrant, indefensible, and continuing violation of the First Amendment." *New York Times Co.*, 403 U.S. at 715 (Black, J., concurring).

Defendant has placed "its finger on the scale" by eliminating Plaintiff's views and content from voters, and "led to the demise of the Trump Campaign merchandising and fundraising program."  (Declaration of Corey Lewandowski, dated August 16, 2021 ("Lewandowski Decl.") annexed hereto as Exhibit C, ¶ 27; Declaration of Christl Pitre Mahfouz, dated August 13, 2021 ("Mahfouz Decl.") annexed hereto as Exhibit D, ¶ 25.)  The First Amendment rights of Plaintiff's millions of Twitter followers—to receive his messages and to comment to one another thereon—will be irreparably injured as well. At the same time, by de-platforming the presumptive head and most popular member of the Republican Party, cutting him off from the most effective and direct forms of communication with potential voters, Defendant is threatening irreparable damage to the Republican Party's prospects in the 2022 and 2024 elections.

Similarly, a preliminary injunction on Plaintiff's FDUTPA and SSMCA claims will benefit more parties than just Plaintiff.  Billions of Users rely on Defendant's terms of service regarding the criteria by which content is permitted to remain on Defendant's platform.

**POINT VI**
**THE BALANCE OF HARDSHIPS FAVORS PLAINTIFF**

While Defendant faces no harm from the reinstatement of Plaintiff's access to its platform, Plaintiff faces irreparable injury; thus, the balance of hardships manifestly favors a preliminary injunction. "Unless preliminary relief is granted, it is likely that the censorship imposed by Facebook and Twitter will impact the 2022 elections." (Dershowitz Decl. ¶ 11.)  Plaintiff faces loss of his donor and merchandising platforms, and ability to communicate his views, content, and endorsements of local candidates. (Lewandowski Decl. ¶¶ 14, 15; Mahfouz Decl. ¶ 16.) Defendant's First Amendment freedoms will not suffer if this Court orders it to reinstate Plaintiff's access to its platform.  While Defendant undoubtedly has the First Amendment right to express its own opinion and carry messages it favors, the First Amendment does not protect Defendant when it functions as a censorship arm of federal lawmakers and officials.

**POINT VII**
**AN INJUNCTION WOULD NOT**
**BE ADVERSE TO THE PUBLIC INTEREST**

Defendant cannot argue that access to its platform is not an issue of public interest.  The terms of access to Defendant require clear and transparent disclosure to Defendant's Users, who have the right to know if the terms of service they have agreed to are, in fact, the terms applied by Defendant to leave up or censor content. Twitter's elimination of Plaintiff's views and content creates a "significant and negative impact on political debate" and "constituents a prior restraint in the vitality of the 'marketplace of ideas' in American politics." (Lewandowski Decl. ¶ 27.)

Moreover, "[a] preliminary injunction is in the public['s] interest.  Censoring the 45th President of the United States, the leader of the Republican [p]arty, will have an adverse and unknowable effect on the 2022 elections." (Dershowitz Decl. ¶ 8.)

The country does not benefit from attempts to suppress political speech. Still less does it benefit from attempts to muzzle political speakers. Even those most passionately antagonistic to Plaintiff's views are not well-served by attempts to silence him. Such, at least, has always been the fundamental principle of the First Amendment. "That Amendment rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public…" *Associated Press v. United States*, 326 U.S. 1, 20 (1945). Although this principle is under assault today throughout the United States, it can still be saved by—and perhaps only by—the Nation's courts. Accordingly, granting Plaintiff's request for a preliminary injunction will manifestly be in the public interest.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the injunctive relief prayed for herein.

## **REQUEST FOR RELIEF**

Plaintiff respectfully requests the Court to issue a preliminary injunction at the earliest possible date and enter the following Order:

A.      Enjoining and restraining Defendant and its officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with anyone falling under the direct or general control or supervision of Defendant from enforcing the suspension of Plaintiff's access to its platform.

B.      Directing Defendant immediately, and no later than forty-eight (48) hours following the issuance of the Court's Order, to reinstate Plaintiff's access to its platform and lift all temporary or permanent bans on Plaintiff's Twitter account(s).

C.      Enjoining and declaring that Section 230(c) of the Communications Decency Act of 1996

is unconstitutional as applied to the facts of this case, as it violates Plaintiff's right to free speech

under the First Amendment.

D.      Granting such other and further relief as the Court may deem just, proper, and equitable.

Respectfully submitted,

/s/ Matthew Lee Baldwin
Matthew L. Baldwin, Esq.
Florida Bar No. 27463
VARGAS GONZALEZ
BALDWIN DELOMBARD, LLP
815 Ponce De Leon Blvd., Third Floor
Coral Gables, FL  33134
Telephone: 305.631.2528
Email: Matthew@VargasGonzalez.com
E-service: Service8@VargasGonzalez.com


/s/ Carlos Trujillo
Carlos Trujillo, Esq.
Florida Bar No. 42697
VARGAS GONZALEZ
BALDWIN DELOMBARD, LLP
815 Ponce De Leon Blvd., Third Floor
Coral Gables, FL  33134
Telephone: 305.631.2528
Email: Ctrujillo@VargasGonzalez.com
E-service: Service8@VargasGonzalez.com
Of Counsel

JOHN P. COALE *(Pro Hac Vice)*
2901 Fessenden St. NW
Washington, D.C. 20008
Telephone: (202) 255-2096
Email: johnpcoale@aol.com

JOHN Q. KELLY *(Pro Hac Vice)*
E-mail: jqkelly@ibolaw.com
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Facsimile: (203) 661-9461

MICHAEL J. JONES *(Pro Hac Vice)*
E-mail: mjones@ibolaw.com
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000

RYAN S. TOUGIAS *(Pro Hac Vice)*
E-mail: rtougias@ibolaw.com
IVEY, BARNUM & O'MARA, LLC
170 Mason Street
Greenwich, CT 06830
Telephone: (203) 661-6000
Facsimile: (203) 661-9461

30

RICHARD P. LAWSON, ESQ.
Florida Bar No. 165085
Gardner Brewer Martinez-Monfort P.A.
400 North Ashley Drive, Ste. 1100
Tampa, Florida 33602
(813) 221-9600 Telephone
(813) 221-9611 Fax
Primary Email: rlawson@gbmmlaw.com
Secondary
Email:  litigation@gbmmlaw.com

LUIS MARTINEZ-MONFORT, ESQ.
Florida Bar No. 0132713
Gardner Brewer Martinez-Monfort P.A.
400 North Ashley Drive, Ste. 1100
Tampa, Florida 33602
(813) 221-9600 Telephone
(813) 221-9611 Fax
Primary Email: lmmonfort@gbmmlaw.com
Secondary
Email:  litigation@gbmmlaw.com

31

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 1, 2021, a true and correct copy of the foregoing was electronically

filed with the Clerk of the Court using CM/ECF and electronically provided to all Counsel of Record

registered for service of same.


                                       By:      */s/ Matthew Lee Baldwin*
                                                  Fla. Bar No.: 27463
                                                  Email: Matthew@VargasGonzalez.com
                                                  Vargas Gonzalez
                                                  Baldwin Delombard, LLP
                                                  815 Ponce De Leon Blvd., Third Floor
                                                  Coral Gables, Florida  33134