# CONGRESS.GOV

## ONLINE PLATFORMS AND MARKET POWER, PART 6: EXAMINING THE DOMINANCE OF AMAZON, APPLE, FACEBOOK, AND GOOGLE

116th Congress (2019-2020)

**Committee:** House Judiciary
**Related Items:** Data will display when it becomes available.
**Date:** 07/29/2020
**Location:** Data will display when it becomes available.
**Website:** https://judiciary.house.gov/

**Text available as:** PDF (49MB)   (PDF provides a complete and accurate display of this text.)

```
[House Hearing, 116 Congress]
[From the U.S. Government Publishing Office]




                    ONLINE PLATFORMS AND MARKET POWER, PART 6:
                           EXAMINING THE DOMINANCE OF
                        AMAZON, APPLE, FACEBOOK, AND GOOGLE

=======================================================================

                                  HEARING

                                before the

                   SUBCOMMITTEE ON ANTITRUST, COMMERCIAL AND
                             ADMINISTRATIVE LAW

                                  of the

                        COMMITTEE ON THE JUDICIARY
                        HOUSE OF REPRESENTATIVES

                     ONE HUNDRED SIXTEENTH CONGRESS

                             SECOND SESSION

                              ----------

                             JULY 29, 2020

                              ----------

                           Serial No. 116-94

                              ----------

             Printed for the use of the Committee on the Judiciary



[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]
```

EXHIBIT U(ii)

Available http://judiciary.house.gov or www.govinfo.gov

ONLINE PLATFORMS AND MARKET POWER, PART 6: EXAMINING THE DOMINANCE OF AMAZON, APPLE, FACEBOOK, AND GOOGLE

ONLINE PLATFORMS AND MARKET POWER, PART 6:
EXAMINING THE DOMINANCE OF
AMAZON, APPLE, FACEBOOK, AND GOOGLE

=======================================================================

HEARING

before the

SUBCOMMITTEE ON ANTITRUST, COMMERCIAL AND
ADMINISTRATIVE LAW

of the

COMMITTEE ON THE JUDICIARY
HOUSE OF REPRESENTATIVES

ONE HUNDRED SIXTEENTH CONGRESS

SECOND SESSION

_____

JULY 29, 2020

_____

Serial No. 116-94

_____

Printed for the use of the Committee on the Judiciary

[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

Available http://judiciary.house.gov or www.govinfo.gov

_____

EXHIBIT U(ii)

U.S. GOVERNMENT PUBLISHING OFFICE
41-317                 WASHINGTON : 2021

COMMITTEE ON THE JUDICIARY

JERROLD NADLER, New York, Chairman

| | |
|---|---|
| ZOE LOFGREN, California | JIM JORDAN, Ohio, |
| SHEILA JACKSON LEE, Texas | Ranking Member |
| STEVE COHEN, Tennessee | F. JAMES SENSENBRENNER, Jr., |
| HENRY C. ``HANK'' JOHNSON, Jr., | Wisconsin |
| Georgia | STEVE CHABOT, Ohio |
| THEODORE E. DEUTCH, Florida | LOUIE GOHMERT, Texas |
| KAREN BASS, California | DOUG COLLINS, Georgia |
| CEDRIC L. RICHMOND, Louisiana | KEN BUCK, Colorado |
| HAKEEM S. JEFFRIES, New York | JOHN RATCLIFFE, Texas |
| DAVID N. CICILLINE, Rhode Island | MARTHA ROBY, Alabama |
| ERIC SWALWELL, California | MATT GAETZ, Florida |
| TED LIEU, California | MIKE JOHNSON, Louisiana |
| JAMIE RASKIN, Maryland | ANDY BIGGS, Arizona |
| PRAMILA JAYAPAL, Washington | TOM McCLINTOCK, California |
| VAL BUTLER DEMINGS, Florida | DEBBIE LESKO, Arizona |
| J. LUIS CORREA, California | GUY RESCHENTHALER, Pennsylvania |
| MARY GAY SCANLON, Pennsylvania, | BEN CLINE, Virginia |
| Vice-Chair | KELLY ARMSTRONG, North Dakota |
| SYLVIA R. GARCIA, Texas | W. GREGORY STEUBE, Florida |
| JOE NEGUSE, Colorado | |
| LUCY McBATH, Georgia | |
| GREG STANTON, Arizona | |
| MADELEINE DEAN, Pennsylvania | |
| DEBBIE MUCARSEL-POWELL, Florida | |
| VERONICA ESCOBAR, Texas | |

Perry Apelbaum, Majority Staff Director & Chief Counsel
Chris Hixon, Minority Staff Director
------

SUBCOMMITTEE ON ANTITRUST, COMMERCIAL AND
ADMINISTRATIVE LAW

DAVID N. CICILLINE, Rhode Island, Chair
JOE NEGUSE, Colorado, Vice-Chair

| | |
|---|---|
| HENRY C. ``HANK'' JOHNSON, Jr., | F. JAMES SENSENBRENNER, Jr., |
| Georgia | Wisconsin, Ranking Member |
| JAMIE RASKIN, Maryland | KEN BUCK, Colorado |
| PRAMILA JAYAPAL, Washington | MATT GAETZ, Florida |
| VAL BUTLER DEMINGS, Florida | KELLY ARMSTRONG, North Dakota |
| MARY GAY SCANLON, Pennsylvania | W. GREGORY STEUBE, Florida |
| LUCY McBATH, Georgia | |

Slade Bond, Chief Counsel
Douglas Geho, Minority Chief Counsel for Administrative Law

C O N T E N T S

----------

JULY 29, 2020
OPENING STATEMENTS

Page

The Honorable David Cicilline, Chairman, Subcommittee on
   Antitrust, Commercial and Administrative Law.................    2
The Honorable James Sensenbrenner, Ranking Member, Subcommittee

EXHIBIT U(ii)

on Antitrust, Commercial and Administrative Law......................    4
The Honorable Jerrold Nadler, Chairman, Committee on the
  Judiciary...................................................    5
The Honorable Jim Jordan, Ranking Member, Committee on the
  Judiciary...................................................    7

## WITNESSES

Jeff Bezos, Chief Executive Officer, Amazon.com, Inc.
    Oral Testimony..............................................   11
    Prepared Testimony..........................................   13
Sundar Pichai, Chief Executive Officer, Alphabet Inc.
    Oral Testimony..............................................   21
    Prepared Testimony..........................................   23
Tim Cook, Chief Executive Officer, Apple Inc.
    Oral Testimony..............................................   27
    Prepared Testimony..........................................   29
Mark Zuckerberg, Chief Executive Officer, Facebook, Inc.
    Oral Testimony..............................................   33
    Prepared Testimony..........................................   35

## LETTERS, STATEMENTS, ETC., SUBMITTED FOR THE HEARING

Exhibits Used at Hearing.......................................   42
``Police Requests for Google Users' Location Histories Face New
  Scrutiny,'' a Wall Street Journal article for the record from
  the Honorable Kelly Armstrong, Member, Subcommittee on
  Antitrust, Commercial and Administrative Law..................   89
Letter to Apple by Representatives Greg Walden and Cathy McMorris
  Rodgers from the Honorable Kelly Armstrong, Member,
  Subcommittee on Antitrust, Commercial and Administrative Law...   95
Letter to Google by Representatives Greg Walden and Cathy
  McMorris Rodgers from the Honorable Kelly Armstrong, Member,
  Subcommittee on Antitrust, Commercial and Administrative Law...   98

## APPENDIX

Statement for the record from Paul Rafelson, Executive Director,
  Online Merchants Guild.......................................  169
Letter to Mark Zuckerberg from Dr. Arthur C. Evans, Jr., Chief
  Executive Officer, American Psychological Association..........  212
Statement for the record from the Leadership Conference on Civil
  and Human Rights.............................................  216
Statement for the record from Richard Stables, Chief Executive
  Officers, the Kelkoo Group...................................  223
Statement for the record from Color of Change...................  225
Statement for the record from Caitriona Fitzgerald, Interim
  Associate Director and Policy Director, Electronic Privacy
  Information Center...........................................  232
Statement for the record from Christine Bannan, Policy Counsel,
  New America's Open Technology Institute......................  237
Statement for the record from Michael Beckerman, Vice President
  and Head of US Public Policy, TikTok.........................  245
Statement for the record from Dr. Ajintha Pathmanathan, ClinIQ...  251
Statement for the record from Michael Kleinman and Charanya
  Krishnaswami, Amnesty International...........................  263
Statement for the record from Margrethe Vestager, Executive Vice-
  President, European Commission...............................  267
Statement for the record from Dirk Van Dongen, President and CEO,
  National Association of Wholesaler-Distributors...............  275
Statement for the record from Jake Ward, President, Connected
  Commerce Council.............................................  278
Responses to Questions for the Record from Jeff Bezos, Chief
  Executive Officer, Amazon.com, Inc...........................  280
Responses to Questions for the Record from Sundar Pichai, Chief

EXHIBIT U(ii)

Executive Officer, Alphabet Inc......................... 335
Responses to Questions for the Record from Tim Cook, Chief
    Executive Officer, Apple Inc....................... 395
Responses to Questions for the Record from Mark Zuckerberg, Chief
    Executive Officer, Facebook, Inc.................. 421
Documents Referenced by Members at Hearing............. 437

              ONLINE PLATFORMS AND MARKET POWER, PART 6: EXAMINING THE DOMINANCE OF
                    AMAZON, APPLE, FACEBOOK, AND GOOGLE


                                 ----------


                          WEDNESDAY, JULY 29, 2020


                         House of Representatives


                    Subcommittee on Antitrust, Commercial,
                           and Administrative Law


                       Committee on the Judiciary


                             Washington, DC.


    The subcommittee met, pursuant to call, at 1:05 p.m., in
Room 2141, Rayburn House Office Building, Hon. David Cicilline
[chairman of the subcommittee] presiding.
    Present: Representatives Cicilline, Nadler, Johnson,
Raskin, Jayapal, Demings, Scanlon, Neguse, McBath,
Sensenbrenner, Jordan, Buck, Gaetz, Armstrong, and Steube.
    Staff Present: Phillip Berenbroick, Counsel; Joseph
Ehrenkrantz, Special Assistant; David Greengrass, Senior
Counsel; Madeline Strasser, Chief Clerk; Anthony Valdez, Staff
Assistant; John Williams, Parliamentarian; Amanda Lewis,
Counsel, ACAL; Joseph Van Wye, Professional Staff Member, ACAL;
Lina Khan, Counsel, ACAL; Slade Bond, Chief Counsel, ACAL;
Catherine Larsen, Special Assistant, ACAL; Chris Hixon,
Minority Staff Director; David Brewer, Minority Deputy Staff
Director; Tyler Grimm, Minority Chief Counsel for Policy and
Strategy; Stephen Castor, Minority General Counsel; Katy
Rother, Minority Deputy General Counsel and Parliamentarian;
Ella Yates, Minority Director of Member Services and
Coalitions; Douglas Geho, Minority Chief Counsel for
Administrative Law; and Kiley Bidelman, Minority Clerk.
    Mr. Cicilline. The subcommittee will come to order.
    Without objection, the chair is authorized to declare a
recess at any time.
    We welcome everyone to today's hearing on ``Online
Platforms and Market Power, Part 6: Examining the Dominance of
Amazon, Apple, Facebook, and Google.''
    Before we begin, I'd like to remind members that we have
established an email address and distribution list dedicated to
circulating exhibits, motions, or other written materials that
members might want to offer as part of our hearing today. If
you'd like to submit materials, please send them to the email
address that has been previously distributed to your offices,
and we will circulate the materials to members and staff as
quickly as we can.
    I would also remind all members that guidance from the
Office of the Attending Physician states that face coverings
are required for all meetings in an enclosed space, such as
committee hearings. I expect all members on both sides of the
aisle to wear a mask except when you are speaking.
    I now recognize myself for an opening statement.

EXHIBIT U(ii)

More than a year ago, this subcommittee launched an investigation into digital markets. Our two objectives have been to document competition problems in the digital economy and to evaluate whether the current antitrust framework is able to properly address them.

In September 2019, the chairmen and ranking members of the full committee and the subcommittee issued sweeping, bipartisan requests for information to the four firms that will testify at today's hearing. Since then, we've received millions of pages of evidence from these firms as well as documents and submissions from more than 100 market participants. We've also conducted hundreds of hours of interviews.

As part of this investigation, we have held five hearings to examine the effects of online market power on innovation and entrepreneurship, data privacy, a free and diverse press, and independent businesses in the online marketplace. We've held 17 briefings and roundtables with over 35 experts and stakeholders in support of our work.

This investigation has been bipartisan from the start. It's been an honor to work alongside my colleague Congressman Jim Sensenbrenner, the subcommittee's ranking member, as well as the former ranking member of the full committee, Congressman Doug Collins.

We've worked closely with all members of the subcommittee on both sides of the aisle who have taken this work seriously and studied these issues carefully. As my colleague Congressman Ken Buck recently commented, and I quote, ``This is the most bipartisan effort that I've been involved with in 5\1/2\ years of Congress,'' end quote.

The purpose of today's hearing is to examine the dominance of Amazon, Apple, Facebook, and Google.

Amazon runs the largest online marketplace in America, capturing 70 percent of all online marketplace sales. It operates across a vast array of businesses, from cloud computing and movie production to transportation logistics and small-business lending. Amazon's market valuation recently hit $1.5 trillion, more than that of Walmart, Target, Salesforce, IBM, eBay, and Etsy combined.

Apple is a dominant provider of smartphones, with more than 100 million iPhone users in the United States alone. In addition to hardware, Apple sells services and apps, including financial services, media, and games.

Facebook is the world's largest provider of social networking services, with a business model that sells digital ads. Despite a litany of privacy scandals and record-breaking fines, Facebook continues to enjoy booming profits--$18 billion last year alone.

Lastly, Google is the world's largest online search engine, capturing more than 90 percent of searches online. It controls key technologies in digital ad markets and enjoys more than a billion users across six products, including browsers, smartphones, and digital maps.

Prior to the COVID-19 pandemic, these corporations already stood out as titans in our economy. In the wake of COVID-19, however, they're likely to emerge stronger and more powerful than ever before. As American families shift more of their work, shopping, and communication online, these giants stand to profit. Locally owned businesses, meanwhile, mom-and-pop stores on Main Street, face an economic crisis unlike any in recent history. As hard as it is to believe, it's possible that our economy will emerge from this crisis even more concentrated and consolidated than before.

These companies serve as critical arteries of commerce and communications. Because these companies are so central to our modern life, their business practices and decisions have an

EXHIBIT U(ii)

outsized effect on our economy and our democracy. Any single action by one of these companies can affect hundreds of millions of us in profound and lasting ways.

Although these four corporations differ in important and meaningful ways, we've observed common patterns and competition problems over the course of this investigation.

First, each platform is a bottleneck for a key channel of distribution. Whether they control access to information or to a marketplace, these platforms have the incentive and ability to exploit this power. They can charge exorbitant fees, impose oppressive contracts, and extract valuable data from the people and businesses that rely on them.

Second, each platform uses its control over digital infrastructure to surveil other companies, their growth, business activity, and whether they might pose a competitive threat. Each platform has used this data to protect its power by either buying, copying, or cutting off access for any actual or potential rival.

Third, these platforms abuse their control over current technologies to extend their power. Whether it's through self-preferencing, predatory pricing, or requiring users to buy additional products, the dominant platforms have wielded their power in destructive, harmful ways in order to expand.

At today's hearing, we'll examine how each of these companies have used this playbook to achieve and maintain dominance and how their power shapes and affects our daily lives.

So why does this matter? Many of the practices used by these companies have harmful economic effects. They discourage entrepreneurship, destroy jobs, hike costs, and degrade quality. Simply put, they have too much power. This power staves off new forms of competition, creativity, and innovation. And while these dominant firms may still produce some new, innovative products, their dominance is killing the small businesses, manufacturing, and overall dynamism that are the engines of the American economy.

Several of these firms also harvest and abuse people's data to sell ads for everything from new books to dangerous so-called ``miracle'' cures. When everyday Americans learn how much of their data is being mined, they can't run away fast enough. But, in many cases, there is no escape from the surveillance, because there's no alternative. People are stuck with bad options.

Open markets are predicated on the idea that, if a company harms people, consumers, workers, and business partners will choose another option. We're here today because that choice is no longer possible.

In closing, I'm confident that addressing the problems we see in these markets will lead to a stronger, more vibrant economy. Because concentrated economic power also leads to concentrated political power, this investigation also goes to the heart of whether we, as a people, govern ourselves or whether we let ourselves be governed by private monopolies.

American democracy has always been at war against monopoly power. Throughout our history, we've recognized that concentrated markets and concentrated political control are incompatible with democratic ideals. When the American people confronted monopolists in the past, be it the railroads or the oil tycoons or AT&T and Microsoft, we took action to ensure no private corporation controls our economy or our democracy. We face similar challenges today.

As gatekeepers of the digital economy, these platforms enjoy the power to pick winners and losers, to shake down small businesses, and enrich themselves while choking off competitors. Their ability to dictate terms, call the shots,

EXHIBIT U(ii)

upend entire sectors, and inspire fear represent the powers of
a private government. Our Founders would not bow before a king,
nor should we bow before the emperors of the online economy.

And, with that, I now recognize the ranking member of the
subcommittee, Mr. Sensenbrenner, for his opening statement.

Mr. Sensenbrenner. Thank you, Mr. Chairman.

I want to thank the CEOs for quickly working with the
subcommittee to appear today. The memorial service for John
Lewis on Monday required our attention. However, this hearing
is vital to our oversight work, and I appreciate your
flexibility.

Throughout my long time in Congress, I have prioritized
oversight as one of our seminal responsibilities. Part of that
responsibility is to periodically review the effectiveness of
our laws. And I think it's a good and timely thing that we are
now turning our attention to technological innovations, which
brings us to all of your companies.

Our country stricken by a pandemic becomes a dramatic
illustration of the extraordinary reliance Americans have on
technological innovations. In these unexpected and
unprecedented times, your companies have provided innovations
so our Nation can meet a myriad of our daily needs: the
delivery of groceries, virtual visits with doctors, connecting
socially distant families, or keeping our small and large
businesses connected. With that responsibility comes an
increased scrutiny of your dominance in the marketplace.

I want to reiterate something I've said throughout this
investigation: Being big is not inherently bad. Quite the
opposite. In America, you should be rewarded for success.

We are here to better understand the role your companies
have in the digital marketplace and, importantly, the effect
they have on consumers and the public at large. You lead some
of today's most powerful companies, and my colleagues and I
have great interest in what your companies do with that
accumulated power.

We also know that the tech marketplace is driven by data.
So it follows that those who control the data in essence
control the marketplace. There are broader questions
surrounding data, however: Who owns the data? What
responsibilities do companies have to share it with their
customers or their competitors? What is the fair market value
of that data? Is there anything monopolistic in acquiring this
data? And what about monetizing it? These are complex issues
that Congress, regulators, and even your own companies are
wrestling with in the current technological landscape, and the
answers to which we owe the American consumers.

Since the tech investigation began, we have heard rumblings
from many who are quick to say your successful companies have
grown too large. Since this hearing was announced, it seems
that those complaints have gotten even louder. While I find
these complaints informative, I don't plan on litigating each
of these complaints today.

Antitrust law and the consumer welfare standard have served
this country well for over a century. Those laws have provided
the framework and creativity to make way for some of our most
successful and innovative companies. I will be the first to
highlight that. However, as the business landscape evolves, we
must ensure that our existing antitrust laws are applied to
meet the needs of our country and its consumers.

I share the concern that market dominance in the digital
space is ripe for abuse, particularly when it comes to free
speech. As we know, companies like Facebook, Google's YouTube,
and Twitter have become the public square of today, where
political debate unfolds in real-time. But reports that
dissenting views--often conservative views--are targeted or

EXHIBIT U(ii)

censored is seriously troubling. Conservatives are consumers too, and they need the protection of the antitrust laws. The power to influence debate carries with it remarkable responsibilities.

So let the facts be our guide here. Your companies are large. That's not a problem. Your companies are successful. That's not a problem either. But I want to leave here today with a more complete picture of how your individual companies use your size, success, and power and what it means to the American consumer.

And I yield back the balance of my time.

Mr. Cicilline. I thank the gentleman.

The chair now recognizes the distinguished chairman of the full committee, the gentleman from New York, Mr. Nadler, for his opening statement.

Chairman Nadler. Thank you, Mr. Chairman.

I want to thank you, Ranking Member Sensenbrenner, and the subcommittee members for the tremendous effort that you have all put into this subcommittee's investigation. I appreciate your calling this hearing today so that we can hear directly from the leaders of Amazon, Apple, Facebook, and Google, and I look forward to an important dialogue.

Today, it is effectively impossible to use the internet without using, in one way or another, the services of these four companies. I have long believed, with Thomas Jefferson and Louis Brandeis, that concentration of power in any form, especially concentration of economic or political power, is dangerous to a democratic society. That is why we must examine these and other companies that play a dominant role in our economy and in our society and ensure that our antitrust laws give enforcers the tools they need to preserve a healthy marketplace. These principles have guided this committee's year-long investigation into competition in digital markets, and they are the lens through which I approach today's hearing.

The open internet has delivered enormous benefits to Americans, including a surge of economic opportunity, massive investment, and new pathways for education online. But there's growing evidence that a handful of corporations have come to capture an outsized share of online commerce communications.

From providing the dominant search platform, retail platform, and online messaging platform, to providing the underlying mapping services and cloud computing on which hundreds of thousands of other businesses rely, these dominant platforms now comprise the essential infrastructure for the 21st century.

By virtue of controlling essential infrastructure, these companies have the ability to control access to markets. In some basic ways, the problem is not unlike what we faced 130 years ago when railroads transformed American life, both enabling farmers and producers to access new markets but also creating a key chokehold that the railroad monopolies could exploit.

Railroads notoriously abused this gatekeeper power in a variety of ways. They charged tolls, extorting the producers reliant on their rails. They discriminated among farmers, picking winners and losers across the economy. And by expanding into lines of business that competed directly with producers, they could use their dominance in transportation to pay for their own services.

These tactics by the railroads spurred fury and despair across the country. Congress initiated investigations to document these problems and enacted legislative solutions to halt and outlaw these anticompetitive practices in the railroad industry and other industries dominated by unregulated monopolies and trusts.

EXHIBIT U(ii)

Importantly, congressional oversight and legislative reforms during this period did not prevent or encumber the inexorable arrival of new technology or human progress. Instead, Congress recognized that these powerful new technologies had reshaped the balance of power in our economy and that it was the role of Congress to ensure that the new monopolists could not abuse their power.

Today, the digital economy poses similar challenges. While the underlying technology is dramatically different, of course, new digital intermediaries have the ability to control access to critical markets. If you are an independent merchant, developer, or content producer, you are increasingly reliant on these powerful intermediaries to access markets and consumers. Across the economy, many businesses live in fear of exclusion from these platforms, a fact that some companies have shared with the committee over the past year during this investigation.

The subcommittee's current review of competition in the digital marketplace continues a long tradition in this committee of oversight of the antitrust laws and our economy. From the days of Chairman Emanuel Celler, the House Judiciary Committee and its Antitrust Subcommittee have conducted careful, fact-based inquiries into industrial sectors showing signs of consolidation and anticompetitive conduct. This has continued on a bipartisan basis over the years, from Chairmen Brooks and Hyde to Chairmen Sensenbrenner and Conyers and others.

As a 1950 report from the then-named Subcommittee on Monopoly Power described our mandate, quote, ``It is the province of this subcommittee to investigate factors which tend to eliminate competition, strengthen monopolies, injure small businesses, or promote undo concentration of economic power, to ascertain the facts, and to make recommendations based on those findings.''

Following in this proud tradition, our investigation has held hearings with industry and government witnesses, consultations with subject matter experts, and the careful and at times painstaking review of large volumes of evidence provided by industry participants and regulators.

While ultimately it is the responsibility of the antitrust enforcement agencies to enforce the law, Congress has an obligation to assess whether existing antitrust laws and competition policies and the will to enforce those laws and policies are adequate to address the competition issues facing our country and to take action if they are found to be lacking.

Given the dominant role that these four companies play in our economy and our society, it is only reasonable that our careful examination of the antitrust laws begin with them.

I appreciate the participation of all of our witnesses today. Our investigation would not be complete--indeed, it has hardly begun--without hearing directly from the decisionmakers of these companies. And I look forward to their testimony and to today's discussion.

I yield back the balance of my time.

Mr. Cicilline. I thank the gentleman.

And I now recognize the ranking member of the full committee, the gentleman from Ohio, Mr. Jordan, for his opening statement.

Mr. Jordan. Thank you, Mr. Chairman.

And I also want to thank the ranking member of this subcommittee, Mr. Sensenbrenner. I'm not sure how many more committee hearings this subcommittee or the full committee are going to have this Congress, but I want to thank Jim for his great work for the constituents of his district in Wisconsin for this many years and for the work he has done for this

EXHIBIT U(ii)

entire committee.

I'll just cut to the chase: Big Tech's out to get conservatives. That's not a suspicion. That's not a hunch. That's a fact.

July 20, 2020, Google removes the homepages of Breitbart and The Daily Caller. Just last night, we learned Google has censored Breitbart so much traffic had declined 99 percent.

June 16, 2020, Google threatens to demonetize and ban The Federalist.

April 19, 2020, Google and YouTube announce a policy censoring content that conflicts with recommendations of the World Health Organization. Now, think about that. The World Health Organization, an organization that lied to us, the organization that shilled for China, and if you contradict something they say--they can say whatever they want. They can lie for China. They can shill for China. You say something against them, you get censored.

June 29, 2020, Amazon bans President Trump's account on Twitch after he raises concerns about defunding the police.

June 4, 2020, Amazon bans a book critical of the coronavirus lockdowns written by a conservative commentator.

May 27, 2020, AmazonSmile won't let you give to the Family Research Council and the Alliance Defense Fund, but you can give to Planned Parenthood.

Facebook, June 19, 2020, takes down posts from President Trump's reelection campaign.

November 1, 2018, Facebook silences a pro-life organization's advertisement.

May 19, 2016, former Facebook employees admit Facebook routinely suppresses conservative views.

And I haven't even mentioned Twitter, who we actually invited, Mr. Chairman. We asked for you guys to invite them as one of our witnesses. You guys said no. I haven't even mentioned them.

Two years ago, they shadow banned two members of this committee. Four Members of Congress were shadowed banned 2 years ago. Four-hundred-and-thirty-five in the House, 100 in the Senate, 535. Only four--only four--Gaetz, Meadows, Nunes, Jordan--only four get shadowed banned.

And, of course, what did Mr. Dorsey tell us? He said, oh, it was just a glitch in our algorithm. Just a glitch. I asked him, what did you put in the algorithm, the names ``Gaetz,'' ``Meadows,'' ``Nunes,'' ``Jordan''? I mean, if I had a nickel for every time I heard it was just a glitch, I wouldn't be as wealthy as our witnesses but I'd be doing all right. We've heard that excuse time and time again.

May 28, Twitter censors President Trump's tweet on the riots in Minneapolis.

May 29, 2020, Twitter censors the White House for quoting the President's comments about the riots in Minneapolis.

June 23, 2020, Twitter censors the President again for saying he'll enforce the rule of law against any autonomous zone in Washington, D.C. You can tweet all you want about the autonomous zone that happened in Seattle, but the President tweets that he's not going to have one in Washington, D.C.--oh, oh, oh, nope, you can't do that. You get banned, you get censored.

Dozens of examples--oh, I forgot one. I forgot one. Just last week, July 21, July 21, here's what Twitter did. The leader of Iran, the Islamic Republic of Iran--this is from the largest state sponsor of terrorism. Twitter allows this tweet: Quote, ``The Islamic Republic of Iran will never forget the martyrdom of Soleimani and will definitely strike a reciprocal blow in the United States.''

So you can threaten the citizens of this great country, the

EXHIBIT U(ii)

leader of the largest state sponsor of terrorism, that's just fine. But, oh, the President says he's not going to allow some autonomous zone in D.C., and he gets censored.

Mr. Jordan. All kinds of examples, most of them from this year. And that's what's, I think, critical for us all to understand: most of them from this year, an election year. And that's what concerns me and so many Americans.

Because we saw what Google did in 2016. We all know about the email the day after the election, where top executives at Google--email chain where they talked about the silent donation Google made to the Clinton campaign. Now, thank goodness, it wasn't enough and, in spite of their efforts to help Clinton, President Trump won.

But we're 97 days before an election. And the power, as the previous chairman and ranking member have said, the power these companies have to impact what happens during an election, what American citizens get to see prior to their voting, is pretty darn important. That's why this committee hearing's important.

Look, we all think the free market's great. We think competition's great. We love the fact that these are American companies. But what's not great is censoring people, censoring conservatives, and trying to impact elections. And if it doesn't end, there has to be consequences. There has to be consequences. That's what I'm concerned about and, I think, what so many Americans are concerned about.

So I look forward to hearing from our witnesses, Mr. Chairman.

And before I yield back, Mr. Chairman, we have a colleague--I would ask unanimous consent that Mr. Johnson, the ranking member of the Constitution Subcommittee, be allowed to participate in today's hearing, which is our customary practice for subcommittee hearings.

Mr. Cicilline. The gentleman makes a unanimous consent request----

Mr. Raskin. Mr. Chairman, I would object.

Mr. Cicilline. Objection is heard.

I now have the pleasure of introducing today's witnesses---

Mr. Jordan. Mr. Chairman, why are we not allowing--it is customary.

Mr. Cicilline. Mr. Jordan, there was a unanimous consent request. Objection was heard. I now will introduce our witnesses.

It is now my pleasure----

Mr. Jordan. This has never happened in the history of the Judiciary Committee.

Mr. Cicilline. It is now my pleasure to introduce today's witnesses.

Our first witness is Jeff Bezos, the chief executive officer----

Mr. Jordan. And this is----

Mr. Cicilline. Mr. Jordan, I have the time.

Mr. Jordan. But this is the ranking member of the--we're talking about people's liberties here, and we've got the ranking member----

Mr. Cicilline. Mr. Jordan, you made a unanimous consent request. Objection was heard. Those are our rules.

Mr. Jordan. The objection was not----

Mr. Cicilline. It is now my pleasure to introduce today's witnesses.

Mr. Jordan [continuing]. Law professor----

Mr. Cicilline. Our first witness is Jeff Bezos----

Mr. Raskin. Put your mask on.

Mr. Cicilline [continuing]. The chief executive officer of Amazon.com. Mr. Bezos founded Amazon in----

EXHIBIT U(ii)

Mr. Jordan. I'm still speaking----

Mr. Cicilline. Excuse me. I'm going to remind members of this committee, unless you are speaking, our rules require you to wear a mask, according to the Attending Physician.

Mr. Jordan. I'm still----

Mr. Cicilline. No, I'm speaking about another member of this committee.

I'll begin again.

It is now my pleasure to introduce today's witnesses.

Our first witness is Jeff Bezos, the chief executive officer of Amazon.com. Mr. Bezos founded Amazon in 1994 as an online bookstore. Since then, Amazon has grown to be the largest online retailer on the internet. Mr. Bezos also oversees his company's expansion into areas including cloud computing, digital streaming, and artificial intelligence. Mr. Bezos received his bachelor's of science from Princeton University.

Our second witness, Sundar Pichai, is the chief executive officer of both Alphabet and its subsidiary, Google. Mr. Pichai joined Google in 2004 and has helped manage a number of successful products, including Google Chrome, Gmail, and the Android operating system. Mr. Pichai also oversaw the company's popular search products. Prior to his time at Google, Mr. Pichai worked in management consulting at McKinsey. Mr. Pichai received a degree in metallurgical engineering from the Indian Institute of Technology, a master's degree from Stanford University, and an MBA from the Wharton School at the University of Pennsylvania.

Our third witness is Tim Cook, the chief executive officer of Apple. Mr. Cook joined Apple in 1998 and served as its chief operational officer under Steve Jobs. In 2011, Mr. Cook was named CEO. While at Apple, he has overseen their expansion into new markets through the launch and development of products and services like Apple Pay, Apple Watch, iCloud, Apple Card, and HomePod. Prior to joining Apple, Mr. Cook served as the director of North American fulfillment for IBM. Mr. Cook received a bachelor of science from Auburn University and an MBA from Duke University's Fuqua School of Business.

The last witness at today's hearing is Mark Zuckerberg, founder, chairman, and CEO of Facebook. Mr. Zuckerberg initially launched Facebook in order to help connect college students at his school more easily. Since then, the company has grown into the world's largest social media platform, with 1.7 billion global daily active users. Mr. Zuckerberg attended Harvard University, leaving in 2005 to focus full-time on developing Facebook.

We welcome all of our distinguished witnesses and thank them for participating in today's hearing.

And now we'll begin by swearing you in. And before I do that, I want to also remind you that you are the only ones from your respective companies invited to testify today and that, in accordance with normal House practice and section G of the House remote committee proceeding regulations, your sworn testimony must be your own. Please let me know if at any point in the hearing you wish to mute yourself so you can confer with your counsel.

So will you please unmute your microphones and raise your right hands?

Do you swear or affirm under penalty of perjury that the testimony you're about to give is true and correct to the best of your knowledge, information, and belief, so help you God?

Mr. Bezos. Yes.

Mr. Pichai. I do.

Mr. Zuckerberg. Yes.

Mr. Cook. I do.

EXHIBIT U(ii)

Mr. Cicilline. Let the record show the witnesses answered in the affirmative.

Thank you, and you may remain seated.

Please note that your written statements will be entered into the record in their entirety. Accordingly, I ask that you summarize your testimony in 5 minutes. To help you stay within that time, there is a timing light in Webex. When the light switches from green to yellow, you have 1 minute to conclude your testimony. When the light turns red, it signals your 5 minutes have expired.

Mr. Bezos, you may begin.

TESTIMONY OF JEFF BEZOS, CHIEF EXECUTIVE OFFICER, AMAZON.COM, INC.; SUNDAR PICHAI, CHIEF EXECUTIVE OFFICER, ALPHABET INC.; TIM COOK, CHIEF EXECUTIVE OFFICER, APPLE INC.; AND MARK ZUCKERBERG, CHIEF EXECUTIVE OFFICER, FACEBOOK, INC.

TESTIMONY OF JEFF BEZOS

Mr. Bezos. Thank you, Chairman Cicilline, Ranking Member Sensenbrenner, and members of the subcommittee.

I was born into great wealth, not monetary wealth but, instead, the wealth of a loving family, a family that fostered my curiosity and encouraged me to dream big.

My mom, Jackie, had me when she was a 17-year-old high school student in Albuquerque. Being pregnant in high school was not popular. The school tried to kick her out, but she was allowed to finish after my grandfather negotiated terms with the principal. She couldn't have a locker, no extracurriculars, and couldn't walk across the stage to get her diploma. She graduated and was determined to continue her education, so she enrolled in night school, bringing me, her infant son, to class with her throughout.

My dad's name is Miguel. He adopted me when I was 4. He was 16 when he came to the U.S. from Cuba by himself shortly after Castro took over. My dad didn't speak English, and he did not have an easy path. What he did have was grit and determination. He received a scholarship to college in Albuquerque, which is where he met my mom.

Together with my grandparents, these hardworking, resourceful, and loving people made me who I am.

I walked away from a steady job on Wall Street into a Seattle garage to found Amazon, fully understanding that it might not work. It feels like just yesterday I was driving the packages to the post office myself, dreaming that one day we might afford a forklift.

Customer obsession has driven our success, and I take it as an article of faith that customers notice when you do the right thing. You earn trust slowly, over time, by doing hard things well, delivering on time, offering everyday low prices, making promises and keeping them, and making principled decisions, even when they are unpopular.

And our approach is working. Eighty percent of Americans have a favorable impression of Amazon overall. Who do Americans trust more than Amazon to do the right thing? Only their doctors and the military.

The retail market we participate in is extraordinarily large and competitive. Amazon accounts for less than 1 percent of the $25 trillion global retail market and less than 4 percent of U.S. retail. There's room in retail for multiple winners. We compete against large, established players like Target, Costco, Kroger, and, of course, Walmart, a company more than twice Amazon's size.

Twenty years ago, we made the decision to invite other sellers to sell in our store, to share the same valuable real

EXHIBIT U(ii)

estate we spent billions to build, market, and maintain. We
believed that combining the strengths of Amazon's store with
the vast selection of products offered by third parties would
be a better experience for customers and that the growing pie
of revenue and profits would be big enough for all. We were
betting that it was not a zero-sum game. Fortunately, we were
right. There are now 1.7 million small and medium-size
businesses selling on Amazon.

The trust customers put in us every day has allowed Amazon
to create more jobs in the United States over the past decade
than any other company--hundreds of thousands of jobs across 42
states. Amazon employees make a minimum of $15 an hour, more
than double the federal minimum wage. And we offer the best
benefits--benefits that include comprehensive health insurance,
401(k) retirement, and parental leave, which includes 20 weeks
of paid maternity leave.

More than any place on Earth, entrepreneurial companies
start, grow, and thrive here in the U.S. We nurture
entrepreneurs and startups with stable rule of law, the finest
university system in the world, the freedom of democracy, and a
deeply accepted culture of risk-taking.

Of course, this great Nation of ours is far from perfect.
Even as we remember Congressman John Lewis and honor his
legacy, we're in the middle of a much-needed race reckoning. We
also face the challenges of climate change and income
inequality, and we're stumbling through the crisis of a global
pandemic.

Still, with all of our faults and problems, the rest of the
world would love even the tiniest sip of the elixir we have
here in the U.S. Immigrants like my dad see what a treasure
this country is. They have perspective and often can see it
even more clearly than those of us who were lucky enough to be
born here.

It is still day one for this country, and even in the face
of today's humbling challenges, I have never been more
optimistic about our future.

I appreciate the opportunity to appear before you today,
and I'm very happy to take your questions.

[The statement of Mr. Bezos follows:]


[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]


Mr. Cicilline. Thank you, Mr. Bezos.
Mr. Pichai, you are now recognized for 5 minutes.

TESTIMONY OF SUNDAR PICHAI

Mr. Pichai. Thank you, Mr. Chairman, Ranking Member
Sensenbrenner, and members of the subcommittee.

Before I start, I know this hearing was delayed because of
the ceremonies to honor the life of your colleague,
Representative John Lewis. Because of his courage, this world
is a better place. He'll be deeply missed.

At its heart, a discussion about competition is a
discussion about opportunity. This has never been more
important, as the global pandemic poses dual challenges to our
health and our economy.

Expanding access to opportunity through technology is
personal to me. I didn't have much access to a computer growing
up in India, so you can imagine my amazement when I arrived in
the U.S. for graduate school and saw an entire lab of computers
to use whenever I wanted.

Accessing the internet for the first time set me on a path
to bring technology to as many people as possible. It inspired

EXHIBIT U(ii)

me to build Google's first browser, Chrome. I'm proud that, 11 years later, so many people experience the web through Chrome for free.

Google takes pride in the number of people who choose our products. We are even prouder of what they do with them. From the 140 million students and teachers using G Suite for education to stay connected during the pandemic, to the 5 million Americans gaining digital skills through Grow with Google, to all the people who turn to Google for help, from finding the fastest route home to learning how to cook a new dish on YouTube.

Google's work would not be possible without the long tradition of American innovation, and we are proud to contribute to its future. We employ more than 75,000 people in the U.S. across 26 States. The Progressive Policy Institute estimated that in 2018 we invested more than $20 billion in the U.S., citing us as the largest capital investor in America that year and one of the top five for the last 3 years.

One way we contribute is by building helpful products. Research found that free services like Search, Gmail, Maps, and Photos provide thousands of dollars a year in value to the average American, and many are small businesses using our digital tools to grow.

Stone Dimensions, a family-owned stone company in Pewaukee, Wisconsin, uses Google My Business to draw more customers. Gil's Appliances, a family-owned appliance store in Bristol, Rhode Island, credits Google Analytics with helping them reach customers online during the pandemic. Nearly one-third of small-business owners say that without digital tools they would have had to close all or part of their business during COVID.

Another way we contribute is by being among the world's biggest investors in research and development. At the end of 2019, our R&D spend had increased tenfold over 10 years, from $2.8 billion to $26 billion, and we have invested over $90 billion the last 5 years. Our engineers are helping America remain a global leader in emerging technologies like artificial intelligence, self-driving cars, and quantum computing.

Just as America's technology leadership is not inevitable, Google's continued success is not guaranteed. New competitors emerge every day, and, today, users have more access to information than ever before. Competition drives us to innovate, and it also leads to better products, lower prices, and more choices for everyone. For example, competition helped lower online advertising costs by 40 percent over the last decade, with savings passed down to consumers.

Open platforms like Android also support the innovation of others. Using Android, thousands of mobile operators build and sell their own devices without paying any licensing fees to us. This has enabled billions of consumers to offer cutting-edge smartphones, some for less than $50. Whether building tools for small businesses or platforms like Android, Google succeeds when others succeed.

Competition also sets higher standards for privacy and security. I've always believed that privacy is a universal right. And Google is committed to keeping your information safe, treating it responsibly, putting you in control. And we've long supported the creation of comprehensive Federal privacy laws.

I've never forgotten how access to technology and innovation changed the course of my life. Google aims to build products that increase access to opportunity for everyone, no matter where you live, what you believe, or how much money you earn. We are committed to doing this responsibly, in partnership with lawmakers, to ensure every American has access to the incredible opportunity technology creates.

EXHIBIT U(ii)

Thank you.
[The statement of Mr. Pichai follows:]

[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

    Mr. Cicilline. Thank you, Mr. Pichai.
    Mr. Cook is now recognized for 5 minutes.

                    TESTIMONY OF TIM COOK

    Mr. Cook. Chairmen Cicilline and Nadler, Ranking Members
Sensenbrenner and Jordan, members of the subcommittee, thank
you for the opportunity to offer testimony.
    Before I begin, I want to recognize the life and legacy of
John Lewis. I join you in mourning not only a hero but someone
I knew personally, whose example inspires and guides me still.
Every American owes John Lewis a debt, and I feel fortunate to
hail from a state and a country that benefited so profoundly
from his leadership.
    My name is Tim Cook. I've been Apple's CEO since 2011 and a
proud employee of this uniquely American company since 1998. At
Apple, we make ourselves a promise and our customers a promise;
it's a promise that we'll only build things that make us proud.
As Steve put it, we only make things that we'd recommend to our
family and friends.
    You can try to define this difference in a lot of ways. You
can call it the seamless integration of hardware and software.
You can call it simplicity of design or a great ecosystem. All
of those things are true. But if you want to put it simply,
products like iPhone just work. When customers consistently
give iPhone a 99 percent satisfaction rating, that's the
message they're sending about the user experience.
    But we also know that customers have a lot of choices and
that our products face fierce competition. Companies like
Samsung, LG, Huawei, and Google have built successful
businesses with different approaches. We're okay with that. Our
goal is the best, not the most. In fact, we don't have a
dominant share in any market or in any product category where
we do business.
    What does motivate us is that timeless drive to build new
things that we're proud to show our users. We focus
relentlessly on those innovations, on deepening core principles
like privacy and security, and on creating new features.
    In 2008, we introduced a new feature of the iPhone called
the App Store. Launched with 500 apps, which seemed like a lot
at the time, the App Store provided a safe and trusted way for
users to get more out of their phone.
    We knew the distribution options for software developers at
the time didn't work well. Brick-and-mortar stores charged high
fees and had limited reach. Physical media, like CDs, had to be
shipped and were hard to update.
    From the beginning, the App Store was a revolutionary
alternative. App Store developers set prices for their apps and
never pay for shelf space. We provide every developer with
cutting-edge tools like compilers, programming languages, and
more than 150,000 essential software building blocks called
APIs.
    The App Store guidelines ensure a high-quality, reliable,
and secure user experience. They are transparent and applied
equally to every developer.
    For the vast majority of apps, developers keep 100 percent
of the money they make. The only apps that are subject to a
commission are those where the developer acquires a customer on
an Apple device and where the features or services would be
experienced and consumed on an Apple device.

EXHIBIT U(ii)

In the App Store's more-than-10-year history, we have never raised a commission or added a single fee. In fact, we've reduced it for subscriptions and exempted additional categories of apps.

I'm here today because scrutiny is reasonable and appropriate. We approach this process with respect and humility. But we make no concession on the facts. What began as 500 apps is now more than 1.7 million, only 60 of which are Apple software. If Apple is a gatekeeper, what we've done is open the gate wider. We want to get every app we can on the Store, not keep them off.

The App Store's economic contributions are significant. The ecosystem is responsible for 1.9 million jobs in all 50 states, and it facilitated $138 billion in commerce in the U.S. in 2019 alone.

I share the committee's belief that competition promotes innovation, that it makes space for the next great idea, and that it gives consumers more choices. Since Apple was founded, these things have defined us. The first Mac brought opportunity and possibility into the home. The iPod helped musicians and artists to share their creations and be paid fairly for it. This legacy does much more than make us proud; it inspires us to work tirelessly to make sure tomorrow will be even better than today.

Thank you very much. I look forward to responding to your questions.

[The statement of Mr. Cook follows:]

[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

Mr. Cicilline. Thank you, Mr. Cook.
Mr. Zuckerberg is now recognized for 5 minutes.

TESTIMONY OF MARK ZUCKERBERG

Mr. Zuckerberg. Thank you.
Before I begin, I want to add my voice to those honoring Congressman John Lewis and his service to our country. America has lost a real hero who never stopped fighting for the rights of every person.

Chairman Cicilline, Ranking Member Sensenbrenner, members of the subcommittee, thank you for the opportunity to testify.

The tech industry is an American success story. The products we build have changed the world and improved people's lives. Our industry is one of the ways that America shares its values with the world and one of our greatest economic and cultural exports.

Facebook is part of this story. We started with an idea: to give people the power to share and connect. And we've built services that billions of people find useful.

I'm proud that we've given people who've never had a voice before the opportunity to be heard and given small businesses access to tools that only the largest players used to have.

Since COVID emerged, I'm proud that people have used our services to stay in touch with friends and family who they can't be with in person and to keep their small businesses running online when physical stores are closed.

I believe that Facebook and the U.S. tech industry are a force for innovation and empowering people, but I recognize that there are concerns about the size and power of tech companies.

Our services are about connection, and our business model is advertising, and we face intense competition in both. Many of our competitors have hundreds of millions or billions of users. Some are upstarts, but others are gatekeepers with the

EXHIBIT U(ii)

power to decide if we can even release our apps in their app stores to compete with them.

In many areas, we are behind our competitors. The most popular messaging service in the U.S. is iMessage. The fastest growing app is TikTok. The most popular app for video is YouTube. The fastest growing ads platform is Amazon. The largest ads platform is Google. And for every dollar spent on advertising in the U.S., less than 10 cents is spent with us.

We're here to talk about online platforms, but I think the true nature of competition is much broader. When Google bought YouTube, it could compete against the dominant player in video, which was the cable industry. When Amazon bought Whole Foods, it could compete against Kroger's and Walmart. When Facebook bought WhatsApp, we could compete against telcos who used to charge 10 cents a text message but not anymore. Now, people can watch video, get groceries delivered, and send private messages for free. That's competition.

New companies are created all the time, all over the world, and history shows that if we don't keep innovating, someone will replace every company here today. And that change can often happen faster than you expect. Of the 10 most valuable companies a decade ago, only 3 still make that list today. And if you look at where the top technology companies have come from, a decade ago, the vast majority were American. Today, almost half are Chinese.

Aside from competition, there are other serious issues related to the internet, including questions about elections, harmful content, and privacy. And while these are not antitrust issues and are not specifically the topic of today's hearing, I recognize that we are often at the center of these discussions.

We build platforms for sharing ideas, and important debates play out across our services. I believe that this ultimately leads to more progress, but it means we often find ourselves in the middle of deep disagreements about social issues and high-stakes elections.

I personally don't believe that private companies should be making so many decisions about these issues by themselves. And that's why, last year, I made the case that there needs to be new regulation for the internet.

Facebook stands for a set of basic principles: giving people voice and economic opportunity; keeping people safe; upholding democratic traditions like freedom of expression and voting; and enabling an open and competitive marketplace. These are fundamental values for most of us but not for everyone in the world--not for every company we compete with or the countries they represent. And as global competition increases, there is no guarantee that our values will win out.

I am proud of the services we build and how they improve people's lives. We compete hard. We compete fairly. We try to be the best. That's what I was taught matters in this country. And when we succeed, it's because we deliver great experiences that people love.

Thank you, and I look forward to answering your questions.
[The statement of Mr. Zuckerberg follows:]

[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

Mr. Cicilline. Thank you.
And I thank the witnesses for your opening statements.
Before I begin recognizing members for questioning under the 5-minute rule, without objection, I'm going to enter into the hearing record the documents and exhibits majority members will be referencing in their questioning today. These materials have been distributed to the witnesses.
[The information follows:]

EXHIBIT U(ii)

```
     MR. CICILLINE FOR THE OFFICIAL RECORD
```

===================================================================

[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

Mr. Cicilline. I will now recognize myself for 5 minutes.

Mr. Pichai, over 85 percent of all online searches go through Google. Every online company in the United States depends on Google to reach users. A business may sink or swim based on Google's decisions alone.

Numerous online businesses told us that Google steals their content and privileges its own sites in ways that profit Google but crush everyone else. Most businesses asked to stay anonymous due to fears that Google would retaliate against them.

One entrepreneur, Brian Warner, told us his website was thriving until Google stole his content. After Google's decision, traffic to his website dropped by 80 percent. He had to downsize his business and lay off half his staff. He told us, and I quote, ``If someone came to me with an idea for a website or a web service today, I'd tell then to run--run as far away from the web as possible. Launch a lawn-care business or a dog-grooming business, something Google can't take away as soon as he or she is thriving.''

So my first question, Mr. Pichai, is why does Google steal content from honest businesses?

Mr. Pichai. Mr. Chairman, with respect, I disagree with that categorization.

Just last week, I met with many small businesses. In fact, today, we support 1.4 million small businesses, supporting over $385 billion in economic activity.

We see many businesses thrive, particularly even during the pandemic. An example: Kettle Kings in Texas, which sells kettlebells, they've really expanded----

Mr. Cicilline. Mr. Pichai, I have a limited amount of time, so I don't want to interrupt you, but my question is very specific.

We've heard throughout this investigation that Google has stolen content to build your own business. These are consistent reports. And so your testimony that that doesn't happen is really inconsistent with what we've learned during the course of the investigation.

But I'll move on to a new question.

Mr. Pichai, most Americans believe that when they enter a search query that what Google shows are the most relevant results. But, increasingly, Google just shows whatever is most profitable for Google, be it Google Ads or Google's own sites.

And so my question, Mr. Pichai: Isn't there a fundamental conflict of interest between serving users who want to access the best and most relevant information and Google's business model, which incentivizes Google to sell ads and keep users on Google's own sites?

Mr. Pichai. We have always focused on providing users the most relevant information. And we rely on that trust for users to come back to Google every day.

In fact, the vast majority of queries in Google, we don't show ads at all. And we show ads only for a small subset of queries where the intent from users is highly commercial. For example, they may be looking for something like TV sets or so on. So----

Mr. Cicilline. But, Mr. Pichai, what is the value of the part that you do use the Google Ads for? I mean, it's a

EXHIBIT U(ii)

substantial part of your business. What's the actual value?
$200 billion? $300 billion?

Mr. Pichai. You know, in terms of revenue, it's around
$100-plus billion.

Mr. Cicilline. Okay.

Mr. Pichai. But----

Mr. Cicilline. That's a lot of money, Mr. Pichai.

Let me move on.

Really, Mr. Pichai, it's Google's business model that is
the problem. Our documents show that Google evolved from a
turnstile to the rest of the web to a walled garden that
increasingly keeps users within its sites.

Emails show that, over a decade ago, Google started to fear
competition from certain websites, web pages that could divert
search traffic and revenue from Google. These documents show
that Google staff discussed the ``proliferating threat,'' is
how it was described, that these web pages posed to Google. Any
traffic lost to other sites was a loss in revenue. One of
Google's memos observed that certain websites were getting, and
I quote, ``too much traffic,'' so Google decided to put an end
to that.

Mr. Pichai, you've been at Google since 2004. Were you
involved in these discussions about the threat from vertical
search?

Mr. Pichai. Congressman, without knowing the specifics, you
know, I'm not really clear of the context.

But, definitely, when we look at vertical searches, it
validates the competition we see. For example, when users come
looking to shop online, independent studies show that over 55
percent of product searches originate with Amazon and over 70
percent originate with the major e-commerce companies.

In the few categories which are commercial in nature, we
see vigorous competition, be it travel, be it real estate. And
we are working hard for----

Mr. Cicilline. Well, let me ask very specifically, Mr.
Pichai: The evidence that we collected shows that Google
pursued a multipronged attack.

First, Google began to steal other web pages' content. For
example, in 2010, Google stole restaurant reviews from Yelp to
bootstrap its own rival local search business.

Mr. Pichai, do you know how Google responded when Yelp
asked you to stop stealing their reviews?

Well, I'll tell you. Our investigation shows that Google's
response was to threaten to delist Yelp entirely. In other
words, the choice Google gave Yelp was: Let us steal your
content, or effectively disappear from the web.

Mr. Pichai, isn't that anticompetitive?

Mr. Pichai. Congressman, you know, when I run the company,
I am really focused on giving users what they want. We conduct
ourselves to the highest standard. Happy to engage, understand
the specifics, and answer your questions further.

Mr. Cicilline. Thank you.

And I just have one final series of questions, Mr. Pichai.
Did Google ever use its surveillance over web traffic to
identify competitive threats?

Mr. Pichai. Congressman, just like other businesses, we try
to understand trends from, you know, data which we can see, and
we use it to improve our products for our users. But we are
really focused on improving our products, and that's how----

Mr. Cicilline. I appreciate that, Mr. Pichai.

Google's own documents and numerous interviews with
companies affected by this conduct show that Google did just
that, which is very disturbing and very anticompetitive.

In addition to stealing content, Google also began to
privilege its own sites. An investigative report published just

EXHIBIT U(ii)

yesterday found that 63 percent of web searches that start on Google also end somewhere on Google's own websites.

And, to me, that's evidence that Google is increasingly a walled garden which keeps users on Google sites even if Google doesn't have the most relevant information. And it's economically catastrophic for other companies online.

And so my time is running out, but, Mr. Pichai, I'll just end by saying, the evidence seems very clear to me. As Google became the gateway to the internet, it began to abuse its power. It used its surveillance over web traffic to identify competitive threats and crush them. It has dampened innovation and new business growth. And it's dramatically increased the price of accessing users on the internet, virtually ensuring that any business that wants to be found on the web must pay Google a tax.

And, with that, I recognize the ranking member of the subcommittee, Mr. Sensenbrenner, for his first round of questions.

Mr. Sensenbrenner. Thank you very much, Mr. Chairman.

I've been in Congress 42 years. That's coming to an end at the end of this year. I'm breathing a sigh of relief. But during that period of time, during the decade of the 1990s and the 2000s, you know, I was involved, as chairman of the Science Committee and chairman of this committee, in trying to make the net universal, you know, and open it up to everybody.

And one of the theses that we used is that the net should end up becoming basically the debate on issues, not only in our country but throughout the world. And in exchange for that, this committee and the Congress gave internet service providers immunity, so if somebody said something defamatory in what they posted, the ISPs could not be a part of a lawsuit for defamation.

Now, after hearing Mr. Jordan give a long line of censorship of conservative viewpoints, you know, I am concerned that the people who manage the net--and the four of you manage a big part of the net--you know, are ending up using this as a political screen.

Conservatives are consumers too. And the way the net was put together, in the eyes of Congress, is that everybody should be able to speak their mind.

Mr. Zuckerberg, Mr. Jordan's litany of censorship zeros in on Facebook. Exactly what are your standards in, quote, ``filtering out'' political speech that maybe some people out there don't agree with?

Mr. Zuckerberg. Congressman, thank you for the opportunity to address this.

Our goal is to offer a platform for all ideas. We want to give everyone in the world a voice to share their experiences and ideas. A lot of that is day-to-day things that happen in their lives; some of it is political. And, frankly, I think that we've distinguished ourselves as one of the companies that defends free expression the most.

We do have community standards around things that you can and cannot say. I think you would likely agree with most of them. They ban categories of harm such as promoting terrorist propaganda, child exploitation, incitement of violence, some more legalistic things like intellectual property violations. And they also ban things like hate speech that could lead to dehumanizing people and----

Mr. Sensenbrenner. Now, if I----

Mr. Zuckerberg [continuing]. Encouraging violence down the road.

Mr. Sensenbrenner [continuing]. May ask a specific question of you. It was reported that Donald Trump, Jr., got taken down for a period of time because he put something up on the

EXHIBIT U(ii)

efficacy of hydroxychloroquine.

Now, I wouldn't take it myself, but there still is a debate on whether it is effective either in treating or preventing COVID-19, and I think that this is a legitimate matter of discussion. And it would be up to a patient and their doctor to determine whether hydroxychloroquine was the correct medication, you know, given the circumstances.

Now, why did that happen?

Mr. Zuckerberg. Congressman, well, first, to be clear, I think what you might be referring to happened on Twitter. So it's hard for me to speak to that. But I can talk to our policies about this. We do prohibit content that will lead to imminent risk of harm, and stating that there's a proven cure for COVID when there is, in fact, none might encourage someone to go take something that could have some adverse effect. So we do take that down.

We do not prohibit discussion around trials of drugs or people saying that they think that things might work or personal experiences with experimental drugs. But if someone is going to say that something is proven when, in fact, it is not, that could lead people to make the decision----

Mr. Sensenbrenner. Wouldn't that be up to somebody on the other side of the issue to say that this is not proven? And, you know, I know as a fact that, you know, for people with certain conditions, it's contraindicated, and they shouldn't take it on that. But wouldn't that be up to somebody else, you know, to say, ``Okay, what somebody posted on this really isn't true, and here's what the facts are,'' rather than having Twitter or Facebook take it down?

Mr. Zuckerberg. Congressman, in general I agree with you, and we do not want to become the arbiters of truth. I think that that would be a bad position for us to be in and not what we should be doing.

But on specific claims, if someone is going to go out and say that hydroxychloroquine is proven to cure COVID when, in fact, it has not been proven to cure COVID and that statement could lead people to take a drug that in some cases some of the data suggests that it might be harmful to people, we think that we should take that down. That could cause imminent risk of harm.

Mr. Sensenbrenner. Thank you. I yield back.

Mr. Cicilline. I thank the gentleman.

I now recognize the distinguished chair of the full Judiciary Committee, Mr. Nadler, from New York for 5 minutes.

Mr. Nadler. Thank you, Mr. Chairman.

Mr. Zuckerberg, I want to thank you for providing this information during our investigation. However, the documents you provided tell a very disturbing story, and that story is that Facebook saw Instagram as a powerful threat that could syphon business away from Facebook. And so, rather than compete with it, Facebook bought it. This is exactly the type of anticompetitive acquisition that the antitrust laws were designed to prevent.

Now, let me explain what I mean. Mr. Zuckerberg, you have written that Facebook can likely always just buy any competitive startups. In fact, on the day Facebook bought Instagram, which you describe as a threat, you wrote, quote, ``One thing about startups is you can often acquire them,'' closed quote. Mr. Zuckerberg, you were referring to companies like Instagram in that quote, weren't you?

Mr. Zuckerberg. Congressman, I don't have the exact document in front of me, but I have always been clear that we viewed Instagram both as a competitor and as a complement to our services. In the growing space around--after smartphones started getting big, and they competed with us in the space of

EXHIBIT U(ii)

mobile cameras and mobile photo sharing, but at the time, almost no one thought of them as a general social network. And people didn't think of them as competing with us in that space.

And, you know, I think that the acquisition has been wildly successful. We were able to, by acquiring them, continue investing in it and growing it as a stand-alone brand that now reaches many more people than I think either Kevin, the cofounder, or I thought would be possible at the time while also incorporating some of the technology into making Facebook's photos--sharing products better. So, yes.

Mr. Nadler. Okay. Now, in early 2012, when Facebook contemplated acquiring Instagram, a competitive startup, you told your CFO that the nascent Instagram could be very disruptive to us. And in the weeks leading up to the deal, you described Instagram as a threat, saying that, quote, ``Instagram can meaningfully hurt us without becoming a huge business,'' unquote.

Now, Mr. Zuckerberg, what did you mean when you described Instagram as a threat, as disruptive, and when you said that Instagram could meaningfully hurt Facebook? Did you mean that consumers might switch from Facebook to Instagram?

Mr. Zuckerberg. Congressman, thanks for the opportunity to address this. At the time, there was a small but growing field of----

Mr. Nadler. Did you mean that consumers might switch from Facebook to Instagram? That was my question.

Mr. Zuckerberg. Thanks. Congressman----

Mr. Nadler. Yes or no? Did you mean that?

Mr. Zuckerberg. In the space of mobile photos and camera apps, which was growing, they were a competitor. I've been clear about that.

Mr. Nadler. Okay. Fine.

Mr. Zuckerberg. And----

Mr. Nadler. Fine. In February of that year, in February 2012, you told Facebook's chief financial officer that you were interested in buying Instagram. He asked you whether the purpose of the deal was to neutralize a potential competitor or to integrate their products with ours in order to improve our services.

You answered that it was a combination of both, saying: What we're really buying is time. Even if some new competitors springs up, those products won't get much traction since we'll already have their mechanics deployed at scale.

Mr. Zuckerberg, what did you mean when you answered that the purpose of the deal was to neutralize a potential competitor?

Mr. Zuckerberg. Congressman, well, those aren't my words, but, yes, I've been clear that Instagram was a competitor in the space of mobile photo sharing. There were a lot of others at the time that competed with apps like VSCO Cam and PicPlease and companies like Path.

It was a subset of the overall space of connecting that we exist in. And by having them join us they certainly went from being a competitor in the space of being a mobile camera to an app that we could help grow and help get more people to be able to use and be on our team, and I think that that's been wildly successful.

Mr. Nadler. Reclaiming my time. Well, Mr. Zuckerberg, mergers and acquisitions that buy off potential competitive threats violate the antitrust laws. In your own words, you purchased Instagram to neutralize a competitive threat. If this was an illegal merger at the time of the transaction, why shouldn't Instagram now be broken off into a separate company?

Mr. Zuckerberg. Well, Congressman, I think the FTC had all of these documents and reviewed this and unanimously voted at

EXHIBIT U(ii)

the time not to challenge the acquisition. I mean, I think with hindsight, it probably looks like obvious that Instagram would have reached the scale that it has today, but at the time, it was far from obvious.

A lot of the competitors that Instagram competed with in mobile sharing, I'm including companies like Path, which were hot at the time and had great founders and entrepreneurs running them, like Dave Morin and I worked closely with him, I mean, I don't even think Path exists today. It was not a guarantee that Instagram was going to succeed.

The acquisition has done wildly well, largely not just because of the founders' talent but because we invested heavily in building up the infrastructure and promoting it and working on security and working on a lot of things around this, and I think that this has been an American success story.

Mr. Nadler. Well, thank you. Mr. Zuckerberg, you're making my point.

In closing, Mr. Chairman, I want to end where I began. Facebook, by Mr. Zuckerberg's own admission and by the documents we have from the time, saw Instagram as a threat that could potentially syphon business away from Facebook. And so, rather than compete with it, Facebook bought it. This is exactly the type of anticompetitive acquisition that the antitrust laws were designed to prevent. This should never have happened in the first place. It should never have been permitted to happen, and it cannot happen again.

I yield back.

Mr. Cicilline. Thank you, Mr. Chairman. I would remind the witness that the failures of the FTC in 2012, of course, do not alleviate the antitrust challenges that the chairman described.

And, with that, I'm going to recognize the gentleman from Colorado and, again, thank him for co-hosting one of the most important hearings we had along with Mr. Neguse in Colorado that I think was very critical in this investigation. And you're recognized for 5 minutes, Mr. Buck.

Mr. Buck. Thank you, Mr. Chairman. And I want to offer my appreciation to you for the bipartisan way that you have approached the subcommittee's investigation.

I want to start by saying that capitalism is the greatest instrument for freedom this world has ever seen. Capitalism has given the United States the freedom and means to defeat the Soviet Union, beat back fascism, and put a man on the moon.

This economic system has lifted millions out of poverty. It has made America the freest, most prosperous nation in the world. Our witnesses have taken ideas born out of a dorm room, a garage, a warehouse and built these dreams into four of the biggest power players in the digital global economy. You have all enjoyed the freedom to succeed.

Now, let me be clear: I do not believe big is necessarily bad; in fact, big is often a force for good. However, I want to address one particularly disturbing issue. Mr. Pichai, in October 2018, Google dropped out of the running for a Pentagon contract to complete the joint enterprise defense infrastructure, or JEDI contract, which was valued at more than $10 billion. Google's stated reason for removing itself from the bidding process is that the U.S. military's project did not align with Google's corporate values and principles.

This is the same U.S. military that fights for our freedoms and stands as a force for good across the globe. These are the same soldiers, sailors, and airmen that sacrificed their lives to ensure you have the freedom to build your company and set your corporate policies without fear of government interference, unlike in Communist China.

I also find it very interesting that only months after making this decision to withdraw from the JEDI contract, Marine

EXHIBIT U(ii)

General Joseph Dunford, the Chairman of the U.S. Joint Chiefs of Staff, warned the Senate Armed Forces Committee that the Chinese military was directly benefiting from Google's work.

It made me wonder, what values Google and Communist Red China had in common? I asked myself, self, is it that the Chinese Communist Party imprisons Uighur Muslims in concentration camps like is shown on the chart behind me? Could it be that China forces slaves to work in sweatshops? Maybe they align on the design to suppress free speech in Hong Kong.

Did Google agree with CCP's decision to lie to the world about the COVID-19 pandemic? Then I thought about Google's dragonfly experiment. I wondered if perhaps you agreed with the Chinese Government's use of technology platforms to spy on its own people and enforce draconian security laws. Maybe it's that your company is aligned with the Chinese Communist Party's corporate espionage policies where the strategy is to steal whatever can't be produced domestically.

These values that allow Google to work with the Chinese military but not the U.S. military help explain why Google wouldn't think twice about blatantly stealing a competitor's product, right down to the watermark, without any hint of attribution.

Mr. Pichai, during our field hearing in my home state of Colorado, I heard a story that sounded so brazen and contrary to free market principles that I thought it must have been straight from the Chinese Communist Party's corporate espionage playbook.

Google took advantage of a company that relied on your search engine to build its brand and compete. Google misappropriated lyrics from Genius Media Group's website and published those lyrics on Google's own platform. However, Genius caught Google in the act, quite literally red-handed.

When Genius suspected this corporate theft was occurring, the company incorporated a digital watermark in its lyrics that spelled out ``red-handed'' in Morse code. Google's lyric boxes contained the watermark showing that your company stole what you couldn't or didn't want to produce yourself.

After Google executives stated that they were investigating this problematic behavior, Genius created another experiment to determine the scope of the misappropriation. It turns out that, out of 271 songs where the watermark was applied, 43 percent showed clear evidence of matching. Your company, which advertises itself as a doorway to freedom, took advantage of this small company, all but extinguishing Genius' freedom to compete.

Google is supposed to connect people to information. Your corporate values once stood for freedom, a platform that let capitalism flourish and helped bring countless people across the globe out of poverty.

My question to you, Mr. Pichai, do you think that Google could get away with following China's corporate espionage playbook if you didn't have a monopolistic advantage in the market?

Mr. Pichai. Congressman, I want to be able to address the important concerns you raised. First of all, we are proud to support the U.S. Government. We recently signed a big project with the Department of Defense where we are bringing our world-class zero trust-based cybersecurity approach to help protect our networks from cybersecurity attacks.

We have projects underway with the Navy, with the Department of Veterans Affairs. Happy to follow up and explain more. We have a very limited presence in China. We don't offer any of our services, Search, Maps, Gmail, YouTube, et cetera, in China.

And with respect to music, we license content fair, in

EXHIBIT U(ii)

fact, we license content from other companies, and so this is a dispute between Genius and the other companies in terms of where the source of the content is. But, again, happy to engage and explain what we do here further.

Mr. Buck. Thank you. I yield back, Mr. Chairman.

Mr. Cicilline. I thank the gentleman.

I now recognize the gentleman from Georgia, Mr. Johnson, for 5 minutes.

Mr. Johnson. Thank you, Mr. Chairman.

Mr. Cook, with over 100 million iPhone users in the United States alone, and with Apple's ownership of the App Store giving Apple the ability to control which apps are allowed to be marketed to Apple users, you wield immense power over small businesses to grow and prosper.

Apple is the sole decisionmaker as to whether an app is made available to app users through Apple's App Store. Isn't that correct?

Mr. Cook. Sir, the App Store--thank you for the questions. The App Store is a feature of the iPhone much like the camera is and the chip is, and so what the----

Mr. Johnson. Yeah. My point is--and I'm sorry to interrupt, but I want to get to the point. The point is that Apple is the sole decisionmaker as to whether an app is made available to app users through the Apple store. Isn't that correct?

Mr. Cook. If it's a native app, yes, sir. If it's a web app, no.

Mr. Johnson. All right. Okay. Thank you. Thank you. And throughout our investigation, we've heard concerns that rules governing the App Store review process are not available to the app developers. The rules are made up as you go. They are arbitrarily interpreted and enforced and are subject to change whenever Apple sees fit to change them. And developers have no choice but to go along with the changes or, more, they must leave the App Store. That is an enormous amount of power.

Also, the rules get changed to benefit Apple at the expense of app developers, and the App Store is said to also discriminate between app developers with similar apps on the Apple platform and also against small app developers versus large app developers. So, Mr. Cook, does Apple not treat all app developers equally?

Mr. Cook. Sir, we treat every developer the same. We have open and transparent rules. It's a rigorous process. Because we care so deeply about privacy and security and quality, we do look at every app before it goes on. But those apps--those rules apply evenly to everyone. And as you can tell by going from----

Mr. Johnson. Some developers are favored over others though. Isn't that correct?

Mr. Cook. That is not correct. And as you can tell from going from just 500----

Mr. Johnson. Sir, I'll give you example. Baidu has two App Store employees assigned to help it navigate the App Store bureaucracy. Is that true?

Mr. Cook. I don't know about that, sir.

Mr. Johnson. Well, you don't have other app developers who have that same access to Apple personnel, do you?

Mr. Cook. We do a lot of things with developers including looking at their beta test apps regardless of whether they're small or large.

Mr. Johnson. Okay. Well, let me ask you this question: Apple has negotiated exceptions to its typical 30 percent commission for some apps like Amazon Prime. Is that--is a reduced commission such as the one that Amazon Prime gets available to other app developers?

Mr. Cook. It's available to anyone meeting the conditions,

EXHIBIT U(ii)

yes.

Mr. Johnson. Okay. Well, let me ask you this: Apple requires all app developers to use Apple's payment processing system if those developers want to sell their goods or services to Apple users through Apple's App Store. Isn't that correct?

Mr. Cook. That is correct because it's----

Mr. Johnson. And by processing payments for apps that you allow into the App Store, you collect their customer data and you use that data to inform Apple as to whether Apple should-- whether or not it would be profitable for Apple to launch a competing app. Isn't that correct?

Mr. Cook. Sir, 84 percent of the apps are charged nothing. The remaining 16 percent either pay 15 or 30 depending upon the specifics. If it's in the second year of a subscription, as an example, it only pays 15 percent. If you look back at history----

Mr. Johnson. Well, what's to stop Apple from increasing its commission to 50 percent?

Mr. Cook. Sir, we have never increased commissions in the store since the first day it operated in 2008.

Mr. Johnson. There's nothing to stop you from doing so, is there?

Mr. Cook. No, sir, I disagree strongly with that. There's a competition for developers just like there's a competition for customers, and so the competition for developers, they write their apps for Android or Windows or Xbox or PlayStation.

So we have fierce competition at the developer side and the customer side, which is essentially--it's so competitive I would describe it as a street fight for market share in the smart phone business.

Mr. Johnson. Has Apple ever retaliated against or disadvantaged a developer who went public about their frustrations with the App Store?

Mr. Cook. Sir, we don't--we do not retaliate or bully people. It's strongly against our company culture.

Mr. Cicilline. The time of the gentleman has expired.

The chair now recognizes the gentleman from Florida, Mr. Gaetz.

Mr. Gaetz. Mr. Zuckerberg in his written testimony made the claim that Facebook is an American company with American values. Do any of the rest of you take a different view, that is to say that your companies don't embrace American values? It's great to see that none of you do.

Mr. Pichai, I'm worried about Google's market power, how it concentrates that power, and then ultimately how it wields it. Project Maven was a collaboration between Google and the Department of Defense that Google pulled out of, citing ethical concerns, and you made the decision to pull out of that joint venture following receipt of a letter from thousands of your employees saying that Google should not be in the business of war.

My question, Mr. Pichai is, did you weigh the input from your employees when making the decision to abandon that project with the United States military?

Mr. Pichai. Congressman, thanks for your concern. As I said earlier, we are deeply committed to supporting the military and the U.S. Government. We have undertaken several projects since then. We do take our employees' input into account, but it's one input. We make decisions based on a variety of factors. As a company, we were new in the cloud space at that time. Since then we have----

Mr. Gaetz. Thank you. That is a sufficient answer, that you did take their feedback into account. And, in fact, some of your Googlers have recently sent you a letter where they've asked you to exit other partnerships as a consequence of

EXHIBIT U(ii)

ethical concerns.

They've asked you to stop doing business with American law enforcement, saying that police broadly uphold white supremacy and that Google should not be engaged in any services to police. And as you well know, you provide some of the most basic services to police, like email, but you also provide services that help keep our cops safe when they're doing their job.

And so my question is here, in front of Congress and the American people, will you take the pledge that Google will not adopt the bigoted antipolice policy that is requested in the most recent letter?

Mr. Pichai. Congressman, we have a long track record of working with law enforcement when it is supported by due process and the law. We push back against over broad requests. We are transparent about the requests we get. But we have a long history of following the law and cooperating with law enforcement.

Mr. Gaetz. I understand the history. I'm asking about the future. To the law enforcement that are watching today, can they rest assured that, under your leadership, Google will not adopt these bigoted antipolice policies?

Mr. Pichai. Congressman, we have committed to continuing to work with law enforcement in a way that's consistent with law and due processes in the U.S.

Mr. Gaetz. Well, I greatly appreciate that, and I know that will be very comforting to the police who utilize your services.

You mentioned earlier in the discussion about China that your engagement in China was very limited. But yet Google has an AI China center. The Chinese Academy of Sciences has published a paper that enhanced the targeting capabilities of China's J-20 fighter aircraft.

You collaborate with Chinese universities that take millions upon millions of dollars from the Chinese military. As a matter of fact, one of your Googlers, Fei-Fei Li, while under your employ, was cited in Chinese state media saying, ``China is like a sleeping giant; when she wakes, she will tremble the world.''

The former Secretary of Defense, Mr. Shanahan, said that the lines have been blurred in China between commercial and military application. And as Mr. Buck cited, General Dunford says that your company is directly aiding the Chinese military. And Peter Thiel, who actually serves on Mr. Zuckerberg's board at Facebook, said that Google's activities with China are treasonous. He accused you of treason.

So why would an American company with American values so directly aid the Chinese military but have ethical concerns about working alongside the U.S. military on Project Maven? And I understand your point about cybersecurity and those things, but Project Maven was a specific way to ensure that our troops are safe on the battlefield. And if you have no problem making the J-20 Chinese fighter more effective in its targeting, why wouldn't you want to make America as effective?

Mr. Pichai. Congressman, with respect, we are not working with the Chinese military. It's absolutely false. I had a chance to meet with General Dunford personally. We have clarified what we do in China compared to our peers. It's very, very limited in nature. Our AI work in China is limited to a handful of people working on open-source projects. I'm happy to share and engage with your office to explain our work in China further.

Mr. Gaetz. Gosh, I mean, when the Chairman of the Joint Chiefs of Staff says that an American company is directly aiding China, when you have an AI center, when you're working

EXHIBIT U(ii)

with universities, and when your employees are talking about China trembling the world, it seems to really call into question your commitment to our country and our values.

I see my time is expired. I hope we have an additional round, Mr. Chairman.

Mr. Cicilline. I thank the gentleman.

I now recognize the gentleman from Maryland, Mr. Raskin, for 5 minutes.

Mr. Raskin. Thank you, Mr. Chairman.

Mr. Zuckerberg, as you know, the proliferation of fake Facebook accounts was a key tool in the strategy of Russian interference in the American election in 2016. American law enforcement, the Senate, the House, have all found that Vladimir Putin engaged in a sweeping and systematic campaign to undermine American democracy in 2016 and to work for a victory for Donald Trump.

In his remarkable book ``Mind'' blank--and I'm being polite here--``Cambridge Analytica and the Plot to Break America,'' whistleblower Christopher Wylie, who worked for several years at Cambridge Analytica recounts how the Russian assault on America in Cambridge Analytica's research depended on Facebook, quote: ``When Cambridge Analytica launched in the summer of 2014, Steve Bannon's goal was to change politics by changing culture. Facebook's data, algorithms, and narratives were his key weapons. The Cambridge Analytica team used these tools to identify people who exhibited the three traits in what they called the dark triad: narcissism, Machiavellianism, and psychopathy.

They then proceeded to bombard and activate these people, a small percentage of the American public, but still millions of people with increasingly dark and manipulative messages from fake Facebook pages, both to get them to vote for Trump but, more importantly, to activate them as racist and white nationalists.''

And they go on to describe--he goes on to describe the remarkable success of this campaign, both electorally but also politically in the country in terms of sowing the terrible racial and ethnic divisions that you see in America today. So they waged a mass campaign of psychological warfare to polarize America around race and religion and to activate racists and anti-Semites. And it worked splendidly for them, but it didn't work so well for America.

So, Mr. Zuckerberg, which parts of this narrative have you addressed or are you planning to address, or do you just see that essentially as the cost of being a forum in a marketplace for ideas? Is there nothing that can be done about the use of Facebook to engender social division in America?

Mr. Zuckerberg. Congressman, thank you.

Since 2016, there have been a lot of steps that we've taken to protect the integrity of elections. We've hired, I think it's more than 30,000 people to work on safety and security. We've built up AI systems to be able to find harmful content, including being able to find more than 50 different networks of coordinated and authentic behavior, basically nation-states trying to interfere in elections around the globe, not just----

Mr. Raskin. Let me just pause you there for a second because I'm interested in that. The Stop Hate for Profit campaign is a coalition that includes the Color of Change, the Anti-Defamation League and other civil rights groups, and they're targeting Facebook right now for a boycott because of the rapid spread of hate messages online, the presence of boogaloo and other right-wing extremist groups trying to infiltrate and disrupt Black Lives Matter protests and the fact that alt-right racist and anti-Semitic content flourishes on Facebook. So they're asking you to remove these pages and

EXHIBIT U(ii)

essentially to join the movement for civil rights by not allowing that kind of content. Their boycotters include a lot of big companies, including Patagonia, Levi's, McDonalds, VW, Heineken, and so on. But you seem not to be that moved by their campaign, and I just wonder what you think about what they're asking you to do?

Mr. Zuckerberg. Congressman, thanks. We're very focused on fighting against election interference, and we're also very focused on fighting against hate speech. And our commitment to those issues in fighting them go back years before this recent movement.

Since 2016, the defenses that the company has built up to help secure elections, not just in the U.S. but around the world, I think are some of the most advanced that any company or government has in the world now. We routinely now collaborate with law enforcement and intelligence agencies and are able to sometimes identify threats coming from other countries before governments are even able to.

In terms of fighting hate, we've built really sophisticated systems. Our goal is to identify it before anyone even sees it on the platform. And we've built AI systems, and as I mentioned, have tens of thousands of people working on safety and security with the goal of getting this stuff down so that way--before people even see it.

And, right now, we're able to proactively identify 89 percent of the hate speech that we take down before I think it's even reported by other people. So I want to do better than 89 percent. I'd like to get that to 99 percent. But we have a massive investment here. We invest in billions of dollars----

Mr. Raskin. Because my time is almost out, can you just address the proliferation of fake accounts? I understand annually you get 6.5 billion fake accounts produced there, but in some sense, you have a profit motive that's linked to that because that's what's reported to your investors, the number of accounts. Are you working zealously to try to ferret out these fake accounts that are used to spread hate and disinformation?

Mr. Cicilline. The gentleman's time has expired, but the witness may answer the question.

Mr. Zuckerberg. Congressman, absolutely. We work hard on this. We take down billions of fake accounts a year. A lot of that is just people trying to set up accounts to scam people for commercial reasons. A very small percent of that are nation-states trying to interfere in elections, but we are very focused on trying to find those.

Having fake and harmful content on our platform does not help our business. It hurts our business. People do not want to see that stuff, and they use our services less when they do. So we are aligned with people in order to take that down, and we invest billions of dollars a year in doing so.

Mr. Raskin. I yield back. Thank you.

Mr. Cicilline. The committee will stand in recess for 10 minutes while we fix a technical feed with one of our witnesses.

[Recess.]

Mr. Cicilline. The committee will come back to order.

I now recognize the gentleman from North Dakota, Mr. Armstrong, for 5 minutes.

Mr. Armstrong. Google has received criticism about bias against conservatives and content moderation. There were threats of demonetizing the Federalist and numerous other complaints of viewpoint suppression. As a result, a significant portion of the American public has lost trust in your company.

A lack of public confidence in a product usually means there is economic harm to the company, but that just isn't the case with Google. So I think it's a legitimate question as to

EXHIBIT U(ii)

whether Google's market power insulates it from loss of revenue normally associated with offending half the people who use your product. I also think it's a legitimate question to ask if other attempts to regulate your industries have worked.

So, Mr. Pichai, Google has restricted advertising analytics or the portability of user data related to advertising due to compliance with the General Data Protection Regulation. Specifically, in 2018, Google restricted the ability to export the Double ID, a cookie-based identifier that compiles individual user data and creates profiles through Google data transfer. Is that correct?

Mr. Pichai. Congressman, I'm not familiar with the specifics of the particular issue, but happy to follow up more once I understand it better.

Mr. Armstrong. So you're not particularly familiar with how you're complying with GDPR?

Mr. Pichai. Congressman, we have long been working to comply with GDPR. We think it's an important regulation, and, you know, we have--we are in full compliance, to the extent of my knowledge. I just meant not aware of the specific issue with the identifier you mentioned there, but happy to understand it better and follow up.

Mr. Armstrong. All right. So, in order to comply with GDPR, Google must retain control over more user data and restrict the ability to combine this user data with other platforms to conduct cross-platform analysis. It seems as if that ultimately limits the ability of advertisers to make comparisons between Google-based campaigns and non-Google-based campaigns. Would you agree with that?

Mr. Pichai. In all these ecosystems, we are balancing between users, advertisers, and publishers. We deeply care about the privacy and security of our users, and so, when we serve these ecosystems, we have to take that into account. We have to comply with important laws and regulations in every country we operate in. And so that's the delicate balance we are constantly striking, but we are focused on our users and trying to do the best we can.

Mr. Armstrong. And I just want to be perfectly clear, I personally believe that just the market power consolidation is significant, but I also want to be clear that when we're moving forward to regulate this, that we aren't actually squeezing out competition in our quest to do something, because I've said that before in this hearing and I'll say it again: Usually in our quest to regulate big companies, we end up hurting small companies more.

And I'm a strong privacy advocate, but the consequences of GDPR have been to further entrench large established actors like Google, leading to regulatory capture that exasperates competition concerns. And Google's digital ad market share has increased since the implementation of GDPR. Do you know that to be correct?

Mr. Pichai. Congressman, to just give you a sense of the robust competition we see, ad prices have fallen down by 40 percent in the past 10 years. And, in fact, in the U.S., advertising as a share of GDP has come down from 1.4 percent in 1992, less than 1 percent today.

So we see robust competition in the marketplace. And as I said earlier, you know, we have to comply with regulation, we have to interpret it strictly, and we have to balance the ecosystem. But our utmost care is ensuring privacy and security of our users as we serve these markets.

Mr. Armstrong. And I'm glad you mentioned privacy, because I would be remiss if I didn't deal with this issue, because it is so relevant. And I think, generally speaking, outside of the political issues and the biases with all of this, and this is

EXHIBIT U(ii)

for essentially all four of our witnesses, I think one of our
bigger concerns when we talk about data and value--and that
data having value, and privacy, which is where people really
get concerned with how the digital age is moving forward.

    And there are news reports that law enforcement has made
increasing use of what are called geo-fence warrants, and these
geo-fence warrants allow authorities to compel technology
companies to disclose location records for any device in a
certain area at a particular time. Court filings suggest that
Google received about 1,500-percent increase in geo-fence
requests from 2017 to 2018 and a 500-percent increase from 2018
to 2019.

    Unless--and so the Fourth Amendment requires probable cause
and specificity, and that's not what these are. These warrants
are essentially for any person in an area at a particular time,
and geo-fence warrants require neither. So, unless a company by
particularized information and identifying a subject, geo-
warrants are essentially general warrants.

    I believe that location information should be considered as
a contents of the Electronic Communications Act under the
historic Communications Act. Do you agree?

    Mr. Pichai. You know, happy to understand more. We deeply
care about--this is why we issue transparency reports because
we think it's an important area for Congress to have oversight.
And we recently made a change by which we automatically delete
location activity after a certain period of time by default for
our users. So we are happy to engage with your office,
Congressman, and engage more.

    Mr. Armstrong. And I'm using you because these are going on
in Virginia and New York, I think, right now, but, I mean, this
equates for everything. I think people would be terrified to
know that law enforcement could grab general warrants and get
everybody's information anyway. So it requires Congress to act,
and it requires everybody that is a witness in this hearing to
be willing to work too because it is the single most important
issue I think we are going to----

    Mr. Cicilline. The time of the gentleman is expired, but I
believe he has a unanimous consent request.

    Mr. Armstrong. I do. I have a unanimous consent request for
Wall Street Journal article, ``Police Requests for Google
Users' Location Histories Face New Scrutiny.''

    Mr. Cicilline. Without objection.


  MR. ARMSTRONG FOR THE OFFICIAL RECORD

======================================================================

[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

    Mr. Armstrong. And then I have two letters, the letters are
from Congressman Walden and Congresswoman McMorris Rodgers. The
first letter is to Mr. Cook of Apple. The second letter is to
Mr. Pichai of Google.

    Mr. Cicilline. Without objection, both may be entered into
the record.

    [The information follows:]


  MR. ARMSTRONG FOR THE OFFICIAL RECORD

======================================================================

[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

EXHIBIT U(ii)

Mr. Cicilline. I now recognize the gentlelady from Washington, Ms. Jayapal.

Ms. Jayapal. Thank you, Mr. Chairman.

And thank you all for being with us.

Mr. Bezos, in July 2019, your employee Nate Sutton told me under oath in this committee that Amazon does not, quote, ``use any specific seller data when creating its own private brand product.'' So let me ask you, Mr. Bezos, does Amazon ever access and use third-party seller data when making business decisions? And just a yes or no will suffice, sir.

Mr. Bezos. Thank you for the question. I know it's an important topic, and I also want to thank you for representing us. I can't answer that question yes or no. What I can tell you is we have a policy against using seller-specific data to aid our private label business, but I can't guarantee you that that policy has never been violated.

Ms. Jayapal. Mr. Bezos, you're probably aware that an April 2020 report in The Wall Street Journal revealed that your company does access data on third-party sellers both by reviewing data on popular individual sellers and products and by creating tiny product categories that allowed your company to categorically access detailed seller information in a supposedly aggregate category. Do you deny that report?

Mr. Bezos. I'm familiar with The Wall Street Journal article that you're talking about, and we continue to look into that very carefully. I'm not yet satisfied that we've gotten to the bottom of it, and we're going to keep looking at it. It's not as easy to do as you would think because some of the sources in the article are anonymous, but we continue to look into it.

Ms. Jayapal. I'll take that as you're not denying that; you're looking into it. I will tell you, a former Amazon employee in third-party sales and recruitment told this committee, quote, ``There's a rule, but there's nobody enforcing or spot checking. They just say, don't help yourself to the data. It's a candy shop. Everyone can have access to anything they want.''

Do category managers have access to nonpublic data about third-party products and businesses?

Mr. Bezos. Here's what I can tell you. We do have certain safeguards in place. We train people on the policy. We expect people to follow that policy the same way we would any other. It's a voluntary policy. As far as I'm aware, no other retailer lists their----

Ms. Jayapal. So there's no----

Mr. Bezos [continuing]. User data at all. And then I think we have----

Ms. Jayapal. So there's no actual enforcement of that policy?

Mr. Bezos. Oh, no, I was going to say----

Ms. Jayapal. So it's voluntary, and there's no actual enforcement, so maybe that answers my----

Mr. Bezos. Sorry. No, I think I may have misspoke. I'm trying to say that Amazon's--the fact that we have such a policy is voluntary. I think no other retailer even has such a policy.

Ms. Jayapal. Well, that's----

Mr. Bezos. Our enforcement of that policy, we would treat that like any internal policy, and if we found that someone violated it, we would take action against them. I recognize this----

Ms. Jayapal. Well, there's numerous reports and the committee has conducted interviews with former employees who confirm that there are employees who do have access to that data and are using it. And so my next question was going to be,

EXHIBIT U(ii)

if you thought you were actually enforcing these rules, do you think that it's working?

And, again, I would just say that there's credible reporting that's documented breaches of these rules that you have put into place. And the committee has interviewed employees that typically--say that these breaches typically occur.

Let's talk about aggregate data for a minute. Your rules do allow for you to access combined data on a product when there are only one or two sellers in the marketplace, correct?

Mr. Bezos. Yes, aggregate data is allowed under our policies; that is correct.

Ms. Jayapal. Okay. And interviews with former employees have made it clear that that aggregate data essentially allows access to highly detailed data in those product categories. There's the example of Fortem, a small business that had no direct competitors except for Amazon Warehouse Deals, a resale clearance account that only sold 17 units.

An Amazon employee accessed a detailed sales report on Fortem's product with information on how much the company spent on advertising per unit and the cost to ship each trunk. And then Amazon launched its own competing products in October 2019.

That's a major loophole. And I go back to the general counsel's statement to this committee very clearly that there was no access to this data, that Amazon does not use that data for its own benefit. And I'm now hearing you say, well, you're not so sure that that's going on.

And the issue that we're concerned with here is very simple. You have access to data that far exceeds the sellers on your platforms with whom you compete. You can track consumer habits, interests, even what consumers clicked on but then didn't buy.

You have access to the entirety of sellers' pricing and inventory information, past, present, and future, and you dictate the participation of third-party sellers on your platform. So you can set the rules of the game for your competitors but not actually follow those same rules for yourself. Do you think that's fair to the mom-and-pop third-party businesses who are trying to sell on your platform?

Mr. Bezos. I appreciate that question, and I like it a lot because I really wanted a chance to address that. I'm very proud of what we have done for third-party sellers on this platform. We started our third-party platform 20 years ago, and we had zero sellers on it.

Ms. Jayapal. The question I'm asking----

Mr. Bezos [continuing]. eBay I'm sorry. Go ahead.

Ms. Jayapal. I'm so sorry. My time is expiring. And the question I wanted to ask you is that you have access to data that your competitors do not have. So you might allow third-party sellers onto your platform, but if you're continuously monitoring the data to make sure that they're never going to get big enough that they can compete with you, that is actually the concern that the committee has.

And, you know, I think your company started in my district. I want to thank you for that. I want to thank you for the work that you've done and say that the whole goal of this committee's work is to make sure that there are more Amazons, that there are more Apples, that there are more companies that get to innovate and small businesses that get to thrive, and that is what we're trying to get at. That is why we need to regulate these marketplaces so that no company has a platform so dominant that it is essentially a monopoly.

Thank you, Mr. Chairman. I yield back.

Mr. Cicilline. The time of the gentlelady has expired.

EXHIBIT U(ii)

I just want to remind the witnesses, we appreciate the gratitude for the questions and your description of them as good questions, but we'll just assume that they're good questions and you're happy to answer them so we can make sure we're making good use of your time.

And, with that, I recognize the gentleman from Florida, Mr. Steube.

Mr. Steube. Thank you, Mr. Chairman.

Mr. Pichai, I would like to start with you, and I'm just going to illustrate my question with a factual incident that actually occurred to me. Several months ago my wife called and said, ``Hey, there's a good article on The Gateway Pundit that you should read.''

So out of curiosity--I was up here in Washington. Out of curiosity, I Googled Gateway Pundit. And it didn't show up on the first page, and it didn't show up on the second page. There was a bunch of different blogging sites about how there were disagreements with what was on The Gateway Pundit.

But I actually had to type in GatewayPundit.com to get to it. Interestingly, Google didn't allow me to get to the actual website. That was a couple months ago. Before this hearing was set to be heard, before this hearing was noticed, before you knew that you would be appearing before us today and that this is an issue that obviously conservatives and Republicans have had.

Last week, after this was noticed, this hearing was noticed, I did the exact same thing here in the Capitol. And wouldn't you know it, I Googled Gateway Pundit, and that was the very first website that came up.

Now, this isn't from a constituent in my district. This isn't from somebody telling me, this isn't a news report. I actually physically did this on my laptop here in the Capitol several months ago and then today. So, clearly, something had happened between not being notified that you were going to be appearing before our committee and then, last week, knowing that you would be appearing before our committee and suddenly conservative websites are now at the top of the bar when you search for them.

So was there anything done at Google between a couple of months ago and last week or the week before you appearing today that has changed your approach to silencing conservative websites?

Mr. Pichai. Congressman, we approach our work with a deep sense of responsibility without--in a nonpartisan way. We want to serve all our users, no matter where they are. In fact, it's in our long-term business incentive to do so. And I believe on our platforms, including YouTube, there are more conservative voices than ever before, and we believe in freedom of expression.

On the specific issue, you know, I will have to look into it. You know, I obviously wasn't aware of it. We do--it could be a number of reasons. We constantly get reports from both sides of the aisle----

Mr. Steube. So, if you're going to look into it for me, is there--can I expect a response from you say in the next 2 weeks as to why that occurred?

Mr. Pichai. Congressman, we'll do our best to follow up, and I'll engage with your office to respond on that

Mr. Steube. Okay. We'll follow up on that. I've got a similar question. So I've been in elected politics for almost 10 years, and when I was in the Florida Senate and the State Senate, I never had a problem with my campaign emails being marked as spam or going to junk folders or anything along those lines. And we had 30,000, 40,000, 50,000 people on our email list.

EXHIBIT U(ii)

And suddenly I get elected to Congress and I'm now up here in Washington, D.C., and my parents who have a Gmail account aren't getting my campaign emails. My supporters, just last week, one of my supporters called me and said, ``Hey, I just want you to know this, that my Gmail account suddenly is taking your campaign emails that I've received for almost 10 years and suddenly they're going to spam and junk folders.'' This appears to only be happening to conservative Republicans.

I don't see anything in the news or anything in the press or other Members on the other side of the aisle talking about their campaign emails getting thrown into junk folders in Gmail. So my question is, is why is this only happening to Republicans? And it's a fact it's happening, because I can have my supporters testify that they've received my emails for 8 years, 8, 9 years, and suddenly this last year all of their Gmail--my campaign emails in their Gmail are going to their spam folder. So, if you could give me some clarification on that, I would appreciate it.

Mr. Pichai. In Gmail, we are focused on what users want, and users have indicated they want us to organize their personal emails, emails they receive from friends and family, separately. And so all we have done is we have a tabbed organization, and, you know, the primary tab has emails from friends and family and the secondary tab has other notifications and so on. These things are applied----

Mr. Steube. Okay. Well, it was my father who is not receiving now my campaign emails, so clearly that familial thing that you're talking about didn't apply to my emails.

Mr. Pichai. Our systems probably are not able to understand that your campaign--I mean that it's your father. Obviously, we don't have that context there. We just apply it neutrally across, you know, all organizations and, you know----

Mr. Steube. Well, what assurances can you give me that there's--my time is short. One last question. What assurances can you give me that any bias amongst your employees isn't influencing your spam folder algorithms?

Mr. Pichai. Congressman, there's nothing in the algorithm which has anything to do with political ideology, and, you know, we do get complaints across the aisle. For example, the World Socialist Review complained in January of this year that, you know, their site wasn't found in Google Search results.

And so we get complaints. We look into it, but, you know, we approach our work in a nonpartisan way, and it's in our long-term incentive to serve users across the country. And today that's why we invest in our raters in 49 States across the U.S. so that we can capture all viewpoints.

Mr. Cicilline. Thank you. The gentleman's time is expired.

I now recognize the gentlelady from Florida, Mrs. Demings, for 5 minutes.

Mrs. Demings. Thank you so much, Mr. Chairman.

And let me just say just for the record: I'm a Democrat from Florida, and I've had--heard complaints about my emails going into spam as well. And I'm sure other Democratic Members have had the same experiences, unfortunately.

Mr. Pichai, in 2007 Google purchased DoubleClick, the leading provider of certain advertising tools. Is that correct?

Mr. Pichai. That is correct, Congresswoman.

Mrs. Demings. When Google proposed the merger alarm bells were raised about the access to data Google would have, specifically the ability to connect users' personal identity with their browsing activity. Google, however, committed to Congress and to the antitrust enforcers that the deal would not reduce user privacy.

Google's chief legal adviser testified before the Senate Antitrust Subcommittee that Google wouldn't be able to merge

this data even if it wanted to, given contractual restrictions. But in June of 2016, Google went ahead and merged its data anyway, effectively destroying anonymity on the internet.

Mr. Pichai, you became CEO of Google in 2015. Is that correct?

Mr. Pichai. That's right.

Mrs. Demings. Okay. And this change was made in 2016. Is that correct?

Mr. Pichai. That's my understanding.

Mrs. Demings. Okay. Thank you for that. Did you sign off on this decision to combine the sets of data with--that Google had told Congress would be kept separate?

Mr. Pichai. Congresswoman, any changes we made, you know, we complied----

Mrs. Demings. Mr. Pichai, with all due respect, please, did you sign off on the decision or not?

Mr. Pichai. I review at a high level all important decisions we make. We deeply care about privacy and security of our users, and we----

NEW LINE: [continuing]. And we provide user consent for----

Mrs. Demings. So you signed off on the decision?

Okay. You signed off on the decision.

Practically, this decision meant that your company would not combine all of--would now combine, for example, all of my data on Google, my search history, my location from Google Maps, information from my emails, from Gmail, as well as my personal identity with the record of almost all of the websites I visited. That is absolutely staggering.

According to an email from a DoubleClick executive, that was exactly the type of reduction in user privacy that Google's founders had previously worried would lead to a backlash. And I quote, they were unwavering on the policy due to philosophical reasons, which is Larry and Sergey's fundamentally not wanting users associated with a cross-site cookie. They were also worried about a privacy storm as well as damage to Google's brand. So, in 2007, Google's founders feared making this change because they knew it would upset their users, but in 2016, Google didn't seem to care.

Mr. Pichai, isn't it true that what changed between 2007 and 2016 is that Google gained enormous market power. So. While Google had to care about user privacy in 2007, it no longer had to in 2016? Would you agree that what changed was Google gained enormous market power?

Mr. Pichai. Congresswoman, this is an important issue, if I could explain. You know, we today make it very easy for users to be in control of their data. We have simplified their settings. They can turn ad personalization on or off. We have combined most of activity settings into three groupings. We remind users to go do a privacy checkup. 1 billion users have done so, and 20 million people do it----

Mrs. Demings. Okay, Mr. Pichai, thank you so much for that. I am concerned that Google's bait and switch with DoubleClick is part of a broader pattern where Google buys up companies for the purposes of surveilling Americans, and because of Google's dominance users have no choice but to surrender.

In 2019, Google made over 80 percent of its total revenue through selling of ad placement. Is that correct, Mr. Pichai?

Mr. Pichai. You know, a majority of the business----

Mrs. Demings. About 80 percent? Yeah, okay.

And because Google sells behavioral ads, ads targeted to each of us as individuals, the more user data that Google collects, the more money Google can make. More user data means more money. Is that correct?

Mr. Pichai. In general, that's not true. For example there's common sites, when you type----

EXHIBIT U(ii)

Mrs. Demings. More user data, not the more money Google collects?

Mr. Pichai. Most of the data we need is built into the----

I'm sorry, please. So you're saying that the more user data does not mean the more money that Google can collect?

Mr. Pichai. Congresswoman, most of the data today we collect is to help users and provide personal experiences back. Ad data is not relevant at that time at all----

Mrs. Demings. Okay. Thank you so much, Mr. Pichai.

Mr. Chairman, I yield back.

Mr. Cicilline. I thank the gentlelady.

The chair now recognizes the ranking member of the full committee, Mr. Jordan, for 5 minutes.

Mr. Jordan. Thank you, Mr. Chairman.

Mr. Pichai, is Google going to tailor its features to help Joe Biden win the 2020 election?

Mr. Pichai. Congressman, we approach our work--you know, we support both campaigns today. We think political ads is an important part of free speech in democratic societies, and we engage with campaigns, you know, according to law, and we approach our work in a nonpartisan way.

Mr. Jordan. It was a yes or no question. Can you assure Americans today you won't tailor your features to help Joe Biden in the upcoming election?

Mr. Pichai. You know, we support work that campaigns do. I just want to make sure I am answering that clearly.

Mr. Jordan. We all understand that. We all do all kinds of online social media, all kinds of that kind of--that outreach, that communication. This is a simple question: Can you today assure Americans you will not tailor your features in any way to help--specifically help one candidate over another? And what I'm concerned about is you helping Joe Biden over President Trump.

Mr. Pichai. We won't do any work, you know, to politically tilt anything one way or another. It's against our core values, Congressman.

Mr. Jordan. But you did it in 2016. There's an email in 2016 that was widely circulated amongst the executives at your company that got public where Ms. Eliana Murillo, head of your multicultural marketing, talks about the silent donation Google made to the Clinton campaign, and you applauded her work. She points that out in the email.

I'm just curious, if you did it in 2016, I want to make-- and, you know, in spite of the fact you did it in 2016 President Trump won, I just want to make sure you're not going to do it again in 2020?

Mr. Pichai. Congressman, I recall our conversation at that time, and I appreciate your concern. We didn't find any evidence of such activity, and I took the opportunity after our conversation to reinforce to the company--we realize even an appearance could be improper, so we have clearly communicated to our employees any personal political activity, while it's their right, needs to happen on their own time and resources and should avoid any use of company time.

Mr. Jordan. Well, of course, everyone has got their First Amendment rights to campaign for who they want. What they can't do is configure your features to help one candidate over the other. So you might not have found any evidence, but here's what she wrote to the email to a number of key executives in your company, quote, ``We push to get out the Latino vote with our features.'' Second quote, ``We push to get out the Latino vote with our features in key states.''

It seems to me those last three words are the real qualifier here. That is electioneering when you're trying to increase the Latino vote in key states. And she'd already

EXHIBIT U(ii)

communicated that she was supporting Clinton, that she wanted Clinton to win.

So, when she talks about increasing the Latino vote, which she assumes is going to help candidate Clinton, and she's doing that in key states--it's one thing if you're going to increase the Latino vote around the country. If you're just a good, corporate citizen, you're urging people to vote. It's quite another when you're focusing on in key states. And you know what those key states were? Nevada and Florida, the swing states. So, again, I want to make sure this isn't going to happen in 2020.

Mr. Pichai. I can assure you that we complied with laws in 2016. As a company, any work we do around elections is nonpartisan. Users do come to us for understanding where polling places are, where to vote, which is the date to vote, what the voting hours are. We have committed to providing that information, and I can assure you that we'll approach our work in a nonpartisan----

Mr. Jordan. So, Mr. Pichai, here's the question I think's on so many Americans' minds. They saw the list that we read here earlier on in our opening statements, all the things Google has done. Google is siding with the World Health Organization over anyone who disagrees with them, even though the World Health Organization obviously lied to America, obviously shills for China. Google's siding with them; YouTube is siding with them.

We have the history of all the things Google has done and the history of what happened in 2016 in the election, where they obviously, according to one--your multicultural marketing executive tried to help Clinton. And here we are, 97 days before the election, and we want to make sure it's not going to happen again.

Can you give us two assurances: one, you're not going to try to tailor your features, configure your platform in a way to help Joe Biden; and, second, that you're not going to use your search engine to silence conservatives? Can you give us those two assurances today?

Mr. Pichai. Congressman, on our search engine, conservatives have more access to information than ever before----

Mr. Jordan. And we appreciate that. That wasn't the question. Can you assure us today you're not going to try to silence conservatives? And can you assure us today you're not going to try to configure your features, as Ms. Murillo said you did for Clinton in 2016--can you assure us today you're not going to do the same thing for Joe Biden in 2020?

Mr. Pichai. You know, you have my commitment. It's always been true, and we'll continue to conduct ourselves in a neutral way.

Mr. Jordan. Appreciate it.

I yield back.

Mr. Cicilline. The chair now recognizes the gentlelady from Pennsylvania, Ms. Scanlon.

Ms. Scanlon. Thank you, gentlemen. I'd like to redirect your attention to antitrust law rather than fringe conspiracy theories.

Mr. Bezos, our investigations----

Mr. Jordan. Mr. Chairman, we have the email. There is no fringe conspiracy----

Mr. Cicilline. Excuse me.

Mr. Raskin. It's not your time.

Mr. Cicilline. Mr. Jordan, you do not have the time.

Mr. Jordan. But--but--but----

Mr. Cicilline. Please be respectful of your colleague.

Mr. Jordan [continuing]. When someone directly----

EXHIBIT U(ii)

Mr. Cicilline. She controls the time.

Mr. Jordan [continuing]. Directly----

Mr. Raskin. Put your mask on. Put your mask on.

Mr. Jordan. Mr. Raskin----

Mr. Cicilline. Mr. Jordan----

Mr. Jordan [continuing]. If you want to talk about masks----

Mr. Cicilline. Mr. Jordan, Ms. Scanlon holds the time.

Mr. Jordan [continuing]. Why would the Deputy Secretary of the Treasury unmask Michael Flynn's name, Mr. Raskin?

Mr. Cicilline. Ms. Scanlon----

Mr. Jordan. And what I want to know is----

Mr. Cicilline. Ms. Scanlon----

Mr. Jordan. When someone comes after my motives for asking questions, I get a chance to respond.

Mr. Cicilline. The gentlelady is recognized.

Ms. Scanlon. Thank you, Mr. Chairman.

Mr. Bezos, our investigation uncovered documents that show that Amazon sometimes doesn't play fairly, crossing the line from robust competition to predatory pricing to destroy rivals rather than outcompete them.

And let's take the example of Quidsi, which used to own diapers.com and provided online baby care products. In 2009, your team viewed diapers.com as Amazon's largest and fastest growing online competitor for diapers. One of Amazon's top executives said that diapers.com keeps the pressure on pricing on us. And strong competition from diapers.com meant that Amazon was having to work harder and harder so that customers didn't pick diapers.com over Amazon. And the customers we're talking about were hard-working families, single parents with babies and young children.

Now, because diapers.com was so successful, Amazon saw it as a threat. The documents that we've obtained show that Amazon employees began strategizing about ways to weaken this company, and, in 2010, Amazon hatched a plot to go after diapers.com and take it out.

In an email that I reviewed--and we've got these up on the slides--one of your top executives proposed to you a, quote, ``aggressive plan to win,'' end quote, against diapers.com, a plan that sought to undercut their business by temporarily slashing Amazon prices. We saw one of your profit-and-loss statements, and it appears that, in 1 month alone, Amazon was willing to bleed over $200 million in diaper profit losses.

Mr. Bezos, how much money was Amazon ultimately willing to lose on this campaign to undermine diapers.com?

Mr. Bezos. Thank you for the question.

I don't know the direct answer to your question. This is going back in time, I think, maybe 10 or 11 years or so. You could give me, maybe, the dates on those documents.

Ms. Scanlon. Okay.

Mr. Bezos. But what I can tell you is that the idea of using diapers and products like that to attract new customers who have new families is a very traditional idea. We didn't invent----

Ms. Scanlon. Sure. Well, let's delve into this----

Mr. Bezos [continuing]. That idea. Neither did diapers.com.

Ms. Scanlon [continuing]. A little further. I'm sorry. You know I only have a few minutes here, so I just----

Mr. Bezos. Of course.

Ms. Scanlon [continuing]. Want to press on.

Mr. Bezos. Please.

Ms. Scanlon. Your own documents make clear that the price war against diapers.com worked, and within a few months it was struggling, and so then Amazon bought it.

After buying your leading competitor here, Amazon cut

promotions, like Amazon.mom, and the steep discounts it used to
lure customers away from diapers.com and then increased the
prices of diapers for new moms and dads.

Mr. Bezos, did you personally sign off on the plan to raise
prices after Amazon eliminated its competition?

Mr. Bezos. I don't remember that at all.

Ms. Scanlon. Okay. Thank you.

Mr. Bezos. What I remember is that we matched competitor
prices, and I believe we followed diapers.com--again, this is
11 years ago, so you're asking a lot of my memory--but I
believe we followed diapers.com.

I can also tell you, after we bought diapers.com----

Ms. Scanlon. I understand that. Okay.

Mr. Bezos [continuing]. We put more than----

Ms. Scanlon. Just moving on----

Mr. Bezos [continuing]. $300 million into trying----

Ms. Scanlon. Reclaiming my time, sir. I'm----

Mr. Bezos [continuing]. To make it successful.

Ms. Scanlon [continuing]. Sorry.

So you said that Amazon focuses excessively on customers.
So how would customers, especially single moms, new families,
how would they benefit when the prices were driven up by the
fact that you eliminated your main competitor?

Mr. Bezos. Well, I don't agree--with great respect, I don't
agree with the premise. At the same time, you should recognize,
in context, diapers is a very large product category sold in
many, many places----

Ms. Scanlon. Right, but this was----

Mr. Bezos [continuing]. Not just at Amazon and diapers.com.

Ms. Scanlon [continuing]. The online diaper market.

Mr. Bezos. It sold at----

Ms. Scanlon. Now, we do have evidence----

Mr. Bezos. It sold at drugstores and Costco----

Ms. Scanlon [continuing]. That these predatory--I'm sorry,
Mr. Bezos----

Mr. Bezos [continuing]. And Kroger and Walmart----

Ms. Scanlon [continuing]. I need to push on here.

Mr. Bezos. Of course. Sorry.

Ms. Scanlon. The evidence we've collected suggests that
predatory practices weren't unique here. In 2013, it was
reported that you instructed Amazon employees to approach
discussions with certain business partners, and I quote, ``the
way a cheetah would pursue a sickly gazelle.''

Is the gazelle project still in place? And does Amazon
pursue similar predatory campaigns in other parts of its
business?

Mr. Bezos. I cannot comment on that because I don't
remember it.

What I can tell you is that we are very, very focused on
the customer, as you started----

Ms. Scanlon. Okay. Well, I'm concerned with----

Mr. Bezos [continuing]. And, of course, that does include--
--

Ms. Scanlon [continuing]. The customers as well, especially
those families----

Mr. Bezos [continuing]. Bargaining very hard with vendors
and suppliers to get the lowest prices----

Ms. Scanlon [continuing]. In my district.

Mr. Bezos [continuing]. So that we can offer those to
customers.

Ms. Scanlon. I'm sorry, Mr. Bezos. I'm almost out of time.

I'm concerned too, because, especially with the current
pandemic, one of the biggest needs I'm seeing at the food
drives and the giveaways that we're having to run in my
district is that families don't have diapers, and we have to

EXHIBIT U(ii)

collect them to give them out. So it certainly is something that has a really hard impact on families, and I'm really concerned that pricing might have been driven up here by this tactic.

And I yield back.

Mr. Cicilline. The gentlelady yields back.

I would just announce that votes have been called, but we're going to continue with the hearing, so I invite colleagues to vote. You know, it's a rolling vote, so vote according to your own schedule.

I now recognize the gentleman from Colorado, Mr. Neguse, for 5 minutes.

Mr. Neguse. Thank you, Mr. Chairman.

And I want to thank each of the witnesses today for your testimony.

Mr. Zuckerberg, in 2004, when you had launched Facebook, it's fair so say, I think you'd agree with me, that you had quite a few competitors. Would you agree with that?

Mr. Zuckerberg. Congressman, yes.

Mr. Neguse. Myspace, Friendster, Google's Orkut, Mixi, Psy World, Yahoo! 360, AOL's Bebo, they were all competitors?

Mr. Zuckerberg. Congressman, those were some of the competitors at the time, and it's only gotten a lot more competitive since.

Mr. Neguse. Well, let's talk about that. Because, by 2012, Mr. Zuckerberg, none of those companies that I just identified existed. You're certainly aware of that. They were all basically gone. Facebook, in my view, I think, was in a monopoly by then.

I wonder whether you would agree with that. I take it you don't?

Mr. Zuckerberg. Congressman, that's correct, I don't. We face a lot of competitors in every part of what we do, from connecting with friends privately, to connecting with people in communities, to connecting with all your friends at once, to connecting with all kinds of user-generated content. And I would bet that you or most people here have multiple apps for each of those on your phones, multiple----

Mr. Neguse. Well, Mr. Zuckerberg, let's--why don't we dig into this a bit further. So you and I clearly disagree about that.

In 2012--I'm looking at a document that was produced by Facebook in response to the subcommittee's investigation. It's a presentation prepared for Sheryl Sandberg to deliver to the board of directors of a major telecommunications firm, boasting that, quote, ``Facebook is now 95 percent of all social media in the United States.'' The title of the slide is even, quote, ``The Industry Consolidates As It Matures.''

So, as I look at that graph, I, you know, certainly think most folks would concede that Facebook was a monopoly as early as 2012. But, nonetheless, I understand that we disagree on that point.

Would you agree with me that Facebook, its strategy since that time, to essentially protect what I describe as a monopoly but obviously what you would describe as market power, that Facebook has been engaged in purchasing competition, in some cases replicating competition, and in some cases eliminating competition? Would that be a fair statement?

Mr. Zuckerberg. Congressman, the space of people connecting with other people is a very large space, and I would agree that there were different approaches that we took to addressing different parts of that space, but it's all in service of building the best services----

Mr. Neguse. And I----

Mr. Zuckerberg [continuing]. For people to help connect----

EXHIBIT U(ii)

Mr. Neguse. I appreciate that, Mr. Zuckerberg. I appreciate the latter point. It sounds like you are conceding that at least some of those strategies were what I identified, and so I want to talk a little bit about that.

In 2014--here's an email. It's from Facebook's current chief financial officer, describing the company's acquisition strategy as, quote, ``a land grab'' and saying that ``we are going to spend 5 to 10 percent of our market cap every couple of years to shore up our position.'' And my sense of the facts is that that is, in fact, what has occurred.

Facebook, as you conceded--you conceded earlier that Instagram was a competitor of Facebook's. You acquired Instagram in 2012. Instagram is now the sixth-largest social media platform in the world. Is that right?

Mr. Zuckerberg. Congressman, I'm not sure what rank it is, but it's certainly grown beyond our wildest expectations.

Mr. Neguse. I can represent to you that the statistics demonstrate--the empirical data shows it's the sixth-largest.

In 2014, Facebook bought its competitor WhatsApp. Is that correct?

Mr. Zuckerberg. Congressman, yes, WhatsApp was also both a competitor and complementary. They competed with us in the space of mobile messaging, which is a growing and important space and is, again, one part of the global space of how people connect more broadly.

Mr. Neguse. Understood. And, at that time, WhatsApp had over 400 million monthly users, a clear path towards 1 billion monthly active users. And WhatsApp is now the second-largest social media platform in the world, with 2 billion users worldwide, more than Facebook Messenger. And, of course, your company owns WhatsApp.

Facebook also tried to buy other competitive startups. In fact, as Chairman Nadler noted, you did tell one of Facebook's senior engineers in 2012 that you can, quote, ``likely just buy any competitive startup, but it'll be a while before we can buy Google.''

Do you recall writing that email?

Mr. Zuckerberg. Congressman, I don't specifically, but it sounds like a joke.

Mr. Neguse. Well, it certainly--I don't take it as a joke, you know, as I review the email. It was in regards to having just closed the Instagram sale. And the response from this individual, this engineer, to you was, quote, ``Well played.''

Your response was, ``Thanks. One reason people underestimate the importance of watching Google is that we can likely always just buy any competitive startups, but it'll be a while before we can buy Google.''

And given the purchases that Facebook had made previous to this and the attempted purchases--my understanding is that Facebook made several overtures to Snapchat, for example, which rebuffed those efforts--clearly demonstrates, in my view, that that email was not made in jest.

But here's why I ask these questions, Mr. Zuckerberg. It strikes me that, over the course of the last several years, Facebook has used its market power to either, you know, purchase or replicate the competition. And Facebook, Facebook Messenger, WhatsApp, and Instagram are the most now downloaded apps of the last decade. Your company, sir, owns them all. And we have a word for that; that word is ``monopoly.''

With that, I would yield back, Mr. Chairman.

Mr. Cicilline. I thank the gentleman.

I now recognize the gentlelady from Georgia, Mrs. McBath, for 5 minutes.

Mrs. McBath. Thank you, Mr. Chairman.

Mr. Bezos, you referred to third-party sellers today as

EXHIBIT U(ii)

``Amazon's partners'' and that your success depends on their success.

But, over the past year, we've heard a completely different story. As part of this investigation, we've interviewed many small businesses, and they use the words like ``bullying,'' ``fear,'' and ``panic'' to describe their relationship with Amazon.

And I'm going to share the story of a small-business owner who is also a wife and a mother, so you can understand how this is actually affecting the lives of everyday people and why this truly matters.

[Video played.]

Mrs. McBath. So, Mr. Bezos, after Amazon delisted this small business without any apparent reason or notice, she told us that they sent more than 500 separate communications to Amazon, including to you, Mr. Bezos, over the past year, and there was not a single meaningful response.

Do you think this is an acceptable way to treat someone that you described as both a partner and a customer?

Mr. Bezos. No, Congresswoman. And I appreciate you showing me that anecdote, and I would like to talk to her. It does not at all, to me, seem like the right way to treat her, and I'm surprised by that. And it's not the systematic approach that we take, I can assure you.

I don't even understand what's going on in that anecdote, because we would love for third-party sellers to sell books----

Mrs. McBath. Well, respectfully, sir----

Mr. Bezos [continuing]. On the website. So I don't understand it, but I would like to understand it better. And----

Mrs. McBath. That's the point, sir.

Mr. Bezos [continuing]. With your permission, I would like to get in touch with your office.

Mrs. McBath. I think, though, that you're missing the point. This is not just about one business. I'm concerned that this is a pattern of behavior. And, basically, this pattern of behavior has to change.

Mr. Bezos, my question is simply: Are you willing to make sure, going forward, that, you know--the numerous sellers that we've talked to, they have problems just like this. And there are more sellers who have told us that they have exhausted all of their options before finally reaching out to you directly as a last resort, but they're still waiting for your response.

So what do you have to say to the small businesses who are talking to Congress because you simply won't listen to them?

Mr. Bezos. Well, I'd say that's not acceptable. If we aren't listening to you, I'm not happy about that at all.

And I--but, you know, if you would allow me to disagree a little bit with a piece of this, I do not think that's systematically what's going on. And the evidence that I would suggest would be useful for you to consider in that regard is that third-party sellers, in aggregate, are doing extremely well on Amazon. They grew from--you know, 20 years ago it was zero, and today it's 60 percent----

Mrs. McBath. Great. Okay.

Mr. Bezos [continuing]. Of sales.

Mrs. McBath. Thank you very much.

Mr. Bezos. Third-party sellers are growing even faster----

Mrs. McBath. Thank you so much.

Mr. Bezos [continuing]. Than first-party retail. So----

Mrs. McBath. Mr. Bezos, you said----

Mr. Bezos. Thank you.

Mrs. McBath. Thank you so much.

You said that sellers have many other attractive options to reach customers, but that's not at all what we found in our

EXHIBIT U(ii)

investigation. According to eMarketer, a source Amazon cited in submissions to this committee, Amazon has nearly seven times the market share of its closest e-commerce competitor. One seller told us that, and I quote, ``Amazon continues to be the only show in town. No matter how angry sellers get, they have nowhere else to go.''

So are you saying that these people aren't being truthful when they say that Amazon is the only game in town?

Mr. Bezos. Yeah, Congresswoman, with great respect, I do disagree with that. I believe that there are a lot of options. And some of them are not even listed on that chart. I just looked at it briefly, but I didn't see some that I know of, for example.

So I think there are a lot of----

Mrs. McBath. Okay. Thank you----

Mr. Bezos [continuing]. Things in this dynamic.

Mrs. McBath. All right. Thank you for that.

Mr. Bezos. There are more and more every day.

Mrs. McBath. Mr. Bezos, my time is short.

If Amazon didn't have monopoly power over these sellers, do you think they would choose to stay in a relationship that is characterized by bullying, fear, and panic?

Mr. Bezos. With all respect, Congresswoman, I do not accept the premise of your question. That is not how we operate the business.

Mrs. McBath. Okay. All right.

Mr. Bezos. And, in fact, we work very hard to----

Mrs. McBath. Thank you for that.

Mr. Bezos [continuing]. Provide a fantastic pool for sellers----

Mrs. McBath. Thank you for that.

Mr. Bezos [continuing]. And that's why they've been successful.

Mrs. McBath. Thank you for that.

Mr. Bezos, I'm going to close with giving the bookseller the opportunity to finally be heard by you.

[Video played.]

Mrs. McBath. With that, I yield back the balance of my time.

Mr. Cicilline. I thank the gentlelady.

We've now concluded our first round.

I now recognize myself for 5 minutes.

Mr. Bezos, according to your testimony, the marketplace is competitive. But Amazon controls as much as 75 percent of all online marketplace sales. And eMarketer, a source you cited to us in submissions to this committee, reports that Amazon has nearly seven times the market share of its closest competitor.

Isn't it true that small businesses have no real option but to rely on Amazon to connect with customers and make online sales?

Mr. Bezos. No, sir. With great respect, I do have a different opinion on that. I believe there are a lot of options for small sellers. I believe Amazon is a great one, and we've worked very hard. I think we are the best one.

Mr. Cicilline. Well, Mr. Bezos----

Mr. Bezos. We have a lot of different programs that help sellers. But----

Mr. Cicilline. Thank you.

Mr. Bezos [continuing]. We are not the only option.

Mr. Cicilline. There are 2.2 million active sellers as of yesterday. About 37 percent of those sellers rely on Amazon as their sole source of income. That is over 800,000 people relying on Amazon to feed their families, put their kids through school, and keep a roof over their heads.

Mr. Bezos, you have referred to third-party sellers as both

your partners and customers. But isn't it true that Amazon refers to third-party sellers as ``internal competitors''?

Mr. Bezos. I think in--it wouldn't surprise me. In some ways, we are competing. And they're also competing with each other.

Mr. Cicilline. Well, that's right.

Mr. Bezos. And the marketplace does allow that.

Mr. Cicilline. Your own document, Mr. Bezos, Amazon's own documents that you produced refer to the very same sellers that you've described as Amazon partners as ``internal competitors.''

In fact, we've heard from third-party sellers again and again during the course of the investigation that Amazon is the only game in town. One small-business owner we interviewed described it this way, and I quote: ``We're stuck. We don't have a choice but to sell through Amazon.'' Another said, and I quote, ``They've never been a great partner, but you have to work with them.''

During this investigation, we have heard so many heartbreaking stories of small businesses who sunk significant time and resources into building a business and selling on Amazon, only to have Amazon poach their best-selling items and drive them out of business.

So I want to talk to you about one company that really stood out from the rest. I want you to pay close attention to how they described your partnership, Mr. Bezos. We heard from a small apparel company that makes and sells what they call ``useful apparel'' for people who work on their feet and with their hands, like construction workers and firefighters.

This particular business discovered and started selling a unique item that had never been a top seller for the brand. They were making about $60,000 a year on just this one item. One day, they woke up and found that Amazon had started listing the exact same product, causing their sales to go to zero overnight. Amazon had undercut their price, setting it below where the manufacturer would generally allow it to be sold so that, even if they wanted to, they couldn't match the price.

Here's how the apparel company described working with Amazon, and I quote: ``Amazon strings you along for a while because it feels so good to get that paycheck every week. And in the past, for lack of a better term, we called it `Amazon heroin' because you just kept going and you had to get your next fix, your next check. But, at the end of the day, you find out that this person, who was seemingly benefiting you, making you feel good, was just ultimately going to be your downfall,'' end quote.

So, Mr. Bezos, this is one of your partners. Why on Earth would they compare your company to a drug dealer?

Mr. Bezos. Sir, I have great respect for you and this committee, but I completely disagree with that characterization.

What we have done is create in the store a place--if you go back in time, we sold only our own inventory. It was a very controversial decision inside the company to invite third-party sellers to come into what is really our most valuable retail real estate, our product detail pages.

We did that because we were convinced that it would be better for the consumer, it would be better for the customer----

Mr. Cicilline. Well, Mr. Bezos----

Mr. Bezos [continuing]. To have all of that selection. And I think we were right, and I think it's worked----

Mr. Cicilline. Reclaiming my time----

Mr. Bezos [continuing]. Out well for the customer and----

Mr. Cicilline [continuing]. Unfortunately, this is one of--

EXHIBIT U(ii)

--

Mr. Bezos [continuing]. Third-party sellers and for----

Mr. Cicilline. Reclaiming my time, Mr. Bezos, this is one of many small companies that have told us during this year-long investigation that they were mistreated, abused, and tossed aside by Amazon.

Now, Mr. Bezos, you say that Amazon is only focused on doing what's best for the customer--you just said it again--and also third-party sellers.

But how is that possible, when you compete directly with third-party sellers with your own products that undercut the competition? Isn't it an inherent conflict of interest for Amazon to produce and sell products on its platform that compete directly with third-party sellers, particularly when you, Amazon, set the rules of the game?

Mr. Bezos. Thank you. No, I don't believe it is. We have-- the consumer is the one ultimately making the decisions. They're making the decisions about what to buy, what price to buy it at, who to buy it from. And our--what we try to do is make it an easy----

Mr. Cicilline. That's not the question, Mr. Bezos. The question is, is there an inherent conflict of interest? Because you are a data company. You know when customers put something in their cart, when they take it out. Traditional brick-and-mortar stores, like a grocery store, where competition occurs, don't have that.

And so I just want to follow up, finally, on an answer to the question that you gave to Congresswoman Jayapal. You said that you can't guarantee that the policy of not sharing third-party sellers' data with Amazon's own line hasn't been violated; you couldn't be certain.

Can you please explain that to me? Can you list examples of where that policy has been violated?

Because it's particularly concerning to me, Mr. Bezos, that--shouldn't third parties know for sure that data isn't being shared with your own line, their competitors? Why should a third-party seller list their product on Amazon if they're just going to be undercut by Amazon's own product as a result of data you take from them?

Mr. Bezos. Sir, I think what I want you to understand, and I think is important to understand, is that we have a policy against using individual seller data to compete with our private-label products. And----

Mr. Cicilline. You couldn't assure Ms. Jayapal that that policy isn't violated routinely.

Mr. Bezos. Well, we are investigating that. And I do not want to sit here and I do not want to go beyond what I know right now. But we are--as a result of that Wall Street Journal article, we are looking at that very carefully----

Mr. Cicilline. Thank you, Mr. Bezos.

Mr. Bezos [continuing]. And we want to get this back, and we will surely share them with you.

Mr. Cicilline. Thank you. And we look forward to that.

The evidence we've collected shows that Amazon is only interested in exploiting its monopoly power over the e-commerce marketplace to further expand and protect this power. This investigation makes clear that Amazon's dual role as a platform operator and competing seller on that platform is fundamentally anticompetitive. And Congress must take action.

And, with that, I recognize the gentleman from Wisconsin, the ranking member of the subcommittee, Mr. Sensenbrenner, for 5 minutes.

Mr. Sensenbrenner. Well, Mr. Chairman, I think that the history proves that Congress does a poor job in picking winners and losers. And I've looked over a lot of the material that has

EXHIBIT U(ii)

been assembled. I've been working with the chairman for over a year on this bipartisan investigation. And I have reached the conclusion that we do not need to change our antitrust laws. They have been working just fine. The question here is the question of enforcement of those antitrust laws.

Now, we've heard a lot about the Facebook acquisition of Instagram. That happened in 2012. Obama's FTC signed off on that. So, regardless of what you think happened at that time, the fact is that this acquisition did pass the smell test of the regulators involved. Now, maybe they made a mistake, or maybe something else happened. I don't know. But the fact is that there is not a problem with the law.

Now, you know, back about 35 years ago, AT&T was broken up because it was determined that one-stop shops were monopolistic. And AT&T, because you had to get your long-distance service from your local phone company, that was monopolistic. So the Baby Bells were spun off.

A whole lot has happened since then. There were mergers and acquisitions in the telecom industry. Technology advanced a huge amount. And guess what? We're back to exactly where we were in 1984. So this goes to show that congressional pressure is not the best.

Now, using the AT&T example, which I think was a big flop and counterproductive, let me ask Mr. Bezos, you know, say the AT&T example was applied to Amazon and you were required to spin stuff off. So you might have no more one-stop shop, but you have to go to separate places for books or groceries or videos or electronics. How are the consumers helped by that?

Mr. Bezos. Sir, thank you. They would not be.

Mr. Sensenbrenner. Right.

Mr. Bezos. That's very clear.

Mr. Sensenbrenner. Now, Mr. Pichai, let me ask about Google. If you were forced to split up your business lines, say, spin off ad tech and YouTube, can you describe what happens to consumers there?

Mr. Pichai. Congressman, today, consumers in most of the areas we are dealing with, they see prices free or falling, and they get more choice than ever before. So I think it serves them well.

Mr. Sensenbrenner. And you're right there.

So, you know, I'm not going to be on this committee in the next Congress. I am going to put my feet up and become a ``senior, statesman.''

But, you know, let me say that we have heard a whole lot of complaints about Big Tech. Some of them are political in nature, and I share the complaints and the concern of Mr. Jordan and others. And others talk about allegedly anticompetitive activity.

It seems to me that it's not for Congress that legislates to toss all of our antitrust laws and the precedent that has been established through litigation over the last 100-plus years, but it's something where we ought to go back to the regulators, to the enforcers, have them look at this stuff, and have them make a determination on whether or not the law has been violated. I think the law is good on that, and we don't need to throw it all in the wastebasket.

But there are some matters of concern that we have heard from both sides of the aisle that I think need to be addressed. And if it requires an agency like the FTC to say that they've made mistakes in the past, so be it. We're all human; we all make mistakes. And even government agencies do that.

I yield back.

Mr. Cicilline. The gentleman yields back.

I now recognize the gentlelady from Washington, Ms. Jayapal.

EXHIBIT U(ii)

Ms. Jayapal. Thank you, Mr. Chairman.

Mr. Zuckerberg, in March of 2012, you suggested by email to your management team that moving faster in copying other apps could, quote, ``prevent our competitors from getting footholds.''

Sheryl Sandberg responded that, quote, ``it is better to do more and move faster, especially if that means you don't have competitors build products that take some of our users.''

Facebook's product management director added that, quote, ``I would love to be far more aggressive and nimble in copying competitors.''

Has Facebook ever taken steps to prevent competitors from getting footholds by copying competitors?

Mr. Zuckerberg. Congresswoman, I view it as our job to understand what people are finding valuable in all of the services that they use. And, certainly, if someone----

Ms. Jayapal. Do you copy your competitors?

Mr. Zuckerberg. Congresswoman, we've certainly adapted features that others have led in, as others have copied and adapted features that we've led in.

Ms. Jayapal. I'm not concerned about others. I'm just asking you, Mr. Zuckerberg.

Since March of 2012, after that email conversation, how many competitors did Facebook end up copying?

Mr. Zuckerberg. Congresswoman, I can't give you a number of companies who have----

Ms. Jayapal. Was it less than five?

Mr. Zuckerberg. Congresswoman, I don't know. I----

Ms. Jayapal. Less than 50? Any estimates?

Your team was making a plan. How did it play out?

Mr. Zuckerberg. Congresswoman, I'm not sure I agree with the premise here. Our job is to make sure that we build the best services for people to connect with all the people they care about. And a lot of that is done by innovating and by building new things that are----

Ms. Jayapal. Thank you.

Mr. Zuckerberg [continuing]. Leading the way internally----

Ms. Jayapal. Thank you, Mr. Zuckerberg. Let me go on.

Has Facebook ever threatened to clone the products of another company while also attempting to acquire that company?

Mr. Zuckerberg. Congresswoman, not that I would--not that I recall.

Ms. Jayapal. And I'd like to just remind you that you are under oath, and there are quotes from Facebook's own documents.

Prior to acquiring Instagram, Facebook began developing a similar product called Facebook Camera, correct?

Mr. Zuckerberg. Congresswoman, that's correct. I've said multiple times that we were competing in the space of building mobile cameras with Instagram. That's what they did at the time. Their competitive set was companies like what we were building with Facebook Camera----

Ms. Jayapal. Great.

Mr. Zuckerberg [continuing]. And VSCO Cam and----

Ms. Jayapal. Thank you, Mr.----

Mr. Zuckerberg [continuing]. We were certainly competing with that.

Ms. Jayapal. Thank you, Mr. Zuckerberg.

Did you ever use this very similar Facebook Camera product to threaten Instagram's founder, Kevin Systrom?

Mr. Zuckerberg. Congresswoman, I'm not sure what you would mean by ``threaten.'' I think it was public that we were building a camera app at the time. That was a well-documented thing.

Ms. Jayapal. Let me tell you that Mr.--in a chat, you told Mr. Systrom that Facebook was, quote, ``developing our own

EXHIBIT U(ii)

photo strategy, so how we engage now will also determine how much we're partners versus competitors down the line.''

   Instagram's founder seemed to think that was a threat. He confided in an investor at the time that he feared you would go--that you would go into, quote, ``destroy mode'' if he didn't sell Instagram to you.

   So let's just recap. Facebook cloned a popular product, approached the company you identified as a competitive threat, and told them that if they didn't let you buy them up, there would be consequences.

   Were there any other companies that you used this same tactic with while attempting to buy them?

   Mr. Zuckerberg. Congresswoman, I want to respectfully disagree with the characterization. I think it was clear that this was a space that we were going to compete in, one way or another. I don't view those conversations as a threat in any way. I was trying to figure out----

   Ms. Jayapal. I'm just using the documents and the testimony that the committee has collected from others.

   Did you warn Evan Spiegel, the founder of Snapchat, that Facebook was in the process of cloning the features of his company while also attempting to buy Snapchat?

   Mr. Zuckerberg. Congresswoman, I don't remember those specific conversations.

   But that was also an area where it was very clear that we were going to be building something. People want to be able to communicate privately. They want to be able to communicate with all of their friends at once. And we're going to make sure that we build the best products in all of the spaces that we can around helping people stay connected with the people they care about.

   Ms. Jayapal. I appreciate that, Mr. Zuckerberg. I think the question, again, here is, when the dominant platform threatens its potential rivals, that should not be a normal business practice.

   Facebook is a case study, in my opinion, in monopoly power, because your company harvests and monetizes our data, and then your company uses that data to spy on competitors and to copy, acquire, and kill rivals. You've used Facebook's power to threaten smaller competitors and to ensure that you always get your way. These tactics reinforce Facebook's dominance, which you then use in increasingly destructive ways.

   So Facebook's very model makes it impossible for new companies to flourish separately. And that harms our democracy, it harms mom-and-pop businesses, and it harms consumers.

   Mr. Chairman, I yield back.

   Mr. Neguse [presiding]. The gentlewoman yields back.

   The gentleman from Colorado, Mr. Buck, is recognized for 5 minutes.

   Mr. Buck. Thank you, Mr. Chairman.

   Mr. Bezos, thank you for being here today. I'm concerned that you've used Amazon's dominant market position to unfairly harm competition. We've heard from a number of companies that Amazon uses proprietary data from third-party companies to launch its own private-label products, meets with startups to discuss investing in the product and then uses the proprietary data from these meetings to create its own private-label products, and allows the sale of counterfeit items through its web platform.

   During this subcommittee's field hearing in Boulder this January, PopSockets' CEO and inventor, David Barnett, detailed how Amazon allowed counterfeit products to appear on Amazon's marketplace ahead of PopSockets' products. Mr. Barnett told CNBC that PopSockets found at least 1,000 counterfeit products for sale on Amazon's marketplace, which Amazon allegedly failed

EXHIBIT U(ii)

to remedy until PopSockets agreed to a nearly $2 million marketing deal with Amazon.

We've also seen troubling reports in The Wall Street Journal detailing Amazon's use of third-party sellers' proprietary data to develop and market its own competitive private-label products.

The Wall Street Journal also reported last week that Amazon's venture capital fund used meetings with unsuspecting startup companies to gain access to secret proprietary product information and financial details. Amazon then reportedly used that information to launch competing products, often with disastrous results for the original startup company.

There are many examples of this behavior, but one allegation in the Journal's reporting sticks out in particular. In 2011, Amazon contacted Vocalife, LLC's inventor about the possibility of investing in the speech-detection technology. Vocalife's founder accepted the meeting, thinking this was the company's big break.

After displaying Vocalife's microphone technology and providing proprietary information, including engineering data, to Amazon employees, the relationship came to an abrupt halt. Amazon employees allegedly stopped responding to emails before the technology eventually found its way into the Amazon Echo device.

These allegations are serious, especially because the size and scope of these practices couldn't happen without Amazon's monopolistic control of the marketplace.

I'm also concerned that, given Amazon's allowance of counterfeit goods on its marketplace, especially counterfeit goods from China, that Amazon's marketplace may be knowingly or unknowingly furthering China's use of forced and slave labor conditions.

This is especially important following recent reports that at least 80 global companies that sell on the Amazon marketplace, including Nike, Starbucks, and Samsung, have ties to Chinese factories that use enslaved Uighur Muslims.

Following these concerning reports, Senator Hawley introduced an important bill last week requiring American businesses to certify that their supply chain does not rely on forced labor. I will be introducing the House companion bill later this afternoon.

While I do not expect you to have intimate knowledge of the legislation, I do want to ask all four of our witnesses a simple yes-or-no question.

Will you certify here today that your company does not use and will never use slave labor to manufacture your products or allow products to be sold on your platform that are manufactured using slave labor?

Mr. Cook, you were kind enough to visit with me on the phone. I think we briefly discussed this issue. If you----

Mr. Cook. Yes.

Mr. Buck [continuing]. Can, give a yes-or-no answer. And I understand you haven't read the details of the bill. But would you agree to this idea?

Mr. Cook. I would love to engage on the legislation with you, Congressman. But let me be clear: Forced labor is abhorrent, and we would not tolerate it in Apple. And so I would love to get with your office and engage on the legislation.

Mr. Buck. Thank you.

Mr. Pichai.

Mr. Pichai. Congressman, I share your concern in this area. I find it abhorrent as well. Happy to engage with your office and discuss this further.

Mr. Buck. So I really don't want to even engage with my

office half the time. Will you guys agree that slave labor is not something that you will tolerate in manufacturing your products or in products that are sold on your platforms?

Mr. Pichai. I agree, Congressman.

Mr. Buck. And Mr. Cook?

Mr. Cook. We wouldn't tolerate it. We would terminate a supplier relationship if it were found.

Mr. Buck. Mr. Zuckerberg?

Mr. Zuckerberg. I agree, we wouldn't tolerate this, and if we found anything like this, we would also terminate any relationship.

Mr. Buck. And Mr. Bezos?

Mr. Bezos. Yes, I agree completely.

Mr. Buck. Great. Thank you very much, gentlemen.

And I yield back.

Mr. Cicilline [presiding]. I thank the gentleman.

I now recognize the gentleman from Maryland, Mr. Raskin, for 5 minutes.

Mr. Raskin. Thank you, Mr. Chairman.

I want to thank Mr. Buck for that excellent line of questioning and for the upcoming legislation. I look forward to joining that.

You know, in the 19th century, we had the robber barons. In the 21st century, we've got the cyber barons. And we want to make sure that the extraordinary power and wealth that you've been able to amass is not used against the interests of democracy and human rights around the world and not against the interests of a free market at home.

So, Mr. Bezos, let me turn to you. I'm interested in the role that you play as a gatekeeper. A lot of consumers want to know when the HBO Max app will be available on your Fire device. And I understand that negotiations are ongoing but that your company is not only asking for financial terms but also for content from Warner Media. Is that right? And is that a fair way to proceed?

In other words, is it fair to use your gatekeeper-status role in the streaming device market to promote your position as a competitor in the video streaming market with respect to content?

Mr. Bezos. I'm not familiar with the details of those negotiations. As you said, they're underway right now. I predict that the companies will eventually come to an agreement. And I think this is kind of--two large companies negotiate an agreement; this is kind of normal case of simple commerce----

Mr. Raskin. Right. But here's why I pursue it: Precisely because it is a large company, and, in a way, they stand in for hundreds of thousands of much smaller companies, who are even in a more disadvantageous position with respect to negotiating with you.

I guess, the general proposition, then, you can speak to, if you don't know the details of this, which is: Is it okay to negotiate not just for financial terms in having someone be part of your Fire unit but also to try to extract in that negotiation leverage with respect to getting content from them?

Mr. Bezos. Well, again, I'm not familiar with the details. What I would say is I think----

Mr. Raskin. I'm not asking about that one. In general. In general.

Mr. Bezos. In general, I think that when two companies are negotiating, you are negotiating not just the amount of money that's going to change hands but also what you're going to get in exchange for the amount of money. That is a very fundamental way that business works----

Mr. Raskin. Do you see, at least to outsiders, that would

EXHIBIT U(ii)

look like a structural conflict of interest? Like, you're using your control over access to people's living rooms essentially, you're using that in order to obtain leverage in terms of getting creative content that you want. And are you essentially converting power in one domain into power in another domain where it doesn't belong?

Mr. Bezos. I think what I should do is offer to get you information. I'll get it to your office for you. Because I'm not familiar enough with this, and I could imagine that there would be scenarios, if we're just talking in the abstract, where it would be inappropriate, and I could imagine scenarios where it would be very normal business----

Mr. Raskin. Okay.

Mr. Bezos [continuing]. And very appropriate.

Mr. Raskin. Fair enough.

I want to talk about an emerging market, smart homes. And I want to start with the hub of the smart home, smart speakers. Does Amazon price the Echo device below cost?

Mr. Bezos. Not its list price, but it's often on promotion, and sometimes when it's on promotion it may be below cost, yes.

Mr. Raskin. Well, several other companies did tell us, in fact, that Amazon is pricing Echo devices way below cost, making it nearly impossible for them to compete, and aggressively discounting Alexa-enabled speakers as a strategy to own the smart home.

Like many markets we've heard about today, smart speakers with voice assistants, like Alexa, along with the myriad of smart-home appliances that Alexa can interact with, make up the next ecosystem or platform for tech companies to lock in customers.

Would you say the smart-home market, for which the Echo, Ring security system, and other smart devices operate, is a winners-take-all market, yes or no?

Mr. Bezos. No, I wouldn't, especially if we're able to succeed at what we want, which is, we would like--our vision for this is that smart-home speakers should answer to different wake words. So, you know----

Mr. Raskin. So, when considering the acquisition of----

Mr. Bezos [continuing]. On a case-by-case basis. And I think in that--just if I could, because I think it's important. If we could achieve that, then I think you would get really good behavior on the part of----

Mr. Raskin. Okay.

Mr. Bezos [continuing]. You know, competitive voice agents helping you.

Mr. Raskin. When you were looking at acquiring Ring, you wrote to your executive team, quote, ``We're buying market position, not technology. And that market position and momentum is very valuable.''

So, if smart homes are not a market with lock-in effects, why would a leading market position and momentum be so very valuable?

Mr. Bezos. Sir, market position is valuable in almost any business, and it's one of the primary things that one would look at in an acquisition.

There are multiple reasons that we might buy a company. Sometimes we're trying to buy some technology or some IP. Sometimes it's a talent acquisition. But the most common case is market position, that the company has traction with customers, they've built a service, maybe they were the first mover. There could be any number of reasons why they have that market position. But that's a very common reason to acquire a company.

Mr. Raskin. Well, once a company becomes dominant in a market, it can favor its own products and services. Alexa-

enabled smart speakers make up over 60 percent of the smart-speaker market.

Mr. Bezos, when I ask Alexa to play my favorite song, Prime Music is the default music player. Is that right?

Mr. Bezos. If you're--I think that's true if you're a Prime member, yes.

Mr. Raskin. And a New York Times report found that, when users say, ``Alexa, buy batteries,'' Alexa responds, ``Would you like to buy double A AmazonBasics batteries?''

So has Alexa ever been trained to favor Amazon products when users shop by voice?

Mr. Cicilline. The time of the gentleman has expired, but the witness may answer the question.

Mr. Bezos. I don't know if it's been trained in that way. I'm sure there are cases where we do promote our own products, which is, of course, a common practice in business. You know, so it wouldn't surprise me if Alexa sometimes does promote our own products.

Mr. Raskin. Thank you, and I yield back.

Mr. Cicilline. The chair recognizes the gentleman from Florida, Mr. Gaetz, for 5 minutes.

Mr. Gaetz. Mr. Pichai, during our prior discussion earlier today, you said that Google doesn't work with the Chinese military. That answer was deceptive, because Google works with many of the entities that work with the Chinese military in common collaboration.

And just one example would be Tsinghua University, where Jeff Dean, who is the head of Google AI, served on the Computer Science Advisory Committee for the university, and then the university takes nearly $15 million from China's Central Military Commission.

So you can see how, even if you don't literally show up at the offices of the Chinese military, if you're all showing up at the same place, working together on AI, that would lead to my concern.

But I want to talk about search, because that's an area where I know Google has real market dominance.

On December 11, you testified to the Judiciary Committee, and in response to a question from my colleague Zoe Lofgren about Search, you said, ``We don't manually intervene on any particular search result.''

But leaked memos obtained by The Daily Caller show that that isn't true. In fact, those memos were altered December 3, just a week before your testimony, and they describe a ``deceptive news blacklist'' and a process for developing that blacklist, approved by Ben Gomes, who leads Search with your company, and also something called a fringe ranking, which seems to beg the question, you know, who gets to decide what's fringe?

And, in your answer, you know, you said to Ms. Lofgren that there is no manual intervention of search. That was your testimony. But now I'm going to cite specifically from this memo from The Daily Caller. It says--or that, I'm sorry, that The Daily Caller obtained from your company.

It says, ``The beginning of the workflow starts when a website is placed on a watchlist.'' It continues, ``This watchlist is maintained and stored by Ares, with access restricted to policy and enforcement specialists.'' It sort of does beg the question who these enforcement specialists are.

``Access to the listing can also be shared on a need-to-know basis to enforce or enrich the policy violations. The investigation of the watchlist is done in the tool Athena, the Ares manual review tool.''

So you said to Congresswoman Lofgren that there was no manual review tool, and then your documents indicate that there

is a manual review tool. So help us understand the inconsistency.

Mr. Pichai. Congressman, there are two parts to this.

In general, you know, we algorithmically approach our search results. We have robust policies to do so. And we test it both with user feedback and we use raters to validate. Last year alone, we ran over 300,000 experiments and launched around 3,000 improvements to Search.

And we don't manually tune. The question last time was in the context of, is there someone behind the curtain manually tuning an individual search result? We don't. We generally approach it algorithmically.

We, however, in order to comply with the law in every country we operate in--for example, there may be an actor or a website identified as interfering in elections, and we then have to put that site on a list so that that doesn't appear in our search results against queries. So other examples would be violent extremism----

Mr. Gaetz. And is that done manually, Mr. Pichai? That process you described, is that done manually?

Mr. Pichai. And we could get reports from law enforcement agencies. You know, we are complying with--or it's a known-- DMCA-based copyright violation

Mr. Gaetz. There is either a manual component or there is not a manual component. Which is it?

Mr. Pichai. For creating those lists, that process can involve manual portions, too.

Mr. Gaetz. Okay. Great. Well, that is sort of the concern that I have. You've now said something different today than you said to Ms. Lofgren, because you've confessed that there is a manual component to the way in which you blacklist content. And it seems to be no coincidence that sites like Gateway Pundit, The Western Journal, American Spectator, Daily Caller, and Breitbart receive ire or negative treatment as a consequence of your manual tooling.

And it also seems noteworthy that whistleblowers at your own company have spoken out. You said that one of the reasons you maintain this manual tool is to stop election interference. I believe it is, in fact, your company that is engaging in election interference. And it's not just my view. Mike Wacker came out and was a whistleblower, indicating that the manual blacklist targets that Google specifically goes after are those who support President Trump, who hold a conservative viewpoint. And he left your company in 2019 because he was speaking out against these ``outrage mobs.''

So can you see how, when you empower individuals, some of the same individuals that Project Veritas has exposed as labeling people as terrorists who say ``Make America Great Again'' or who support the President, that, in fact, can be the very election interference that we're concerned about and that you're using your market dominance in search to accomplish that election interference?

Mr. Pichai. Congressman, with respect, I strongly disagree with that characterization. We don't approach this work with any political viewpoint. We do that to comply with law, known copyright violations, in very narrow circumstances. And we have to do that to comply with the law. And, in many cases, those requests can come from law enforcement agencies----

Mr. Gaetz. Your own employees are saying----

Mr. Cicilline. The time of the gentleman----

Mr. Gaetz [continuing]. You're doing it for a different reason.

Mr. Cicilline. The time of the gentleman has expired.

Mr. Gaetz. Your own employees are saying it's political bias.

EXHIBIT U(ii)

I yield back.

Mr. Cicilline. Thank you, Mr.----

Mr. Gaetz. Oh, I'm sorry. May I be recognized for a unanimous consent request?

Mr. Cicilline. Yes.

Mr. Gaetz. Mr. Chairman, just, given the productivity of our discussion, I'd request that we be permitted a third round of questioning.

Mr. Cicilline. Without objection.

I now recognize the chairman of the full committee, Mr. Nadler.

Chairman Nadler. Yeah. You know, the documents prove--the news and journalism industry in this country are in economic free fall. Over 200 counties in America no longer have a local newspaper, and tens of thousands of journalists have been laid off in recent years.

The reason journalism is in free fall is that Google and Facebook now capture the vast majority of digital ad revenue. Although news publishers produce valuable content, it is Google and Facebook that increasingly profit off their content. Publishers have told us that Google and Facebook maintain their dominance in these markets in part through anticompetitive conduct as well as conflict of interest.

Mr. Zuckerberg, in 2015, Facebook reported high and quickly growing rates of video viewership on its platform. Based on these metrics, news publishers fired hundreds of journalists, choosing instead to boost their video divisions.

In 2018, it was discovered that Facebook had inflated these metrics and had known about the inaccuracies several years before Facebook publicly disclosed this.

Mr. Zuckerberg, did you know that these metrics were inflated before they were publicly released?

Mr. Zuckerberg. Congressman, no, I did not. And we regret that mistake and have put in place a number of other measures since then to make sure that we----

Chairman Nadler. And do you realize the harm that this caused journalists across the country?

Mr. Zuckerberg. Congressman, I certainly know how important it is that the metrics that we report are accurate, and we've put in place additional measures to make sure we can audit those.

Chairman Nadler. And what do you have to say to the journalists who lost their jobs because of Facebook's deception?

Mr. Zuckerberg. Well, Congressman, I disagree with that characterization and also your description of what----

Chairman Nadler. Okay. Reclaiming my time.

Google, meanwhile, maintains its dominance in part through aggregating data from across its products and services.

Mr. Pichai, I understand that Google collects user data on users' browsing activity through its Chrome browser. Does Google use that data for its own purposes, either in advertising or to develop and refine its algorithms?

Mr. Pichai. Mr. Chairman, we do use data to improve our products and services for our users. Anytime we do it, we believe in giving users choice, control, and transparency; we make it very clear. And we give them simplified settings to choose how would they like their data to be used.

Chairman Nadler. So you do use the data that you get from these companies for your purposes.

Mr. Pichai. My understanding was whether we use data in general to improve our products and services. And, you know, we do use data to show ads, but we give users a choice; they can turn ads personalization on or off. And----

Chairman Nadler. No, this--obviously, the use of this data

EXHIBIT U(ii)

from all these companies gives you a tremendous advantage over them and over any competitor.

Does the ability to make money in any way affect Google's algorithm in terms of what news appears in a typical user's search results?

Mr. Pichai. The way we rank our search results, you know, we don't take into account a commercial relationship that we have.

Chairman Nadler. Okay. But Facebook and Google have gravely threatened journalism in the United States. Reporters have been fired. Local newspapers have been shut down. And now we hear that Google and Facebook are making money over what news they let the American people see. This is a very dangerous situation.

And, unfortunately, my time has expired and I have to yield back.

Mr. Cicilline. I thank the gentleman for yielding.

I now recognize the gentleman from Florida, Mr. Steube, for 5 minutes.

Mr. Steube. Thank you, Mr. Chairman. I'm just going to pick up where I left off.

Mr. Pichai, there are rioting groups that are going unchecked with the posting of what I would contend is very violent video. Yet, yesterday, I was sent a YouTube video about doctors discussing hydroxychloroquine and discussing the not-dangers of children returning to school, and when I clicked on the link, it was taken down.

And then I was sent a different link on YouTube, and it was taken down. I just checked again, just to make sure, and it says that this video has been removed for violating YouTube's community guidelines.

How can doctors giving their opinion on a drug that they think is effective for the treatment of COVID-19 and doctors who think it's appropriate for children to return back to school violate YouTube's community guidelines, when all of these videos of violence are all posted on YouTube?

Mr. Pichai. Congressman, we believe in freedom of expression. And there is a lot of debate on YouTube about effective ways to deal with COVID. We allow robust debate.

But in the area, during a pandemic, we look to local health authorities--so, for example, in the U.S., it would be CDC--for guidelines around medical misinformation in a narrow way which could cause harm in the real world.

And so, for example, if there are aspects of a video and if it explicitly states something could be a proven cure, and that doesn't meet CDC guidelines, you know, we would remove that video----

Mr. Steube. But it's free expression of speech. And you have these doctors who are giving their opinion as doctors. And I don't understand why YouTube and, therefore, Google thinks it's appropriate to silence physicians and their opinion of what can help and cure people with COVID-19.

I'm going to switch quickly to Mr. Zuckerberg.

I think at this point it's fairly obvious that technology platforms have been stifling conservative news and opinions. You employ a panel of content moderators. Can you explain how Facebook chooses who these moderators are?

Mr. Zuckerberg. Thanks, Congressman. We do hire a lot of people around the world to work on safety and security. Our team is more than 30,000 or 35,000 people working on that now. We certainly try to do this in a way that is neutral to all viewpoints. We want to be a platform for all ideas. I don't think you build a social product with the goal of giving people a voice if you don't believe that people being able to express a wide variety of things is ultimately valuable for the world.

EXHIBIT U(ii)

And we try to make sure that our policies and our operations ultimately reflect and carry that out.

Mr. Steube. Is there an ideological diversity amongst the content moderators?

Mr. Zuckerberg. Congressman, I don't think we choose to hire them on the basis of an ideology. They're hired all over the world. There is certainly a bunch in the U.S. There's diversity in where they're hired, but certainly we don't want to have any bias in what we do, and we wouldn't tolerate it if we discovered that.

Mr. Steube. So you don't specifically hire, say, conservative moderators and Democrat or liberal moderators so that there's a balance in your content moderators?

Mr. Zuckerberg. Congressman, in terms of the 30,000 to 35,000 people or more at this point who are doing safety and security review, that is correct. In terms of the people setting the policies, I think it is valuable to have people with a diversity of viewpoints involved so we can make sure that we have the different viewpoints represented in the policy development process.

And we also consult with a number of outside groups whenever we develop new policies to make sure that we're taking into account all perspectives.

Mr. Steube. What are some of those outside groups that would be conservative leaning?

Mr. Zuckerberg. Congressman, I need to get back to you with a list of specific groups, but it would depend on what the topic is that we're talking about.

Mr. Steube. Yeah. Can you just think of one? I mean, you said that you reach out to outside groups. Can you think of one conservative outside group that you reach out to and use as a content moderator?

Mr. Zuckerberg. Oh, Congressman, I'm talking about different external stakeholders and groups that are inputs to our policy development process. And I'm not involved in those conversations directly. So I would have to get back to you with specifics on that. But I am quite confident that we speak with people across the ideological spectrum when we're developing our policies.

Mr. Steube. I would very much appreciate a followup on that.

Real quickly, can you briefly explain the approval process for third-party fact-checkers, and how many fact-checkers does Facebook employ?

Mr. Zuckerberg. Yes, thanks. We work with about 70 fact-checking partners around the world, and the goal of the program is to limit the distribution of viral hoaxes, so things that are clearly false, from getting a lot of distribution. But we don't ourselves want to be in the business of determining what is true and what is false. That feels like an inappropriate role for us to play.

We rely on an organization called the Poynter Institute, and I think it's called the independent fact-checking organization that has a set of guidelines of what makes an independent fact checker, and they certify those fact-checkers. And then any organization that gets certification from that group is qualified to be a fact-checking partner within Facebook.

Mr. Cicilline. Thank you. The gentleman's time has expired.

I'm going to recognize Mr. Johnson for 5 minutes, and then we are going to take a short break of the committee.

Mr. Johnson, you are recognized.

Mr. Johnson. Thank you, Mr. Chairman.

Mr. Bezos, Amazon has a significant problem with counterfeit products being sold on its platform. Counterfeit

EXHIBIT U(ii)

products not only rip off the owners of legitimate businesses, they also can be dangerous. Counterfeit medicine, baby food, automobile tires, and other products can kill. Amazon has said its fixing its counterfeit problem, but counterfeiting seems to be getting worse, not better.

Amazon is a trillion-dollar company, but Amazon customers are not guaranteed that the products purchased on your platform are authentic. Amazon acts like it's not responsible for counterfeits being sold by third-party sellers on its platform, and we've heard that Amazon puts the burden and cost on brand owners to police Amazon's site, even though Amazon makes money when a counterfeit good is sold on its site.

More than half of Amazon's sales come from third-party seller accounts. Why isn't Amazon more aggressive in ensuring that counterfeit goods are not sold on its platform, and why isn't Amazon responsible for keeping all counterfeit products off of its platform?

Mr. Bezos. Thank you. This is an incredibly important issue and one that we work very hard on. Counterfeits are a scourge. They are a problem that is not--does not help us earn trust with customers. It's bad for customers. It's bad for honest third-party sellers.

We do a lot to prevent counterfeiting. We have a team of more than a thousand people that does this. We invest hundreds of millions of dollars in systems that do this. We have something called Project Zero, which helps brands serialize individual products, which really helps with counterfeiting. We have other programs as well----

Mr. Johnson. I'm glad that you have those features in place, but why isn't Amazon responsible for keeping all counterfeit products off of its platform?

Mr. Bezos. We certainly work to do so, Congressman, and we do so not just for our own retail products but for third-party products as well. We do work closely with brands----

Mr. Johnson. Thank you. We've heard from numerous third-party sellers and brand owners that Amazon has used knockoffs as leverage to pressure sellers to do what Amazon wants. For example, the founder of Popsockets testified in January that Amazon itself was selling knockoffs of its product.

After reporting the problem, it was only after his company committed to spending $2 million on advertisements that Amazon appears to have stopped diverting sales to these knockoffs. What is your explanation for that business practice?

Mr. Bezos. That's unacceptable. If that is--if those are the facts and if someone somewhere inside Amazon said, you know, ``Buy X dollars in ads, and then we'll help you with your counterfeit problem,'' that is unacceptable. And I will look into that, and we'll get back to your office with that.

What I can tell you is that we have a counterfeit crimes unit. We attempt to prosecute counterfeiters. I would encourage this body to pass stricter penalties for counterfeiters and to increase law enforcement resources to go after counterfeiters because they are bad actors.

Mr. Johnson. But your company still makes money off of counterfeit goods being sold on your platform. Isn't that correct?

Mr. Bezos. If it does, in my view, sir, it would only be in the short term. I would much rather lose a sale than lose a customer. We make money when the customer comes back.

Mr. Johnson. All right. Fair enough, sir.

Making companies pay extra to avoid having their products disappear in rankings seems to be so unfair, especially to small businesses. The American Dream is threatened when that happens. Don't you think so?

Mr. Bezos. Sir, I'm not exactly sure what you're referring

EXHIBIT U(ii)

to. If you're talking about what we were just talking about a second ago, I agree completely.

Mr. Johnson. No, I'm talking about a totally different situation now, where a company that is selling on your platform but is not paying anything extra gets buried in the rankings, but companies that pay extra are able to get their products pushed up and they avoid getting pushed down. Is that an acceptable practice?

Mr. Bezos. Sir, I think what you're referring to is the fact that we offer an advertising service basically for third-party sellers to drive additional promotion to their products. That is a voluntary program. Some sellers use it. Some don't. And it's been very effective at helping people promote their products.

Mr. Johnson. With that, I yield back. Thank you.

Mr. Cicilline. The gentleman yields back.

The committee will stand in a brief recess.

[Recess.]

Mr. Cicilline. The committee will come to order.

I recognize the gentlelady from Florida, Mrs. Demings, for 5 minutes. I'm sorry?

I recognize the gentleman from North Dakota, Mr. Armstrong, for 5 minutes.

Mr. Armstrong. Thank you, Mr. Chairman.

Mr. Bezos, earlier, my colleague brought up what I think is an important issue, and they were discussing Amazon's stated policy against using third-party seller information to inform business decisions regarding Amazon's private label brands. Ms. Jayapal specifically noted that a possible loophole allows Amazon to review nonpublic aggregate data to inform private brands even in instances where there are only a few third-party sellers.

I just want to drill down on that just a little more. Where exactly does Amazon draw the line?

Mr. Bezos. I'm sorry. Aggregate data would be more than one seller. And the--of course you have to remember that the person seeing the report would have no way of knowing how many sellers are inside that group or what the, you know, what the breakdown would be between those sellers. And I would remind you that it's not that different from perhaps a bestseller list or a product ranking, which we do make public for all.

Mr. Armstrong. And I just want to be clear, does Amazon allow the use of aggregate data to inform private label Amazon brands when there are only three sellers for a product?

Mr. Bezos. Yes, sir.

Mr. Armstrong. Okay. Does Amazon look at aggregate data when there are only two sellers of a product?

Mr. Bezos. Yes, sir.

Mr. Armstrong. And am I correct in my understanding that Amazon is conducting an internal investigation on the use of third-party data?

Mr. Bezos. Yes. We're basically trying to understand some of the anecdotes that we saw in the Wall Street Journal article.

Mr. Armstrong. Will you commit to informing this committee on the outcome of that investigation, including on the exact circumstances of when Amazon is allowed to view and/or use aggregate data?

Mr. Bezos. Yes. Yes, we will do that.

Mr. Armstrong. And now I want to move, just really quick, music can be used to drive revenue. And obviously there is a reason it's important, and I want to talk about Twitch for a second. News reports have indicated that Twitch users are receiving notice and takedown requests pursuant to the Digital Millennium Copyright Act. My understanding is that Twitch

EXHIBIT U(ii)

allows users to stream music but does not license the music. Is that correct?

Mr. Bezos. I'm going to have to ask that I could get back to your office with an answer to that question. I don't know.

Mr. Armstrong. Okay. So that would be great. And then--so my--I just have two more questions related to that. If Twitch is responding to DMCA notice and takedown requirements, should we--or should, one, Twitch consider proactively licensing music instead of retroactively adhering to those notices?

So these are the questions we're interested in. I'm primarily concerned about small, up-and-coming musicians, different people that aren't necessarily labels, to make it easy for them to at least get cease-and-desist notices out as well and as we continue to move forward there.

Mr. Bezos. Yes, Congressman. That is an important issue, and I understand it, and we will get--I will get back to your office on that.

Mr. Armstrong. All right. Earlier this year, Google announced plans to retire third-party cookies that websites attached to users' browsers, and this allows users to be tracked across the internet. A consequence of that change is that it will put other digital advertising market participants at a disadvantage because they can no longer track users.

And at the very, very danger of being pro-cookie, because I'm not when I use my computer as well, but--and I understand that there are legitimate privacy concerns with third-party cookies, but I do want to focus on the competition aspect.

Did this asset--action also place Google at a disadvantage, or does Google have alternative means of collecting that user data to inform its digital advertising activities, Mr. Pichai?

Mr. Pichai. Congressman, as you rightly pointed out, this is an area where we have focused on user privacy, and users clearly don't want to be tracked with third-party cookies. In fact, other browser vendors, including from Apple and Mozilla Foundation have also implemented these changes.

We are doing it thoughtfully, giving time for the industry to adapt because we know publishers depend on revenue in this area. But it's an important change, and I think we have to be focused on privacy to drive the change forward.

Mr. Armstrong. But you have other ways of collecting that information, correct?

Mr. Pichai. On our first-party services, you know, we don't rely on cookies, and obviously when people come and type into search, to give an example----

Mr. Armstrong. I'm not asking if you rely on cookies. I'm asking you, you have other ways of collecting it through Gmail or consumer facing platforms, right?

Mr. Pichai. We don't use data for Gmail for ads, Congressman. But to the extent on the services where we provide ads and if users have consented to ads personalization, yes, we do have data.

Mr. Armstrong. Thank you. I yield back.

Mr. Cicilline. The gentleman yields back.

I now recognize the gentlelady from Florida, Mrs. Demings, for 5 minutes.

Mrs. Demings. Thank you so much, Mr. Chairman.

Mr. Zuckerberg, during discussions of changing Facebook's platform policy in 2012, you said that, and I quote, ``in any model, I'm assuming we enforce our policies against competitors much more strongly.'' It sounds like Facebook weaponizes its policies to target competitors. Why would Facebook enforce its policies against competitors more strongly?

Mr. Zuckerberg. Congresswoman, when we were a much smaller company, we saw that----

Mrs. Demings. This is 2012 now. This was in 2012, so,

please, go right ahead.

Mr. Zuckerberg. Sure. We've had policies in the past that have prevented our competitors, which at the time we were primarily worried about larger competitors, from using our platforms to grow and compete with us. So we had some of those policies. We continually reviewed them over time and since then we've----

Mrs. Demings. Okay. Mr. Zuckerberg, in 2013, a senior Facebook employee identified MessageMe as a fast-growing app on Facebook and said that we will restrict their access. Was this another example of enforcing Facebook's policies against competitors much more strongly, against MessageMe?

Mr. Zuckerberg. Congresswoman, I'm not familiar with that specific example, but we did have that policy. We evaluated it since then and changed our policies.

Mrs. Demings. Okay. Let's move to another one and see if you remember this one. In 2014, other Facebook product managers openly discuss removing Pinterest's access to Facebook's platform tools.

As one employee said, ``I am 100 percent in favor of the idea of moving it from Pinterest, but I am not recommending removing it from Netflix going forward.'' Why would Facebook product managers want to restrict Pinterest's access to Facebook but not Netflix?

Mr. Zuckerberg. Congresswoman, I'm not familiar with that exchange. I don't think I was on that.

Mrs. Demings. Why do you think--you wouldn't have to be on that, but why do you think they made that decision or would make a decision like that?

Mr. Zuckerberg. Well, Congresswoman, as I said, we used to have a policy that restricted competitors from using our platform, and Pinterest is a social competitor with us. It's one of the many competitors that allow people to share----

Mrs. Demings. Okay. All right. Mr. Zuckerberg, these examples and supporting documents strongly suggest that Facebook does weaponize its policy--platform policies, enforcing them selectively to undermine competitors. But let's move on.

Mr. Cook, I am concerned that Apple's policies are also picking winners and losers in the app economy and that Apple rules mean Apple apps always win. Mr. Cook, in 2019, Apple removed from the Apple Store certain apps that helped parents control their children's devices. Do you remember what justification Apple cited?

Mr. Cook. Yes, Congresswoman, I do. It was that the use of technology called MDM, mobile device management, placed kids' data at risk, and so we were worried about the safety of kids.

Mrs. Demings. Okay. All right. So you were concerned about--that the app basically undermined kids' privacy. But another app that used the same tool was AppSure, an app owned by the Saudi Arabian Government. Do you recall what Apple's position was towards this app?

Mr. Cook. I'm not familiar with that app.

Mrs. Demings. Okay. Apple allowed this Saudi app to remain. So there are two types of apps. They use the same tool. Apple kicks one out and said that that was help--one that was helping parents, but keeps the one owned by a powerful government. If that is correct, Mr. Cook, that app that supposedly did the same thing, why do you--why would you keep the one owned by a powerful government?

Mr. Cook. I'd like to look into this and get back with your office. I know----

Mrs. Demings. Because it sounds like you applied different rules to the same apps.

Mr. Cook. We apply the rules to all developers evenly. What

EXHIBIT U(ii)

we were worried about----

Mrs. Demings. Did the fact that Apple had its own--Mr. Cook, let me just ask you this. Did the fact that Apple had its own parental control apps that were competing with these third-party apps contribute to Apple's decision to kick them off the Apple store? Mr. Cook, what do you think about that?

Mr. Cook. It did not. There's over 30 parental controls on the App Store today. So there's plenty of competition in this area. And I would point out that this is not an area where Apple gets any revenue at all. We do this because----

Mrs. Demings. Mr. Cook, I didn't ask you anything about revenue. I didn't--that was not my question. But I'm out of time, and thank you so much, Mr. Chair. I yield back.

Mr. Cicilline. I thank the gentlelady for yielding back.

I now recognize the ranking member of the full committee, Mr. Jordan, for 5 minutes.

Mr. Jordan. Thank you, Mr. Chairman. I would yield to the gentleman from Florida, Mr. Gaetz.

Mr. Gaetz. I thank the gentleman for yielding.

Mr. Zuckerberg, just as Mr. Pichai gave prior testimony to Congress saying there wasn't editorial manipulation on their platform, you have previously given testimony to the Congress saying that there is not editorial manipulation that disadvantages conservatives.

And just like in the case of Google, there have been whistleblowers from Facebook that not only have offered evidence indicating your testimony was not truthful, but there is even video that suggests that content moderators that you employ are out there disadvantaging conservative content.

I'm wondering if you are familiar with the experiences of Zach McElroy and Ryan Hartwig, two people who participated in Facebook content review, and what is your response to the very damning video evidence and the testimony from them that the culture that you lead within Facebook is one that disadvantages conservatives and leads to content manipulation?

Mr. Zuckerberg. So, Congressman, I'm somewhat familiar with the concerns that they have raised, and as I've said, we aim to be a platform for all ideas. We got into this because we want to give everyone a voice. I certainly do not want our platforms to be run in a way that has any ideological bias, and I want people to be able to discuss a range of issues.

When people raise concerns like that, we do look into them to make sure that everyone in our operation is behaving in upholding the standards that we would like. And if the behavior that they cited is true, then that would be unacceptable in our operation.

Mr. Gaetz. And in following the release of those videos in that evidence from Project Veritas, will you then describe the investigation that Facebook undertook to root out these very corrosive effects on your platform?

Mr. Zuckerberg. Congressman, I'd have to get back to you with more details on that, but I know that we have ongoing training in what we do, and we certainly will look into any complaints that come up. And we want to make sure that in how we run the content review teams, that it's done in a way that reflects the values of the company around giving everyone a voice and being a platform for all ideas.

Mr. Gaetz. I'm concerned that the content review does reflect the values of the company, but those values don't, in fact, give everyone a voice. They prejudice against certain content. And while I appreciate training as a prophylactic endeavor to try to guide future content, it seems disingenuous for you to suggest that these videos come out that are very damning that show the people that you trust with content moderation admitting on video that they disadvantage

EXHIBIT U(ii)

conservatives, that they label people who support the President as a way to push down their content and limit the reach of that content.

For you to then come to us many months later after that was all over the news and the internet and say, well, you know, you'll get back to us and you do a little training, it seems to suggest that you don't take these allegations and this evidence very seriously.

And so I'll ask the question perhaps in a different way, would you revise your prior--you know, in your prior testimony to Energy and Commerce, you said that does not happen. It cannot happen. Would you at least be willing to acknowledge, based on the irrefutable evidence before us that you don't seem to have investigated that it is possible that at Facebook your employees do have the power to disadvantage conservative viewpoints and that they, in fact, have used that power in ways that we need to root out?

Mr. Zuckerberg. Congressman, my testimony in the past and today is about what our principles are as a company and what we try to do. Of course, when you have tens of thousands of employees, people make mistakes, people have some of their own goals some of the time, and it's our job in running the company to make sure that we minimize errors and that we make sure that the company's operations reflect the principles that we intend to run it on.

Mr. Gaetz. And when you fire people as a consequence of their politics, do you think that impacts the culture and perhaps empowers some of the content moderators to also treat people worse as a consequence of their politics?

Mr. Zuckerberg. Congressman, I'm not sure what you're referring to, but I'm not aware of any case where we have fired someone because of their politics, and I would say that would be an inappropriate thing for us to do.

Mr. Gaetz. Why did you fire Palmer Luckey?

Mr. Zuckerberg. Congressman, I'm not sure it's appropriate to get into a specific personnel issue publicly, but I can assure you it was not----

Mr. Gaetz. I mean, I could just tell you that Palmer Luckey's NDA with you--I only have 10 seconds, but Palmer Luckey's NDA with you doesn't allow him to talk to anyone except government officials. I'm a government official. I've seen the messages where you have specifically directed Mr. Luckey to make statements regarding his politics for the benefit of your company.

So I think both in the case of these content moderators and in the case of the testimony you just gave regarding Mr. Luckey and firing people over their politics, there is serious question as to whether or not you're giving truthful testimony here or whether it's lying before Congress.

I see my time is expired, and I'll yield back.

Mr. Cicilline. The gentleman yields back.

I now recognize the gentlelady from Pennsylvania, Ms. Scanlon.

Ms. Scanlon. Thank you, Mr. Chairman.

Mr. Pichai, I wanted to focus a little bit on Google's acquisition of YouTube and some of the consequences of that move for consumer privacy and competition. Now, Google purchased YouTube in 2006 after identifying it as a potential rival that could eventually draw business away from Google, and it's my understanding Google paid $1.65 billion for that acquisition, nearly 30 times its original bid of $50 million.

So could you tell us why Google was willing to pay so much more beyond the initial proposed bid, and was this the result of any analysis on the harm Google would suffer if a competitor had purchased YouTube?

EXHIBIT U(ii)

Mr. Pichai. Congresswoman, we acquired YouTube in 2006, and this was well before my time there as CEO, and I wasn't directly involved, but, you know, what I do recall at the time is that we saw it as a new emerging area, and we are--our mission is to help users with information. We saw an opportunity and it wasn't clear. YouTube only had 67 people.

Ms. Scanlon. Okay. Was Mr. Page in charge of that decision?

Mr. Pichai. Congresswoman----

Ms. Scanlon. You don't know, okay.

Mr. Pichai [continuing]. I wasn't directly involved, but I am pretty sure our senior leadership team at that time definitely looked into it.

Ms. Scanlon. Okay. I would encourage the subcommittee to take the steps necessary to have us hear from whoever it was in charge of that.

Moving on, Google is now by far the top online site where Americans watch videos, including children's videos. And as I'm sure you're aware, Federal law prevents companies from collecting data on children under 13. However, just last year, the Federal Trade Commission found that Google had spent years knowingly collecting data on children under 13 on YouTube and offering advertisers the ability to target those children directly.

Mr. Pichai, did YouTube use the data it illegally acquired to improve its ability to target ads to children?

Mr. Pichai. We are--you know, we are--this is an area, you know, we take it very seriously. I'm a parent too. We have invested tremendously. We have a dedicated product for kids in YouTube Kids on the main YouTube platform. We make sure we have clear policies. We enforce them rigorously.

Just in Q4 in 2019, we flagged and removed almost close to 1 million videos potentially for concerns around child safety. So it is an area we are investing rigorously, and we'll continue to do so.

Ms. Scanlon. Okay. Well, I'm more concerned about the fact that you're investing rigorously in luring in advertisers like toy makers Mattel and Hasbro by telling them that YouTube is the number one website regularly visited by kids. So that sounds like you're targeting the kids and then targeting advertisers to bring them on board. Is that correct?

Mr. Pichai. Today, in the main site of YouTube, we don't allow anyone under 13 to create accounts. There are scenarios in which there could be family viewing, and today there are creators who create content oriented towards families, and as part of that, there are advertisers which are interested in connecting with those users. But everything we do here we obviously comply with all the applicable regulations and it's----

Ms. Scanlon. Okay. Well, let's look at some of the content that is specifically for children. COPPA makes it illegal to target those kids, but we've got an issue where content creators are in a very difficult position now. So, if a show like Sesame Street doesn't want to show ads for junk food on YouTube, does YouTube allow it to make that choice?

Mr. Pichai. Today, we do--you know, we have choices both for creators in terms of, you know, tools and preferences, and we have extensive tools for advertisers. And above all, for users we give the choice, they can either use YouTube as a subscription service without seeing those types of ads, or, you know, they can use it for free with ads.

So we give choice, and, you know, for us it is of utmost importance that YouTube is a place where people come to learn, and, you know, we find increasingly small and medium businesses use YouTube to thrive especially even during COVID particularly many----

EXHIBIT U(ii)

Ms. Scanlon. Okay. Let's go back to content that's designed for children. So, you know, if there's an organization like Sesame Street that wants to provide child-centered content but they don't want that content to be sullied, shall we say, with junk food ads or something, my understanding is that you say that the content creators can do that.

But we've got a recent report from The Wall Street Journal that says YouTube hasn't been honoring those requests, and it's been making it difficult for independent auditing companies like OpenSlate to independently audit that and then report back to those content creators about whether or not YouTube is honoring those. Is that correct?

Mr. Pichai. I'm not familiar with the particular report, but I'm happy to understand it better and, you know, have my office follow up with your staff, Congresswoman.

Ms. Scanlon. I would appreciate that. And my time is expired. I yield back.

Mr. Neguse [presiding]. The gentlewoman yields back.

The chair will now recognize himself for 5 minutes.

Mr. Bezos, thank you for being here today. In your opening statement, you--I reviewed your written testimony--you indicated, and I'll just quote, that Amazon accounts for less than 1 percent of the $25 trillion global retail market and less than 4 percent of retail in the U.S., end quote.

When you refer to retail--I take it based on the empirical studies I reviewed--you're referring to a broad definition of retail that includes restaurants, bars, gas stations, it's a fairly all-encompassing view of retail. I wonder if you know what percentage of Amazon's sales are represented in the terms of online retail sales, the e-commerce market stream?

Mr. Bezos. The figures I've seen for--you know, I don't-- with all respect, I don't accept that e-commerce is a different market. But as a different channel, what I've seen is sort of 30 to 40 percent is the outside studies that I've seen were Amazon's share of that e-commerce channel.

Mr. Neguse. And that's consistent with the data that I have seen.

Mr. Bezos. Okay.

Mr. Neguse. The latest figure I saw was 40 percent. And so, in terms of how we define it, whether it's a stream or a channel, nonetheless, I do think that factually it's important. It's an important distinction that I want to make sure we clear here.

Obviously, I suspect you understand more than most that the early stages of a startup where entrepreneurs are undertaking risks to bring up their products and services to market. Over the course of our investigation, we've heard directly from startups who rely on Amazon services, and that includes obviously Representative Jayapal's questions, Representative Buck, my colleague from Colorado, with respect to concerns about the way in which Amazon uses confidential information.

But we've also heard that, not just with respect to the marketplace but Amazon's cloud computing arm, AWS, the notion that that computing arm essentially identifies startups' best technologies and rolls out replica products and services. So, Mr. Bezos, does Amazon use confidential information that companies share via AWS to build competing services?

Mr. Bezos. No, sir, not that I'm aware of. AWS does often-- you know, they do keep expanding their services. AWS started, you know, 15 years ago. We invented this entire category.

Mr. Neguse. Let me just clarify that, Mr. Bezos. I appreciate that, sorry. Apologies for interrupting. But last week one of Amazon's former engineers posted online that he and his team, quote, ``proactively identified growing businesses on AWS,'' that they built competing products, and that they

EXHIBIT U(ii)

targeted those products to the businesses' customers, and there's been public reporting on that strategy. So I guess I wonder if you can comment on that and how you would account for those statements.

Mr. Bezos. Well, I think there may be categories--I know some--databases of different kinds and so on where we see that it's an important product for customers, and we make our own product offering in that arena. But it doesn't mean we stop servicing the other companies that are also making those products. We have competitors using AWS, and we work very hard to make them successful. Netflix is one example, Hulu is another, and so on.

Mr. Neguse. I think the concern, Mr. Bezos, with respect, is that the pattern emerges across the different components in Amazon, whether it's the marketplace or whether it's the cloud services I mentioned.

In addition, there was an article, I'm sure you're aware, in The Wall Street Journal regarding the Alexa Fund, that according to news reports Amazon's venture capital fund, the Alexa Fund, had invested in a number of different companies. I believe you're familiar with the Alexa Fund investing, for example, in DefinedCrowd Corp.? Does that ring a bell?

Mr. Bezos. No, sir, I'm afraid it doesn't.

Mr. Neguse. Okay. Well, I'll represent to you, according to The Wall Street Journal, and I'll just quote from them, ``When Amazon, Incorporated's venture-capital fund invested in DefinedCrowd Corp., it gained access to the technology startup's finances and other confidential information. Nearly 4 years later, in April, Amazon's cloud-computing unit launched an artificial intelligence product that does almost exactly what DefinedCrowd does, said DefinedCrowd founder and chief executive Daniela Braga. Does that refresh your recollection? Are you aware of those allegations?

Mr. Bezos. I read that article, but I didn't remember that piece of it. I apologize for that. I don't know the specifics of that situation, and I would be happy to get back to your office with more information about that.

Mr. Neguse. Well, I would appreciate it. I certainly would welcome that, and to the extent that you all can follow up with the subcommittee, with respect to this particular article and the different episodes that are referenced both in terms of DefinedCrowd Corp. There's also another company called Nucleus that you may be familiar with.

The reason why I ask these questions, the reasons why it matters, Mr. Bezos, to me is that we are very concerned about this innovation kill zone that seems to be emerging. I represent Boulder and Fort Collins, two of the fastest growing and most innovative tech hubs in the country.

And entrepreneurs and founders shared their stories with this committee during one of our field hearings, actually a field hearing that we held at the University of Colorado Law School just earlier this year. And they are extremely dependent on big technology firms, including in terms of investment in capital, yet they live in constant fear that the platforms could steal their core technologies or ideas making it impossible to compete because of those existing advantages.

So I see my time has expired, but we will certainly be following up with respect to the episodes that I referenced. With that, I would yield back. The gentleman's time is expired.

And the gentlewoman from Georgia, Mrs. McBath, is recognized for 5 minutes.

Mrs. McBath. Thank you, Mr. Chair.

Mr. Cook, Facebook acquired WhatsApp in 2014, and at that time, Sheryl Sandberg told the board that the deal was critical for countering the App Store power of Apple and Google who

EXHIBIT U(ii)

choke off Facebook's access to mobile devices. Was Sheryl Sandberg correct? Does Apple have the power to exclude apps from the App Store?

Mr. Cook. If you look at the history of this, Congresswoman, we've increased the number of apps from 500 to 1.7 million. So there's a very wide gate for the App Store, and there's fierce competition for developers, and we want every app we can on the platform.

Mrs. McBath. Okay. So, but, Mr. Cook, then what you're saying is that Apple can exclude apps from the App Store; in fact, it has. In 2018, Apple introduced an app called Screen Time, which helps people limit the amount of time they or their kids spend on their iPhones. Is that correct?

Mr. Cook. It sounds right.

Mrs. McBath. Okay. But before Screen Time existed, there were other apps in the App Store that gave parents control over the kids' phone usage, apps like OurPact and Kidslox, and parents depended on them.

Soon after you introduced Screen Time, however, you removed these competing apps from the App Store. One mother wrote to Apple saying, and I quote her, ``I am deeply disappointed that you have decided to remove this app and others like it, thereby reducing consumer access to much-needed services to keep children safe and protect their mental health and well-being.''

Mr. Cook, why did Apple remove competing apps right after you released Screen Time?

Mr. Cook. We were concerned, Congresswoman, about the privacy and security of kids. The technology that was being used at that time was called MDM, and it had the ability to sort of take over the kid's screen and a third party could see it, and so we were worried about their safety.

Mrs. McBath. Okay. Thank you. I appreciate that.

Mr. Cook. Today we have----

Mrs. McBath. I appreciate that, but the timing of the removal seems very coincidental. If Apple wasn't attempting to harm competitors in order to help its own app, why did Phil Schiller, who runs the App Store promote the Screen Time app to customers who complained about the removal of rival parental control apps?

Mr. Cook. Congresswoman, I can't see this email. I am sorry. My eyes are not good enough to read it. But I see Screen Time as just an alternative, that there are over 30 parental control apps that are in the App Store today, and so there is vibrant competition for parental controls out there.

Mrs. McBath. Okay. Well, Mr. Cook, the fact is that Apple sidelined Screen Time's competition by keeping them out of the App Store. And while Apple claims these competitors weren't meeting Apple's privacy standards, these app designers say that you admitted them back in 6 months later without requiring significant privacy changes.

And, of course, 6 months is truly an eternity for small businesses to be shut down, even worse if all the while a larger competitor is actually taking away customers. And, you know, this is not the first time something like this seems to have happened, Mr. Cook. Let me give you another example, you know, of the harm that's been caused to your competitors.

In 2010, Apple introduced an online bookstore called the iBookStore where it offered e-books, and the only major publisher that didn't agree to join iBookStore was Random House. Random House wanted to offer its own e-books through its own apps and submitted their apps to be added to the App Store.

Amidst continued negotiations between Apple and Random House, senior VP Eddy Cue said, and I'm quoting him when he said, it prevented an app from Random House from going live in the App Store. Cue himself cited this app rejection as a factor

in finally getting Random House to give in and join iBookstore.

Mr. Cook, is it fair for Apple to use its power over the App Store to pressure a business to join Apple's own app?

Mr. Cook. I can't see the email and so I don't know the context of it, but there are many reasons why an app might not initially go through the App Store gate, because it may not work properly. There may be other issues with it. So it's very difficult to see.

What I would say though on a macro basis, the gate to the App Store is very wide. We have 1.7 million apps in it. It has become an economic miracle with over $138 billion of commerce just in the United States.

Mrs. McBath. Well, Mr. Cook, I really, really appreciate that sentiment, but, you know, I want to say to you that Apple enjoys enormous power to control which apps can reach consumers. Even some of the largest companies in the country fear your power.

Our evidence suggests that your company has used its power to harm your rivals and boost your own business. This is fundamentally unfair and harms small businesses that rely on you to reach customers and stifles the innovation that is the life blood of our economy. Ultimately, it reduces the competition and choices that are made available to consumers, and that is a great concern to all of us.

And I yield back.

Mr. Cicilline [presiding]. The gentlelady yields back.

That concludes that round. In light of the request of Mr. Gaetz for a third round and because many of my colleagues would like to get more fulsome answers on a number of issues, we'll proceed to a final round, and my expectation is we will conclude within the hour. And I'll recognize myself for 5 minutes.

Mr. Zuckerberg, we've seen the dominance of several of the companies appearing before us today, that it's not just harmful to our economy and competition, but it's harmful to the founding principles of our democracy. Facebook and Google are designed to keep users on their platforms whatever the cost. Because disinformation, propaganda, and hateful speech are good for engagement, they're good for business.

But over 100 years ago, the Supreme Court Justice Oliver Wendell Holmes, Jr. wrote, ``The most stringent protection of free speech would not protect a man in falsely shouting fire in a theater and causing panic.''

My first question is, Mr. Zuckerberg, do you agree with that principle, that there are limits to harmful and false speech and that are particularly important when it comes to the health and safety of the public?

Mr. Zuckerberg. Congressman, I certainly do, and I actually think that our policies go further than just limiting those types of things.

Mr. Cicilline. Well, Mr. Zuckerberg, you have 1 billion users and almost 50,000 employees, and so you agree you have a responsibility to remove harmful lies from your platform, correct?

Mr. Zuckerberg. Congressman, I think we have a responsibility to limit the spread of content that's going to be harmful for people. And also if--I'd like to add that I do not believe that we have any incentive to have this content on our service. People don't like it----

Mr. Cicilline. Mr. Zuckerberg, with all due respect, except that it is often the most engaging. It's the most--it brings the most likes or it brings the most activity which, of course, produces great profit. So you do have an incentive. The more engagement there is, the more money you make on advertising.

So let me ask you a question. Let me give you some specific

EXHIBIT U(ii)

examples that will illustrate my concerns. These are some of the top ten most shared articles on Facebook in 2020: ``Trump Suggests `Injection' of Disinfectant to Beat Coronavirus and Clean the Lungs,'' ``Coronavirus Hype Biggest Political Hoax in History,'' ``U.S. Hospitals Getting Paid More to Label Cause of Death As Coronavirus.''

During the greatest public health crisis of our lifetime, don't you agree that these articles viewed by millions on your platform will cost lives?

Mr. Zuckerberg. Congressman, with respect, we certainly have policies that prohibit false information about COVID that would lead to imminent harm, and we've been quite aggressive about taking that down as some of the questioning from the other side of the aisle has shown so far.

Mr. Cicilline. Well, Mr. Zuckerberg----

Mr. Zuckerberg. I am proud of our efforts here. We've----

Mr. Cicilline. With all due respect, the problem is Facebook is profiting off of and amplifying disinformation that harms others because it's profitable. This isn't a speech issue. It's about Facebook's business model that prioritizes engagement in order to keep people on Facebook's platform to serve up more advertisements.

So I'll ask it very specifically, what are you doing right now to protect people from demonstrably false claims related to this deadly pandemic?

Mr. Zuckerberg. Congressman, I'll certainly answer that, but I have to disagree with the assertion that you're making that this content is somehow helpful for our business. It is not what people want to see, and we rank our--what we show in News feed is based on what is going to be the most meaningful to people and is going to create long-term satisfaction, not what's just going to get engagement or clicks today. That is a common misperception about the company.

Mr. Cicilline. Sir, if that's true--if that's true, Mr. Zuckerberg, how do you explain that on Monday, the second most popular post on Facebook was a Breitbart video claiming that you don't need a mask and hydroxychloroquine is a cure for COVID, and in the first 5 hours after being posted on Facebook, it racked up 20 million views and over 100,000 comments before Facebook acted to remove it?

Mr. Zuckerberg. Well, Congressman, a lot of people shared that, and we did take it down because it violates our policies. We work with the CDC to----

Mr. Cicilline. After 20 million people saw it over the period of 5 hours. I mean, doesn't that suggest, Mr. Zuckerberg, that your platform is so big that, even with the right policies in place, you can't contain deadly content?

Mr. Zuckerberg. Congressman, I don't think so. I think we have, on COVID misinformation in particular, a relatively good track record of fighting and taking down lots of false content, as well as putting up authoritative information. We have built a COVID information center----

Mr. Cicilline. Well, I understand that.

Mr. Zuckerberg [continuing]. With authoritative information from health officials that we have put----

Mr. Cicilline. Thank you, Mr. Zuckerberg. One more question.

Mr. Zuckerberg [continuing]. And shown more than 2 billion people.

Mr. Cicilline. I appreciate that, Mr. Zuckerberg.

When a television station runs a false political advertisement, they're held liable for that. Why should Facebook or any other platform be different? While you may not be a publisher, you're responsible maybe not for the first posting, but you then take that posting and you apply a set of

EXHIBIT U(ii)

algorithms that decide how you will disseminate that, which is a business decision, not a First Amendment decision. And it's hard to understand why Facebook shouldn't be responsible for those business decisions.

Mr. Zuckerberg. Congressman, in terms of political ads, we've modeled a lot of our policies off of the FCC guidelines on broadcasters and their requirements to run political ads equally from all different sides----

Mr. Cicilline. I think these examples unfortunately, Mr. Zuckerberg, are just the tip of the iceberg. It's not just about COVID. Facebook hosts or enables countless of pages in ads that are dedicated to conspiracy theories and calls to violence, including content that led to the white supremacist rally in Charlottesville in 2017.

And Facebook gets away with it because you're the only game in town. There's no competition forcing you to police your own platform. Allowing this misinformation to spread can lead to violence, and, frankly, I believe it strikes at the very heart of the American democracy.

And, with that, I now recognize the gentleman from Florida, Mr. Gaetz, for 5 minutes.

Mr. Gaetz. Thank you, Mr. Chairman.

Mr. Pichai, in 2016, there was an internal Google meeting. You attended that meeting along with Sergey Brin. A video of that meeting was leaked to Breitbart. And at the meeting, top Google executives, including Kent Walker, lamented Trump's victory, they compared Trump voters to extremists, and it was discussed that there was an intent to make the Trump win a blip in the populous movement in American history.

Now, I know you've testified today in response to my questions and Mr. Jordan's questions that you don't intend this time to engage in electioneering on behalf of the former Vice President. But given the video evidence of senior members of your team in your presence saying that they had the intent to make the Trump victory a blip, why should we believe that testimony today?

Mr. Pichai. Congressman, we do not have a view on--we respect the democratic process. We are deeply committed to it. As a company, we take pride in the information we provide to help people participate in free elections, and we are deeply committed to it, as I said to Congressman Jordan as well.

Mr. Gaetz. Do you remember that meeting in 2016?

Mr. Pichai. Congressman, yes, I do. Yes, I do. It was in the context of, you know, to the election across both sides, there was a lot of opinions. And as you know, elections are kind of a polarizing moment generally in the country, and there was a lot of rhetoric about certain issues which were affecting our employees and----

Mr. Gaetz. Oh, I understand rhetoric. I guess the question is, when the senior members of your team in your presence said that they did have the intent to change the outcome in a subsequent election and then, since that moment in time, where we've seen all of these conservative websites and conservative viewpoints censored, you can understand why people would be concerned.

So, after your employees and top executives said in your presence that they intended to make the Trump victory a blip, what action did you take as the CEO to protect and preserve the neutrality of your platform?

Mr. Pichai. Congressman, no one had a view on, you know, ever interfering with elections or so on. But what I can tell you is we have made it very clear--about 2 years ago, we announced new community guidelines for within Google clearly making it clear that, you know, employees can--obviously are free to have their political views.

EXHIBIT U(ii)

But none of that should ever--they shouldn't bring that as they work on any of our products, and if we found any evidence that people are using a political agenda to manipulate any of our content platforms, we will take strong enforcement action.

Mr. Gaetz. Well, unfortunately, we have sort of a string of events here. We have the 2016 meeting, where people demonstrated their intent to make changes to hurt the President. Then we have your testimony today that's a little different than your testimony from December where you say people can manipulate blacklists.

And then you have the outcome, where sites like Breitbart and Gateway Pundit and others see that disparate treatment. So it really doesn't take Sherlock Holmes here to connect the dots and see what Google is doing.

I'm going to move on with my final 90 seconds. Mr. Bezos, I am deeply moved by your personal story. I am not here accusing you as someone who would ever traffic in hate, but it seems you have empowered people who do. And I'm particularly talking about the Southern Poverty Law Center.

The Southern Poverty Law Center, which you allow to dictate who can receive donations on your AmazonSmile platform, have said the Catholic Family News, Catholic Family Ministries, the Federation for American Immigration Reform, the American Family Association, the Family Research Council, the Jewish Defense League, and even Dr. Ben Carson are extremists and should be treated differently.

Dr. Carson is on the Cabinet and is one of the most renowned minds in America. I'm just wondering why you would place your confidence in a group that seems to be so out of step and seems to take mainstream Christian doctrine and label it as hate?

Mr. Bezos. Sir, it's a good question. We have--for those of you that don't know what AmazonSmile is, it's a program that allows customers to designate a certain fraction of their purchases to go to charity that we then pay for, and they can select from any one of millions of charities. And we use the Southern Poverty Law Center data to say which charities are extremist organizations. We also use the U.S. Foreign Asset Office to do the same thing, so those two together----

Mr. Gaetz. But why? Since they're calling Catholics and these Jewish groups hateful groups, why would you trust them?

Mr. Bezos. Sir, I'm going to acknowledge this is an imperfect system.

Mr. Gaetz. No doubt.

Mr. Bezos. And I would love suggestions on better--or better or additional sources for how to----

Mr. Gaetz. My suggestion would be a divorce from the SPLC, and I see that I'm out of time and I yield back.

Mr. Cicilline. The gentleman yields back.

I now recognize the chair--sorry. I recognize the gentleman from Georgia, Mr. Johnson.

Mr. Johnson. Thank you, Mr. Chairman.

Facebook is dominant, not just in the social media market but also in its digital surveillance capabilities. In 2012, Facebook had several tools that allowed it to conduct digital surveillance, including trackers, Facebook's Like button, Facebook login, and a series of application programming interfaces, or APIs.

Mr. Zuckerberg, these tools provide Facebook with insights into its competitors' websites and apps. Isn't that correct? Yes or no.

Mr. Zuckerberg. Congressman, I'm--I think broadly the answer to what you're saying is, yes.

Mr. Johnson. All right.

Mr. Zuckerberg. We--every other company here do market

EXHIBIT U(ii)

research to understand what people are finding valuable and----

Mr. Johnson. Okay. So you're going beyond the scope of my question. I appreciate that answer though.

Mr. Zuckerberg, a few days before Facebook acquired Instagram, a Facebook vice president emailed you suggesting ways to improve Facebook's, quote, ``competitive research,'' end quote. By building a custom model Facebook could improve its understanding of its competitors and, quote,``make more bold decisions on whether they are friends or foes'', end quote.

Mr. Zuckerberg, how does Facebook improve its competitive research to distinguish friends from foe?

Mr. Zuckerberg. Congressman, I'm not sure exactly what he was referring to in that email there, but he is one of the people involved in running our analytics organization, and I think it's natural that he would, as part of his responsibility, be focused on market research and understanding more there.

Mr. Johnson. And, certainly, isn't it true that Facebook, after that conversation, purchased the web analytics company Onavo in 2013 to give Facebook more capability to monitor its competitors?

Mr. Zuckerberg. Congressman, I think you have the timing correct. We purchased Onavo as part of our broader market research capacity.

Mr. Johnson. And that would give you the capability to monitor your competitors, correct?

Mr. Zuckerberg. Congressman, it gave aggregate analytics as to what people were using and what people were finding valuable, sort of like the type of product you would get from Nielsen or Comscore, or some of the other third-party companies that provide similar data.

Mr. Johnson. Well, Mr. Zuckerberg, that acquisition gave you nonpublic real-time data about engagement, usage, and how much time people spend on apps. And when it became public that Facebook was using Onavo to conduct digital surveillance, your company got kicked out of Apple's App Store. Isn't that true?

Mr. Zuckerberg. Congressman, I'm not sure I'd characterize it in that way. I think this is part of the problem----

Mr. Johnson. Well, Onavo did get kicked out of the App Store. Isn't that true?

Mr. Zuckerberg. Congressman, I believe we took the app out after Apple changed their policies about protecting VPN apps.

Mr. Johnson. And it was because of the use of these surveillance tools?

Mr. Zuckerberg. Congressman, I'm not sure that the policy was worded that way or that that's exactly the right characterization of it, but----

Mr. Johnson. Okay, well, let me ask you this question. Let me ask you this question. After Onavo was booted out of the App Store, you turned to other surveillance tools, such as Facebook Research app, correct?

Mr. Zuckerberg. Congressman, in general, yes, we do a broad variety of----

Mr. Johnson. And, also, isn't it true, Mr. Zuckerberg, that Facebook paid teenagers to sell their privacy by installing Facebook Research app?

Mr. Zuckerberg. Congressman, I'm not familiar with that, but I think it's a general practice to be able to--that companies used to have different surveys and give--understand data from how people are using different products and what their preferences are.

Mr. Johnson. Facebook Research app got thrown out of the App Store too. Isn't that true?

Mr. Zuckerberg. Congressman, I'm not familiar with that.

EXHIBIT U(ii)

Mr. Johnson. Okay. Well, over nearly a decade, Mr. Zuckerberg, you led a sustained effort to surveil smaller competitors to benefit the Facebook--to benefit Facebook. These were steps taken to abuse data, to harm competitors, and to shield Facebook from competition. You tried one thing and then you got caught, made some apologies, then you did it all over again. Isn't it true?

Mr. Zuckerberg. Congressman, I respectfully disagree with that characterization. I think every company engages in research to understand what their customers are enjoying so they can learn and make their products better. And that's what we were trying to do. That is what our analytics team was doing. And I think, in general, that allowed us to make our services better for people to be able to connect in a whole lot of different ways, which is our goal.

Mr. Johnson. Did you use that capability to purchase WhatsApp?

Mr. Zuckerberg. Congressman, it was one of the signals that we had about WhatsApp's trajectory, but we didn't need it. Without a doubt, it was pretty clear that WhatsApp was a great product. I already had a relationship with Jan Koum, the founder, and----

Mr. Johnson. And it was a competitor.

Mr. Cicilline. The gentleman's time has expired.

I now recognize the gentleman from Florida, Mr. Steube.

Mr. Steube. Thank you, Mr. Chairman.

I have a question for all four, a yes-or-no answer. Do you believe that the Chinese Government steals technology from U.S. companies?

We'll start with Mr. Cook.

Mr. Cook. I don't know of specific cases where we have been stolen from by the government.

Mr. Steube. So you don't believe that the Chinese Government is stealing technology from U.S. companies? Or you're just saying not from yours?

Mr. Cook. I'm saying I know of no case, ours, where it occurred, which is--I can only speak to firsthand knowledge.

Mr. Steube. Mr. Pichai, do you believe that the Chinese Government steals technology from United States companies?

Mr. Pichai. Congressman, I have no firsthand knowledge of any information stolen from Google in this regard.

Mr. Steub. Mr. Zuckerberg.

Mr. Zuckerberg. Congressman, I think it's well-documented that the Chinese Government steals technology from American companies.

Mr. Steube. Yeah. Thank you.

Mr. Bezos.

You're on mute.

Mr. Cicilline. Mr. Bezos, I believe you're on mute.

Mr. Bezos. I'm sorry. I was saying I have heard many reports of that, and I haven't seen it personally, but I've heard many reports of it.

Mr. Steube. So, of all the different products that Amazon carries, you haven't seen that in any of the companies that sell products on Amazon or your company yourself?

Mr. Bezos. Well, certainly, there are knock-off products, if that's what you mean, and there are counterfeit products and all of that. But the Chinese--if the answer is the Chinese Government is stealing technology, that's the thing I have read reports of but don't have personal experience with.

Mr. Steube. It's no secret that Europe increasingly seems to have an agenda of attacking large, successful U.S. tech companies. Yet Europe's approach to regulation in general, and antitrust in particular, seems to have been much less successful than America's approach.

EXHIBIT U(ii)

America is a remarkable nursery for innovation and entrepreneurship and pursuit of the American Dream. As you all know from direct experience, this is a country where it's possible to start a company from a garage or a dorm room and experience tremendous success.

Do you have any recommendations on how Congress can better protect U.S. firms and U.S. companies from aggression and government intervention abroad, not just in Europe but in China as well?

Anybody that would like to chime in. I'll open it up to any of you.

None of you have any recommendations on how Congress can better protect U.S. companies like yourself?

All right. Well, I'll yield the remainder of my time to Mr. Gaetz.

Mr. Gaetz. I thank the gentleman for yielding.

Mr. Zuckerberg, what is a digital land grab?

Mr. Zuckerberg. Congressman, I'm not sure what you're referring to.

Mr. Gaetz. Well, in the emails that your company produced to the committee, there's one from David Wehner in 2014 where he's describing, under the mergers and acquisitions advice within the company, that you need to engage in a land grab. And he says, ``I hate the word `land grab,' but I think that's the best convincing argument, and we should own that.''

And it goes on to describe a strategy wherein Facebook would spend 5 to 10 percent of its market cap each year to shore up its market position.

Does that refresh your recollection?

Mr. Zuckerberg. Yes, Congressman. Thanks for the opportunity to address this and, frankly, to correct the record, because I believe that what he was referring to was a question that was incoming from investors about whether we would continue to acquire different companies. I don't think that was--that wasn't referring to an internal strategy; it was referring to an external question that we were facing about how investors should expect us to act going forward.

And I think he was discussing the fact that, as mobile phones were growing in popularity, there were a lot of new ways that people could connect and communicate that were part of this overall broader space and market around human connection and helping people stay connected and share their experiences that were----

Mr. Gaetz. Okay, but, Mr. Zuckerberg, it seems to be both internal and external, because then in an email from you in 2012, we see a similar sentiment expressed. You write, ``We can likely always just buy any competitive startups.''

So is your desire to limit competition by purchasing your competitors consistent with the message to your investors that the way you'll run your company is through digital land grabs?

Mr. Zuckerberg. Congressman, I'm not sure I agree with the characterization of how we communicated with investors, but----

Mr. Gaetz. Your words, Mr. Zuckerberg.

Mr. Zuckerberg. But I think the broader point is that there were a lot of new ways that people can connect that were created by smartphones, and we----

Mr. Gaetz. But this is about your merger and acquisition strategy. You went on to say, ``One thing about startups is you can often acquire them.''

So, I mean, I'm not interested in how people connect. I'm interested in how you acquire businesses to limit competition.

Mr. Cicilline. The gentleman's time has expired, but the witness may answer the question.

Mr. Zuckerberg. Congressman, in order to serve people better and help people connect in all the ways that we want, we

EXHIBIT U(ii)

innovated and built a lot of new use cases internally and we acquired others.

And that, I think, has been a very successful strategy at serving people well. And a lot of the companies that we've been able to acquire have gone on to reach and help connect many more people than they would've been able to on their own. You know----

Mr. Gaetz. You've grabbed a lot of land, I would say.

I yield back, Mr. Chairman.

Mr. Cicilline. Thank you.

The gentleman yields back.

I now recognize the chair of the full committee, Mr. Nadler, for 5 minutes.

Chairman Nadler. Thank you, Mr. Chairman.

Mr. Cook, we've heard from businesses that Apple is canvassing the App Store to determine whether it can extract commissions from apps that have changed their business models in response to the pandemic. Businesses that relied on in-person interactions have moved online, and Apple is looking for its cut.

My staff has heard from some of the affected businesses. They say you're calling them up, demanding your 30 percent. Isn't this pandemic profiteering?

Mr. Cook. We would never do that, Mr. Chairman. The pandemic is a tragedy, and it's hurting Americans and many people from all around the world, and we would never take advantage of that.

I believe the cases that you're talking about are cases where something has moved to a digital service, which technically does need to go through our commission model. But in both of the cases that I'm aware of, we are working with the developers.

To sort of zoom out and to give you some historical context on this, when we entered the app store market, the cost of distributing software was 50 to 70 percent. And so we took the rate in half, to 30 percent, and we've held it in that same level over time or lowered it.

It's now responsible for 2 million jobs across America. And 84 percent of the apps on the store are distributed for free, where 100 percent of the proceeds go to the developer. Only that 16 percent is subject to a commission of either 15 or 30 percent.

Chairman Nadler. And school is about to start around the country, and millions of parents and students will attend school online. They will rely on apps to talk to teachers, tutors, and virtual learning tools.

Are these online learning tools next on Apple's--are they on Apple's list to monetize?

Mr. Cook. They're not, Mr. Chairman. We would--we will--we're very proud of what we've done in education. We are serving that market in a significant way, including tons of donations. And we will work with the people that happen to move from a physical to a virtual world because of the pandemic.

Chairman Nadler. And----

Mr. Cook. We've done a lot to address COVID, in general, as a company. We've sourced and donated 30 million masks, turning our supply chain into something that would be great for America. We've designed a face shield and donated 10 million of those. We're donating significant----

Chairman Nadler. Okay.

Mr. Cook [continuing]. Amounts of money across the U.S.

Chairman Nadler. Thank you. Thank you.

Now----

Mr. Cook. Thank you.

Chairman Nadler [continuing]. We've heard that Apple is now

EXHIBIT U(ii)

trying to extract commissions from various apps that previously didn't pay you anything. You approved, we're told, the email app HEY and then, days later, threatened to kick it out of the App Store unless it built a way to give you a cut of revenue.

The COO of Basecamp, maker of the HEY app, testified before our committee earlier this year. He was concerned about Apple's monopoly over software distribution on iOS devices. And he seems to have been right. Apple says services like HEY have always been required to cut Apple in, but you previously didn't interpret your rules that way--you didn't enforce your rules this way.

So would you comment on this, please?

Mr. Cook. Mr. Chairman, I would. HEY is in the store today, and we're happy that they're there. I believe that they have--a version of their product is for free, and so they're not paying anything on that.

I would also say, the 30 percent--I hope you give me a time to explain this--or 15 percent is for lots of different services, from programming languages, to compilers, to 150,000 APIs. It has been an economic miracle to allow the person in their basement to start a company, a global company, and serve 175 countries in the world. It is amazing. Likely the highest job creator in the last decade.

Chairman Nadler. I see.

And you haven't changed the rules in such a way as to make apps pay when they weren't paying before?

Mr. Cook. I know of no case where we've done that. I'm sure we've made errors before. We get 100,000 different apps submitted a week, and we've got 1.7 million on the store. But across that period of time, we've never raised commissions, from the first day the App Store went into effect back in 2008. We've only lowered them.

Chairman Nadler. Well, thank you.

I see my time has expired. I yield back.

Mr. Cicilline. The gentleman yields back.

Mr. Cook. Thank you for the question.

Mr. Cicilline. I now recognize the gentleman from North Dakota, Mr. Armstrong.

Mr. Armstrong. Thank you, Mr. Chairman.

Mr. Pichai, in 2015, Google announced that it would not allow third parties to buy YouTube ads via AdX. That means that ad buys on YouTube are conducted only through Google demand-side products.

Google justified this change by citing privacy and user experience. My understanding is that Google cited a concern that third-party digital ad participants would develop user profiles based on this viewing. It is also my understanding that, even under the GDPR, you allow users to provide consent which would authorize this type of activity.

It seems that this policy, regardless of the privacy concerns, reduced competition for demand-side platforms on YouTube. Do you agree?

Mr. Pichai. Congressman, we are always looking to improve the YouTube experience. Part of being able to integrate the space while in YouTube, we've been able to innovate with something called TrueView ads. So, for users, we give them skippable ads. If they find the ads not to be relevant, they can skip past those ads.

And, you know, monetizing YouTube well is what allows--today, we have many, literally hundreds of thousands of creators earning a livelihood. And many of them are small and medium businesses. So we want to support that well, and so we are focused on that. Allowing this type of integration is what allows us to create that user experience.

Mr. Armstrong. But after Google stopped allowing third

EXHIBIT U(ii)

parties to buy YouTube ads via AdX, Google limited the interoperability of third-party analytics on YouTube. You now require the use of ads on Data Hub.

Again, the justification is based on user privacy. Other ad market participants may not have access to that data, but it doesn't disappear, does it?

Mr. Pichai. Congressman, this is consistent with how today many services, be it Facebook or Snapchat or Pinterest, you work with their ad tools to buy ads on their properties. I think we are trying----

Mr. Armstrong. Well, I understand that, but the excuse is privacy. But the data doesn't disappear; you just have greater control over it, right?

Mr. Pichai. Congressman, it's a service we provide to our users. We obviously want to make sure we protect the privacy of users there.

We do monetize with ads. We give users a choice of either consuming it as a subscription service or using it with ads. And we've been very focused on making YouTube a great platform for creators, and I think the model is working well. It's really helped many small and medium businesses to invest on the platform and grow their businesses.

Mr. Armstrong. So, regardless if the intent was to lessen competition or not, the action resulted in smaller competitors unable to participate in placing ads on YouTube. Isn't that correct?

Mr. Pichai. Congressman, we see robust choice for, you know, advertisers. You know, there are several alternatives. There is, obviously, Facebook's suite of products. There is Amazon with their ads marketplace. There is companies like Snapchat, Pinterest, Twitter that are new competitors who have emerged. And this is why we have seen advertising costs decline by 40 percent in the last 10 years. And so we see dynamism in the marketplace. We are focused on----

Mr. Armstrong. Yeah, but here is my issue. And there are policies that actually protect user privacy: Apple's encryption policy. Microsoft just came out on facial recognition policy. My concern is that your--the position is that, when we're using privacy, we're trying to use privacy and we're using privacy as a shield, but what we're really doing and what your company is really doing is using it as a cudgel to beat down the competition.

And when we're talking about privacy, it's a great word that people care about, but not when it's utilized to control more of the marketplace and squeeze out smaller competitors.

And, with that, I'd yield the remainder of my time to Mr. Gaetz.

Mr. Gaetz. I thank the gentleman for yielding.

Mr. Bezos, we were cut short in our last discussion. I just wanted to give you the chance to clear this up. You don't believe Dr. Ben Carson is an extremist, do you?

Mr. Bezos. No, sir, I don't.

Mr. Gaetz. So help me understand why you would partner with a group that labels him as someone worthy of an extremist watchlist.

Mr. Bezos. Well, I want you to hopefully appreciate, when we're trying to make it possible for people to donate to any number of--from millions of different charities, and we need to have some source of data to use. And while I accept what you're saying, that the Southern Poverty Law Center and the U.S. Foreign Assets Office are not perfect--and I would like a better source if we could get it--that is what we use today. But I would happily engage with you----

Mr. Gaetz. Well, that's breaking news. It's great to hear that you do recognize the infirmities in the Southern Poverty

Law Center.
     And I guess Mr. Zuckerberg and Mr. Pichai's companies use
them as well.
     Mr. Zuckerberg, do you believe that Dr. Ben Carson is an
extremist?
     Mr. Zuckerberg. No, Congressman.
     Mr. Gaetz. And so why would you trust the people who think
he is?
     Mr. Zuckerberg. Congressman, I'm not aware of where we work
with the organization that you're saying----
     Mr. Gaetz. Oh, the Southern Poverty Law Center?
     Mr. Cicilline. The gentleman's time has expired.
     Mr. Gaetz. Okay. That's all.
     Mr. Cicilline. And I recognize the gentleman from Maryland,
Mr. Raskin, for 5 minutes.
     Mr. Raskin. Thank you, Mr. Chairman.
     I read Richard Hofstadter's ``The Paranoid Style in
American Politics,'' so I suppose it's futile to try to cure
the obsessive persecution complex and victimology of some of
our colleagues. But they should check out the top-performing
Facebook link posts by the United States pages today or
yesterday or any day for the last week, and 7 or 8 out of the
10 each day are right-wing sites: Ben Shapiro, FOX News, Dan
Bongino, Ben Shapiro, FOX News, Blue Lives Matter, and so on.
     So, if Facebook is out there trying to repress conservative
speech, they're doing a terrible job at it. And so I don't
understand just the endless whining about how Facebook or
Twitter, or Facebook and Twitter, are somehow discriminating
against conservatives.
     The removal of Donald Trump and Donald Trump, Jr., from
Twitter, their tweets, was all about their spreading
disinformation, false statements about COVID-19. That was an
absolute public health measure which I hope all of us would
endorse. We don't want anybody, including the President of the
United States, spreading false information about COVID-19.
     So I think they essentially destroy their own case when
they pick that as their cause for going after all of you.
     And I don't understand, for the life of me, the line of
questioning about electioneering taking place by some of your
companies. If you're opposed to electioneering by corporations,
as I am, and you're opposed to Citizens United, then you've got
no problem.
     Citizens United is what gave corporations the power to go
out and spend money. And if you don't like the way that some
companies are spending money, then, you know, either start your
own company or tell them what's wrong with it. But the idea
that electioneering is something you're opposed to just strikes
me as completely inconsistent with the history and the facts.
     So I want to go to Mr. Cook, if we could, but, first, a
quick question: Are any of your companies benefit corporations,
and is that something you've considered doing? Is there any
one--any one of you that have thought about becoming a B corp,
or a benefit corporation?
     Okay. I take it the answer's ``no'' there.
     Mr. Cook, I'm hung up on this whole 30 percent question
that several members have talked to you about. And you said
sometimes it's 15 percent, sometimes it's 30 percent. Can you
explain when it's 15 and when it's 30 and why it's 15 sometimes
and why it's 30?
     Mr. Cook. Sure. Thank you for the question, Congressman.
     In eighty-four percent of the time, it's zero. Sixteen
percent of the time, it's 15 or 30. In the case of--it's 15 if
it's in the second year of a subscription.
     Mr. Raskin. Okay. So you just graduate from--your first
year, you're taking no toll, essentially. The second year, it's

EXHIBIT U(ii)

15. And then it's 30 after that. Is that right?

Mr. Cook. No, no. If it's a subscription product, it's 30 percent in the first year, and then it drops to 15 in the second year and every year thereafter.

Mr. Raskin. I gotcha. Okay.

Well, what troubles me is just what one businesswoman told me when I was looking at this, which is, she said, I pay around 25 percent of my income to Uncle Sam, to the government, and then I pay 30 percent of my income to Apple. And so I get half of it, and it's very hard to make ends meet.

And I just wonder--you know, look, all of you are in business and all of you are tremendously successful at what you do, and obviously this model has worked for you. But the question is, does this model actually squeeze out the next generation of entrepreneurs? And is it an unjust arrangement because you're, you know, the 10,000-pound gorilla and they're just trying to get started?

Mr. Cook. No, I don't think so. And, in fact, keep in mind, we've gone from 500 apps to 1.7 million. And so there's a lot of apps on the store, and a lot of people are making a very good living from it----

Mr. Raskin. And you've said that--forgive me for interrupting, but you've said that several times. But that, to me, might just underscore the monopoly nature of your business, that everybody's got to go through you. There's really no alternative.

And so, I mean, I don't blame you for taking them all, but that doesn't mean that the terms that are being dictated are, in fact, fair terms. So how would you defend, substantively, that bargain?

Mr. Cook. That whether you look at it from a customer point of view or a developer point of view, there are enormous choices out there. If you're a developer, you can write for Android, you can write for Windows, you can write for Xbox or PlayStation. If you're a customer and you don't like the setup, the curated experience of the App Store, you can buy a Samsung, you can buy----

Mr. Raskin. Okay. I appreciate that. Forgive me for cutting you off. I've got one more final question for Mr. Zuckerberg.

You spend a lot of your time speaking to our conservative colleagues who have this persecution complex that you're somehow going after them. Will you have time to meet with this broad coalition of civil rights groups that are engaged in a boycott because of what they think is the proliferation of hate speech and Holocaust revisionism and other affiliated topics on Facebook?

Mr. Zuckerberg. Congressman, yes. I already have taken the time to meet with them. I think that the topics that they're pushing on are important. On a lot of the goals, we agree. These are issues around fighting hate that we have focused on for years. And we are committed to continuing to improve the way that our company works and just continually getting better on these issues.

Mr. Raskin. I appreciate that, and I will tell them of your answer.

Thank you.

Mr. Cicilline. Thank you, Mr. Zuckerberg.

I now recognize the gentleman from Ohio, Mr. Jordan, for 5 minutes.

Mr. Jordan. Thank you, Mr. Chairman.

Mr. Cook, is the cancel culture mob dangerous?

Mr. Cook. It's something I'm not all the way up to speed on. But if you're talking about where somebody with a different point of view talks and they're canceled, I don't think that's good. I think it's good for people to hear different points of

EXHIBIT U(ii)

view and decide for themselves.

Mr. Jordan. Yeah, I agree with that.

And I want to just reference a letter. Bari Weiss, who resigned as an editor at The New York Times, she wrote a letter explaining why she resigned. And I'll just read three sentences for--for all of you, actually.

She says, first of all, ``My own forays into Wrongthink have made me the subject of constant bullying by my colleagues who disagree with my views.''

She then says later in the letter, ``Everyone lives in fear of the digital thunderdome. The online venom is excused so long as it is directed at the proper targets.'' And those targets aren't just conservative. In fact, Ms. Weiss is actually center-left. She's not conservative. The targets are anyone who disagrees with the mob.

Are the rest of you concerned about the cancel culture mob and what it's up to?

Mr. Pichai.

Mr. Pichai. Congressman, I'm sorry. I had momentary difficulty hearing.

But, you know, I can--we've built platforms which allow for freedom of expression. And we take pride in the fact that, across our platforms, including YouTube, there are more diverse voices than ever before. It is something we have committed----

Mr. Jordan. That's fine. That's fine. I'm just saying, are you--I'm concerned about it. And, again, I'm concerned about it not just because conservatives get attacked. I'm concerned when anyone gets attacked for expressing a viewpoint. I thought we had a First Amendment, and yet they constantly get attacked.

How about you, Mr. Zuckerberg?

Mr. Zuckerberg. Yes, Congressman, I believe strongly in free expression. Giving people a voice is an important part of what our services do. And I am very worried about some of the forces of illiberalism that I see in this country that are pushing against free expression. I think that this is one of the fundamental democratic traditions that we have in our country, and it's how we make progress over the long term on a number of issues. And our company is committed to doing what we can to----

Mr. Jordan. Mr. Bezos.

Mr. Zuckerberg [continuing]. Protect people's voice.

Mr. Jordan. Thank you, Mr. Zuckerberg.

Mr. Bezos.

Mr. Bezos. Yes, sir, I am concerned in general about that. And what I find, and I find a little discouraging, is that it appears to me that social media is a nuance-destruction machine, and I don't think that's helpful for a democracy.

Mr. Jordan. Do you agree with the term she used, Ms. Weiss, she used, ``digital thunderdome''?

Mr. Bezos. I see that, yes.

Mr. Jordan. Yeah, I see it too.

And I think--I guess my point is, you are four pretty important guys leading four of the most important companies on the planet, and it would sure be helpful if you spoke out against this.

I mean, Mr. Cook, there was a 1984 Super Bowl ad in black and white, had this Big Brother-type figure as the narrator saying over the screen to a bunch of these workers--looks like it was straight out of the Soviet Union--saying to a bunch of these workers, as they're sort of marching along, he says--one of the lines that the narrator uses is, ``Our unification of thoughts is more powerful a weapon than any fleet or army on the Earth.'' And then the ad ends with this lady running in in color and smashing the screen, busting the groupthink, busting the mobthink.

Do you remember that ad, Mr. Cook? What company had that ad?

Mr. Cook. I remember it very well. It was Apple versus IBM at the time.

Mr. Jordan. Yeah, but the point was mobthink, cancel culture, groupthink is not what this country's about. And we are seeing it play out every single--just take the sports world, for goodness' sake. In the last few weeks, Drew Brees had to bow to the mob simply because he suggested you should stand for the anthem. There was a football coach at Oklahoma State who wore the, quote, ``wrong'' T-shirt fishing with his boys, and he got in all kinds of trouble. James Harden wears a mask saying back the police, help the police, support the police; he gets attacked.

Why don't we just let the First Amendment work? That's all we're asking.

And you are four individuals who have so much influence. It would sure help if you're out there--if you're out there criticizing what the cancel culture mob is doing to this country. And people see it every single day. And I hope you'll do it. I hope you'll--you all said you disagree with it. I hope you'll really speak out against it and be fair with all viewpoints.

I yield back.

Mr. Cicilline. The gentleman yields back.

I recognize the gentlelady from Washington, Ms. Jayapal.

Ms. Jayapal. Thank you, Mr. Chairman.

Mr. Pichai, I direct my questions to you. Many of us feel a deep urgency to protect independent journalism, and I wanted to talk a little bit about ad revenue and independent journalism.

Google makes most of its revenue through selling advertising. And Google's advertising exchange is a, quote, ``real-time marketplace to buy and sell display advertising space,'' correct?

Mr. Pichai. Yes, Congresswoman, that's correct.

Ms. Jayapal. And over 2 million websites, including online newspapers, use that exchange, correct?

Mr. Pichai. We are very proud to support publishers, and I don't have the exact numbers, but, yes, that seems----

Ms. Jayapal. Okay. Well, that's an estimate put forth by tech expert Dina Srinivasan. And your own website for Google Display Network says you have access to over 2 million sites.

What is Google's share of the ad exchange market?

Mr. Pichai. Congressman, I'm not exactly familiar. I've seen various reports, but, you know----

Ms. Jayapal. Okay.

Mr. Pichai [continuing]. We are a popular choice.

Ms. Jayapal. Great. Let me put it up for you. If you look at the screen, you will see that 50 to 60 percent--Google has 50 to 60 percent, according to the online platforms and digital advertising CMA market study that was just released.

And, in order to buy and sell on these exchanges, websites and advertisers go through a middleman, like Google's DV360 and Google Ads. If you look at the slide, Mr. Pichai, you can see that the share of this buy-side market that Google has is 50 to 90 percent, according to the same study.

And I just want to simplify how these exchanges work. So, say, in Seattle, Dee's Electronics, a mom-and-pop business, wants to buy online ad space in The Seattle Times. Dee's Electronics would need to go to a middleman, like Google Ads, which would then bid for ad space on an ad exchange.

And the problem is that Google controls all of these entities. So it's running the marketplace, it's acting on the buy side, and it's acting on the sell side at the same time, which is a major conflict of interest. It allows you to set

EXHIBIT U(ii)

rates very low as a buyer of ad space from newspapers, depriving them of their ad revenue, and then also to sell high to small businesses who are very dependent on advertising on your platform.

It sounds a bit like a stock market, except, unlike a stock market, there's no regulation on your ad exchange market. If there were regulation, it would actually prohibit insider trading, which means that the broker can't use the data in the broker division to buy and sell for their own interest. Instead, brokers have to serve the clients, their clients.

Does Google have a similar obligation to serve its clients, the businesses that are selling and buying ad space?

Mr. Pichai. Congresswoman, if I could explain this for a minute. We paid over $14 billion to publishers. We are deeply committed to journalism. In this area, on average, we pay out 69 percent of the revenue when publishers use Google's buy and sell side tools. And, you know, out of--it's a low-margin business for us. We do it because we want to help support publishers----

Ms. Jayapal. Right.

Mr. Pichai [continuing]. In this area.

Ms. Jayapal. No, I understand that, Mr. Pichai. What I'm trying to get at is, when any company controls the buy and the sell side--I worked on Wall Street a very long time ago. There are reasons that insider trading is regulated. And this ad exchange is essentially the same thing. And without accountability, it isn't meaningful to just care about the newspapers. We're seeing them die all over, and ad revenue is a big reason.

Let me put up a graph here that shows that Google's ad revenue is increasingly coming from ads on Google-owned sites and less so from other websites. Can you explain that trend?

Mr. Pichai. I can't quite see whether this is net revenue or gross revenue. Obviously, when it comes to non-Google properties, we share the majority of revenue back to publishers, whereas, on our own properties, we obviously--you know, we have the inventory.

But I would need to understand more. I just quickly looked at it. I'm not sure I fully grasp the----

Ms. Jayapal. Okay. We can send it to you and make sure you have it.

You know, Google has not made its search traffic volumes public in years, so there's no way for us to know exactly what's happening here. And there's no way for businesses to verify whether they've been treated fairly or left behind in favor of Google-owned companies.

Is Google steering advertising revenue to Google Search?

Mr. Pichai. Congresswoman, users come to Google Search. It is that traffic and--you know, that's where our source of revenue comes from.

So we are focused on providing users the information they are looking for. We work hard to earn that trust. We know competition for information is just a click away----

Ms. Jayapal. Thank you, Mr. Pichai.

I just want to make the point that independent journalism is incredibly necessary to our democracy, and we want to do what we can to protect it.

I want to just ask one last question of Mr. Zuckerberg.

Over 1,100 companies and organizations pulled their advertising business from Facebook as part of the Stop Hate for Profit campaign to protest the spread of hate speech and disinformation. But you had a staff meeting earlier this month where you told employees, ``We're not going to change our policies or approach because of a threat to any percent of our revenue. My guess is all these advertisers will be back on the

platform soon enough.''

Mr. Zuckerberg, are you so big that you don't care how you're impacted by a major boycott of 1,100 advertisers?

Mr. Zuckerberg. No, Congresswoman. Of course we care. But we're also not going to set our content policies because of advertisers. I think that that would be the wrong thing for us to do.

We've cared about issues like fighting hate speech for a long time, and we've invested billions of dollars--and I've talked about today how we have tens of thousands of content reviewers. We've built AI systems that proactively identify the majority--we're now at 89 percent of the hate speech that we remove before anyone even reports it to us.

We're going to continue getting better at that. And I think that those investments over time and the results that we put up will be recognized by people, since I do believe that they are industry-leading.

And I think that our advertising also is, for a lot of small businesses, the most effective or among the most effective ways that they can find and reach new customers----

Ms. Jayapal. Thank you--thank you, Mr. Zuckerberg.

My time has expired, but I would just say that, I know you've commissioned your own civil rights audit. I don't think that you've implemented all those recommendations yet. I hope you will move quickly to implement those. This is a critical time, as we watched the body of John Lewis leave us here in the Capitol, that we focus on civil rights.

Thank you, Mr. Chairman. I yield back.

Mr. Cicilline. Before I call on the next witness, I want to recognize Mr. Pichai, who I think wants to make a correction for the hearing.

Mr. Pichai. The only correction--thanks, Mr. Chairman.

There was a question earlier about information with respect to China. I just wanted to acknowledge on record that I recall in 2009 we had a well-publicized cyber attack originating there, which did exfiltrate some code from there. I just wanted to correct that.

Mr. Cicilline. Thank you, Mr. Pichai. The record will so reflect.

I recognize the gentlelady from Pennsylvania for 5 minutes.

Ms. Scanlon. Thank you, Mr. Chairman.

In March 2020, Amazon announced that it was going to start delaying shipments of nonessential products in order to better serve customers and meet need while helping to ensure the safety of their warehouse workers. In practice, however, it appears that this policy was applied selectively, as Amazon appeared to continue to designate its own products as essential even as it delayed competing products from third-party sellers.

So the essential items were supposed to include household staples, medical supplies, high-demand products, and that many factors were considered when determining eligibility to be essential. But we've had several employees report that Amazon continued to ship nonessential items like hammocks, fish tanks, pool floaties, et cetera.

Mr. Bezos, were Amazon devices like Fire TV, Echo speakers, and Ring doorbell designated as essential during the pandemic?

Mr. Bezos. I don't know the answer to that question. What I can tell you is that we had--there was no playbook for this. We moved very quickly. Demand went through the roof. It was like having a holiday selling season, but in March. And we had to make a lot of decisions very rapidly.

Ms. Scanlon. Okay.

Mr. Bezos. Our goal was to limit it to essential supplies, but I'm sure we did not do that perfectly.

Ms. Scanlon. Okay.

EXHIBIT U(ii)

I know the Ring doorbell has two competing products, including Arlo and--Eufy maybe? Do you know if they were designated as essential?

Mr. Bezos. I do not.

Ms. Scanlon. Okay.

Are you able to testify to Congress today whether Amazon's profit was a factor in giving an ``essential'' classification distinction?

Mr. Bezos. No, not to my knowledge. We were working to achieve two objectives. One was to get essential products to customers, and the second was to keep our frontline employees safe. And we did a tremendous amount of work in both categories, and that's what we were focused on. We were not focused on profitability at that time.

Ms. Scanlon. Pushing out the elusive Clorox Wipe, I guess.

But, at any rate, moving along, let's talk about the fees that Amazon charges sellers. According to a recent report, seller fees netted Amazon almost $60 billion in 2019, nearly double the $35 billion in revenue from AWS, Amazon's massive cloud-computing division.

Five years ago, Amazon took an average of 19 percent of each sale made by a third party on its site. Today, Amazon keeps an average of 30 percent. Doesn't Amazon's ability to hike those fees so steeply suggest that Amazon enjoys market power over those sellers?

Mr. Bezos. No, Congresswoman, I don't believe so. I think what you're seeing there, when you see that go from 19 to 30 percent, is that more and more sellers are taking advantage of the incremental services that we offer.

And a big piece of that is Fulfillment by Amazon, which is probably the greatest invention that we ever created for sellers. And it's working for sellers. That's why, today, 60 percent of sales are going through third-party sellers, up from zero 20 years ago.

Ms. Scanlon. Right. But I think a little more concerning is the 11-percent hike.

Since 2014, Amazon's revenue from seller fees has grown almost twice as fast as its overall sales. So seller fees now account for 21 percent of Amazon's total revenue.

Mr. Bezos, aren't seller fees now effectively subsidizing Amazon's retail division?

Mr. Bezos. Congresswoman, no, I don't believe so. I think what you're seeing there, when you see these fees going up, what's really happening is that sellers are choosing to use more of our services that we make available.

There are, you know, previously, perhaps, they were shipping their own products from their own fulfillment centers. So they would've had costs doing that. If you're operating your own fulfillment center and buying transportation services to the customer through the postal service or through UPS or whoever it would be, you----

Ms. Scanlon. Okay. So let's talk a little bit about the fulfillment centers.

Mr. Bezos [continuing]. Have those fees anyway. But now you're doing that with Fulfillment by Amazon.

Ms. Scanlon. Right.

Mr. Bezos. Yes, please. Go ahead. Sorry.

Ms. Scanlon. Okay. So we've got Fulfillment by Amazon. And, a year ago, we asked whether a merchant who was enrolled in Fulfillment by Amazon, also known as FBA, is a factor in whether they can be awarded the Buy Box. And, at that time, Amazon said no.

But the evidence is indicating and your own documents are showing that being enrolled in that program is a major factor, and it effectively forces sellers to pay for fulfillment

EXHIBIT U(ii)

services from Amazon if they want to make sales.

Mr. Bezos, has Amazon's big Buy Box algorithm ever favored third-party sellers who buy fulfillment services from Amazon over other sellers?

Mr. Bezos. I think, effectively, the Buy Box--maybe directly or indirectly--I'm not sure if it's direct, but, indirectly, I think the Buy Box does favor products that can be shipped with Prime. So especially if you're a Prime member, the Buy Box is trying to pick the offer--if we have multiple offers from multiple sellers for the same item, a customer wants to buy that item, the Buy Box is trying to pick the offer that we predict the customer would most like. That includes price, delivery speed, and if you're a Prime member, it includes whether the item is eligible for Prime.

And so, I think at least indirectly----

Ms. Scanlon. Thank you, Mr. Bezos. I think my time has expired.

Mr. Cicilline. The gentlelady's time has expired.

Before I recognize our last two colleagues, I think Mr. Zuckerberg would like to clarify something for the record as well.

Mr. Zuckerberg. Chairman, thank you.

In response to Congressman Johnson's question before, I said that I wasn't familiar with the Facebook research app, when I wasn't familiar with that name for it. But I just want to be clear that I do recall that we used an app for research, and it has since been discontinued. And I would be happy to follow up with his staff on any more details that he would like on that.

Mr. Cicilline. Thank you, Mr. Zuckerberg.

Mr. Zuckerberg. Thank you.

Mr. Cicilline. The record shall so reflect.

I recognize the gentleman from Colorado, Mr. Neguse.

Mr. Neguse. Thank you, Mr. Chairman.

Good afternoon, Mr. Cook. I wanted to direct a few questions to you and wanted to talk a little bit about the App Store and app development.

So, just taking a step back, my understanding from your testimony today is that, essentially, Apple has to operate by the same rules that the app developers operate by, in terms of being able to access the App Store. Is that correct?

Mr. Cook. We have 60 apps on the App Store. They go through the same rules that the 1.7 million do.

Mr. Neguse. Okay. So here's, kind of, why I ask that question. My understanding is the App Store review guidelines tell app developers not to submit copycat apps. Is that correct?

Mr. Cook. I'm not totally familiar, but I believe that's the case, because we were getting a number of apps that were essentially the same thing, like sort of a cookie cutter.

Mr. Neguse. And I can represent to you, Mr. Cook, we've reviewed--our subcommittee staff has obviously reviewed the guidelines, and they--precisely. They say that app developers should have original ideas, that copycat ideas aren't fair, and Apple's customers don't want those.

On the other hand, the app developer agreement, which you require every developer to agree to, does give Apple the right to copy other apps.

And so I guess the question is, why one rule for the developers that compete with you and the opposite rule for Apple?

Mr. Cook. Congressman, I'm not familiar with that, but I could follow up with your office on it.

Mr. Neguse. Well, I would appreciate if you could follow up with our office. My understanding, again, is that the app

EXHIBIT U(ii)

developer agreement explicitly says that Apple can use any information that an app developer provides to Apple for any purpose.

And so, obviously, you have complaints from any number of, you know, app developers who have testified before our committee--and I, as I said, represent the State of Colorado. We heard from a company called Tile, which said that Apple had access to confidential information about the apps distributed by the App Store. And, given that, juxtaposed against this language in the exclusive agreement, you can understand why we would have concerns about anticompetitive conduct.

Mr. Cook. Yeah, Congressman, we run the App Store to help developers, not hurt them. We respect innovation. It's what our company is built on. We would never steal somebody's IP.

But I will follow up with your office on more detail on this.

Mr. Neguse. Well, and I appreciate that, Mr. Cook. Because I think, to the extent that Apple were willing to commit--and I intend to ask Mr. Pichai a similar line of questioning, because I believe this is consistent across multiple different platforms. To the extent Apple was willing to commit within the developer agreement to say that, while you have access to that data, that you are not going to use that data and are not permitted to use that data to replicate your own app, a copycat app, if you will, that would certainly, in my view, be a reflection of a step away from any type of anticompetitive conduct. And it sounds like you'll follow up, and we can learn more with respect to that issue.

Mr. Pichai, similarly, there was an article just today, or, excuse me, yesterday, from The Verge. The title is, ``Google reportedly keeps tabs on usage of rival Android apps to develop competitors.''

And I'll quote from the article. ``Google said that the data doesn't give information about how people behave while they're using individual apps, but it wouldn't say whether it had been used to develop competing apps.''

So I guess, first, I take it you would confirm that Google does have access to confidential information or, ultimately, competitively sensitive information about apps on the Android devices?

Mr. Pichai. Congressman, if I could clarify this, today we have an API, which is available for other developers as long as users consent. This gives us system health metrics. This is how we can launch digital well-being features on Android. This is how we understand which apps are using battery and we can give a dashboard which shows, you know, maybe for crashing or quality control or for battery usage or for digital well-being.

So, at a high level, this data is available through a public API, and other developers can avail as long as the users give consent to it.

Mr. Neguse. So, Mr. Pichai, I just want to clarify. Again, I'll quote from this article. The article refers to this data as ``sensitive data about other apps, including how often they're opened and for how long they're used.''

I'm not asking how you use that information. I'm just asking whether or not, in fact, what the article alleges is correct, that you do have access to that data.

Mr. Pichai. Yeah, with user consent, and the APIs exist. Yes, we do.

Mr. Neguse. And does Google----

Mr. Pichai. And it's critical for us to have access to that so that we can maintain the--you know, this is how we understand and we can, you know, improve resource usage of applications----

Mr. Neguse. Understood.

EXHIBIT U(ii)

Mr. Pichai [continuing]. Just like----

Mr. Neguse. My time's limited. Sorry. I just want to get to this core question: Given that Google does have access to that data, does Google use that data to develop competing apps?

And if your answer is no, will Google commit to making the necessary changes within its Android developer app agreements to ensure that developers have that sense of clarity that, in fact, the data will not be used for Google to be able to develop a competing application?

Mr. Pichai. Congressman, like other businesses today, we do look at trends. And, you know, in fact, in Play Store, we do publish the number of installs of application, and we give ranges. And so there's a wide variety of ways by which we try to understand what's happening in the market. But I appreciate your concern about making sure there's clarity in this area, and we'll continue to invest and give more clarity.

Mr. Neguse. Yeah, just I must, I guess--I want to just follow up very quickly, Mr. Chairman, if you're willing.

So I guess I'm wondering if you can just answer that fundamental question: Does Google use that information to develop competing apps?

I understand the purposes you've described in terms of how you use the information. I'm just asking if one of those, in fact, is to develop competing apps.

Mr. Cicilline. The gentleman's time has expired, but the witness may answer the question.

Mr. Pichai. Congressman, because we try to understand what's going on in market and we are aware of, you know, popularity of apps, you know, I don't want to--I want to be accurate in my answer.

But, in general, the primary use for that data is to improve the health of Android. But, you know, any data we get, we have user consent for it, and we make it available through an API to other developers as well.

Mr. Cicilline. The gentleman's time has expired.

I now recognize the gentlelady from Georgia, Mrs. McBath.

Mrs. McBath. Thank you, Mr. Chairman.

And, gentlemen, thank you so much for spending so much of your time with us today. We really appreciate it.

And many of you have mentioned John Lewis today and his fight for equality and that I know that all my colleagues and I will carry on.

Very quickly, can each of you simply commit to improving racial and gender equity at your companies, including Black leadership and women in your senior ranks? Just a yes-or-no answer, please.

Mr. Zuckerberg?

Mr. Zuckerberg. Yes.

Mrs. McBath. Mr. Cook?

Mr. Cook. Yes. I am very personally committed.

Mrs. McBath. Thank you.

Mr. Bezos?

Mr. Bezos. Absolutely, yes.

Mrs. McBath. Thank you.

Mr. Pichai?

Mr. Pichai. Yes. And we've made public commitments to this regard.

Mrs. McBath. Thank you so much.

Mr. Zuckerberg, in 2004, there were dozens of social media companies. Facebook distinguished itself from the competitors by focusing specifically on privacy. You had a short, clear privacy policy; it was just 950 words. It made a promise to users, and I quote, ``We do not and will not use cookies to collect private information from any user.''

And you said ``will not.'' That's a commitment about the

future. And that was 2004. Mr. Zuckerberg, today, does Facebook use cookies to collect private information on users?

Mr. Zuckerberg. Congresswoman, my understanding to that is, no, we're not using cookies to collect private information about people who use our services, and I believe we've upheld that commitment.

Mrs. McBath. Okay. Thank you.

So, Mr. Zuckerberg, do you think that your company would be as successful if it had started with today's cookies policy in place?

Mr. Zuckerberg. Congresswoman, I'm not sure exactly what you're referring to, but, in general, cookies are not a big part of how we're collecting information. We've primarily used them to make sure that someone can stay logged in on the web. We use them, to some degree, for security to make sure that you don't have someone trying to log in under a lot of different accounts for one computer or something like that.

Mrs. McBath. So, Mr. Zuckerberg, once again, you do not use cookies.

Mr. Zuckerberg. Congresswoman, just to make sure----

Mrs. McBath. Yes or no?

Mr. Zuckerberg [continuing]. I'm clear--we do use cookies. We do use cookies.

Mrs. McBath. Okay.

Mr. Zuckerberg. Yes, we do use cookies.

Mrs. McBath. Okay. So, Mr. Zuckerberg, the bottom line here is that you broke a commitment to your users. And who can say if you may or may not do that again in the future? The reality is that Facebook's market power grew and Facebook sacrificed its user policy.

Mr. Bezos, my colleagues have touched on counterfeit goods, and I share their concerns very deeply. I'm also concerned about stolen goods. Mr. Bezos, are stolen goods sold on Amazon?

Mr. Bezos. Congresswoman, not to my knowledge, although, you know, there are more than a million sellers, and so I'm sure that there have been stolen goods----

Mrs. McBath. Really, Mr. Bezos?

Mr. Bezos [continuing]. Sold on Amazon.

Mrs. McBath. Really, Mr. Bezos?

Mr. Bezos. I'm sorry?

Mrs. McBath. There's not? You don't believe that there is? That surprises me.

Mr. Bezos. No, I just said, with over a million sellers, I'm sure that it has happened. But, certainly, I don't think it's a large part of what we're selling.

Mrs. McBath. Okay. So, Mr. Bezos, basically, then, you're saying ``yes.''

Mr. Bezos. I guess so.

Mrs. McBath. Okay.

So I want to ask you about information that you require from sellers to prevent the sale of stolen goods. Do you require a real name and address, yes or no?

Mr. Bezos. For sellers?

Mrs. McBath. Once again, do you require a real name and address from sellers?

Mr. Bezos. I believe we do. But let me get back to your office with a--I'd rather give you the accurate answer, but I think we do.

Mrs. McBath. All right. And I am aware that you are. So, yes, you do require a name and address.

Do you require a phone number, yes or no?

Mr. Bezos. I don't know if it's required. I think we often have it. But I don't know.

Mrs. McBath. So, briefly, then, how do you verify that each of these pieces of information is accurate?

EXHIBIT U(ii)

Mr. Bezos. I don't know the answer to your question.

Mrs. McBath. So you don't know how many people work on seller verification before the seller is allowed to sell on Amazon?

Mr. Bezos. No, Congresswoman, I don't.

Mrs. McBath. Okay. Then I'm going to ask you, sir, will you commit to reporting all sales of stolen and counterfeit goods to law enforcement and to victims to track large-scale offenders engaged in organized retail crime?

Mr. Bezos. To the degree that we're aware of it, we will certainly pursue it. In fact, I would encourage----

Mrs. McBath. Sir, can you just make a blanket commitment-- can you just make a blanket commitment, whether you're aware of it or not?

Mr. Bezos. A blanket commitment to what? Sorry, Congresswoman. I'm trying to be helpful.

Mrs. McBath. Reporting all sales of stolen and counterfeit goods to law enforcement and to victims to track large-scale offenders engaged in organized retail crime.

Mr. Bezos. I see no reason why, if we're aware of stolen goods, we wouldn't report it. We would want the correct law enforcement authorities to be involved.

Mrs. McBath. Okay. Thank you so much.

I yield back my time.

Mr. Cicilline. I thank the gentlelady for yielding back.

I want to thank the witnesses for their testimony today and my colleagues on both sides of the aisle.

I also want to acknowledge the extraordinary work of our team, led by Slade Bond, Lina Khan, Amanda Lewis, Phil Berenbroick, Anna Lenhart, and Joe Van Wye, who have done an extraordinary job throughout this investigation and in preparation for our hearing today.

Today, we had the opportunity to hear from the decisionmakers at four of the most powerful companies in the world. This hearing has made one fact clear to me: These companies, as they exist today, have monopoly power. Some need to be broken up. All need to be properly regulated and held accountable.

We need to ensure the antitrust laws first written more than a century ago work in the digital age. When these laws were written, the monopolists were men named Rockefeller and Carnegie. Their control of the marketplace allowed them to do whatever it took to crush independent businesses and expand their own power.

Well, the names have changed, but the story is the same. Today, the men are named Zuckerberg, Cook, Pichai, and Bezos. Once again, their control of the marketplace allows them to do whatever it takes to crush independent business and expand their own power. This must end.

This subcommittee will next publish a report on the findings of our investigation. We will propose solutions to the problems before us.

As the great American Supreme Court Justice Louis Brandeis once said, ``We must make our choice. We may have democracy, or we may have wealth concentrated in the hands of a few, but we can't have both.''

This concludes today's hearing.

Thank you again to our witnesses for attending.

Without objection, all members will have 5 legislative days to submit additional written questions for the witnesses or additional materials for the record.

Mr. Cicilline. And, without objection, this hearing is adjourned.

[Whereupon, at 6:33 p.m., the subcommittee was adjourned.]

EXHIBIT U(ii)

APPENDIX

===========================================================================

_____

[GRAPHIC(S) NOT AVAILABLE IN TIFF FORMAT]

EXHIBIT U(ii)